## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **HYUNDAI STEEL COMPANY,**<br><br>       **Plaintiff,**<br><br>**NUCOR CORPORATION,**<br><br>       **Consolidated-Plaintiff**<br><br>       **v.**<br><br>**UNITED STATES,**<br><br>       **Defendant,**<br><br>       **and**<br><br>**NUCOR CORPORATION, and GOVERNMENT OF THE REPUBLIC OF KOREA,**<br><br>       **Defendant-Intervenors.** |

Before: Hon. Mark A. Barnett,
      Chief Judge

Consol. Court No. 22-00170

## ORDER

Upon consideration of Consolidated-Plaintiff Nucor Corporation's ("Nucor") Rule 56.2 motion for judgment on the agency record, and all other pertinent papers and proceedings herein, it is hereby

**ORDERED**, that Nucor's motion for judgment on the agency record is granted; and it is further

**ORDERED**, that this action is remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED**.

_____
   Hon. Mark A. Barnett, Chief Judge

Dated: _____, 2022
      New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>              Plaintiff,<br><br>NUCOR CORPORATION,<br><br>              Consolidated-Plaintiff<br><br>     v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>     and<br><br>NUCOR CORPORATION, and<br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>              Defendant-Intervenors. | Before:  Hon. Mark A. Barnett,<br>         Chief Judge<br><br>Consol. Court No. 22-00170 |

## CONSOLIDATED-PLAINTIFF NUCOR CORPORATION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Nucor Corporation ("Nucor"), consolidated-plaintiff in this action, hereby moves for judgment upon the agency record with respect to the final results in the administrative review of the countervailing duty order covering *Certain Hot-Rolled Steel Flat Products from the Republic of Korea* for the period of review of January 1, 2019 through December 31, 2019.  *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) (final results of countervailing duty admin. rev.; 2019).  The final results were issued by the U.S. Department of Commerce ("Commerce") on May 3, 2022 and published in the *Federal Register* on May 9, 2022.  *See* Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel*

*Flat Products from the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) (final results of countervailing duty admin. rev.; 2019).

For the reasons explained in the brief accompanying this motion, Nucor respectfully submits that Commerce's findings, conclusions, and determination with respect to the final results are not supported by substantial evidence or otherwise not in accordance with law. Nucor further moves that the Court remand these results to Commerce to correct the errors consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Consolidated-Plaintiff Nucor Corporation*

Dated: November 28, 2022

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

HYUDAI STEEL COMPANY,

              Plaintiff,

NUCOR CORPORATION,

              Consolidated-Plaintiff,

v.

UNITED STATES,

              Defendant,

       and

NUCOR CORPORATION, and
GOVERNMENT OF THE REPUBLIC
OF KOREA,

              Defendant-Intervenors.

</td><td>

Before:  Hon. Mark A. Barnett,
        Chief Judge

Consol. Court No. 22-001170

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 15, 17, 19-20,
and 22

</td></tr>
</table>

**CONSOLIDATED-PLAINTIFF NUCOR CORPORATION'S MEMORANDUM IN
SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Consolidated-Plaintijf Nucor
Corporation*

Dated: November 28, 2022

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    RULE 56.2 STATEMENT ................................................................................... 1

       A.     Administrative Decision under Review ................................................... 1

       B.     Issues Presented ..................................................................................... 1

III.   STATEMENT OF FACTS .................................................................................. 2

       A.     Legal Framework ................................................................................... 2

       B.     Administrative Proceedings Below.......................................................... 5

IV.    STANDARD OF REVIEW ............................................................................... 10

V.     ARGUMENT .................................................................................................... 12

       A.     Commerce's Finding that the GOK Does Not Subsidize the Korean
              Steel Industry through the Provision of Electricity for LTAR Was
              Unlawful ............................................................................................... 12

              1.     Commerce Unlawfully Disregarded the Government Price
                     to the Respondent in Determining Whether a Benefit Exists ...................14

       B.     Commerce's Finding that the GOK Does Not Subsidize the Korean
              Steel Industry through the Provision of Electricity for LTAR Was
              Unsupported by Substantial Evidence ................................................... 18

              1.     Record Evidence Demonstrates that the Korean Electricity
                     "Market" Is Not Governed by Market Principles ......................................18

              2.     Commerce Nevertheless Accepted Costs Distorted by the
                     GOK's Control of the Electricity Market ..................................................20

              3.     The Government Prices to the Respondent Did Not Reflect
                     the Cost of Production Plus an Amount for Profit......................................21

VI.    CONCLUSION.................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altx, Inc. v. United States,*
    25 CIT 1100, 167 F.Supp.2d 1353 (2001) ........................................................11

*Asociacion Colombiana de Exportadores de Flores v. United States,*
    13 CIT 13, 704 F. Supp. 1114 (1989) .............................................................10

*Asociacion Colombiana de Exportadores de Flores v. United States,*
    901 F.2d 1089 (Fed. Cir. 1990).......................................................................10

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962).........................................................................................11

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
    28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ...................................................11

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984)........................................................................10

*Micron Tech., Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997).......................................................................10

*Mid Continent Nail Corp. v. United States,*
    846 F.3d 1364 (Fed. Cir. 2017).......................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)...........................................................................................11

*New Am. Keg v. United States,*
    No. 20-00008, slip op. 21-30 (Ct. Int'l Trade Mar. 23, 2021) .......................11

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995).........................................................................11

*Nucor Corp. v. United States,*
    927 F.3d 1243 (Fed. Cir. 2019)....................................................................3, 12

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001).......................................................................11

*Target Corp. v. United States,*
    609 F.3d 1352 (Fed. Cir. 2010).......................................................................10

*U.S. Steel Corp. v. United States*,
33 CIT 1935 (2009) ...............................................................................16

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................10

19 U.S.C. § 1677(5)(A) .............................................................................2

19 U.S.C. § 1677(5)(B) .............................................................................2

19 U.S.C. § 1677(5)(D)(iii) ........................................................................2

19 U.S.C. § 1677(5)(E) ....................................................................2, 4, 17

19 U.S.C. § 1677(5)(E)(iv) ........................................................................2

19 U.S.C. § 1677f-1(e)..............................................................................12

**Regulations**

19 C.F.R. § 351.503(b)(1).........................................................................12

19 C.F.R. § 351.511(a)(2)(i) ...............................................................3, 12

19 C.F.R. § 351.511(a)(2)(ii) ...................................................................12

19 C.F.R. § 351.511(a)(2)(iii) .............................................................3, 12

19 C.F.R. § 351.511(b) ........................................................................3, 12

**Administrative Materials**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*,
81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ........................13

*Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea*,
81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) ...........................5

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) .........................1

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea*,
86 Fed. Reg. 60,797 (Dep't Commerce Nov. 4, 2021).........................7

*Certain Oil Country Tubular Goods from the Republic of Korea*,
84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) .......................19

*Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186, 43,193
    (Dep't Commerce Aug. 17, 2001) ...................................................................................4, 5

*Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*,
    73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) ..........................................13

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*,
    73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ............................................16

*Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642
    (Dep't Commerce Oct. 25, 2007) .............................................................................13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
    from the People's Republic of China*, 83 Fed. Reg. 34,828 (Dep't Commerce
    July 13, 2018) ...........................................................................................................23

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from
    the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) ......5

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    85 Fed. Reg. 78,990, 78,994 (Dep't Commerce Dec. 8, 2020) ..................................5

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China*,
    73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) ..........................................16

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188
    (Dep't Commerce May 22, 2017) .............................................................................13

*Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce
    Oct. 20, 2015) ...........................................................................................................14

## Other Authorities

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
    No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ...................................4, 17

# I.    INTRODUCTION

On behalf of Consolidated-Plaintiff Nucor Corporation ("Nucor"), we hereby submit the following brief in support of Nucor's Rule 56.2 Motion for Judgment on the Agency Record.

# II.    RULE 56.2 STATEMENT

## A.    Administrative Decision under Review

The administrative determination challenged herein is the U.S. Department of Commerce's ("Commerce") final results in the 2019 administrative review of the countervailing duty ("CVD") order on *Certain Hot-Rolled Steel Flat Products from the Republic of Korea* ("*HR from Korea*"). Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) (final results of countervailing duty admin. rev.; 2019), P.R. 132 ("Final I&D Memo"). *See also Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) (final results of countervailing duty admin. rev.; 2019), P.R. 132 ("Final Results").

## B.    Issues Presented

### 1.    Whether Commerce's Determination that the GOK's Provision of Electricity for LTAR Conferred a Non-Measurable Benefit Was Supported by Substantial Evidence or Otherwise in Accordance with Law?

No. The Final Results are unsupported by substantial evidence and not in accordance with law because Commerce applied an unlawful methodology in determining whether a benefit was conferred by the Government of Korea's ("GOK") provision of electricity for less-than-adequate remuneration ("LTAR"), and the record evidence clearly confirmed that a benefit was conferred. Commerce determined that no benefit was conferred by the GOK's provision of electricity for LTAR because the state-owned electric utility, the Korea Electric Power Corporation ("KEPCO"), was able to recover its overall costs on sales to all customers in the relevant tariff class, despite the

fact that it did not recover costs plus a rate of return on the lower rates it charged to the respondent. *See* Final Decision Memo at 42-47.  As Commerce has previously recognized, a benefit is conferred "if the tariff charged <u>to the respondent</u> does not cover 'cost of production' plus a 'profitable return on investment.'"  Redetermination Pursuant to Ct. Remand, *POSCO v. United States*, Consol. Ct. No. 17-00137 (Ct. Int'l Trade July 6, 2021), ECF No. 118 at 30 ("*POSCO* Remand Results") (emphasis added).  Commerce's focus on the aggregate performance and total revenues of the government supplier, instead of the prices actually paid by the Hyundai Steel Company ("Hyundai Steel"), was thus contrary to the statute, the agency's regulations, and relevant judicial and agency precedents.  Furthermore, record evidence overwhelmingly showed that a benefit was conferred.

## III.   **STATEMENT OF FACTS**

### A.   **Legal Framework**

The statute defines a countervailable subsidy as occurring where "an authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred" when the subsidy is "specific" to an industry or enterprise or group thereof.  19 U.S.C. § 1677(5)(A)–(B).  A "financial contribution" includes an authority "providing goods or services, other than general infrastructure," 19 U.S.C. § 1677(5)(D)(iii), in which case a benefit is conferred "if such goods or services are provided for less than adequate remuneration," 19 U.S.C. § 1677(5)(E)(iv).  The statute provides that Commerce should determine the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review," including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E).

Commerce's regulations further establish a three-tier hierarchy for analyzing the adequacy of remuneration. First, Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). If market-determined prices are unavailable in the country under consideration, Commerce applies a "tier two" methodology that "seek{s} to measure the adequacy of remuneration by comparing the government price to a world market price" that "would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). When no such world market prices are available, Commerce uses a "tier three" methodology that "measure{s} the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).

The Court of Appeals for the Federal Circuit has confirmed that Commerce's analysis, regardless of tier, must be directed at determining whether the government price reflects "the value of what is being sold." *Nucor Corp. v. United States*, 927 F.3d 1243, 1252–53 (Fed. Cir. 2019). Because each regulatory "tier" exists to implement the same statutory standard, the court

> {saw} no sound basis for finding in {the tier three rule} a meaning different from the common-sense one already written into the statute by Congress when the regulation was adopted. Indeed, that meaning fits the place of subparagraph (iii) in the regulatory provision as specifying the residual method of implementing the statutory standard when the two primary methods are unavailable. <u>The above-stated meaning of "market principles" sensibly treats the three methods as all of a piece</u>, because the two primary methods of implementing the statutory standard rely on competitive-market prices, which, as {the statute} and our cases indicate, are tied to "fair value."

*Id.* at 1253 (emphasis added). To that end, Commerce has recently clarified that its tier three inquiry asks whether the government price reflects "'cost recovery' plus 'a return on investment or profit.'" *POSCO* Remand Results at 27. "{I}f the tariff charged to the respondent does not

cover 'cost of production' plus a 'profitable return on the investment,' . . . then the respondent has received a countervailable benefit under section 771(5)(E)" of the statute. *Id.* at 30.

The focus of the adequacy of remuneration analysis, regardless of the regulatory "tier" under which it proceeds, is thus the government price "to the respondent." *Id.* Indeed, the "fundamental basis for identifying and measuring subsidies under U.S. CVD practice" is that "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient." 19 U.S.C. § 1677(5)(E); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 927 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4240 ("SAA"). This has been expressly distinguished from benefit analyses based on the cost <u>to the government</u> of providing a subsidy. For example, in its CVD investigation of *Certain Softwood Lumber Products from Canada*, Commerce explained that

> {f}rom the perspective of the recipient of the subsidy, the true measure of the benefit derived from any government largesse is by reference to what the recipient would have had to pay for the physical or financial good or service in the marketplace, absent any government involvement. <u>Thus, while one could argue that, from the government's perspective, remuneration could be considered "adequate" as long as it covers the costs to the government of providing the good or service, the cost-to-government standard is wholly inappropriate from the perspective of the private recipient</u>. This is because the cost to the government does not necessarily measure the price at which the private recipient could have obtained the good or service in the marketplace free of government interference.

*Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186, 43,193 (Dep't Commerce Aug. 17, 2001) (prelim. affirmative countervailing duty deter., prelim. affirmative critical circumstances deter., and alignment of final countervailing duty deter. with final antidumping duty deter.) (emphasis added); *see also id.* (noting World Trade Organization recognition that "{}the authority must{} {likewise} 'determine whether the financial contribution places <u>the recipient</u> in a more advantageous position than would have been the case'" (emphasis added)).

This appeal addresses Commerce's application of the tier three methodology to the GOK's provision of electricity to certain Korean steel producers.

### B. Administrative Proceedings Below

On August 12, 2016, Commerce published its final determination in the CVD investigation of *HR from Korea*. *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirm. deter.). On October 3, 2016, Commerce published the CVD order in the *Federal Register*. *Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirm. countervailing duty deters. and countervailing duty order). Commerce initiated the administrative review subject to this appeal on December 8, 2020, covering a period of review ("POR") from January 1, 2019 to December 31, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 78,990, 78,994 (Dep't Commerce Dec. 8, 2020), P.R. 62.

On March 31, 2021, Nucor and United States Steel Corporation ("U.S. Steel") timely filed a new subsidy allegation. Letter from Cassidy Levy Kent (USA) LLP and Wiley Rein LLP to Sec'y of Commerce, re: *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: New Subsidy Allegations* (Mar. 31, 2021), P.R. 60-61 ("Petitioners' New Subsidy Allegation"). Specifically, Nucor and U.S. Steel alleged that the GOK provided countervailable subsidies to the Korean steel industry in the form of electricity for LTAR. *Id.* at 20-24. Commerce initiated an investigation of this alleged subsidy on July 26, 2021. Memorandum from Kelsie Hohenberger, Int'l Trade Compliance Analyst, AD/CVD Duty Operations, Off. V, through Robert Galantucci, Program Manager, AD/CVD Operations, Off. V, to Shawn Thompson, Office Director, AD/CVD

Operations, Off. V, re: *Countervailing Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: New Subsidy Allegation* (July 26, 2021), P.R. 79.

Commerce issued supplemental questionnaires regarding this new subsidy allegation to the GOK and mandatory respondent Hyundai Steel, who provided responses on August 12, 2021. Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, re: *Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884: Hyundai Steel's Electricity New Subsidy Allegation Questionnaire Response* (Aug. 12, 2021), C.R. 82-85, P.R. 83 ("Hyundai Steel NSA QR"); Letter from Yoon & Yang to Sec'y of Commerce, re: *Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884: GOK's Electricity New Subsidy Allegation Questionnaire Response* (Aug. 12, 2021), C.R. 86-90, P.R. 84-86 ("GOK NSA QR").

In its questionnaire response, the GOK described the structure of the Korean electricity market and the operations of the state-owned electric utility, KEPCO.  It explained that "KEPCO is the exclusive supplier of electricity in Korea," but that "KEPCO itself does not generate electricity."  GOK NSA QR at 3.  Instead, KEPCO "purchases electricity from generators" through a market called the Korea Power Exchange ("KPX") "and transmits and distributes {the electricity} to customers."  *Id.*  The GOK provided information showing that most electricity is generated by six generators that are wholly-owned and consolidated KEPCO subsidiaries, and that the KPX, in turn, is wholly-owned by KEPCO and its six generation subsidiaries.  *Id.* at 4-5, Exhibit E-1, pp. 29-30.  The GOK further explained that the price at which KEPCO purchases electricity from generators through the KPX is determined by a formula consisting of a variable cost component, a fixed cost component, and an "adjusted coefficient factor," which "prevent{s} KEPCO's over payment" to certain types of generators.  *Id.* at 24.  Each of these elements of the electricity price

is determined by a "Cost Evaluation Committee" within the KPX and not by the generators themselves. *Id.*

The GOK also provided "KEPCO's 2019 cost data for supplying electricity." *Id.* at 12, Exhibit E-22. It explained that these costs "include{d} the payment for the purchase of electricity, labor costs, grid maintenance fee" and various taxes and fees that were "not related to the sales of electricity." *Id.* at 12. With respect to sales prices, the GOK explained that the mandatory respondent paid for electricity based on industrial electricity prices in a generally applicable electricity tariff schedule with different prices for on-peak, mid-peak, and off-peak demand periods. *Id.* at Exhibit E-1. Hyundai Steel reported the monthly volume and value of its electricity consumption during each of these demand periods. Hyundai Steel NSA QR at Exhibit NSA-7, Exhibit NSA-8.

Commerce issued its preliminary results on October 29, 2021 and published them in the *Federal Register* on November 4, 2021. *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 86 Fed. Reg. 60,797 (Dep't Commerce Nov. 4, 2021) (prelim. results of countervailing duty admin. rev. and rescission in part, 2019), P.R. 100 and accompanying Preliminary Decision Memorandum, P.R. 98 ("Prelim Decision Memo"). Applying a tier three benefit methodology, Commerce preliminarily determined that KEPCO supplied electricity to Hyundai Steel for LTAR under certain tariff classes but calculated a non-measurable benefit amount. *Id.* at 21-27.

With respect to the price at which KEPCO purchased electricity through the KPX, Commerce reasoned that in prior administrative reviews, it had "examined KPX, in the context of an upstream subsidy allegation," and found that there was no benefit conferred by "KPX's prices of the {generation companies'} electricity to KEPCO." *Id.* at 25. It also found that "the GOK

provided financial statements for the {generation companies}" and determined "that each of the six {generation companies} recovered its costs." *Id.*

Concerning the prices at which KEPCO sold electricity to end users, including the respondent, Commerce "preliminarily determine{d} that KEPCO does have a pricing mechanism in place that is based on market principles, but also that the industrial rates did not always recover costs and a rate of return." *Id.* at 27. For this analysis, Commerce relied on KEPCO's overall cost recovery rates and found that a benefit exists on sales under a specific tariff class to the extent that KEPCO did not cover its costs, inclusive of a return on investment, on sales to all customers in that tariff class. *See* Memorandum from Kelsie Hohenberger, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. V, to Robert Galantucci, Program Manager, AD/CVD Operations, Off. V, re: *Countervailing Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Calculations for the Preliminary Results: Hyundai Steel* (Oct. 29, 2021), C.R. 99-100, P.R. 99 at 5-6 ("Hyundai Steel Prelim Analysis Memo").

Nucor filed its case brief on January 11, 2021, arguing that Commerce's methodology for determining the benefit conferred by the provision of electricity for LTAR was improper and should be modified for the final determination. Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Case Brief* (Jan. 11, 2022), C.R. 121, P.R. 123 at 11-23. Nucor noted the evidentiary flaws with the cost data on which Commerce relied and argued that it was improper to presume that the data reflected market-based costs. *Id.* at 15-18. Since the record was closed and Commerce had decided to rely on KEPCO's cost data as reported by the GOK, Nucor argued that this data nevertheless showed that a benefit was conferred. *Id.* Nucor showed that the tier three standard for electricity programs as previously articulated by Commerce is that a benefit is conferred "if the tariff charged to the respondent does

not cover 'cost of production' plus a 'profitable return on investment.'" *Id.* at 15 (emphasis added). Nucor thus argued that Commerce erred by finding that no benefit was conferred under a particular tariff class when KEPCO covered its costs inclusive of investment return on all sales to all customers in the aggregate. *Id.* at 19-20. Nucor demonstrated that basing the benefit analysis on the aggregate performance of the government supplier rather than on the prices actually paid by the respondent under review was contrary to the statute, Commerce regulations, and clearly articulated court and agency precedent. *Id.* at 20-21.

Hyundai Steel and the GOK filed rebuttal briefs on January 18, 2022, in which they argued in part that Commerce should continue to reject Nucor's arguments with respect to the provision of electricity for LTAR program. *See* Final I&D Memo at 2, 40-42.

Commerce issued the Final Results on May 3, 2022 and published them in the *Federal Register* on May 9, 2022. Final Results; Final I&D Memo. Commerce continued to determine whether the provision of electricity for LTAR conferred a benefit based on KEPCO's costs and revenues in the aggregate under the relevant tariff classes. Final I&D Memo at 42-47. Commerce reasoned that Nucor's arguments were "inapposite to a tier-three analysis," and that "an evaluation of a government supplier's income and costs, and whether the income covers costs and profit . . . has consistently been part of our analysis when assessing whether KEPCO's pricing is consistent with market principles and has been found to be within the bounds of what {the regulation} proposes." *Id.* at 44. According to Commerce, its "tier-three methodology has been to first determine whether the prices are market-based. Where prices are set in accordance with market principles and, thus, are at fair value, we determine no benefit is conferred; where they are not market-based (*i.e.*, they have not recovered costs plus profit), we determine a price that would be market-based and compare that to what was actually paid using a benchmark." *Id.* at 46.

Commerce also found that the KEPCO cost data as reported by the GOK reflected market prices because "the wholesale and retail pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit." *Id.* at 45-46.

Based in part on the determination that no measurable benefit was conferred by the provision of electricity for LTAR, Commerce calculated a final CVD rate of 0.56% for Hyundai Steel. Final Results, 87 Fed. Reg. at 27,570. This appeal followed.

## IV.    **STANDARD OF REVIEW**

Commerce determinations should be remanded if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *accord Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quotations omitted). "Speculation is not {substantial evidence in} support for a finding. . . ." *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 15, 704 F. Supp. 1114, 1117 (1989), *a,f'd*, 901 F.2d 1089 (Fed. Cir. 1990). In determining whether Commerce's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {any evidence} which fairly detracts from {the} weight" of Commerce's conclusions. *Target Corp. v. United States*, 609 F.3d 1352 (Fed. Cir. 2010) (quotation omitted). "{I}t is not enough for Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to 'continue to find' something that is unsupported by a discussion of the evidence in the first

instance." *New Am. Keg v. United States*, No. 20-00008, slip op. 21-30 at 18 (Ct. Int'l Trade Mar. 23, 2021). Although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F.Supp.2d 1353, 1374 (2001). Further, for a determination to be supported by substantial evidence, there must be a rational connection between the facts on the record and Commerce's determination. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). If the Court finds that Commerce's determination was not supported by substantial evidence, it must remand the case to the agency for reconsideration.

Commerce also acts unlawfully where it abuses its discretion or acts arbitrarily. *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors." *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014) (quotation omitted). And the obligation to avoid arbitrary action requires Commerce to engage in reasoned and evenhanded decision-making. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation omitted)); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quotation omitted)).

## V.   ARGUMENT

### A.   Commerce's Finding that the GOK Does Not Subsidize the Korean Steel Industry through the Provision of Electricity for LTAR Was Unlawful

As noted above, under the tier three benefit regulation, "if the tariff <u>charged to the respondent</u> does not cover 'cost of production' plus a 'profitable return on the investment,' . . . then <u>the respondent</u> has received a countervailable benefit under section 771(5)(E) of the Act." *POSCO* Remand Results at 30 (emphasis added).  Thus, as with tier one and tier two adequate remuneration analyses, Commerce must determine whether <u>the respondent</u> has received a benefit because the government's price to <u>the respondent</u> is for LTAR.  Commerce may not, as the agency suggests, *see* Final I&D Memo at 42-43, depart from this fundamental principle simply because it is conducting a tier three benefit analysis, *see Nucor*, 927 F.3d at 1253 (explaining that "{t}he above-stated meaning of 'market principles' sensibly treats the three methods as all of a piece.").

The statute requires Commerce to "determine an <u>individual</u> countervailable subsidy rate for each known exporter or producer of the subject merchandise," or, if it is not practicable to do so, to "determine <u>individual</u> countervailable subsidy rates" for a representative selection of exporters or producers.  19 U.S.C. § 1677f–1(e) (emphasis added).  The general rule regarding the benefit conferred by subsidies provides that Commerce "normally will consider a benefit to be conferred where <u>a firm pays</u> less for its inputs . . . than it otherwise would pay."  19 C.F.R. § 351.503(b)(1) (emphasis added).  Commerce's adequate remuneration rule establishes that the agency should "consider a benefit as having been received as of the date on which <u>the firm</u> pays or, in the absence of payment, was due to pay for the government-provided good or service."  19 C.F.R. § 351.511(b) (emphasis added).  In this regard, there is no dispute that "the government price" for the purpose of tiers one and two refers to the government price paid by the respondent. *See* 19 C.F.R. § 351.511(a)(2)(i)–(ii).

To this end, Commerce's CVD questionnaire in LTAR investigations asks respondents to report the volume and value of their company-specific input purchases, as it did for electricity here. *See, e.g.*, Hyundai Steel NSA QR at 2. The agency uses this information to determine whether a benefit has been conferred and to what extent. *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*, 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) (final affirmative countervailing duty deter.) at 20 ("We then compared the benchmark unit prices to the unit prices the respondents paid to domestic suppliers of {hot-rolled steel} during the {period of investigation} that {Commerce} determines constitute government authorities."); Issues and Decision Memorandum accompanying *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) (final affirmative countervailing duty deter.) at 23 ("{Commerce} has determined that using the . . . fees actually paid is more appropriate for measuring the adequacy of remuneration. As such, we have summed the . . . fees actually paid by the forestry companies . . . and compared this amount to the market-based stumpage fees the . . . forestry companies should have paid during the {period of investigation}."); Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative countervailing duty deter.) at 19 ("{W}e compared the corresponding monthly benchmark unit prices to the unit prices that the NLMK companies paid Gazprom . . . during the {period of investigation}."); Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) (final affirmative countervailing duty deter.) at 12 ("{W}e compared the benchmark per-unit delivered price to the per-unit delivered price Habas actually paid BOTAS for natural gas during the {period of investigation}.");

Issues and Decision Memorandum accompanying *Supercalendered Paper from Canada*, 80 Fed.

Reg. 63,535 (Dep't Commerce Oct. 20, 2015) (final affirmative countervailing duty deter.) at 48.

Accordingly, the statute, Commerce's regulations, and the agency's established practice

confirm that the basis of the LTAR benefit analysis is the price actually paid by the respondent to

the government supplier for the input under consideration. Beyond references to a purportedly

"well-established" practice, Final I&D Memo at 42-43, Commerce has articulated no legal or

methodological justification for treating "the government price" in this case as the revenues earned

by the Korean government supplier on all sales to all firms.

### 1. Commerce Unlawfully Disregarded the Government Price to the Respondent in Determining Whether a Benefit Exists

Here, Commerce's analysis ignored the prices paid by Hyundai Steel to the government

supplier in determining whether a benefit exists. Instead, Commerce considered whether KEPCO

covered its costs based on unit revenues on <u>all</u> sales to <u>all</u> consumers in the relevant tariff class.

Commerce determined that the GOK's provision of electricity conferred no benefit to relevant

classes by first considering whether KEPCO's generation subsidiaries were profitable on their

aggregate operations, including but not limited to electricity sales, and then considering KEPCO's

unit revenues on all sales compared to its total unit costs, based on purchases through the KPX.

*See* Prelim Decision Memo at 24-27; Final I&D Memo at 42-43. With respect to the generators,

Commerce found that "the GOK provided financial statements for the {generators}" and, based

on that information, "that each of the six {generators} recovered its costs." Prelim Decision Memo

at 25; *see also* Final I&D Memo at 45-46. With respect to KEPCO, Commerce found that a benefit

exists under a specific tariff rate only to the extent that KEPCO's total revenue on sales to all

customers under that tariff rate did not recover 100% of KEPCO's reported cost of supply. *See*

Prelim Decision Memo at 25-27; Final I&D Memo at 45-46.

Commerce's insistence that the tier three analysis "require{s} that {it} assess the extent to which the price charged by the government is consistent with market prices" is irrelevant to its actual analysis. Final I&D Memo at 44. As the agency itself explains, it <u>did not</u> base its benefit determination on "the price charged by the government," but rather on KEPCO's "income and costs{} and whether the income covers costs and profit." *Id.* Here, the government prices for electricity were set forth in KEPCO's electricity pricing schedule. GOK NSA QR at Exhibit E-9. The prices that Hyundai Steel actually paid KEPCO for electricity pursuant to this pricing schedule were reported in the respondent's new subsidy allegation questionnaire response. Hyundai Steel NSA QR at Exhibit NSA-7. This shows that KEPCO charged, and Hyundai Steel paid, three different prices under each of the relevant electricity tariff classes—an "off-peak" price, a "mid-peak" price, and an "on-peak" price. GOK NSA QR at Exhibit E-9; Hyundai Steel NSA QR at Exhibit NSA-7.

The information that Commerce used to determine whether the respondent received a benefit, however, was KEPCO's overall cost data, reflecting KEPCO's total cost of sales and total sales income. *See* Prelim Decision Memo at 26; GOK NSA QR at Exhibit E-22. The unit sale price in this data, on which Commerce based its analysis, reflects KEPCO's actual revenues on all sales to all customers under the respective tariff class. In other words, it is not "the price charged by the government." *See* Final I&D Memo at 44. Hyundai Steel, for example, reported purchasing electricity for steel production [

                    ]. *See* Hyundai Steel NSA QR at Exhibit NSA-7. Yet, the unit revenue at which Commerce determined that KEPCO covered its cost of supply under the [                                    ] tariff class was [                    ]. GOK NSA QR at Exhibit E-22; *see also* Prelim Decision Memo at 26. This

number appears nowhere in either KEPCO's price schedule or in the Hyundai Steel's reported electricity purchase data because it is not "the price charged by the government." It is, in fact, not a government "price" at all. It reflects the government's total sales revenue and thus its overall financial performance for the respective tariff class.

Both Commerce and the courts have explained that the government supplier's overall financial performance is irrelevant to an adequate remuneration benchmark analysis. For instance, in the CVD investigation of *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, Commerce explained that "the profitability of Chinese {hot-rolled steel} producers is not relevant to the determination of whether {hot-rolled steel} was sold for LTAR." Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) (final affirmative countervailing duty deter. and final affirmative deter. of critical circumstances) at 65; *see also* Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) (final affirmative countervailing duty investigation deter.) at 36 ("{T}he profitability of {state-owned enterprise hot-rolled steel} producers . . . is not relevant to the determination of whether {hot-rolled steel} was sold for LTAR."). This Court has likewise rejected arguments that an adequate remuneration analysis turns on the broader financial performance of the government supplier. *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) ("The overall profitability of the {National Mineral Development Corporation} does not demonstrate that its prices to Essar are market-based.").

Determining whether a benefit exists based on the government supplier's revenue from sales to all customers rather than based on the prices actually paid by the respondent also contravenes the

"fundamental basis for identifying and measuring subsidies under U.S. CVD practice." SAA at 927,

1994 U.S.C.C.A.N. at 4240. Under the statute and Commerce's practice, "{a} benefit shall normally

be treated as conferred where there is a benefit <u>to the recipient</u>." 19 U.S.C. § 1677(5)(E) (emphasis

added). That KEPCO may cover its costs plus a reasonable rate of return on all sales under a

particular electricity tariff rate would mean only that there is no cost to the GOK from providing the

subsidy because it is able to recoup losses on sales to some customers with excess returns on sales

to <u>other</u> customers. Such a finding says nothing about the benefit to the recipient of the subsidy, the

statutory focus of the inquiry. In effect, Commerce's methodology gives governments *carte blanche*

to engage in harmful cross-subsidization while depriving domestic industries of the relief to which

they are entitled under the CVD laws.

That is the result of Commerce's methodology here, and it is reflected in the benchmark

prices that the agency calculated for those few tariff rates in which it did find that a benefit was

conferred. Comparing KEPCO's total unit revenues to its total unit costs, Commerce determined

that a benefit existed under certain [          ] electricity rates because KEPCO's total cost

recovery rate was [          ]. *See* Hyundai Steel Prelim Analysis Memo at 5-6. Commerce

then calculated a benchmark price by adjusting the prices that the respondent actually paid by the

amount of the shortfall in KEPCO's overall cost recovery. *See id.* at 6. The outcome was

benchmark prices that were [

          ]. *See, e.g.*, GOK NSA QR at Exhibit E-22 (showing unit cost of supply of

[          ] under this tariff classification). This is an absurd outcome that unlawfully

washes away benefits to a respondent based on government revenues on sales to users and

industries that are not under consideration in this proceeding.

**B.      Commerce's Finding that the GOK Does Not Subsidize the Korean Steel Industry through the Provision of Electricity for LTAR Was Unsupported by Substantial Evidence**

The record also seriously undermines key aspects of Commerce's determination. In finding that some electricity prices were in line with market principles and thus conferred no benefit, Commerce accepted pricing data from the GOK and <u>assumed</u> those data were representative of market prices. Based on the structure of the Korean electricity "market," however, that assumption was not supported by record evidence.

**1.      Record Evidence Demonstrates that the Korean Electricity "Market" Is Not Governed by Market Principles**

Government control over energy markets, and over the electricity market in particular, has been a key element of GOK policy to support the international competitiveness of key industries like steel. The Korean economy is one of the world's most energy intensive, despite relying overwhelmingly on imports of energy resources. The Korean industrial sector accounts for around 55% of total energy consumption, the highest of any International Energy Agency ("IEA") country. Petitioners' New Subsidy Allegation at Exhibit 1, p. 3. *See also id.* at Exhibit 3, p. 8 ("South Korea's energy-intensive industrial sector, mostly steel and petrochemical production, drives the country's electricity consumption."). Even though approximately 84% of total Korean energy resources are imported, Korean industrial electricity prices are lower than the IEA median, with low volatility. *See id.* at Exhibit 1, pp. 3-4. This would be impossible without the GOK's strict control over both retail and wholesale prices. *See id.* at Exhibit 5, p. 2 ("{W}holesale electricity trading prices are not determined through supply and demand").

The electricity "market" in Korea is a government-owned, -controlled, and -operated monopoly. Although the Korean electricity market is divided between a wholesale and retail market, the GOK owns and controls the primary entities in both markets. Indeed, the GOK does

not just regulate an otherwise market-oriented electricity market. Rather, the GOK has established a government-controlled monopoly in the Korean electricity market through KEPCO, whose six wholly-owned subsidiary generators generate more than [   ] of the electricity in Korea, and through the KPX, which is wholly-owned by KEPCO and its generation subsidiaries, and which operates the only channel through which electricity may be sold. GOK NSA QR at 2–5.

KEPCO transmits or distributes [   ] of electricity in Korea. *Id.* at 5. As Commerce has previously explained, "{t}he GOK has tight control over the electricity market, including supply and pricing{}" and "electricity in Korea functions as a tool of the government's industrial policy." *See* Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) (final results of antidumping duty admin. rev.; 2016–2017) at 25. Moreover, because steel manufacturers comprise some of the country's largest electricity consumers, they "serve as principal beneficiaries of the Korean government's involvement in the market." *Id.* at 29.

KEPCO admits that the GOK:

> effectively controls us as the supervisor and regulator in a heavily regulated industry, and in effect also exercises the same degree of control over our generation subsidiaries through our sole share ownership over our generation subsidiaries as well as its statutory power of direct appointment of the governing bodies of our generation subsidiaries. In effect, we are acting as an intermediate holding company in a vertical control structure involving the Government, us and our generation subsidiaries, where the Government holds the ultimate control over both us and our generation subsidiaries and exercises its control over our generation subsidiaries in part through us acting as the sole shareholder and the parent company.

GOK NSA QR at Exhibit E-2, p. 171 (emphasis added).

The GOK's control over KEPCO permeates every aspect of their business. KEPCO admits that the GOK "exercises substantial control over our budgeting and other financial and operating decisions," *id.* at Exhibit E-1, p. 55, and supervises "the appointments of {KEPCO's} directors

and . . . other senior management as well as approval of electricity tariff rate adjustments." *Id.* at Exhibit E-2, p. 77. To be clear, KEPCO and its subsidiaries do <u>not set their own prices as independent companies</u>. Although KEPCO and its subsidiaries may submit proposed rates charged for the electricity they sell, the GOK "makes the final decision." *Id.* at Exhibit E-2, p. 55; *see also id.* at Exhibit E-2, p. 84 ("{O}ur business is heavily regulated by the Government, including with respect to the rates we charge to customers for the electricity we sell."). And KEPCO confirms that the GOK's control over its pricing limits its ability to pass on fuel and other cost increases to its customers. *Id.* at Exhibit E-1, p. 5 ("Because the Government regulates the rates we charge for the electricity we sell to our customers . . . , our ability to pass on fuel and other cost increases to our customers is limited. . . . The Government may also set or adjust electricity tariff rates that may not be necessarily responsive to fuel price movements.").

### 2. Commerce Nevertheless Accepted Costs Distorted by the GOK's Control of the Electricity Market

Unsurprisingly, the GOK's control of the electricity "market" directly impacted the inputs used in Commerce's calculations. In its new subsidy allegation questionnaire response, the GOK reported KEPCO's cost data for the POR. GOK NSA QR at Exhibit E-22. This dataset was based on KEPCO's [



], as discussed above. *See id.*

According to that data, the price that KEPCO pays to purchase electricity through the KPX consists of (i) the "system marginal price," which is intended to represent the variable cost of electricity generation; (ii) the "capacity price," which is intended to represent the fixed costs of generating electricity; and (iii) the "adjusted coefficient factor," which is theoretically tied to varying fuel costs but operates in practice as an *ad hoc* reallocation of revenue based on the

financial performance of KEPCO and individual generators at the time that it is established. GOK

NSA QR at 24-25. The values for each element of this formula are determined by the KPX via

the Cost Evaluation Committee and not by the generators themselves. *Id.* at 23-24. The cost data

that the GOK provided thus does not reflect the actual costs of electricity generation and supply,

and any presumption that it does is unsupported. Commerce nevertheless treated the GOK's

reported data as representative of market principles and did not collect information regarding the

actual cost of generation and supply from the generators themselves.

In the Final Results, Commerce defended its presumption that the GOK's self-reported cost

data reflect market principles on the grounds that (1) "KEPCO is obligated to pay {the generators}

for the total cost of generating electricity . . . even if KEPCO is not profitable," and (2) Commerce's

"<u>prior</u> analysis of the prices paid by KEPCO through KPX has determined that they are inclusive

of a rate of return as well as the costs associated with generation." Final I&D Memo at 45

(emphasis added). But neither of these cursory explanations addresses, much less refute, the

overwhelming record evidence to the contrary. Since substantial evidence contradicts

Commerce's assumption that the GOK's reported cost data reflect market principles, Commerce's

determination that "some electricity prices were in line with market principles," *see id.* at 43,

should be remanded.

> **3.     The Government Prices to the Respondent Did Not Reflect the Cost of
> Production Plus an Amount for Profit**

Even based on KEPCO's reported cost of supply, which is distorted by government

interventions throughout the supply chain, the respondent's reported electricity prices "{did} not

cover 'cost of production' plus a 'profitable return on the investment . . . .'" *POSCO* Remand

Results at 30. As noted above, Hyundai Steel reported paying three different prices for electricity

during the POR—an "off-peak" price, a "mid-peak" price, and an "on-peak" price. Hyundai Steel

NSA QR at Exhibit NSA-7. Hyundai Steel further reported paying [

] KEPCO's reported cost of supply for the relevant

tariff class. Specifically, Hyundai Steel reported that its [                ] paid monthly off-peak

prices under the [                                ] electricity rate class of [

]. *Id.* Hyundai Steel also reported that its [                ] paid

mid-peak prices of [                ] in [                ] during the POR. *Id.* In

comparison, KEPCO's reported cost of supply for this electricity rate class was [

]. GOK NSA QR at Exhibit E-22.

Hyundai Steel thus reported paying electricity prices that are [

], meaning that KEPCO has structured its

electricity prices to maintain subsidies to large industrial users like steel producers, while

recouping losses on those sales through higher prices to other users. *See, e.g.*, Petitioners' New

Subsidy Allegation at 18–19, Exhibit 14, p. 4 (noting KEPCO's "overnight discounts offered to

industrial customers"). Basing the analysis on KEPCO's total revenues on all sales to all customers

effectively launders the benefit conferred by subsidized prices by offsetting them with revenues

on sales at non-subsidized prices to other consumers. *See, e.g.*, Issues and Decision Memorandum

accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*

*from the People's Republic of China*, 83 Fed. Reg. 34,828 (Dep't Commerce July 23, 2018) (final

results of countervailing duty admin. rev.; 2015) at 45–46 ("In a subsidy analysis, a benefit is either

conferred or not conferred, and a positive benefit from certain transactions cannot be masked by

'negative benefits' from other transactions.").

In short, Commerce's determination that the prices charged to Hyundai Steel were consistent with market principles is unsupported by record and should be remanded for reconsideration.

## VI.   **<u>CONCLUSION</u>**

Since Commerce's Final Results are in violation of Commerce's statutory obligations and practice, the Final Results are unsupported by substantial evidence and otherwise not in accordance with law.   Accordingly, Nucor respectfully requests that this Court remand the Final Results to Commerce with instructions to correct the errors in its determination.

/s/ Alan H. Price
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Consolidated-Plaint₍ⱼf Nucor Corporation*

Dated: November 28, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,059 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

November 28, 2022
(Date)