## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| NUCOR CORPORATION, | ) |
| | ) |
| Consolidated-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) Consol. Court No. 22-00170 |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR CORPORATION, and | ) |
| GOVERNMENT OF THE REPUBLIC | ) |
| OF KOREA, | ) |
| | ) |
| Defendant-Intervenors. | ) |

_____ )

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
HENDRICKS VALENZUELA
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (240) 449-5852
Email: Hendricks.Valenzuela@trade.gov

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7568
Fax: (202) 305-7644
Email: Sosun.Bae@usdoj.gov

April 28, 2023

Attorneys for Defendant

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____
|                                                        |  )
| HYUNDAI STEEL COMPANY,                  |  )
|                                                        |  )
|                          Plaintiff,               |  )
|                                                        |  )
| NUCOR CORPORATION,                        |  )
|                                                        |  )
|                          Consolidated-Plaintiff,  |  )
|                                                        |  )
|              v.                                       |  )
|                                                        |  )
| UNITED STATES,                                 |  )
|                                                        |  )          Consol. Court No. 22-00170
|                          Defendant,             |  )
|                                                        |  )
|              and                                    |  )
|                                                        |  )
| NUCOR CORPORATION, and                  |  )
| GOVERNMENT OF THE REPUBLIC          |  )
| OF KOREA,                                        |  )
|                                                        |  )
|                          Defendant-Intervenors.  |  )
_____)

## ORDER

     Upon consideration of plaintiffs' motion for judgment on the agency record, defendant's

and defendant-intervenor's responses thereto, plaintiffs' reply, the administrative record, and all

other pertinent papers, it is hereby

     ORDERED that plaintiffs' motion is DENIED; and it is further

     ORDERED that the Department of Commerce determination at issue in this action is

sustained; and it is further

     ORDERED that judgment is entered in favor of the United States.


Dated:_____                    _____
     New York, New York                                          CHIEF JUDGE

# TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 ................................................................... 2

    I.    Administrative Determination Under Review .................................................. 2

    II.   Issues Presented For Review ........................................................................... 2

STATEMENT OF FACTS ........................................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................ 5

ARGUMENT ............................................................................................................. 6

    I.    Standard Of Review ........................................................................................ 6

    II.   Legal Framework For Determining Countervailable Subsidies ......................... 7

    III.   Commerce's Determination To Countervail Part Of The K-ETS Program Is
        Lawful And Supported By Substantial Evidence ............................................ 11

        A.    Background On The K-ETS Program ................................................... 11

        B.    Commerce's Determination To Countervail The Additional KAU
                Allocation Is Supported By Substantial Evidence And In Accordance
                With Law ........................................................................................... 14

                1.    Commerce's Financial Contribution Determination Is Lawful
                        And Supported By Substantial Evidence .................................... 15

                2.    Commerce's Benefit Determination Is Lawful And Supported
                        By Substantial Evidence ............................................................ 17

                3.    Commerce's Specificity Determination Is Lawful And
                        Supported By Substantial Evidence ........................................... 20

    IV.   Commerce's Determination That The Korean Government Did Not Subsidize
        Hyundai Steel By Providing Electricity For Less Than Adequate Remuneration
        Is Lawful And Supported By Substantial
        Evidence ....................................................................................................... 24

A.   Record Evidence Supports Commerce's Conclusion That KEPCO's Prices Were Set In Accordance With Market Principles ........................ 25

B.   Nucor's Assertion That The Korean Government's Pricing Data Is Distorted Fails .................................................................................... 28

C.   Commerce's Application of Its Tier 3 Benchmark Is In Accordance With Law ................................................................................................. 31

CONCLUSION .................................................................................................... 37

# TABLE OF AUTHORITIES

**CASES**                                                                                         **PAGE(S)**

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021)...................................................... 20, 21

*Asociacion de Exportadores e Industriales de Aceituna de Mesa v. United States*,
    589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022)........................................................ 20

*BGH Edelstahl Siegen GmbH v. United States*,
    600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022)................................................. passim

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)............................................................................................. 10

*Consol. Edison Co. v. N.L.R.B.*,
    305 U.S. 197 (1938)..................................................................................7, 28, 31

*Consolo v. Federal Maritime Comm'n*,
    383 U.S. 607 (1966)...................................................................................... 7, 31

*Essar Steel, Ltd. v. United States*,
    395 F. Supp. 2d 1275 (Ct. Int'l Trade 2005).................................................... 16

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ............................................................................7

*Gov't of Quebec v. United States*,
    567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022)..................................................... 15

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ..................................................... 31

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ..........................................................................7

*Nucor Corp. v. United States*,
    927 F.3d  (Fed. Cir. 2019)........................................................................... passim

*Nucor Corp. v. United States*,
    No. 22-00050, 2023 WL 3016851 (Ct. Int'l Trade Apr. 19, 2023)................ passim

*Nucor Corp. v. United States*,
    No. 22-00137, 2023 WL 3017970 (Ct. Int'l Trade Apr. 19, 2023)................ passim

*PAM, S.p.A. v. United States*,
 582 F.3d 1336 (Fed. Cir. 2009) ....................................................................... 7

*POSCO v. United States*,
 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) .................................................. 24

*POSCO v. United States*,
 977 F.3d 1369 (Fed. Cir. 2020) ............................................................... passim

*PPG Industries, Inc.*,
 928 F.2d 1568 (Fed. Cir. 1991) ....................................................................... 9

*Titan Tire Corp. v. Case New Holland, Inc.*,
 566 F.3d 1372 (Fed. Cir. 2009) ..................................................................... 28

*U.S. Steel Corp v. United States*,
 33 CIT 1935 (2009) ....................................................................................... 35

*Utility Air Regulatory Group v. EPA*,
 573 U.S. 302 (2014) ...................................................................................... 32

*Uttam Galva Steel Ltd. v. United States*,
 No 21-2119, 2022 WL 1419596 (Fed. Cir. May 5, 2022) ............................... 25

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
 350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .................................................. 28

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) ............................................................................... 7

19 U.S.C. § 1677(5) .......................................................................................... 7

19 U.S.C. § 1677(5A) ........................................................................................ 8

19 U.S.C. § 1677(5A)(D)(i) ........................................................................ 8, 23

19 U.S.C. § 1677(5A)(D)(ii) ....................................................................... 9, 23

19 U.S.C. § 1677(5A)(D)(i)-(iii) ...................................................................... 8

19 U.S.C. § 1677(5)(B) .................................................................................. 25

19 U.S.C. § 1677(5)(B)(iii) ............................................................................... 8

19 U.S.C. § 1677(5)(C) ...................................................................... 11, 18, 19

19 U.S.C. § 1677(5)(D)..................................................................................... 8, 25

19 U.S.C. § 1677(5)(D)(ii)..........................................................................15, 16, 17

19 U.S.C. § 1677(5)(E)................................................................................9, 10, 17

19 U.S.C. § 1677(5)(E)(iv)....................................................................................7

## REGULATIONS

19 C.F.R. § 351.503(b)(2)....................................................................................17

19 C.F.R. § 351.511..........................................................................................10

19 C.F.R. § 511(a)(2)(iii)............................................................................... 10, 36

## ADMINISTRATIVE DETERMINATIONS

*Countervailing Duties: Final Rule,*
   63 Fed. Reg. 65, 348 (Dep't of Commerce Nov. 25, 1998)................................. 10

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China,*
   73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008)................................. 35

*Light-Walled Rectangular Pipe & Tube from the People's Republic of China,*
   73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008)................................. 35

*Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea,*
   81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016)......................................2

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea,*
   85 Fed. Reg. 38, 361 (Dep't of Commerce June 26, 2020)................................. 34

*Antidumping and Countervailing Duty Order, Finding, or Suspended Investigation;*
*Opportunity to Request Administrative Review,*
   85 Fed. Reg. 31,926 (Dep't of Commerce Oct. 1, 2020)......................................3

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
   85 Fed. Reg. 74,692 (Dep't of Commerce Nov. 23, 2020)................................. 27

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   85 Fed. Reg. 78,990 (Dep't of Commerce Dec. 8, 2020) ....................................3

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
   86 Fed. Reg. 29, 237 (Dep't of Commerce June 1, 2021)............................. 27, 30

*Seamless Carbon and Alloy Steel Standard Line and Pressure Pipe from the Republic of Korea*,
  86 Fed. Reg. 35, 267 (Dep't of Commerce July 2, 2021)........................................................30

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review and Rescission in Part; 2019*,
  86 Fed. Reg. 60,797 (Dep't of Commerce Nov. 4, 2021).........................................................3

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
  87 Fed. Reg. 27,570 (Dep't of Commerce May 9, 2022)....................................................2, 5

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____

|                                         |     |                            |
|-----------------------------------------|-----|----------------------------|
| HYUNDAI STEEL COMPANY,                  | )   |                            |
|                                         | )   |                            |
| Plaintiff,                              | )   |                            |
|                                         | )   |                            |
| NUCOR CORPORATION,                      | )   |                            |
|                                         | )   |                            |
| Consolidated-Plaintiff,                 | )   |                            |
|                                         | )   |                            |
| v.                                      | )   |                            |
|                                         | )   |                            |
| UNITED STATES,                          | )   | Consol. Court No. 22-00170 |
|                                         | )   |                            |
| Defendant,                              | )   |                            |
|                                         | )   |                            |
| and                                     | )   |                            |
|                                         | )   |                            |
| NUCOR CORPORATION, and                  | )   |                            |
| GOVERNMENT OF THE REPUBLIC              | )   |                            |
| OF KOREA,                               | )   |                            |
|                                         | )   |                            |
| Defendant-Intervenors.                  | )   |                            |

_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully

submits this response in opposition to the motions for judgment on the agency record filed by

plaintiff, Hyundai Steel Company (Hyundai Steel), and consolidated-plaintiff Nucor Corporation

(Nucor).  *See* ECF Nos. 25 (Hyundai Steel Br.), 27 (Nucor Br.).  Hyundai Steel and Nucor

challenge certain aspects of the Department of Commerce's (Commerce) final results in the 2019

administrative review of the countervailing duty order covering certain hot-rolled steel flat

products (hot-rolled steel) from the Republic of Korea (Korea).  For the reasons explained below,

the Court should sustain the final results as supported by substantial evidence and otherwise in accordance with law, deny plaintiffs' motions, and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

I.   <u>Administrative Determination Under Review</u>

Plaintiffs challenge certain aspects of the final results of the countervailing duty review covering certain hot-rolled steel from Korea. *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't of Commerce May 9, 2022) (final results) (P.R. 133)[1], and accompanying Issues and Decision Memorandum (IDM) (P.R. 132). The period of review covered by the final results is January 1, 2019 through December 31, 2019.

II.   <u>Issues Presented For Review</u>

1.   Whether Commerce's determination that the Korean Emissions Trading System (K-ETS) program provides a countervailable benefit is supported by substantial evidence and in accordance with law.

2.   Whether Commerce's determinations that the Korean government's provision of electricity to Hyundai Steel resulted in either no benefit or a non-measurable benefit during the period of review is supported by substantial evidence and in accordance with law.

**STATEMENT OF FACTS**

Commerce has published a countervailing duty order covering hot-rolled steel from Korea. *See Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea*, 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) (order). On October 1, 2020, Commerce issued a notice of opportunity to request an administrative review of that order. *See Antidumping*

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review.

*and Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 85 Fed. Reg. 31,926 (Dep't of Commerce Oct. 1, 2020). Pursuant to timely requests, Commerce initiated an administrative review for those producers for whom interested parties requested individual review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 78,990 (Dep't of Commerce Dec. 8, 2020) (initiation notice).

On January 12, 2021, Commerce selected Hyundai Steel as the sole mandatory respondent. *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review and Rescission in Part*, 86 Fed. Reg. 60,797 (Dep't of Commerce Nov. 4, 2021) (preliminary results) (P.R. 100), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 98) at 2. On March 31, 2021, United States Steel Corporation (U.S. Steel) and Nucor submitted timely new subsidy allegations relating to the Korean government's provision of electricity. PDM at 3, New Subsidy Allegations (P.R. 60-61). On April 26, 2021, Commerce issued questionnaires relating to the carbon emissions credit program to the Korean government and Hyundai Steel. PDM at 3, Carbon Program Questionnaire (P.R. 63-64). Hyundai Steel and the Korean government filed timely responses to these questionnaires. PDM at 3, GOK Carbon NSA Questionnaire Response (C.R. 77), Hyundai Steel Carbon NSA Questionnaire Response (C.R. 74-75).

Subsequently, Commerce initiated an investigation into the provision of electricity new subsidy allegation, and issued questionnaires and supplemental questionnaires relating to this program to the Korean government and Hyundai Steel. PDM at 3, New Subsidy Allegation Memo (P.R. 79). The Korean government and Hyundai Steel filed timely responses to all of Commerce's questionnaires concerning the electricity program. PDM at 3, GOK Electricity

NSA Questionnaire Response (C.R. 86-90), Hyundai Steel Electricity NSA Questionnaire Response (C.R. 82-85).

On November 4, 2021, Commerce issued its preliminary results, preliminarily determining a subsidy rate of 0.56 percent for Hyundai Steel. *See Preliminary Results*, 86 Fed. Reg. at 60,798 (P.R. 100). In analyzing the Korea Emissions Trading System (K-ETS) program, Commerce determined that the Korean government's additional allocation of Korean Allowance Units (KAUs), *i.e.*, emissions permits, to certain sectors, including Hyundai Steel, constituted a countervailable subsidy, and calculated a benefit for this program of 0.10 percent *ad valorem*. PDM at 17-21.

As to the subsidy allegation concerning the provision of electricity, Commerce preliminarily determined that KEPCO, the exclusive supplier of electricity in Korea, constituted an "authority" within the meaning of the statute, and provided producers a financial contribution in form of the provision of a good or service. *Id.* at 22-23. However, in analyzing whether the electricity program provided a benefit, Commerce determined that certain reported industrial rates recovered costs and a rate of return, and, for those rates that did not recover costs and a rate of return, Commerce's calculations nonetheless resulted in a non-measurable benefit for Hyundai Steel. *Id.* at 25-29.

In administrative case and rebuttal briefs, parties raised arguments regarding both programs. The Korean government claimed that Commerce's preliminary determination that the K-ETS program confers a benefit is based on a misunderstanding. GOK Case Brief at 8-9 (P.R. 121, C.R. 119). Hyundai Steel contended that Commerce incorrectly found that this program provides a benefit, and that Commerce must consider evidence that detracts from a finding that the program is countervailable. Hyundai Steel Case Brief at 4 (P.R. 122; C.R. 120). In contrast,

Nucor argued that Commerce appropriately countervailed the provision of certain emissions credits to Hyundai Steel because the program satisfied each of the elements required of a countervailable subsidy. Nucor Rebuttal Brief at 3 (P.R. 126; C.R. 124).

With regard to the provision of electricity, Nucor argued that the methodology used by Commerce to calculate the benefit for select types of electricity understates the amount of benefit and fails to generate a price that would cover KEPCO's reported costs plus an amount for profit. Nucor Case Brief at 11-23 (P.R. 123; C.R. 121). The Korean government and Hyundai Steel both supported Commerce's calculations and conclusions in the preliminary results. GOK Rebuttal Brief at 11-18 (P.R. 124; C.R. 122); Hyundai Steel Rebuttal Brief at 13-23 (P.R. 125; C.R. 123).

Commerce issued its final results on May 4, 2022. *Final Results*, 87 Fed. Reg. 27,570. In the final results, Commerce made no changes to the preliminary results with respect to the subsidy rate calculated for Hyundai Steel. IDM at 1. Commerce continued to determine that the K-ETS program constitutes a countervailable subsidy, *id.* at 17-24, and that the provision of electricity program either did not confer a benefit at all or conferred a non-measurable benefit during the period of review. *Id.* at 42-47. As such, Commerce continued to calculate a final subsidy rate for Hyundai Steel of 0.56 percent. *See Final Results*, 87 Fed. Reg. at 27,570.

## SUMMARY OF THE ARGUMENT

Commerce's final results should be sustained in their entirety. First, with regard to the carbon emissions program, K-ETS, Commerce lawfully countervailed the additional three percent allocation granted to entities in trade-intensive sectors, such as Hyundai Steel, under the K-ETS program, and its decision was also supported by substantial evidence. This Court has

already upheld Commerce's determination with regard to a similar emissions program, and Hyundai Steel has not established sufficient cause to depart from the Court's prior holding.

Commerce's determination that the government of Korea does not provide electricity for less than adequate remuneration (LTAR) should also be sustained, as it is supported by substantial evidence and is otherwise in accordance with law. At this juncture, the Court has agreed with Commerce on multiple occasions that the provision of electricity either results in no benefit or no measurable benefit; there is no cause to depart from the Court's prior rulings.

Commerce undertook an LTAR analysis, examining whether the Korean government sets its tariffs in accordance with market principles. The government of Korea's responses indicate that KEPCO fully recovered its costs, plus a rate of recovery or profit. Commerce's examination of the Korea Power Exchange (KPX) shows that generators are paid their costs as well as a return on investment. And to the extent that the industrial rates did not cover costs and a rate of return, Commerce concluded that there was still no measurable benefit.

Nucor contends that Commerce unlawfully limited its analysis to the aggregate performance of KEPCO rather than the prices actually paid by Hyundai Steel. But the nature of a tier 3 analysis means that Commerce does not have the benefit of market-derived or world market prices for comparison, and thus the fundamentals of the program at issue necessarily must be examined to determine if it operates in accordance with market principles.

## **ARGUMENT**

### I.    Standard Of Review

In reviewing Commerce's countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). That is because "{s}ubstantial evidence" is defined as "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The Court must affirm the agency's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusion. *Nippon Steel*, 458 F.3d at 1352. Even if it is possible to draw two inconsistent conclusions from the evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence. *Id.*; *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

II.    <u>Legal Framework For Determining Countervailable Subsidies</u>

A countervailable subsidy exists when a foreign governmental authority has provided a financial contribution to a recipient, a benefit is thereby conferred, and the subsidy is specific. 19 U.S.C. § 1677(5); *see also* Statement of Administrative Action accompanying Uruguay Round Trade Agreements Act, H.R. Doc. 103-316 (1994) (SAA). In determining whether a subsidy is countervailable, Commerce looks to three specific elements: financial contribution, specificity, and whether a benefit was conferred. SAA at 925; *see also* 19 U.S.C. § 1677(5).

In situations where an authority provides a "financial contribution" through the provision of goods and services, the statute explains that a benefit shall normally be treated as conferred when those goods or services "are provided for less than adequate remuneration{.}" 19 U.S.C.

§ 1677(5)(E)(iv).  Commerce may also find that there is a financial contribution "where the government entrusts or directs a private body to provide the subsidy."  19 U.S.C. § 1677(5)(B)(iii).  A financial contribution is defined as:

> (i)    the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

> (ii)    foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

> (iii)    providing goods or service, other than general infrastructure, or

> (iv)    purchasing goods . . . .

19 U.S.C. § 1677(5)(D).  These categories are purposefully broad and non-exhaustive.  SAA at 927.

The statute further defines a countervailable subsidy as one that is specific.  *See* 19 U.S.C. § 1677(5A).  Domestic subsidies can be specific as a matter of law (*de jure*) or in fact (*de facto*).  *See* 19 U.S.C. § 1677(5A)(D)(i)-(iii).  A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprises or industry."  19 U.S.C. § 1677(5A)(D)(i).  "The *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of the subsidy is unnecessary."  SAA at 930.  However, the statute "does not attempt to provide a precise mathematical formula for determining when the number of enterprises or industries eligible for a subsidy is sufficiently small so as to properly be considered {*de jure*} specific."  *Id.*  Rather, "Commerce can only

make this determination on a case-by-case basis." *Id.* The statute also explains the effect of eligibility requirements on determinations of *de jure* specificity:

> Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if:
>
> (I)    eligibility is automatic,
>
> (II)   the criteria or conditions for eligibility are strictly followed, and
>
> (III)  the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.
>
> For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

19 U.S.C. § 1677(5A)(D)(ii). The SAA further emphasizes that for a subsidy not to be *de jure* specific, the eligibility criteria must be objective and neutral. *See* SAA at 930.

If Commerce determines a subsidy is *de jure* specific, it is not required to undertake a *de facto* specificity analysis. *See PPG Industries, Inc.*, 928 F.2d 1568, 1576 (Fed. Cir. 1991) ("{i}f the domestic subsidy is provided by its terms to a particular enterprise or industry or group of enterprises or industries, it is countervailable without further inquiry.").

Finally, 19 U.S.C. § 1677(5)(E) provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy. Specifically, it states that:

> A benefit shall normally be treated as conferred where there is a benefit to the recipient including - . . . (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate renumeration, and in the case where goods are purchased . . . for more than adequate remuneration.

19 U.S.C. § 1677(5)(E). When goods or services are provided for "less than adequate remuneration," the adequacy of remuneration "shall be determined in relation to prevailing

market conditions for the good or service being provided" in the country which is subject to the investigation or review. *Id.* at § 1677(5)(E). Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* The statute is silent as to how to measure the adequacy of remuneration in these circumstances. Thus, Commerce's interpretation governs so long as it is based on a "permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Commerce's regulations explain how it evaluates adequacy of remuneration in particular circumstances. *See* 19 C.F.R. § 351.511. Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." *Id.* at § 351.511(a)(2)(i) (explaining tier 1 benchmark). If market-prices are not available, Commerce "compar{es} the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id.* at § 351.511(a)(2)(ii) (explaining tier 2 benchmark). Where a tier 2 benchmark is also unavailable, Commerce "measure{s} the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id.* at § 351.511(a)(2)(iii) (explaining tier 3 benchmark).

In the preamble to its regulation, Commerce explained that a tier 3 benchmark analysis will examine "such factors as the government's price setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65, 348 (Dep't of Commerce Nov. 25, 1998) (CVD Preamble). Commerce does not consider these tier 3 factors "in any hierarchy" and "may rely on one or

more of these factors in any particular case." *Id.* Additionally, Commerce examines whether a benefit has been conferred regardless of whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise, and does not need to consider the effect of the subsidy in determining whether it exists. 19 U.S.C. § 1677(5)(C).

III.    Commerce's Determination To Countervail Part Of The K-ETS Program Is Lawful And Supported By Substantial Evidence

   A.    Background On The K-ETS Program

The K-ETS program, established under the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits (AAGEP) and administered primarily by the Korean government's Ministry of Environment, is the core of the Korean government's greenhouse gas reduction policy. PDM at 17. K-ETS has been reported as "having one of the widest coverages of any emissions trading system in the world." *Id.* (citing GOK Carbon NSA Questionnaire Response at SQA-1 (P.R. 76, C.R. 77)).

Article 8(1) of the AAGEP establishes that any entity emitting at least 125,000 tons of carbon dioxide or equivalents per year over the prior three years or an entity with any one place of operation that emitted at least 25,000 tons of carbon dioxide or equivalents per year over the prior three years is subject to K-ETS. *Id.* Subject entities are required to surrender emissions permits, known as Korean Allowance Units (KAUs), to offset annual emissions of various greenhouse gases. *Id.* (citing GOK Carbon NSA Questionnaire Response at 1-3 (P.R. 76, C.R. 77)). The primary source by which subject companies obtain KAUs is via allocations from the government of Korea. *Id.* The allocation process is established by Articles 12(2) and 16(1) of the AAGEP and Article 12(1) of the AAGEP Enforcement Decree. PDM at 18. The Korean government has established a mechanism by which it calculates and allocates a certain number of KAUs, with fewer KAUs issued in later phases of the program to place a greater burden on

participants and limit their greenhouse gas emissions over time. *Id.* at 17 (citing GOK Carbon NSA Questionnaire Response at 1-3 (P.R. 76, C.R. 77)). As relevant to Hyundai Steel, the Korean government relied on emissions data submitted for the years 2014 through 2016 to calculate a benchmark allowance of KAUs for each entity. *Id.* at 18 and n.125 (citing GOK Carbon NSA Questionnaire Response at 4 (P.R. 76, C.R. 77)) (this method is referred to as the "grandfathering method," to which most industrial sectors and sub-sectors are subject).

At the end of each calendar year, subject entities must calculate the amount of actual emissions they incurred over the calendar year and surrender to the Korean government an amount of KAUs equivalent to its emissions or be subject to a penalty for any shortfall. PDM at 18. The period of review in this proceeding fell under Phase 2, which covers years 2018 through 2020. *Id.* To determine allocations under Phase 2, the Korean government based its calculation on the total number of KAUs the government was able to allot for each of the three years under this phase, reduced by a percentage kept in reserve for adjustments (including new companies joining, new factories that increase emissions of existing companies) and market stabilization, with the remainder allocated to each industry and then the companies within each industrial classification. *Id.* (citing GOK Carbon NSA Questionnaire Response at 3-5, Exh. CEP-8 (P.R. 76, C.R. 77)). Once the government determined the full number of KAUs it would assign to each entity, it then deducted 3 percent and set those in reserve, allocating 97 percent of the calculated annual allotment to each participant. *Id.*

However, the AAGEP and accompanying Enforcement Decree have established an exception to the 97 percent allocation rule permitting all subject entities within specific sectors to qualify to receive the full 100 percent allocation of KAUs for a specified year. Specifically:

> Article 12(4) of the AAGEP and Article 14 of the AAGEP
> Enforcement Decree provide that those types of businesses (i.e.,

12

> sectors) that meet certain criteria (i.e., high international trade
> intensity and/or having high production costs), qualify to receive
> the entire 100 percent allocation from the GOK each year.

PDM at 18 (citing GOK Carbon NSA Questionnaire Response at 3, Exh. CEP-1 (P.R. 76, C.R.

77)). It is solely this provision of the K-ETS program which Commerce has deemed

countervailable. PDM at 20; *see also* IDM at 27 ("we are only countervailing the benefit

conferred as a result of the additional three percent KAU allocations to Hyundai Steel which

belongs to trade-intensive and/or high production costs sectors.")

The 100 percent allocation figure is not reflective of, or tied to, how much a company

will actually emit in a given year. PDM at 18. Rather, it is based on historical data, under the

"grandfathering method," or a benchmark for a unit of a good or service. *Id.* Changes in a

participant's operations may also result in adjustments to allocations, which come from or go

into the Korean government's KAU reserves. *Id.* 18-19. Thus, the emissions, and respective

allocations, for participants will be in flux until the compliance year is complete. *Id.* at 19. If an

entity's emissions exceed the amount of freely allocated KAUs for the year, that participant is

responsible for acquiring the additional KAUs it needs to account for the difference between the

final amount of emissions and the allocations received from the government, regardless of

allocation percentage. *Id.*

The AAGEP establishes multiple options that the participant can utilize to make up this

difference: (1) use blanked KAUs carried over from a prior compliance year (subject to certain

limits); (2) purchase additional KAUs from other private entities via centralized KAU trading

exchange; (3) purchase additional KAUs directly from other private entities; (4) borrow KAUs

from a forthcoming year (subject to certain limits); and/or (5) apply earned credits for certain

activities, such as external carbon offset programs, intended to reduce greenhouse gas emissions.

PDM at 19 (citing GOK Carbon NSA Questionnaire Response at 4-5 and Exh. CEP-1 (P.R. 76, C.R. 77)).  In addition, beginning in compliance year 2019, the Korean government began a government-run auction where it sold KAUs to qualifying entities.  PDM at 19 (citing GOK Supp. Questionnaire Response at 2-3, 7, and Exh. CEP-7.1 (C.R. 95)).  When entities are unable to obtain sufficient KAUs, the government may impose a penalty of not more than three times the average market price of KAUs during the compliance year, up to KRW 100,000 per KAU. PDM at 19.

Because Hyundai Steel exceeded its allocated KAU allowance during the period of review, it purchased and borrowed from the following compliance year's KAU allocation to surrender the total amount of emissions credits owed to the Korean government.  *See* Hyundai Steel Carbon NSA Questionnaire Response at 4 (P.R. 75; C.R. 74) (referring to the relevant KAU allowance as "KAU19").  To determine whether a benefit existed under the program, Commerce calculated three percent of the total number of KAUs Hyundai Steel received from the government of Korea for compliance year 2019 to determine the value of the additional free three percent KAUs.  PDM at 20.  Commerce calculated a benchmark price for KAUs by using the quantity and value of the private market purchases reported by Hyundai Steel (because it did not make auction purchases), then multiplied that number by the number of KAUs which made up the additional three percent allocation to determine the program benefit.  PDM at 20.  Finally, Commerce divided the total program benefit by Hyundai Steel's total sales to calculate the program rate.  *Id.*

**B.    Commerce's Determination To Countervail The Additional KAU Allocation Is Supported By Substantial Evidence And In Accordance With Law**

The Court should sustain the final results because Commerce lawfully countervailed the additional three percent allocation granted to entities in trade-intensive sectors, such as Hyundai

Steel, under the K-ETS program, and its decision was supported by substantial evidence.

Hyundai Steel challenges Commerce's subsidy determination by claiming that: (1) K-ETS does

not provide a financial contribution because there is no revenue forgone otherwise due; (2) K-

ETS does not provide a benefit; and (3) the K-ETS program is not specific.  Hyundai Steel Br. at

8-35.  None of these arguments have merit.

       1.      Commerce's Financial Contribution Determination Is Lawful And
                Supported By Substantial Evidence

Commerce correctly determined, that through the allocation of an additional three percent

in KAU permits, the Korean government is providing a financial contribution in the form of

revenue foregone, pursuant to 19 U.S.C. § 1677(5)(D)(ii).  PDM at 20; IDM at 21-22.  Hyundai

Steel disagrees, contending that a financial contribution "exists only if the GOK had a 'right' to

collect revenue from Hyundai Steel and Hyundai Steel would have 'owed' revenue to the GOK

as a result of an 'obligation or duty' absent the allocation of permits that it actually received."

Hyundai Steel Br. at 11.  In furtherance of its argument, Hyundai Steel claims that, if "the GOK

had allocated Hyundai Steel 97 percent of its assigned permits, and not 100 percent, Hyundai

Steel would not automatically owe the GOK revenue."  Hyundai Steel Br. at 13.  These

assertions are belied by the law.

A government makes a financial contribution when it forgoes revenue *which is otherwise*

*due*.  *See BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1262 (Ct. Int'l

Trade 2022) (citing 19 U.S.C. § 1677(5)(D)(ii)); *see also Gov't of Quebec v. United States*, 567

F. Supp. 3d 1273, 1278 (Ct. Int'l Trade 2022) (explaining the statute defines financial

contribution "not only as 'the direct transfer of funds' but also as 'foregoing or not collecting

revenue that is otherwise due, such as granting tax credits or deductions from taxable income'");
*Essar Steel, Ltd. v. United States*, 395 F. Supp. 2d 1275, 1277 (Ct. Int'l Trade 2005).

Hyundai Steel received an additional three percent KAU allocation from the government of Korea, which placed it in an advantageous position whereby it would need to purchase fewer permits than otherwise necessary to maintain compliance with K-ETS. While Hyundai Steel focuses on the possibility that any KAUs required may have been purchased from the private market rather than the government, the Korean government is still "foregoing or not collecting revenue that is otherwise due" by granting Hyundai Steel the additional three percent allocation. *See* 19 U.S.C. § 1677(5)(D)(ii). As Commerce explained, the key question when evaluating revenue foregone is whether, if it did not give entities like Hyundai Steel the additional KAUs for free, the government would have otherwise retained the ability to collect the three percent allocation from Hyundai Steel. IDM at 22. The answer is yes.

Commerce further explicated that "the baseline companies receiving the 97 percent of the calculated allotment are able to purchase from the GOK-run auction, and therefore, the GOK is able to collect revenue on any additional credits that these entities may need to purchase{.}" PDM at 20. Thus, the Korean government is providing Hyundai Steel something of value when it could otherwise collect revenue. *Id.* In considering a similar European emissions program, this Court held that "{t}he issue is not whether the {government} can sell the free allowances to companies, rather the issue is whether the {government}forgoes revenue when it gives additional free allowances to companies on the carbon leakage list like BGH, reducing the number of allowances BGH must purchase at the state-run auction or the secondary market." *BGH*

*Edelstahl Siegen GmbH*, 600 F. Supp. 3d at 1263.  The Court's prior reasoning is sound and Hyundai Steel offers no reason to depart from it.

Hyundai Steel received an additional three percent KAU allocation, beyond the standard allocation of 97 percent, from the Korean government *at no cost*.  PDM at 20.  Even if Hyundai Steel could have theoretically purchased those allocations from the private market instead of through government auction, the three percent allocation still represents a value that the Korean government will no longer collect from Hyundai Steel.  IDM at 22.  And the government is "foregoing or not collecting revenue that is otherwise due" by virtue of that additional free three percent allocation.  *See* 19 U.S.C. § 1677(5)(D)(ii).  Had the government treated Hyundai Steel like other companies not receiving the additional three percent, Hyundai Steel would have been eligible to participate in the government-run auction in which the government would have recovered the additional three percent that Hyundai Steel needed to purchase to comply with its K-ETS obligation.[2]  Hyundai Steel's overreliance on the options for obtaining additional KAUs ignores the fact that the additional three percent allocation placed it in an *initial* advantageous position whereby it was relieved from having to purchase those permits from either the government auction or the private trading market.  Because the Korean government is providing something of value for which it could otherwise potentially collect revenue, it provided a financial contribution in the form of revenue foregone pursuant to 19 U.S.C. § 1677(5)(D)(ii).

> 2.  Commerce's Benefit Determination Is Lawful And Supported By Substantial Evidence

Commerce also lawfully determined that the K-ETS program conferred a benefit, pursuant to 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.503(b)(2), because Hyundai Steel is

---

[2]  Hyundai Steel does not deny that the record "shows that the revenue that the GOK *could* have collected from Hyundai Steel had it not received the 100 percent allocation was *otherwise due*."  Hyundai Steel Br. at 20 (emphasis in original)

relieved of the obligation to purchase additional allowances.  PDM at 20.  Hyundai Steel focuses

on the "burden" imposed upon it by the K-ETS program in arguing that the program does not

provide a benefit; in doing so, it contends that, "{t}o the extent certain sectors that are subject to

the emissions reduction requirements are allocated slightly more emissions permits, this just

means they are burdened slightly less than companies with lower emissions permit allocations."

Hyundai Steel Br. at 23.  Hyundai Steel claims that Commerce should have considered

companies that are not subject to the K-ETS program and determined instead "that both Hyundai

Steel and companies who received 97 percent of their assigned permits are disadvantaged vis-à-

vis companies that are not subject to the K-ETS."  *Id.* at 24-25.

Hyundai Steel completely misses the mark, as "{t}he determination of whether a benefit

is conferred is completely separate and distinct from an examination of the 'effect' of a subsidy."

*CVD Preamble,* 63 Fed. Reg. at 65,361; 19 U.S.C. § 1677(5)(C); *see also BGH Edelstahl Siegen*

*GmbH*, 600 F. Supp. 3d at 1264 ("Commerce determines benefit by the reduction or elimination

of the obligation, without regard to the source of that obligation.").  Consistent with the statute

and its regulation, when Commerce analyzes whether a potential subsidy exists, it does not

consider the effects of the subsidy, or any related "burdens" imposed on a firm that are related to

the granting of the subsidy, such as those pertaining to compliance with certain environmental

obligations.  IDM at 18.  Accordingly, Commerce reasonably declined to consider whether the

overall impact of the K-ETS program may result in a "burden."

Indeed, the scenario presented by the K-ETS program here is the very one contemplated

in the CVD Preamble:  "A subsidy that reduces a firm's costs of compliance remains a subsidy . .

. even though the overall effect of the two government actions, taken together, may leave the

firm with higher costs."  IDM at 18 (quoting *CVD Preamble,* 63 Fed. Reg. at 65,361).  And of

18

course, the statute itself explicitly states that Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists." IDM at 18 (citing 19 U.S.C. § 1677(5)(C)).

As discussed above, this Court recently sustained a similar Commerce determination in *BGH Edelstahl*, where the respondent BGH received additional free emissions allowances under the European Union's (EU) ETS program, thus relieving BGH of the obligation to pay for the additional allowances. *BGH Edelstahl*, 600 F. Supp. 3d at 1264. In rejecting the plaintiff's arguments, the Court noted Commerce's practice of "determin{ing} benefit by the reduction or elimination of the obligation, without regard to that source of that obligation" and explained that, "{d}ue to receiving the additional free allowance, BGH received something for free—allowances that BGH otherwise would have been required to pay to acquire at auction or on the private market." *Id*. Similarly, Hyundai Steel is inherently placed into an advantageous position by receiving the additional three percent allocation of KAUs because it will need to purchase fewer permits than necessary to maintain compliance. IDM at 21. And Hyundai Steel acknowledges that, when compared to the companies receiving a 97 percent allocation, it is "burdened slightly less." Hyundai Steel Br. at 23. In other words, Hyundai Steel benefits from having a "lesser burden" compared to companies receiving the standard 97 percent allocation.

Hyundai Steel would have Commerce perform its benefit analysis by comparing Hyundai Steel's experience with companies that do not participate in the K-ETS program, "including companies in the United States . . . ." Hyundai Steel Br. at 25. But this proposal is unsupported by the statute or precedent, and conflicts with Hyundai Steel's claim that Commerce's benefit analysis "must review the program as a whole." *Id*. at 24. To be sure, Commerce considered the free additional three percent allocation within the context of the K-ETS program as a whole

19

when determining if a countervailing subsidy exists.  IDM at 20-21.  Perhaps because its

argument regarding review of the program as a whole proves ineffective, Hyundai Steel now

resorts to arguing that Commerce should have analyzed benefit by comparing Hyundai Steel's

experience *within* the K-ETS to companies *outside* of the program.  But whether the majority of

companies in Korea are subject to the "burdens" of the K-ETS program is irrelevant to

Commerce's determination regarding whether Hyundai Steel, by receiving the additional three

percent allocation, received a benefit.

        3.      Commerce's Specificity Determination Is Lawful And Supported By
              Substantial Evidence

Commerce also reasonably determined the K-ETS program is *de jure* specific because the

AAGEP and its implementing rules establish specific criteria for determining which sectors and

sub-sectors qualify for the additional KAU allotment.  PDM at 20; IDM at 22-23.  Hyundai Steel

primarily relies on this Court's opinion in *Asociacion de Exportadores e Industriales de

Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) (*ASEMESA*), to

argue that Commerce's *de jure* specificity determination is unsupported because the AAGEP

does not "explicitly limit" treatment "to a specific enterprise or industry."  Hyundai Steel Br. at

29-32.

In *ASEMESA,* Commerce determined the EU's Common Agricultural program was *de

jure* specific because subsidies were provided to Spanish olive growers through the Basic

Payment Scheme.  *ASEMESA*, 523 F. Supp. 3d at 1399.[3]  Because portions of the Basic Payment

Scheme subsidy program were based on past iterations of EU subsidy programs, Commerce

---

       [3]  This Court subsequently sustained Commerce's second redetermination finding that the
subsidies received by the Spanish olive industry were *de facto* specific.  *See Asociacion de
Exportadores e Industriales de Aceituna de Mesa v. United States*, 589 F. Supp. 3d 1346 (Ct.
Int'l Trade 2022).

traced the history of this program to a separate program and payment system from 1997, which provided an annual grant to Spanish olive growers. *Id.* That original payment system was replaced in 2003 by the Single Payment Scheme, which provided subsidies to those Spanish olive growers that both meet the eligibility requirements and apply for subsidies. *Id.* In 2015, the Single Payment Scheme was, in turn, replaced by the Basic Payment Scheme program, which relied on data collected by the original programs but allocated "subsidy payments using regional rates based on the 'productive potential' and 'productive orientation' of a particular region." *Id.* The rate assigned to participating farmers did not vary with the type and volume of crop produced, but did account for historically produced crops like olives. *Id.* Commerce concluded that the annual grant under Basic Payment Scheme was crop-specific because the grant amounts received by olive growers under the program were related to industry-specific amounts received under the original 1997 program, and was therefore *de jure* specific. *Id.*

The Court held that Commerce had erred in its *de jure* specificity analysis because "there {was} no uniform treatment across the agricultural sector in the provision of benefits." *Id.* at 1403. The Court found it insufficient that "the legislation underlying the subsidy under consideration {} merely reference{d} and incorporate{d} prior legislation which itself may favor a specific sector." *Id.* Rather, the Court concluded that, under "the plain meaning of Section 1677(5A), subsidies are only *de jure* specific where the authority providing the current subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry." *Id.* at 1404.

*ASEMESA* is distinguishable in multiple ways. First, here, unlike in *ASEMESA*, Commerce is not interpreting previous iterations or the historical evolution of the AAGEP. Rather, the AAGEP still operates in the same fashion as when first established in 2015.

Additionally, Article 12(4) of the AAGEP and Article 14 of the AAGEP Enforcement Decree establish criteria *expressly limiting* which entities qualify for the additional allocation by setting thresholds that they must meet to qualify.  IDM at 23.  Specifically, Article 12(4) of the AAGEP provides that "all emission permits may be allocated gratuitously to a business entity eligible for allocation, if its international trade intensity is higher than the standard prescribed by {AAGEP Enforcement Decree} or if it engages in a type of business for which the production cost increased by reducing greenhouse gases is not less than the standard prescribed by {AAGEP Enforcement Decree}."  *See* GOK's Carbon NSA Questionnaire Response at Exhibit CEP-1 (P.R. 76; C.R. 77).

Moreover, Article 14 of the Enforcement Decree states that the "types of businesses eligible for gratuitous allocation of all emissions permits . .  shall be any of the following types of businesses . . .": (1) a business with an international trade intensity of at least 30 percent; (2) a type of business with production costs of at least 30 percent; or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent.  *Id.* at Exhibit CEP-1; IDM at 23.  A participant who does not meet the criteria because they are a business with low international trade intensity or low production costs is explicitly ineligible.  Thus, the criteria established in the AAGEP and implementing rules result in an express statutory limitation on which industries qualify for the additional allocation by setting thresholds that industries must meet to qualify—ones with high international trade intensity and high costs of production.  IDM at 23.  Hyundai Steel's application of *ASEMESA* in the context of this review is overly broad.  While the K-ETS program does not name specific industries entitled to the additional allocation, the criteria included in the AAGEP and implementing rules establish that

specific types of industries may benefit from the additional assistance from the allocation of additional KAUs, while others do not.  IDM at 23.

Additionally, Hyundai Steel argues that "the GOK could not have 'expressly limited' the K-ETS allocations to an enterprise or industry because it did not yet know which subsectors met the criteria."  Hyundai Steel Br. at 31.  However, the statute does not require Commerce to consider the *intent* behind the subsidy, but rather the *result*.  *See* 19 U.S.C. § 1677(5A)(D)(i); *see also* SAA at 930 ("{t}he *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of the subsidy is unnecessary").  In any event, the AAGEP and the implementing rules identify and provide conditions that limit eligibility to select industries that can meet the criteria, including volume of international trade.

Finally, Hyundai Steel argues that the AAGEP and the implementing rules meet the requirements of the specificity safe harbor provision in 19 U.S.C. § 1677(5A)(D)(ii), and should therefore not be considered *de jure* specific.  Hyundai Steel Br. at 33-35.  This provision states that subsidies are not specific when an authority establishes objective criteria or conditions which are defined as criteria or conditions that are neutral and that do not favor one enterprise or industry over another.  19 U.S.C. § 1677(5A)(D)(ii).  But, as Commerce found, the AAGEP and implementing rules establish explicit limitations that are *not* objective.  IDM at 23 (P.R. 132).  For example, as noted above, the rules clearly favor industries in trade-intensive or high production cost sectors over those with low international trade intensity or low production costs.  Thus, contrary to Hyundai Steel's argument, eligibility is not automatic and does, in fact, favor some enterprises or industries over others.  And, as with benefit and financial contribution, this Court upheld Commerce's determination of *de jure* specificity with regard to the similar EU

emissions program, holding that "{i}t is reasonably discernible that Commerce determined the restrictions of the carbon leakage list[4] to favor certain enterprises or industries or groups of certain industries or enterprises{,}" noting that "not all companies subject to the {emissions program} are eligible to be on the carbon leakage list." *BGH Edelstahl*, 600 F. Supp. 3d at 1264.

Because Hyundai Steel's arguments concerning the K-ETS program fail to establish that Commerce's determination was unlawful or unsupported by substantial evidence, this Court should deny Hyundai Steel's claim and sustain Commerce's determination.

IV.   Commerce's Determination That The Korean Government Did Not Subsidize Hyundai Steel By Providing Electricity For Less Than Adequate Remuneration Is Lawful And Supported By Substantial Evidence

On numerous occasions, this Court and the Court of Appeals for the Federal Circuit have sustained Commerce's methodology and conclusions that the Korean government has not provided a countervailable subsidy through the provision of electricity.  *See Nucor Corp. v. United States*, 927 F.3d 1249 (Fed. Cir. 2019); *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020);[5] *POSCO v. United States*, 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022); *Nucor Corp. v. United States*, No. 22-00050, 2023 WL 3016851 (Ct. Int'l Trade Apr. 19, 2023); *Nucor Corp. v. United States*, No. 22-00137, 2023 WL 3017970 (Ct. Int'l Trade Apr. 19, 2023).  Nucor has not provided a sufficient basis for a different result here.

In any event, substantial evidence and this Court's case law support Commerce's conclusion that the Korean government's supply of electricity to hot-rolled steel producers either

---

[4]  Eligibility for the additional free allowances under the EU program was determined by companies on a carbon leakage list.  *BGH Edelstahl*, 600 F. Supp. 3d at 1264.

[5]  The Federal Circuit in *POSCO* remanded to consider certain issues, in particular to consider data regarding the Korea Power Exchange (KPX), which Commerce did on remand back to this Court, and has done in the underlying review.

provided no benefit or a non-measurable benefit.  Nucor contends that Commerce ignored

evidence showing that Korean market prices are not governed by market principles, are

otherwise "distorted," and do not reflect the cost of production plus an amount for profit.  Nucor

Br. at 12-22.  Substantial evidence, however, supports Commerce's conclusion that electricity

pricing "is based on price-setting methodologies that aim to ensure companies in the chain are

able to cover their costs, as well as a rate of profit."  IDM at 45; PDM at 25.  Thus, Nucor's

disagreement does not satisfy its burden of establishing the cited evidence "could lead

Commerce to reach one and only one reasonable outcome on the administrative record."  *Uttam

Galva Steel Ltd. v. United States,* No 21-2119, 2022 WL 1419596, at *4 (Fed. Cir. May 5, 2022).

Moreover, this Court recently considered, and rejected, similar arguments made by Nucor

concerning the same program during the same period of review but for different subject

merchandise.  *See Nucor*, 2023 WL 3017970, at *3-5; *Nucor*, 2023 WL 3016851, at *3-5.

      A.      Record Evidence Supports Commerce's Conclusion That KEPCO's Prices Were
              Set In Accordance With Market Principles

There is no dispute that KEPCO is an "authority" for purposes of 19 U.S.C.

§ 1677(5)(B), and provides a financial contribution in the form of electricity under 19 U.S.C.

§ 1677(5)(D).  Thus, the only issue for this Court's consideration is whether electricity was

provided for less than adequate remuneration under Commerce's tier 3 benchmark analysis.

While Nucor disagrees with Commerce's conclusion that record evidence establishes that

KEPCO sets prices in accordance with market principles, Commerce identified record evidence

supporting its conclusions in a manner that was approved by the Federal Circuit in *Nucor*, 927

F.3d at 1254-55, and complies with the requirement to consider data from KPX, as discussed in

*POSCO*, 977 F.3d at 1377-78.  Indeed, this Court held recently that "Commerce's determination

regarding whether the prices paid by all companies . . . were consistent with market principles,

was in conformity with the relevant statute's instruction for Commerce to determine the adequacy of remuneration in relation to prevailing market conditions{.}" *Nucor*, 2023 WL 3016851, at *4.

In conducting its tier 3 benchmark analysis, Commerce analyzed whether electricity was provided for adequate remuneration by assessing whether the government price for electricity in Korea is consistent with market principles. PDM at 23. Noting that the applicable tariff schedule in effect during the period of review came into effect in November 2013, Commerce explained that it had previously evaluated the process and methodology to develop and approve that tariff schedule and "determined it was set according to market principles." *Id.* at 24 (citing *e.g., CTL Plate From Korea*, 82 Fed. Reg. 16,341 and accompanying IDM at cmt. 2). And, in those cases, Commerce determined that the "GOK had a pricing methodology in place and that it considered costs and a return on investment." *Id.* Analyzing record evidence submitted by the government of Korea, Commerce concluded that there were no changes from these prior findings and turned to whether KEPCO recovered its costs, including rates of return sufficient to ensure future operations, for the period of review. PDM at 24-25 (citing GOK Electricity NSA Questionnaire Response at 11-13, 22, Exhs. E-7, E-8, E-15, E-22, E-23, E-25 (C.R. 86-89)).

To determine whether KEPCO had recovered its costs, Commerce analyzed KEPCO's purchases of electricity from KPX. PDM at 25 (citing GOK Electricity NSA Questionnaire Response at 22 (C.R. 86)). In doing so, Commerce explained that in recent reviews, such as *CORE from Korea 2017*, 85 Fed. Reg. 15,112, it had examined KPX's prices in the context of an upstream subsidy allegation in which it "evaluated the marginal and capacity price and the adjusted coefficient under a Tier 3 analysis and found there was no benefit." PDM at 25. Commerce also stated that, in other reviews where the Korean government had provided

financial statements for the GENCOs, Commerce determined that each generating company

recovered its costs. *Id.* at 25 (citing *e.g., Certain Corrosion-Resistant Steel Products from the*

*Republic of Korea*, 85 Fed. Reg. 74,692 (Dep't of Commerce Nov. 23, 2020) and accompanying

PDM at "Attribution of Subsidies," *unchanged in Certain Corrosion-Resistant Steel Products*

*from the Republic of Korea*, 86 Fed. Reg. 29, 237 (Dep't of Commerce June 1, 2021) and

accompanying IDM at 9-10 and cmt. 1).  Commerce further stated that, after evaluating the

financial statements placed on the record of this review by the government of Korea, it continued

to find that each of the six GENCOs recovered its costs and the price that KEPCO paid KPX "is

inclusive of a rate of return."  PDM at 25 (citing GOK Electricity NSA Questionnaire Response

at 27-28, Exhs. E-5, E-18 (C.R. 86-88)).

Commerce then analyzed KEPCO's 2019 costs as reported to the Ministry of Trade,

Industry, and Energy (MOTIE) and supporting documentation, along with Hyundai Steel's

electricity usage data.  PDM at 25-27.  For return on capital, or rate of return, Commerce noted

that the Korean government had "provided the relevant regulation, formula, and calculation, and

tied each of the reported numbers in the formula to KEPCO's financial statements or source

documentation," which showed that "the rate of return is inclusive of KEPCO's reported costs to

MOTIE."  PDM at 26 (citing GOK Electricity NSA Questionnaire Response at 11-12, 32-36

(C.R. 86)).  From this information, Commerce was "able to trace the costs and the rate of return

to KEPCO's submitted cost data through to its recovered costs for each tariff classification."

PDM at 26.

Commerce then compared Hyundai Steel's reported industrial tariff rates to KEPCO's

cost data.  *Id.* at 27; *see also* Hyundai Steel Electricity NSA Questionnaire Response (C.R. 82-

85).  From this comparison, Commerce noted that while certain industrial rates recovered costs

and a rate of return, others did not.  PDM at 27 (citing Hyundai Steel Preliminary Calculation

Memo (P.R. 99; C.R. 99)).  For the rates that did not cover costs and a rate of return, Commerce

"determined a percentage amount that would enable cost recovery and a rate of return" and

multiplied this percentage amount "by the rates assigned to the applicable classification to

determine the amount each rate would need to be increased to allow for cost recovery and a rate

of return." *Id.*  This rate was then subtracted from the calculated rate to determine the benefit

per-unit rate, which was then multiplied by electricity volume for each rate on a monthly basis

and summed to determine the benefit.  PDM at 27.  Still, in calculating the benefit, Commerce

concluded that any benefit provided to Hyundai Steel was "non-measurable." *Id.*  Commerce's

methodology, exhaustively explained in this review and sanctioned by the courts, is consistent

with market principles and should be upheld, particular as Commerce has "'considerable prima

facie leeway to make a reasonable choice within the permissible range' of calculation

methodologies{.}" *Nucor*, 2023 WL 3016851, at *4 (quoting *Nucor*, 927 F.3d at 1255).

      B.    <u>Nucor's Assertion That The Korean Government's Pricing Data Is Distorted Fails</u>

      Nucor's argument that Commerce's decision is unsupported by substantial evidence,

Nucor Br. at 18-22, amounts to mere disagreement with the manner in which Commerce

analyzed the record evidence and an invitation to reweigh the evidence, neither of which satisfy

the burden under the substantial evidence standard of review.  *See Titan Tire Corp. v. Case New*

*Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009) (stating that the substantial evidence

standard is a "low evidentiary threshold") (citing *Consol. Edison*, 305 U.S. at 229); *Zhejiang*

*Quzhou Lianzhou Refrigerants Co. v. United States,* 350 F. Supp. 3d 1308, 1324 (Ct. Int'l Trade

2018) (explaining that "mere disagreement is not a sufficient basis to remand Commerce's determination").

Nucor contends that the cost data submitted by the Korean government does not reflect the actual cost of generating and supplying electricity because KPX and the government determine the prices that are paid to the generators. Nucor Br. at 20-21. But Commerce followed the Federal Circuit's guidance in analyzing KPX's standardized pricing system, which applies to all electricity generators in Korea, including the independent generators along with KEPCO and its six wholly-owned GENCOs. IDM at 45; PDM at 21-22. Commerce further explained that, in this system, the electricity price contains a marginal component, representing the variable cost of generating electricity, and a capacity component, representing fixed cost of generating electricity, as well as an "adjusted coefficient" for certain fuel types such as nuclear and coal and GENCOs. IDM at 45; PDM at 21-22.

Moreover, under the "merit order system," "the lowest generator's bid will receive a purchase order for its supply of electricity and the purchase orders will be issued to the next lowest bid until the supply for the given hour is met." PDM at 22. Thus, electricity generators that submit bids that exceed the system marginal price do not receive purchase orders to supply electricity for the hour. *Id.* Additionally, the adjusted coefficient prevents overpayment to generators with low fuel costs (*e.g.*, nuclear and coal), and maintains a differential between the expected rate of return between the GENCOs and KEPCO. PDM at 22; IDM at 45. Commerce explained that this pricing system "includes fixed and variable costs and, for the GENCOs and KEPCO, ensures the expected rate of return is suitably allocated between the GENCOs and KEPCO." IDM at 45. Commerce further noted that KEPCO must pay the GENCOs for the

"total cost of generating electricity, including interest on loans, even if KEPCO is not

profitable." *Id.* (citing GOK Electricity NSA Questionnaire Response at 26 (C.R. 86)).

Commerce also explained that it had previously analyzed the prices paid by KPX in prior

reviews, and concluded that those prices "are inclusive of a rate of return."  IDM at 45; PDM at

24-25 (citing *CORE from Korea*, 86 Fed. Reg. 29,237, and accompanying IDM at 9-10 and cmt.

1; *Seamless Carbon and Alloy Steel Standard Line and Pressure Pipe from the Republic of

Korea*, 86 Fed. Reg. 35, 267 (Dep't of Commerce July 2, 2021), and accompanying IDM at 9).

Commerce further pointed to prior evaluations of KPX's electricity prices and record evidence as

supporting the idea that "there is a pricing mechanism in place for KEPCO to acquire electricity

that does not confer a benefit."  IDM at 46; PDM at 24.  Accordingly, Commerce agreed with the

Korean government "that the wholesale and retail pricing is based on price-setting

methodologies that aim to ensure companies in the chain are able to cover their costs, as well as

a rate of profit."  IDM at 45-46; PDM at 25.  Therefore, Commerce reasonably determined that

the prices reported by the Korean government reflected the costs of electricity generation and

supply, and should continue to be the basis for Commerce's analysis.  IDM at 46.

Nucor claims that Commerce ignored "overwhelming record evidence" that undermines

its determination.  Nucor Br. at 21.  But Nucor completely fails to meaningfully address the

substantial record evidence that Commerce actually relied upon in its determination other than to

raise its disagreement with Commerce's conclusion that the Korean government's cost data

reflects market principles.  Commerce's references to other proceedings in which it consistently

concluded that the same tariff schedule was set in accordance with market principles, and

determined that KEPCO's and KPX's provision of electricity conferred no benefit because

KEPCO recovered its costs, which included a rate of return, were entirely appropriate.  PDM at

24-25; *see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 536 F. Supp. 3d 1333, 1343 (Ct. Int'l Trade 2021) (sustaining Commerce's LTAR analysis where it is "in line {} with prior determinations"). Finally, the Court, in rejecting a similar argument made by Nucor with regard to the provision of electricity, held that Nucor had failed to provide evidence substantiating its claims. *Nucor*, 2023 WL 3016851, at *6.

Nonetheless, even assuming Nucor had record support for its position, which it does not, this would be insufficient to demonstrate Commerce's determination lacked substantial evidence. Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Consol. Edison*, 305 U.S. at 229. That Nucor could reach a different conclusion does not establish that Commerce's determination is unsupported by substantial evidence. *Consolo*, 383 U.S. at 620. This Court should not depart from the recent *Nucor* decisions, in which the Court concluded that Commerce's determinations with regard to provision of electricity for LTAR were supported by substantial evidence because Commerce cited sufficient record documents showing that the respondents did not receive a measurable benefit. *See Nucor*, 2023 WL 3016851, at *6; *Nucor*, 2023 WL 3017970, at *6.

C.    Commerce's Application of Its Tier 3 Benchmark Is In Accordance With Law

Nucor fails to demonstrate that Commerce's application of its tier 3 benchmark is unlawful. Nucor contends that Commerce erred in focusing on the aggregate performance of the government supplier rather than the prices paid by the respondents and that Commerce failed to adhere to its methodology when evaluating whether prices were set in accordance with market principles as set forth in the remand in *POSCO v. United States*, Consol. Ct. No. 17-00137 (March 16, 2021). *Id.* Nucor's arguments are unpersuasive. Although Nucor might prefer a different approach, its subjective preferences are insufficient to show that Commerce's interpretation is not "a reasonable choice within the range permitted by the statutory words."

31

*Nucor*, 927 F.3d at 1248 (citing *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014)). And, again, this Court recently rejected a nearly identical argument from Nucor, holding that the statute "does not require that Commerce focus on the prices that the respondents actually paid KEPCO for electricity" and that Commerce satisfied its statutory mandate to determine an individual countervailable subsidy rate for each known exporter or producer of subject merchandise by determining an individual rate for the examined respondents. *Nucor*, 2023 WL 3016851, at *4.

Commerce lawfully applied its tier 3 benchmark by examining the electricity prices set by KEPCO after evaluating whether those prices allowed for the recovery of costs, plus a rate of recovery or profit. IDM at 43. As noted above, the Federal Circuit has sustained this approach in *Nucor*, 927 F.3d at 1254-55, and did not further question it in *POSCO*, 977 F.3d 1369, other than requiring Commerce to examine both KEPCO and KPX, which Commerce did in this review. In the proceeding underlying *Nucor*, Commerce evaluated whether KEPCO's prices for electricity "do not fully reflect its actual costs of the electricity that it transmits and distributes to its customers in Korea" and concluded that "KEPCO's standard pricing mechanism used to develop its tariff schedule was based upon its costs." *Nucor*, 927 F.3d at 1247. In doing so, Commerce examined how KEPCO: (1) calculated its overall costs, including how it distributed the overall cost according to the stage of providing electricity, (2) divided costs into fixed and variable costs, and (3) calculated the cost by applying the "electricity load level, peak level, and the patterns of consuming electricity." *Id.* Commerce then explained that each cost was then distributed into the fixed charge and the variable charge and divided taking into consideration the electricity load level, the usage pattern, and the volume of electricity consumed and costs were then distributed according to the "number of consumers for each classification of electricity." *Id.*

In affirming Commerce's conclusion that "KEPCO's pricing met familiar standards of cost recovery," the Federal Circuit found "no reversible error in Commerce's decision to rely on that combination of facts as sufficient to meet the 'adequate remuneration' standard." *Nucor*, 927 F.3d at 1254.  Furthermore, the court explained that its holding—that Commerce must "ensur{e} that the government authority's price is not too low considering what the authority is selling"—was "limited in constraining Commerce" and left "a large range of potential implementation choices." *Id.*

The only difference between Commerce's analysis of cost recovery here and in *Nucor* is that, here, Commerce also "investigate{d} and consider{ed} KPX's impact on the Korean electricity market," and examined data and information regarding KPX, as directed in *POSCO*, 977 F.3d at 1377-78.  PDM at 21-27; IDM at 42-47.  As Commerce explained, its tier 3 benchmark analysis "assesses whether the electricity prices charged by KEPCO are consistent with market principles by evaluating the electricity prices to see if they allow for the recovery of costs, plus a rate of recovery or profit."  IDM at 43.  Thus, if electricity prices are in accordance with market principles, then Commerce will find that no benefit is conferred.  *Id.*

Here, Commerce concluded that some electricity prices were in line with market principles, but others were not.  *Id.*  For those that were not, Commerce calculated a benefit amount, which it concluded was non-measurable.  *Id.*  Commerce also explained that Hyundai Steel reported paying electricity prices that are listed on KEPCO's electricity rate schedule, and that supporting documentation indicated that Hyundai Steel's operations were classified under the correct electricity consumption categories.  *Id.* (citing GOK Electricity NSA Questionnaire Response at Exh. E-9 (C.R. 87); Hyundai Steel Electricity NSA Questionnaire Response Exhs. NSA-2, NSA-3 (C.R. 82)).

Nucor is mistaken in suggesting that, in determining that the Korean government's
provision of electricity did not confer a measurable benefit upon Hyundai Steel, Commerce acted
inconsistently with its remand redetermination in *POSCO* (which was ultimately sustained by
this Court).  Nucor Br. at 2.  As Commerce explained in the final results, Nucor takes the
discussion in the *POSCO* remand out of context.  IDM at 43.  In the *POSCO* remand, Commerce
stated:

> When the rate charged is consistent with the standard pricing
> mechanism (in this case, the electricity tariffs charged to the
> respondent covers cost plus a return) and the respondent is treated
> no differently than other companies that purchase comparable
> amounts of electricity (in this case, the rate charged to the
> respondent is from the correct tariff classification based on its
> contract demand for electricity and voltage for that electricity
> consumption, as this is a market condition for the provision of
> electricity in Korea), there is no benefit within the meaning of
> section 771(5)(E) of the Act. In other words, if the tariff charged to
> the respondent does not cover 'cost of production' plus 'a
> profitable return on the investment,' which is the same standard set
> forth in KEPCO's standard pricing methodology, then the
> respondent has received a countervailable benefit under section
> 771(5)(E) of the Act. Moreover, even in the event that the tariff
> charged to the respondent covers 'costs of production' plus 'a
> profitable return on the investment,' there is still a countervailable
> benefit conferred under the statute if KEPCO charges the
> respondent less than what it should be charged under its designated
> tariff classification.

IDM at 43-44 (quoting *POSCO* Remand Results at 30, No. 17-137, ECF No. 119 (Ct. Int'l Trade
Jan. 13, 2020).  Commerce's analysis in this review is consistent with its approach in the *POSCO*
remand results.  IDM at 44.  Here, as in the *POSCO* remand, Commerce's tier 3 benchmark
analysis reviewed whether KEPCO's electricity tariffs covered both cost recovery and a rate of
return.  *Id.* at 45.  Moreover, Commerce's methodology as applied in this case is consistent with
its approach in other determinations.  IDM at 16 (P.R. 132) (citing, *e.g.*, *Certain Cold-Rolled*

*Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38, 361 (Dep't of Commerce June 26, 2020), and accompanying IDM at cmt. 1).

Nucor argues that Commerce's determination is unlawful because it focuses on the financial performance of KEPCO rather than the prices paid by the respondents.[6]  Nucor Br. at 14-17.  Nucor cites, in supports of its proposition, two Commerce determinations and one case from this Court:  (1) *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008) and accompanying IDM at 65; (2) *Light-Walled Rectangular Pipe & Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008) and accompanying IDM at 36; (3) *U.S. Steel Corp v. United States*, 33 CIT 1935, 1944 n.10 (2009).  Nucor Br. at 16.  However, *none of these matters involve a tier 3 benchmark analysis*.  Instead, they relate to decisions to disregard prices in a tier 1 or tier 2 benchmark analysis.  IDM at 44.

For example, *U.S. Steel* concerned a tier 1 analysis in which Commerce relied on "actual transactions in the country" vis-à-vis "market-determined prices" to determine that iron ore was being sold for less than adequate remuneration.  *U.S. Steel*, 33 CIT at 1944-45.  In reaching its determination, Commerce rejected the respondent's assertion that, because the Indian governmental agency covered its costs, the ore was not sold for less than adequate remuneration. *Id.*  That case is inapposite, as here Commerce determined not only that KEPCO recovered its costs; it also determined that the generators selling to KPX recouped their costs plus a return on investment.  PDM at 25.

---

[6]  Again, the Court considered, and rejected, the same argument by Nucor in two recent decisions.  *See Nucor*, 2023 WL 3016851, at *3-4; *Nucor*, 2023 WL 3017970, at *3-4.

Unlike the decisions on which Nucor relies, in a tier 3 benchmark analysis, no data exists to permit Commerce to examine "actual transactions in the country" vis-à-vis "market-determined prices" (tier 1) or a "world market price . . . available to purchasers in the country in question" (tier 2).  Thus, Commerce "measure{d} the adequacy of remuneration by assessing whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  It is unclear how Commerce could determine that the "government price is consistent with market principles" *without* examining "the aggregate performance of the government supplier."  Nucor Br. at 2.

Nucor also repeatedly insists that Commerce's determination is fatally flawed because it does not discuss the prices paid by Hyundai Steel.  Nucor Br. at 2, 14.  But, in the context of a tier 3 analysis, Commerce is necessarily without the benefit of "market-determined" or "world market" prices to which it can compare the prices paid "by the respondent."  In fact, circumstances such as this are precisely *why* Commerce developed the tier 3 analysis—without benchmark prices to rely upon, Commerce examines whether prices are set "in accordance with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  Commerce thus determined that the tariff schedule is set in accordance with market principles and that respondents paid the correct market principle-derived tariff.  Nothing more is required.  Furthermore, as Commerce noted in the final results, an evaluation of "an entity's financial position has consistently been part of {Commerce}'s analysis when assessing whether KEPCO's pricing is consistent with market principles" and was sustained in by the Federal Circuit as "within the bounds of what 19 C.F.R. § 351.511(a)(2)(iii) proposes."  IDM at 44 (citing *Nucor*, 927 F.3d at 1243).

In addition, Commerce's tier 3 benchmark analysis is not based upon KEPCO's total revenue, but rather "KEPCO's methodology for determining the adequacy of its pricing through

cost and revenue data." IDM at 44-45; PDM at 24.  Consequently, Commerce's analysis relates to financial performance only to the extent income from prices charged for each electricity consumption category covers KEPCO's costs, plus profit.  IDM at 45; PDM at 24.  And, "{b}ecause . . . Hyundai Steel paid electricity prices that are charged to all companies in the corresponding electricity consumption classifications, Commerce's analysis does, in fact, account for whether the prices {respondents} paid were covering KEPCO's costs."  IDM at 45.

Finally, there is no merit to Nucor's contention that Commerce's tier 3 analysis is unlawful because it allows the Korean government to subsidize certain customers while recouping losses through charging higher prices to other companies.  As explained above, the prices paid by Hyundai Steel are those set by KEPCO's electricity rate schedules.  IDM at 47. As Commerce explained in the final results, its "analysis is not conducting a preferentiality or discrimination analysis but, rather, is relied on to understand the methodology used to develop the electricity rate schedule and whether the rates that are charged in the electricity classifications reported by the respondents are consistent with market principles."  IDM at 47. Nucor has identified no reversible error in this approach.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the final results in their entirety and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                                   s/Sosun Bae
HENDRICKS VALENZUELA                          SOSUN BAE
Attorney                                      Senior Trial Counsel
U.S. Department of Commerce                   U.S. Department of Justice
Office of the Chief Counsel for Trade         Civil Division
    Enforcement and Compliance                Commercial Litigation Branch
1401 Constitution Avenue, NW                  P.O. Box 480
Washington, D.C. 20230                        Ben Franklin Station
Tel: (240) 449-5852                           Washington D.C. 20044
Email: Hendricks.Valenzuela@trade.gov         Tel: (202) 305-7568
                                              Fax: (202) 305-7644
                                              Email: Sosun.Bae@usdoj.gov


April 28, 2023                                Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant this Court's March 6, 2023 order, ECF No. 33, that this brief contains 11,177 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).


<u>s/Sosun Bae</u>
Sosun Bae

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of April, 2023, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

<u>/s/ Sosun Bae</u>
Sosun Bae