## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, )<br><br>Plaintiff, )<br><br>NUCOR CORPORATION, )<br><br>Consolidated-Plaintiff, )<br>v. )<br><br>UNITED STATES )<br><br>Defendant, )<br><br>and )<br><br><br>NUCOR CORPORATION, and )<br>GOVERNMENT OF THE REPUBLIC )<br>OF KOREA, )<br><br>Defendant-Intervenors. ) | Before: Hon. Mark A. Barnett,<br>Chief Judge<br><br>Consol. Court. No. 22-00170<br><br>NONCONFIDENTIAL<br><br>Business Proprietary Information<br>Removed from Pages 3, 15, 18,<br>19, 20, and 23. |

**DEFENDANT-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN OPPOSITION TO CONSOLIDATED-PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic
of Korea*

Dated: May 19, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ...........................................................................................................1

ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED ...........................1

STATEMENT OF ISSUES ..............................................................................................1

STATEMENT OF FACTS ...............................................................................................1

STANDARD OF REVIEW ..............................................................................................4

ARGUMENT ..................................................................................................................5

I.      Commerce's Assessment Of The Adequacy Of Remuneration Is Lawful ........................6
        A.      Commerce Has Discretion in Deciding How to Assess the Adequacy of
                Remuneration ..............................................................................................6
        B.      Commerce's Approach Is Lawful ...............................................................7

II.     Commerce's Findings Regarding The Adequacy Of Remuneration Are Supported
        By Substantial Evidence ...........................................................................................14
        A.      Record Evidence Demonstrates that the Korean Electricity Market Is
                Governed by Market Principles ....................................................................15
        B.      The Costs Upon Which Commerce Relied Are Not Tainted ..................................17
        C.      The Government Prices Charged to Hyundai Steel Reflected the Cost of
                Electricity Generation Plus a Return on Investment ............................................19

CONCLUSION .............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ................................................................................. 5

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).............. 4

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ................................................................. 15

*CS Wind Viet. Co. v. United* States, 832 F.3d 1367 (Fed. Cir. 2016) .............................................. 4

*Hyster Co. v. United States*, 858 F. Supp. 202 (Ct. Int'l Trade 1994)............................................ 13

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016).................................. 4, 5

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019)....................................... 7, 8, 12, 14

*Nucor Corp. v. United States*, No. 22-00050, 2023 Ct. Intl. Trade LEXIS 56 (Ct. Int'l Trade Apr. 19, 2023) .................................................................................................... 9, 11, 16

*Nucor Corp. v. United States*, No. 22-00070, 2023 Ct. Intl. Trade LEXIS 65 (Ct. Int'l Trade Apr. 28, 2023) ................................................................................................... passim

*Nucor Corp. v. United States*, No. 22-00137, 2023 Ct. Intl. Trade LEXIS 58 (Ct. Int'l Trade Apr. 19, 2023) .................................................................................................... 9, 11, 16

*POSCO v. United States*, 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ........................................ 11

*POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) ..................... 11, 13, 14, 20

*POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) ........................... 11, 12, 23

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ............................................................. 5

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .................................................. 5

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ..................................................................... 5

*Verizon Commc'ns Inc. v. FCC,* 535 U.S. 467 (2002) ................................................................. 14

**STATUTES**

19 C.F.R. § 351.511(a)(2)(iii) ..................................................................................................... 8

19 U.S.C. § 1516a(b)(1)(B)(i).................................................................................................... 4

19 U.S.C. § 1677(5)(E)(iv) ..................................................................................... 6, 8, 12, 16

28 U.S.C. § 1581(c) ................................................................................................................... 4

**ADMINISTRATIVE DETERMINATIONS**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ......................................................................................... 10

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) ..................................................................................................... 1, 8

*Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) ................................................................................................................ 10

*Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) .. 10

**REGULATIONS**

19 C.F.R. § 351.503(b)(1) .................................................................................... 9

19 C.F.R. § 351.511(a)(2) ................................................................................. 6, 7

19 C.F.R. § 351.511(a)(2)(i) ............................................................................ 9, 21

19 C.F.R. § 351.511(a)(2)(ii) .......................................................................... 9, 21

**OTHER AUTHORITIES**

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ..................................... 7, 11, 12, 16

## INTRODUCTION

This brief is submitted on behalf of the Government of the Republic of Korea ("GOK") in response to the arguments raised by Consolidated-Plaintiff, Nucor Corporation ("Nucor"), relating to alleged errors of law and analysis committed by the U.S. Department of Commerce ("Commerce") in the 2019 administrative review of the countervailing duty ("CVD") order on Hot-Rolled Steel Flat Products ("HRS") from the Republic of Korea.  *See* Consol. Pl. Nucor Corp.'s Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 27 ("Nucor Br.").

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Nucor challenges certain aspect of Commerce's final results in the 2019 administrative review of the CVD order on HRS, published as *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) (P.R.133) ("*Final Results*").

## STATEMENT OF ISSUES

1.      Whether Commerce's assessment of the adequacy of remuneration for electricity provided by the GOK is in accordance with law.

2.      Whether Commerce's determination that the GOK did not subsidize Hyundai Steel Company ("Hyundai Steel") through the provision of electricity for less than adequate remuneration ("LTAR") is supported by substantial evidence on the record.

## STATEMENT OF FACTS

The GOK adopts Defendant the United States' ("the Government's") statement of facts as they relate to the GOK's provision of electricity but provides additional relevant facts.

During the underlying proceeding, the GOK responded to questions from Commerce addressing its alleged provision of electricity for LTAR.  Letter from Yoon & Yang to Sec'y of Commerce, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No.

1

C-580-884:  GOK's Electricity New Subsidy Allegation Questionnaire Response" (Aug. 12, 2021) ("GOK NSA QR") (C.R.80-81, 86-90/P.R.84-86); Letter from Yoon & Yang to Sec'y of Commerce, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  GOK's First Supplemental Questionnaire Response" (Sept. 17, 2021) ("GOK SQR") (C.R.95-96/P.R.93).  In its responses, the GOK noted that most electricity in Korea is generated by six subsidiaries of the Korea Electric Power Company ("KEPCO") referred to as "GENCOs," although some electricity is also generated by independent power generators and community energy systems.  GOK NSA QR at 3-5 (C.R.86/P.R.84).  However, none of these generation companies transmits or distributes electricity to consumers, as KEPCO is the exclusive supplier of electricity in Korea.  *Id.* at 3-4.  KEPCO purchases electricity from the generation companies via the Korea Power Exchange ("KPX") market for distribution to the ultimate customer.  *Id.* at 3.

The GOK also provided information establishing that the tariff schedule used by KEPCO during the period of review ("POR") set electricity prices sufficient to cover costs, including those related to electricity generation, plus profit.  The GOK noted that KEPCO is legally required to establish tariff rates at levels that recover the aggregate costs for supplying electricity.  *Id.* at 6-9.  Further, record evidence established that, in 2019, KEPCO earned revenue sufficient to cover costs (including for the generation of electricity), plus profit.  *Id*. at 9.  First, the GOK provided information related to KEPCO's operating expenses (i.e., cost to purchase electricity, labor costs, and other fees not related to the sales of electricity), and demonstrated how its income covers its costs plus profit.  *Id.* at 11-15 (C.R.86/P.R.84), Exhibit E-22 (C.R.90/P.R.86).  The GOK detailed how KEPCO calculates its return on capital (i.e., rate of return).  *See id.* at 32-34; GOK SQR at 22-28 (C.R.95/P.R.93).  Additionally, the GOK submitted an outside audit

NONCONFIDENTIAL

report of KEPCO's overall cost for electricity.  GOK NSA QR at Exhibit E-24 (C.R.90).  Based

on this information, the GOK demonstrated that KEPCO's cost recovery rate in 2019 for

[                                                                              ].  GOK NSA QR at 13-15

(C.R.86/P.R.84), Exhibit E-22 (C.R.90/P.R.86).

     The GOK also provided information regarding the prices at which KEPCO purchases

electricity from the KPX to demonstrate that these prices were sufficient to cover the cost of

electricity production, plus profit for the electricity generators.  This price is determined by a

formula: (1) the marginal price, which is the amount calculated to compensate the generation

companies for fuel costs, the principal component of the variable costs of generating electricity;

(2) the capacity price, which is calculated to compensate the generation companies for fixed

costs related to constructing generation facilities; and (3) the adjustment coefficient, which is

calculated to prevent KEPCO's overpayment to certain generation companies with low fuel costs

and to maintain a differential between the expected rate of return between the GENCOs and

KEPCO.  GOK NSA QR at 22-25 (C.R.86/P.R.84).

     Finally, the GOK provided information substantiating that the price at which KEPCO

purchased electricity via the exchange was sufficient to compensate the GENCOs.  The GOK

first noted that KEPCO is legally required to pay the GENCOs the amount to (i) recover their

total costs (including fuel, maintenance, and administrative costs) and (ii) pay their interest for

loans.  GOK SQR at 18 (C.R.95/P.R.93).  The GOK explained [

     ].  *Id.* at 19-20; GOK NSA QR at 30-31 (C.R.86/P.R.84).  The GOK also placed the

financial statements of the six GENCOs on the record.  GOK NSA QR at Exhibit E-18

(C.R.89/P.R.85).

Mandatory respondent Hyundai Steel also responded to Commerce's questions regarding the alleged provision of electricity for LTAR.  Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  Hyundai Steel's Electricity New Subsidy Allegation Questionnaire Response" (Aug. 12, 2021) ("Hyundai Steel NSA QR") (C.R.82-85/P.R.83); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  Hyundai Steel's Supplemental Questionnaire Response" (Sept. 16, 2021) ("Hyundai Steel SQR") (C.R.94/P.R.92).  Hyundai Steel explained which tariff classifications covered its purchases of electricity and provided the tariff rates applied to its electricity purchases, the total amount purchased at different rates (by month and time), and total amount paid to KEPCO.  Hyundai Steel NSA QR at 1-3, Exhibits NSA-7 (C.R.82/P.R.83), NSA-9 (C.R.85/P.R.83)).

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *CS Wind Viet. Co. v. United* States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (internal quotation marks omitted).

The Court reviews Commerce's interpretation of the statutes it administers under the two-step framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016).  The Court first "must determine whether Congress has directly spoken to the precise question at issue."  *Id.* (internal quotation marks omitted).  If it has, the Court "must give effect

to the unambiguously expressed intent of Congress." *Id.* (internal quotation marks omitted).  If it has not, Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).  In such circumstances, "{a}ny reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

The Court must also ensure that Commerce complied with its own regulations, but defers to Commerce's "interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of {Commerce}'s intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).

In terms of Commerce's choice of methodology in reaching its conclusions under the CVD law, "{a}s long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

## ARGUMENT

As the Government observed in its brief, this Court has repeatedly upheld Commerce's conclusions that the GOK's provision of electricity does not confer a benefit to industrial users, including in cases involving the same review period as the administrative review challenged in this action.  *See* Def.'s Resp. to Pls' Mots. for J. on the Agency R. at 24-25, 31-32, ECF No. 34. Since the Government filed its brief, this Court has once again concluded that Commerce's determination that the GOK's provision of electricity did not provide a countervailable subsidy

was in accordance with the law and supported by substantial evidence, notwithstanding the objections of Nucor. *Nucor Corp. v. United States*, No. 22-00070, 2023 Ct. Intl. Trade LEXIS 65 (Ct. Int'l Trade Apr. 28, 2023) (*Nucor I*). Nucor has not presented novel arguments or facts that would justify a different result in this case. The Court should therefore sustain Commerce's determination that the GOK's provision of electricity to Hyundai Steel did not confer a countervailable benefit.

## I. COMMERCE'S ASSESSMENT OF THE ADEQUACY OF REMUNERATION IS LAWFUL

Nucor argues that Commerce's determination that the GOK did not provide electricity for LTAR was unlawful. Nucor Br. 12-17. Nucor fails to show that Commerce's finding is inconsistent with the statute or regulation.

### A. Commerce Has Discretion in Deciding How to Assess the Adequacy of Remuneration

Under the statute, "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). The statute further directs that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review." *Id.* "Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* The statute does not define what constitutes "adequate remuneration."

Commerce issued regulations regarding how it will determine whether remuneration is adequate, setting forth a three-tiered, hierarchical approach. 19 C.F.R. § 351.511(a)(2). This case involves Commerce's "tier-iii" methodology, under which Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent

with market principles." *Id.* The regulation, however, does not specify how Commerce will make that assessment. When it issued the regulation, Commerce explained that, "in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) ("*Preamble*"). Commerce further stated that

> we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.

*Id.* These statements in the *Preamble* reflect a focus on how the price "was set" and demonstrate that Commerce did not intend to adopt a rigid framework for assessing "whether the government price was set in accordance with market principles." *Id.*

The Court of Appeals for the Federal Circuit ("Federal Circuit") held that the statute and Commerce's implementing regulation require "ensuring that the government authority's price is not too low considering what the authority is selling." *Nucor Corp. v. United States*, 927 F.3d 1243, 1254 (Fed. Cir. 2019). The Federal Circuit also emphasized that this principle still "leaves a large range of potential implementation choices." *Id.* "Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations." *Id.* at 1255.

**B.    Commerce's Approach Is Lawful**

Commerce assessed whether the government price was consistent with market principles by determining whether the electricity prices charged by KEPCO allow for the recovery of costs, plus profit. Memorandum from James Maeder to Lisa Wang, "Issues and Decision

Memorandum for the Final Results of the 2019 Administrative Review of the Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Korea" (May 3, 2022) ("*Final IDM*") at 42-43 (P.R.132).  Specifically, Commerce examined the electricity rates and costs for the tariff classification applicable to Hyundai Steel.  Memorandum from James Maeder to Ryan Majerus, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review, 2019: Certain Hot-Rolled Steel Flat Products from the Republic of Korea" (Oct. 29, 2021) ("*Preliminary IDM*") at 26-27 (P.R.98).  Nucor does not show that Commerce's methodology falls outside the "large range" of permissible choices for implementing the statutory and regulatory standard.  *Nucor Corp.*, 927 F.3d at 1254-55.

Nucor asserts that the "the statute, Commerce's regulations, and the agency's established practice confirm that the basis of the LTAR benefit analysis is the price actually paid by the respondent to the government supplier for the input under consideration."  Nucor Br. 14; *see also id.* at 12-14.  Nucor then claims that Commerce "ignored the prices paid by Hyundai Steel to the government supplier in determining whether a benefit exists," *id.* at 14, which Nucor argues is unlawful, *id.* at 14-17.  Nucor's arguments are flawed.

First, the authorities cited by Nucor do not address how Commerce is to determine whether goods "are provided for less than adequate remuneration" pursuant to 19 U.S.C. § 1677(5)(E)(iv) under the tier-iii methodology, 19 C.F.R. § 351.511(a)(2)(iii).  Nucor cites the statutory requirement that Commerce determine "individual countervailable subsidy rates."  Nucor Br. 12 (quoting 19 U.S.C. § 1677f-1(e)).  This provision does not address how Commerce should determine whether remuneration is adequate, and Commerce complied with this provision by calculating an individual rate for Hyundai Steel in the *Final Results*.  *Final Results*, 87 Fed. Reg. at 27,570 (showing that Commerce calculated subsidy rate of 0.56% for Hyundai Steel); *see*

*also Nucor Corp. v. United States*, No. 22-00050, 2023 Ct. Intl. Trade LEXIS 56, at *10 (Ct. Int'l

Trade Apr. 19, 2023) (*Nucor II*) (noting that the "language of 19 U.S.C. § 1677f-1(e) does not

require that Commerce focus on the prices that the respondents actually paid to KEPCO for

electricity, as alleged by Nucor," but instead "refers to the requirement that Commerce determine

an individual countervailable subsidy rate for each known exporter or producer of the subject

merchandise, which Commerce satisfied" when it determined a separate countervailable subsidy

rate for each respondent); *Nucor Corp. v. United States*, No. 22-00137, 2023 Ct. Intl. Trade

LEXIS 58, at *9 (Ct. Int'l Trade Apr. 19, 2023) (*Nucor III*).  As it did in the reviews at issue in

*Nucor II* and *Nucor III*, Commerce in the *Final Results* considered the specific tariff rates

applicable to Hyundai Steel and then used the company's actual electricity purchases and sales

information to calculate a benefit amount (which Commerce ultimately determined to be non-

measurable) when Commerce found that certain tariff rates were not set consistent with market

principles, thereby satisfying the requirements of 19 U.S.C. § 1677f-1(e).  *See Preliminary IDM*

at 26-27 (P.R.98); Memorandum from Kelsie Hohenberger to Robert Galantucci, "Calculations

for the Preliminary Results:  Hyundai Steel" (Oct. 29, 2021) at 5-6 and Attachment II (C.R.99-

100/P.R.99).

Nucor also cites 19 C.F.R. § 351.503(b)(1) and § 351.511(a)(2)(i)-(ii).  Section

351.503(b)(1) describes how Commerce will measure the benefit for programs not addressed

elsewhere in its regulations.  Section 351.503(a) provides that, if there is a specific rule for

measuring a benefit elsewhere in its regulations, then Commerce "will measure the extent to

which a financial contribution . . . confers a benefit as provided in that rule."  Commerce has a

separate regulation specifically providing for its tier-iii methodology, and thus § 351.503(b)(1) is

irrelevant.  Nucor's citations to § 351.511(a)(2)(i)-(ii) are similarly inapposite, because they

describe Commerce's tier-i and tier-ii methodologies, wherein Commerce's first step is to select a price as a benchmark to measure the adequacy of remuneration. This case involves Commerce's application of the tier-iii methodology, which applies when such prices are not available.

Nucor's case law citations similarly do not support Nucor's argument. First, Nucor mainly cites cases involving the tier-i or tier-ii methodologies, which are misplaced. As Commerce previously explained, the tier-iii methodology is distinct and "more complicated" than the other methodologies "because *the Department is no longer solely examining prices, but assessing how the government sets it prices* and whether the mechanism by which it determines its prices is consistent with market principles." *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), accompanying Issues and Decision Memorandum at 17-18 (emphasis added). This Court similarly found Nucor's reliance on cases involving tier-i and tier-ii methodologies to be misplaced when challenging Commerce's tier-iii analysis. *Nucor I*, 2023 Ct. Intl. Trade LEXIS 65, at *16-17.

Nucor also cites *Certain Cold-Rolled Steel Flat Products from the Russian Federation* as well as *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007), and *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015), which at least involved the tier-iii methodology. Nucor Br. 13-14. But the cited passages discuss how Commerce constructed a benchmark in order to calculate a benefit amount *after* Commerce determined that government prices were not set consistent with market principles, not Commerce's threshold assessment of whether the government set prices in a manner consistent with market principles. In any event, the *Preamble* makes clear that Commerce intended to retain flexibility as to how it would apply the tier-iii methodology. Thus,

Commerce's approach for constructing a particular benchmark in those cases in no way precludes the methodology that Commerce adopted in this case, and this Court similarly has determined that Nucor's reliance on these cases is misplaced. *See Nucor I*, 2023 Ct. Intl. Trade LEXIS 65, at \*16-17.

The only directly relevant case that Nucor cites is Commerce's remand results in the *POSCO* litigation. Nucor Br. 12. Ultimately, Commerce applied fundamentally the same methodology for assessing whether the setting of government prices was consistent with market principles in that case as in this case, and Commerce's remand results were upheld by this Court. *See Final IDM* at 43-44 (P.R.132); *POSCO v. United States*, 556 F. Supp. 3d 1364, 1370-71 (Ct. Int'l Trade 2022). Commerce has employed a similar framework to analyze KEPCO's pricing in other Korea CVD cases, which likewise have been sustained. *See Final IDM* at 43-44 (P.R.132); *see also POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) (sustaining analysis of whether electricity rates were set consistent with market principles based on KEPCO's cost recovery); *POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) (same); *Nucor I*, 2023 Ct. Intl. Trade LEXIS 65; *Nucor II*, 2023 Ct. Intl. Trade LEXIS 56; *Nucor III*, 2023 Ct. Intl. Trade LEXIS 58.

Second, Nucor fails to acknowledge Commerce's explanation for how it would apply its tier-iii methodology when it issued the regulation. Commerce explained that it would look at how "the government price was established." *Preamble*, 63 Fed. Reg. at 65,378. Electricity prices are not set specifically for Hyundai Steel. Rather, the tariff rates paid by Hyundai Steel were generally applicable to the companies in the same electricity consumption classifications, and prices were established for those classifications. Among the factors that Commerce said it might consider in a tier-iii analysis were "the government's price-setting philosophy" and "costs

(including rates of return sufficient to ensure future operations)." *Id.* Given that the rates are broadly applicable, it is unclear how Commerce could examine the government's "price-setting philosophy" without looking at how the rates were set generally. The Federal Circuit also upheld Commerce's use of a tier-iii analysis to determine the adequacy of remuneration for electricity based on "familiar standards of cost recovery" similar to the one employed in this case. *See Nucor Corp.*, 927 F.3d at 1254. As electricity rates were established for the classification instead of individual companies, it was reasonable and appropriate for Commerce to consider the GOK's price-setting philosophy and its costs as they related to each tariff classification generally in assessing whether prices charged for electricity constituted adequate remuneration.

Nucor also asserts that "Commerce's methodology gives governments *carte blanche* to engage in harmful cross-subsidization." Nucor Br. 17. As explained further in Section II, *infra*, Korean electricity prices (and electricity prices generally) are affected by supply and demand considerations that vary over the course of a day and year. Nucor's comparison of certain off- and mid-peak purchases made by Hyundai Steel—the prices for which would be affected by the time of day and time of year when electricity was consumed—to a single, annual average cost ignores prevailing market conditions for electricity in Korea that distort such a comparison. The statute demands that "the adequacy of remuneration shall be determined in relation to prevailing market conditions." 19 U.S.C. § 1677(5)(E)(iv). As this Court has found, setting lower rates for lower demand periods is consistent with this principle. *POSCO*, 581 F. Supp. 3d at 1281; *see also Nucor Corp. I* at *16 fn. 12, *21-22 (rejecting Nucor's analysis that compared respondent's off-peak and mid-peak prices to annual overall average cost of supply).

Moreover, Hyundai Steel was subject to the same rate structure as the other industrial users in the classifications analyzed by Commerce, and it purchased electricity during on-peak,

mid-peak, and off-peak periods.  Hyundai Steel NSA QR at Exhibit NSA-7 (C.R.82/P.R.83); *Preliminary IDM* at 27 (P.R.98).  Nucor makes no claims that that there is cross-subsidization between industrial users.  Further, it stretches logic to conclude that the GOK is cross-subsidizing Hyundai Steel *by charging the same prices* to other, similarly situated electricity customers.  Under Nucor's theory, the same tariff rates paid by Hyundai Steel would constitute excessive remuneration when charged to other industrial users, which is nonsensical, as has already been found by this Court.  *See Nucor I*, 2023 Ct. Intl. Trade LEXIS 65, at *14-15 (noting that "Nucor appears to suggest that the GOK is 'engag{ing} in harmful cross-subsidization' within the industrial tariff classification schedule," but rejecting this premise because the respondent "paid the same tariff rates as other industrial users that purchased electricity during off-peak, mid-peak, and on-peak hours").  Commerce's evaluation of those broadly applicable rates based on the classification level as a whole was reasonable.

Commerce's apples-to-apples comparison of average annual costs and average annual prices allowed it to determine that the rates paid by Hyundai Steel, which are the same rates paid by other companies in its classifications, were based on market principles and thus reflected adequate remuneration for the electricity provided.  Although Nucor "may have preferred for Commerce to have used a different analytical model," Commerce's methodology "permitted it to make the necessary statutory findings," and "it is Commerce, as the administering agency, that is to determine the analytical approach to establish whether a countervailable subsidy exists." *POSCO*, 557 F. Supp. 3d at 1301; *cf. Hyster Co. v. United States*, 858 F. Supp. 202, 206 (Ct. Int'l Trade 1994) ("It is not for this Court to direct Commerce to choose one methodology over another where both methodologies are reasonable.  While plaintiffs articulate another possible methodology, they fail to demonstrate to the Court how the methodology used by Commerce is

unreasonable, not based on substantial evidence or not in accordance with law.")  Thus, consistent with this Court's recent decisions, Commerce's methodology should be sustained.

## II.    COMMERCE'S FINDINGS REGARDING THE ADEQUACY OF REMUNERATION ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Nucor further argues that Commerce's finding that some electricity prices were consistent with market principles and thus conferred no benefit is unsupported by substantial evidence. Nucor 18.  However, as detailed by the Government, the record demonstrates that Commerce collected and evaluated relevant evidence regarding whether KEPCO set electricity prices consistent with market principles, and its decision regarding this issue is supported by substantial evidence.

Nucor's arguments are largely based on objections regarding the methodology Commerce adopted in conducting its analysis.  However, Commerce has broad authority to determine which methodology to employ in its tier-iii analysis.  The Federal Circuit noted that a "great variety of methodologies {have been} used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as 'fair value'), some on various measures of 'cost' (which may reflect value)."  *Nucor Corp.*, 927 F.3d at 1254-55 (*citing Verizon Commc'ns Inc. v. FCC,* 535 U.S. 467, 484-86 (2002)); *see generally Verizon*, 535 U.S. at 477-89. Therefore, Commerce "has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing duty statute as well as practicality and other relevant considerations."  *Nucor Corp.*, 927 F.3d at 1255.  Again, just because Nucor "may have preferred for Commerce to have used a different analytical model" does not mean that Commerce's conclusions are unsupported by substantial evidence.  *POSCO*, 557 F. Supp. 3d at 1301.  For the reasons below, Nucor's arguments are without merit.

14

A.      **Record Evidence Demonstrates that the Korean Electricity Market Is Governed by Market Principles**

Contrary to Nucor's argument, record evidence demonstrates the Korean electricity

market is governed by market principles.  As detailed in the Government's brief, Commerce's

findings regarding KEPCO and the KPX are supported by substantial record evidence.  In

addition, the record makes clear that Commerce closely reviewed the GENCOs' reported profits

and losses during the POR, including the GOK's explanation regarding [


], and detailed information regarding the GENCOs' actual profit/loss information

related to electricity activities [                                                                                  ].  *See*, GOK

NSA QR at 30-31 (C.R.86/P.R.84), Exhibits E-17 (C.R.88/P.R.85), E-18 (C.R.89/P.R.85); GOK

SQR at 19-20 (C.R.95/P.R.93).  Based on its review of the GENCOs' financial performance,

Commerce concluded that the GENCOs recovered their costs and a rate of return in 2019.

*Preliminary IDM* at 25 (P.R.98).  This finding has not been challenged by Nucor either in its

case brief to Commerce or in its opening brief before this Court.  It is clear that Commerce

thoroughly analyzed the information on the record and there is substantial evidence supporting

its determination that KEPCO set electricity prices consistent with market principles.

Nucor argues otherwise, but fails to even establish that Commerce *could* have drawn

another conclusion from the record evidence, which would still be insufficient to require

Commerce to reverse its decision.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)

("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent

{the agency}'s finding from being supported by substantial evidence."); *see also  Nucor I*, 2023

Ct. Intl. Trade LEXIS 65, at *18  ("While Nucor might prefer Commerce to have used a different

approach, Nucor's disagreement is not a basis to remand Commerce's determination.").  Instead,

15

Nucor erroneously argues that "overwhelming record evidence" demonstrates Commerce's determination is not supported by substantial evidence and focuses on irrelevant facts. Referring to the same facts identified by Nucor in this case, this Court has already rejected Nucor's arguments, noting that "{m}ere allegations are insufficient to raise doubts as to the veracity of the evidence upon which Commerce relied in making its determination." *Nucor II*, 2023 Ct. Intl. Trade LEXIS 56, at *16; *Nucor III*, 2023 Ct. Intl. Trade LEXIS 58, at *14-15.

Nucor begins by comparing Korea's energy usage to that of other developed countries and describing the high energy intensity of the Korean economy. Nucor Br. 18-19. Nucor does not explain how these alleged facts are relevant to the issue at hand. These facts do not address factors such as "the government's price-setting philosophy {or} costs (including rates of return sufficient to ensure future operations)" and are therefore unrelated to Commerce's analysis regarding whether prices were set consistent with "market principles." *Preamble*, 63 Fed. Reg. at 65,378. Further, focusing on other energy markets in the world completely ignores the "prevailing market conditions" within the Korean market itself, in direct contradiction of the statute. 19 U.S.C. § 1677(5)(E)(iv).

Nucor then discusses at length how the electricity market in Korea is owned, operated, directed, and controlled by the government through KEPCO. Nucor Br. 19-20. Again, this issue is completely irrelevant to Commerce's analysis. Even assuming that Korea's electricity market is "controlled" by the government (which the GOK does not concede), this would not establish that KEPCO is providing electricity for LTAR. The tier-iii methodology is used precisely in such situations—i.e., where the government is the sole provider of a good or service—and is necessary *because* the mere fact that the government is the sole supplier in a market does not in and of itself lead to the conclusion that the prices within the market are set in a manner that is

inconsistent with market principles.  A proper assessment of electricity prices is required to determine compliance with market principles.  *See Nucor I*, 2023 Ct. Intl. Trade LEXIS 65, at *20 ("Nucor's characterization of the Korean electricity market as 'a government-owned, -operated, and-directed monopoly,' fails to carry the day. . . .  The key question is whether substantial record evidence supports Commerce's determination that the Korean government's electricity prices were consistent with market principles.").  Commerce conducted such an analysis here.

Thus, Commerce properly reviewed the record evidence, and its conclusion that certain electricity prices were consistent with market principles and therefore conferred no benefit is supported by substantial evidence.

### B.      The Costs Upon Which Commerce Relied Are Not Tainted

Nucor next objects to Commerce's evaluation of the cost dataset on the record, asserting that the cost data provided by the GOK do not "reflect the actual costs of electricity generation and supply" and arguing that Commerce's reliance on the reported data was therefore erroneous. Nucor Br. 21-22.  Again, Commerce's determination that cost data submitted by the GOK reflect the actual cost of electricity generation and supply is supported by substantial record evidence.

Record evidence establishes that KEPCO and the GENCOs cover their costs plus profit. As detailed by the Government, Commerce examined KEPCO's costs and was "able to trace the costs and the rate of return." *Preliminary IDM* at 25-26 (P.R.98).  It then determined—based on record evidence—that the KPX's standardized price setting methodology covers costs and "includes consideration of the GENCOs' and KEPCO's rate of return." *Id*.  Further, as explained above, Commerce separately reviewed the financial results of the GENCOs during the POR and concluded that the GENCOs recovered their costs. *Id.* at 25.  Thus, Commerce's conclusion is supported by substantial record evidence.

17

NONCONFIDENTIAL

Nucor claims that "cost data that the GOK provided . . . does not reflect the actual costs of electricity generation and supply." Nucor Br. 21. This position is unsupported. As an initial matter, Nucor inaccurately asserts that Commerce failed to collect information regarding the actual cost of generation and supply from the generators themselves, and—instead—relied solely on the price mechanism establishing the prices KEPCO pays to purchase electricity through the KPX in its evaluation of cost. Nucor Br. 21. This is incorrect. As discussed above, Commerce evaluated the financial position of the GENCOs, including by reviewing their financial statements. GOK NSA QR at 3-5, 30-31 (C.R.86/P.R.84), Exhibits E-17 (C.R.88/P.R.85), E-18 (C.R.89/P.R.85); GOK SQR at 19-20 (C.R.95/P.R.93). Based on this evidence, Commerce concluded that the GENCOs recovered their costs during the POR. *Preliminary IDM* at 25 (P.R.98).

Further, Nucor fails to cite to any evidence that suggests that electricity prices were *not* set to cover costs plus profit. Nucor first argues that KEPCO's cost datasets were based on [

]. However, this in no way establishes that the reported costs were inaccurate. Nucor also objects to the pricing mechanism applied by the KPX, which it claims "operates in practice as an *ad hoc* reallocation of revenue based on the financial performance of KEPCO and individual generators at the time that it is established." Nucor Br. 20-21. This is an unsubstantiated assertion by Nucor that does nothing to establish that KEPCO's costs are distorted. Further, even if true, Nucor's argument would be irrelevant to Commerce's analysis. Commerce's analysis focuses on whether the prices charged are sufficient to cover costs plus a rate of return; as long as this is the case, it is immaterial how the supplying entity allocates profit. The record shows that the GENCOs recovered their actual costs, as did KEPCO, and that electricity rates were set to allow KEPCO

and the GENCOs a rate of return.  Nucor identifies no evidence that suggests the cost data on the record are not accurate.

Based on the above, it is clear that Commerce properly reviewed the evidence on the record, and its reliance on cost data on the record is reasonable and supports its determination in the *Final Results*.

### C.   The Government Prices Charged to Hyundai Steel Reflected the Cost of Electricity Generation Plus a Return on Investment

Finally, Nucor claims—incorrectly—that the electricity prices paid by Hyundai Steel did not cover the cost of electricity generation.  Nucor Br. 21-23.  However, in making this argument, Nucor distorts Commerce's benchmark analysis and completely disregards prevailing market conditions, which render Nucor's comparisons unreasonable.

Nucor maintains that a proper methodology would compare the average cost of supply for a particular tariff classification to the prices Hyundai Steel paid based on time of use and provides calculations that it contends demonstrate that the prices paid by Hyundai Steel did not cover the cost of production plus profit.  Nucor Br. 21-23.  These calculations are fundamentally flawed.  As an initial matter, and as discussed above in Section I.B, it was reasonable and appropriate for Commerce in its analysis to consider the GOK's price-setting philosophy for the *tariff classification* instead of evaluating the rates paid by individual companies given that the electricity rates were established for the classification and not for individual companies.  Nucor disregards this fact.

Further, Nucor's analysis suffers from two additional flaws: first, Nucor inconsistently cherry-picks data to support its position; and, second, Nucor completely ignores prevailing market conditions in the Korean electricity market.  In its analysis, Nucor selectively identifies Hyundai Steel's **[                    ]**, noting that it paid annual average off-peak prices under the

19

NONCONFIDENTIAL

[                                  ] electricity rate classification of [

] and mid-peak prices of [                    ] in [                      ] during

the POR.  Nucor Br. 22.  Nucor then concludes that these prices do not cover the costs of

electricity generation as KEPCO's reported average unit cost of supply for this electricity rate

classification was [                    ].  *Id.*

This Court has already concluded that Nucor's price comparisons relying on cherry-

picked data are insufficient to establish that Commerce's analysis or conclusions are not

supported by substantial evidence:

> Nucor's price comparison also lacks merit.  Nucor seeks to compare the lowest
> monthly average off-peak price paid by the respondents for certain months of the
> POI to the lowest annual average unit price paid to a KEPCO generator. . . . Given
> that the KPX set prices on an hourly basis . . . , Nucor's inconsistent cherry-picking
> of data fails to demonstrate that the respondents paid less for their respective
> electricity consumption than was necessary to allow the generators to recover the
> costs of supplying that electricity and it does not call into question Commerce's
> analysis or conclusions.

*POSCO*, 557 F. Supp. 3d at 1300-01; *see also Nucor I*, 2023 Ct. Intl. Trade LEXIS 65, at *16 fn.

12, *21-22 (rejecting Nucor's arguments that were based on a comparison of off-peak and mid-

peak prices paid by the respondent to KEPCO's annual average unit cost).  In the instant case,

Nucor's comparisons are just as flawed:  Nucor focuses on the off-peak and mid-peak prices

(charged to [            ]), but then compares these prices to KEPCO's average costs for

supplying electricity to all customers within the relevant classification at all times of day and

year.

It is nonsensical to compare an *average* cost to time-specific prices established based on

varying costs of production, and doing so fails to take into account prevailing market conditions.

As electricity is consumed immediately rather than being stored, the relationship between supply

and demand is heavily affected by the time of day and year.  The KPX's pricing formula takes

into account the "marginal price of electricity *at a given hour* at which the projected demand for electricity and the projected supply of electricity for such hour intersect."  GOK NSA QR at 23, Exhibit E-2, p. 36 (C.R.86/P.R.84) (emphasis added).  When demand is low, KEPCO sources electricity for distribution from the lowest-cost generators (e.g., nuclear or coal), thereby meriting a lower price to the downstream customers; when demand is high, KEPCO has to source electricity from higher-cost generators as well (e.g., oil and/or liquefied natural gas ("LNG")), thereby requiring a higher price from its downstream customers.  *Id*.  In turn, the tariff rates charged by KEPCO take these prevailing market conditions into account by establishing different tariff rates based on the time of day and time of year.  *Id.* at Exhibit E-9 (C.R.87/P.R.84).  Therefore, if Commerce were to rely on the comparison suggested by Nucor, it would be ignoring prevailing market conditions in the Korean electricity market in a way that contravenes the statute.

The data on the record allowed Commerce to compare the revenue generated from the tariffs charged to companies within a classification against the annual average cost for supplying electricity to that tariff classification.  This comparison accounts for the prevailing market conditions in Korea, as it incorporates the average cost for generating and distributing electricity for all times of day for all periods of the year to the average revenue generated from supplying electricity at the applicable rates at all times of day for all periods of the year.  The comparison also reflects how the tariff rates were set, which was for each tariff classifications instead of for individual companies.  Commerce will take into account factors affecting comparability between the government and benchmark prices even when applying its tier-i or tier-ii methodologies. 19 C.F.R. § 351.511(a)(2)(i)-(ii) (stating that, in identifying a tier-i benchmark, Commerce "will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting

comparability," and Commerce will make "due allowance for factors affecting comparability" when applying tier-ii methodology). It is thus reasonable for Commerce to also take the comparability of the cost and price data into account when using its tier-iii methodology, and it did so here based on the data it had available on the record. Commerce has discretion in choosing how to measure the adequacy of remuneration, and the methodology it chose in this case, which ensures an apples-to-apples comparison between costs and revenues, was reasonable.

Finally, Nucor claims record evidence suggests that "KEPCO has structured its electricity prices to maintain subsidies to large industrial users like steel producers, while recouping losses on those sales through higher prices to other users." Nucor Br. 22; *see also* Nucor Br. 17. However, not only does Nucor provide no data to support this assertion, it relies on a misstatement of Commerce's analysis. Nucor argues that "{b}asing the analysis on KEPCO's total revenues *on all sales to all customers* effectively launders the benefit conferred by subsidized prices by offsetting them with revenues on sales at non-subsidized prices to other consumers." Nucor Br. 22 (emphasis added). In fact, Commerce did not compare total revenues on *all sales to all customers*; it compared revenue on sales to *large industrial users*, i.e., the classification Nucor argues is being subsidized. *Preliminary IDM* at 27 (P.R.98).

The GOK demonstrated—and Commerce found—that KEPCO's revenue on sales of electricity is sufficient to cover costs (including the cost of generation) *and profit* for each tariff classification applicable to the respondent. *See Preliminary IDM* at 26 (P.R.98). Hyundai Steel was subject to the same electricity rates as the other companies in its respective classifications. *Final IDM* at 43 (P.R.132). To the extent that Hyundai Steel paid less for electricity during particular times of the day than during other periods, this Court has rejected such pricing as evidence of cross-subsidization, explaining that "it would seem that setting lower rates for lower

22

demand during off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'"  *POSCO*, 581 F. Supp. 3d at 1281; *see also Nucor I*, 2023 Ct. Intl. Trade LEXIS 65, at *14-15.  Moreover, Nucor's theory that KEPCO sells at a loss to "large industrial users" while recouping those losses through sales to other customers is contradicted by the fact that KEPCO's **[**


**]**.  GOK NSA QR at 15 (C.R.86/P.R.84), Exhibits E-9 (C.R.87/P.R.84), E-22 (C.R.90/P.R.86).

Thus, notwithstanding Nucor's assertions to the contrary, record evidence demonstrates that the prices charged by KEPCO were above its reported costs of supply for the applicable tariff classes and were sufficient to cover costs (including the cost of electricity generation) plus profit.  Therefore, substantial evidence supports Commerce's conclusion, and Nucor's arguments are without merit.

## **CONCLUSION**

For the reasons discussed above, the challenged aspects of Commerce's *Final Results* are

supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: May 19, 2023                    *Counsel for the Government of the Republic of Korea*

24

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that the forgoing Memorandum in Opposition to Consolidated-Plaintiff's Motion for Judgment on the Agency Record, dated May 19, 2023, complies with the word-count limitation set forth in the Court's March 26, 2023 Scheduling Order.  The memorandum of law contains 6,959 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: May 19, 2023          *Counsel for the Government of the Republic of Korea*

1