**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>　　　　　　　Plaintiff,<br><br>　　and<br><br>NUCOR CORPORATION,<br><br>　　　　　　　Consolidated-Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　　　Defendant,<br><br>NUCOR CORPORATION,<br><br>　　and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>　　　　　　　Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION**<br>Proprietary Information<br>Removed from Page 19<br><br><br><br>Ct. No. 22-00170 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF**
**IN SUPPORT OF ITS MOTION FOR**
**JUDGMENT ON THE AGENCY RECORD**

| | |
|---|---|
| Brady W. Mills<br>Donald B. Cameron<br>Julie C. Mendoza<br>R. Will Planert<br>Mary S. Hodgins<br>Eugene Degnan<br>Edward J. Thomas III<br>Jordan L. Fleischer<br>Nicholas C. Duffey | **MORRIS, MANNING & MARTIN, LLP**<br>1401 Eye Street, N.W., Suite 600<br>Washington, D.C. 20005<br>(202) 216-4116<br><br>*Counsel to Plaintiff Hyundai Steel Company*<br><br>June 16, 2023 |

## TABLE OF CONTENTS

I.   Argument ........................................................................................................ 4

    A.   The KETS Program Does Not Provide A Financial Contribution Because It Does Not Forego Revenue That Is Otherwise Due. ......................................................... 4

    B.   When Viewed In Its Entirety, The KETS Program Does Not Provide A Countervailable Benefit ...................................................................................... 10

    C.   Commerce's Finding That The KETS Is Specific Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law .................................. 17

        1.   The KETS Program Is Not De Jure Specific Pursuant To 19 U.S.C. §1677(5A)(D)(i) ...................................................................................... 17

        2.   The Safe Harbor Has Been Met ............................................................ 18

II.  Conclusion ................................................................................................... 21

Certificate Of Compliance ..................................................................................... 22

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ....................................................17, 18

*BGH Edelstahl Siegen GMBH v. United States*,
600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) .................................................. *passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
467 U.S. 837, 104 S. Ct. 2778 (1984) ..................................................................4, 7

*Creswell Trading Co. v. United States,*
15 F.3d 1054 (Fed. Cir. 1994)....................................................................................11

*CS Wind Vietnam Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016).................................................................................11

*Government of Sri Lanka v. United States*,
308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) .................................................. *passim*

*Itochu Building Prods. Co., Inc. v. United States*,
163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) .........................................................16

*SEC v. Chenery Corp.*,
332 U.S. 194, 67 S. Ct. 1575 (1947)................................................................. 16-17

**Statutes**

19 U.S.C. § 1677(5)(B)..............................................................................................6

19 U.S.C. § 1677(5)(C)...................................................................10, 11, 14, 16

19 U.S.C. § 1677(5)(D)...........................................................................................4, 7

19 U.S.C. § 1677(5)(E)......................................................................10, 12, 13, 15

19 U.S.C. § 1677(5A)(D).................................................................................. 17-18

19 U.S.C. § 1677(5B)(D)........................................................................................12

**Other Authorities**

19 C.F.R.§ 351.503(b)(2)............................................................10, 12, 13, 15, 16

*Countervailing Duties*,
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ..................................................12, 13

*Due*, BLACK'S LAW DICTIONARY (8th ed. 2004) ............................................................................5

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316 (1994) .........................................................................................11, 20

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, <br><br>                 Plaintiff, <br><br>      and <br><br> NUCOR CORPORATION, <br><br>                 Consolidated-Plaintiff, <br><br>    v. <br><br> UNITED STATES, <br><br>                 Defendant, <br><br> NUCOR CORPORATION, <br><br>      and <br><br> GOVERNMENT OF THE REPUBLIC OF KOREA, <br><br>               Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION** <br> Proprietary Information <br> Removed from Page 19 <br><br><br> Ct. No. 22-00170 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF**
**IN SUPPORT OF ITS MOTION FOR**
**JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff") hereby replies to the response briefs filed by Defendant, the United States, and Defendant-Intervenor, Nucor Corporation. Defendant's Response to Plaintiff's Motion for Judgment on the Agency Record, *Hyundai Steel Co. v. United States*, No. 22-00170 (Ct. Int'l Trade Apr. 28, 2023, ECF No. 34 ("Def. Br."); Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the Agency Record, *Hyundai Steel Co., v. United States*, No. 22-00170 (Ct. Int'l Trade May 22, 2023), ECF No.38 ("Def.-Int. Br.").  As discussed more fully below, Defendant's and Defendant-Intervenor's arguments are without merit and should be rejected.

This case involves a unique program that does not seamlessly fit into the standard financial contribution, benefit, and specificity provisions of the countervailing duty ("CVD")

law.  The Government of Korea ("GOK") has decided to take its obligation to fight climate change seriously and has imposed a strict cap and trade system on a small subset of companies in Korea.  The vast majority of companies in Korea are not subject at all to this costly cap and trade system.  The way the program works is that the GOK looks at historical emissions outputs and then uses this level of emissions to set a "baseline" amount.  The GOK then allocates emissions permits using this baseline and then gradually lowers the total permits in phases to incentivize the reduction of carbon emissions below the baseline.  For certain participants that do *not* compete in the international market against companies who are not subject to cap and trade costs, or whose production costs meet a certain threshold, the GOK deducted 3 percent of the emissions permits from the baseline amount in the phase at issue in this case and set them aside in reserve. For participants like Hyundai Steel that do compete in the international market or whose production costs are high, the GOK did not deduct 3 percent.

In allocating emissions permits to mandatory participants like Hyundai Steel, the GOK is merely setting a cap on the participants' carbon emissions during a particular phase of the KETS program.  The GOK is not seeking to generate revenue but is instead trying to lower carbon emissions to comply with its international commitments.  To the extent that a mandatory participant does not meet its carbon reduction goals, it has many options to generate its required level of emissions permits to surrender to the GOK.  This includes buying permits from private parties in the market, carrying forward unused permits from earlier years, or borrowing from future years.  There is no requirement or even expectation that any permit shortfall will be purchased from the GOK.  By not having 3 percent deducted from its emissions permit allocation, companies like Hyundai Steel do not take on a debt to the GOK or owe the GOK

revenue for these permits.  Thus, no revenue is foregone that is otherwise due or owed to the GOK and there is no financial contribution.

Nor is there any benefit.  Being subjected to the KETS system is onerous and imposes costs on participants as they have to make changes to their business operations to lower their carbon footprint.  This program operates to the detriment of mandatory participants like Hyundai Steel as they incur costs that most other companies in Korea, and most foreign competitors, do not.  To the extent there is a beneficiary, it is the GOK who is making progress towards its international commitments to lower carbon emissions through the KETS program.  Instead of viewing this program in its entirety and reaching the obvious conclusion that the KETS program imposes burdens on Hyundai Steel, Commerce has myopically focused on the fact that trade intensive and high production cost companies do not have 3 percent of their emissions permit allocation deducted and thus allegedly receive a countervailable benefit.  In Hyundai Steel's view, this is a perversion of the CVD law and ignores the totality of the program that is established to benefit the GOK and that operates to Hyundai Steel's detriment.  Only by looking at this program narrowly can Commerce come to the conclusion that Hyundai Steel has received a countervailable subsidy.

Finally, the KETS program is not *de jure* specific because it does not expressly limit the receipt of 100 percent emissions permit allocations to specific enterprises or industries.  Instead, the law sets objective criteria related to trade intensity and production costs that could be met by any enterprise or industry.  Commerce's *de jure* specificity determination is thus unlawful because the law does not by its terms expressly limit alleged benefits to particular enterprises or industries.

I.      *Argument.*

As discussed in Hyundai Steel's Rule 56.2 brief, Commerce's determination that the

KETS program provided a financial contribution, benefit, and was specific is unsupported by

substantial evidence and is otherwise not in accordance with law. None of the arguments made

by Defendant and Defendant-Intervenor alter that conclusion.

        A.      *The KETS Program Does Not Provide A Financial Contribution Because It Does*
              *Not Forego Revenue That Is Otherwise Due.*

In the *Final Results*, Commerce determined that the 3 percent of permits that the GOK

did not deduct from Hyundai Steel's permit allocation[1] was a financial contribution under 19

U.S.C. § 1677(5)(D)(ii) because it constituted revenue foregone by the GOK that was otherwise

due. P.R. 133 at 1; P.R. 132 at 20-21, 24. Hyundai Steel argued that this determination is

contrary to the plain language of the statute because under the KETS program the GOK was not

foregoing any revenue that was otherwise due to it or otherwise owed by Hyundai Steel. The

issue presented is whether the plain language of § 1677(5)(D)(ii) mandates that the government

be foregoing revenue that it is otherwise legally obligated to collect or owed, or whether the

mere possibility that the government could collect such revenue suffices. Hyundai Steel submits

that the plain language is clear and Commerce's statutory interpretation is unlawful under

*Chevron* step one. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.

Ct. 2778 (1984).

In response, Defendant argues that "the key question when evaluating revenue foregone

is whether, if it did not give entities like Hyundai Steel the additional KAUs for free, the

---

[1] The GOK first limits companies subject to the KETS to 100 percent of their applicable
carbon emissions permits *and then* takes away 3 percent from subject companies that do not
meet trade intensity and production cost criteria. C.R. 77 (P.R. 76) at 4 & Exhibit CEP-1 Art.
12(3).

government would have otherwise retained the ability to collect the three percent allocation from Hyundai Steel." Def. Br. at 16.  However, retaining the "ability" to collect the three percent allocation from Hyundai Steel is not the same as Hyundai Steel owing the three percent allocation to the GOK as an obligation or debt, which is required for the allocation to be "otherwise due" to the GOK.   This interpretation flows naturally from the plain language of the terms "otherwise" and "due" in the statute as defined by dictionaries.   Merriam-Webster defines "due" as "owed or owing as a debt," or "owed or owing as a natural or moral right."  Pl. Br. at Exhibit A.  Black's Law Dictionary defines "due" as "owing or payable; constituting a debt." *Due*, BLACK'S LAW DICTIONARY (8th ed. 2004).  Merriam-Webster defines "otherwise" as "in different circumstances," and "to suggest an indefinite alternative."  Hyundai Br. at Exhibit B. The plain meaning of the statute thus requires that a financial contribution pursuant to Section 771(5)(D)(ii) exists only if the GOK were "owed" a "debt" as a result of an "obligation or duty" but for the deduction of permits from companies who do not meet the trade intensity or production cost criteria.

Defendant attempts to cure this infirmity by arguing that the GOK could collect revenue on additional permits that companies receiving the 97 percent allocations "may need to purchase," and therefore the GOK is "providing Hyundai Steel something of value when it could otherwise collect revenue." Def. Br. at 16 (emphasis added).  There are at least two problems with this argument.

First, companies subject to the KETS are not "required" to purchase permits from the GOK-run auction.  C.R. 74 (P.R. 75) at 5-6; P.R. 132 at 22.  Instead, if subject companies like Hyundai Steel need more permits, they have the choice whether to acquire permits from the private market, carry forward unused permits from prior years, or borrow its own permits from

future compliance years rather than purchase from the GOK.  C.R. 74 (P.R. 75) at 5-6; C.R. 77 (P.R. 76) at 3-5 & Exhibit SQA-1, at 1-2; P.R. 132 at 22.  They do not owe a debt or have an obligation to purchase the permits from the GOK.

Second, the concession that the GOK is providing something of value "that it *could* otherwise collect revenue" from permits that companies "*may* need to purchase" exposes the fundamental problem with Commerce's financial contribution determination.  *See also* Def. Br. at 17 ("Because the Korean government is providing something of value for which it could otherwise *potentially* collect revenue, it provided a financial contribution.") (emphasis added). Having the "potential" ability to collect revenue is not the same as revenue being "otherwise due."  The revenue needs to be "owing or payable" or "constituting a debt" to be "due."  Here, it is not.

Relying on the *BGH* decision, Defendant claims that the "issue is not whether the {government} can sell the free allowances to companies, rather the issue is whether the {government} forgoes revenue when it gives additional free allowances…, reducing the number of allowances {a respondent} must purchase at the state-run auction or the secondary market." Def. Br. at 16 (citing *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1263 (Ct. Int'l Trade 2022)).  To be sure, the carbon emissions program at issue in *BGH* has similarities to the KETS program, and the court did affirm Commerce's determination that the provision of additional carbon credits provided a financial contribution in the form of revenue foregone.  However, the flaw in the *BGH* court's reasoning is that the government is not foregoing revenue if a participant purchases additional permits from third parties on the secondary market.  The *sine qua non* of a financial contribution is that the form of assistance comes from a government "authority."  *See* 19 U.S.C. §1677 (5)(B) (a subsidy is provided by an

"authority").  Hyundai Steel thus respectfully submits that the *BGH* court got it wrong.

Moreover, the court's discussion of this issue was cursory and the court was not presented with

the precise question of whether the "otherwise due" requirement was violated by the EU

emission trading system.  The case is thus not on point to the issue that Hyundai Steel raises in

this appeal regarding Commerce's financial contribution determination.

As characterized by the *BGH* court, the argument presented by the plaintiff in that case

was that since "neither the EU nor any member state may collect revenues on the free allowances

generally," there is no revenue foregone.  *BGH*, 600 F. Supp. 3d at 1263.  The court

characterized this argument as a "strawman" and summarily dismissed it in one sentence:  "The

issue is not whether the GOG can sell the free allowances to companies, rather the issue is

whether the GOG forgoes revenue when it gives additional free allowances to companies on the

carbon leakage list like BGH, reducing the number of allowances BGH must purchase at the

state-run auction or the secondary market."  *Id.*  The plaintiff did not argue, as here, that pursuant

to *Chevron*, Commerce's interpretation of the "otherwise due" language of 19 U.S.C.

§ 1677(5)(D)(ii) is unlawful because it treats the mere possibility of collecting revenue as

tantamount to revenue that was otherwise due or owed to the government by Hyundai Steel.[2]

---

[2] The argument made by BGH appears to hinge on the factual distinction between the normal allocation of 43% of free allowances and the 57% of allowances that are additionally allocated to companies on the carbon leakage list.  Specifically, Plaintiff argued that:

> The 43% of free allowances cannot be actioned {sic} by the European Union or its Member States and the 57% auctioned allowances cannot be allocated for free… Therefore, Commerce is incorrect in claiming that the allocation of free allowances constitutes a financial contribution in the form of revenue forgone that is otherwise due.  By law, neither the European Union nor any Member State may collect revenues on the 43% of free allowances and none of the 57% auctioned allowances

Thus, while the *BGH* decision deals with a similar program, Hyundai Steel respectfully submits that the holding is not directly relevant to the arguments presented in this appeal.

Defendant's other responses to Hyundai Steel's statutory argument do not establish that, "but for" the fact that the GOK did not deduct 3 percent from Hyundai Steel's emissions permits, the GOK was owed revenue that it did not collect.  For example, Defendant argues "{h}ad the government treated Hyundai Steel like other companies not receiving the additional three percent, Hyundai Steel would have been eligible to participate in the government-run auction in which the {GOK} would have recovered the additional three percent that Hyundai Steel needed to purchase to comply with its KETS obligation."  Def. Br. at 17.  This is again speculative, and does not establish that the GOK was owed a debt or that Hyundai Steel was obligated to purchase permits from the GOK had it been eligible to do so.  Companies have options for obtaining additional permits that do not involve purchasing them from the GOK, including buying from private parties, borrowing from future years, or carrying forward unused permits from prior years.  C.R. 74 (P.R. 75) at 5-6; C.R. 77 (P.R. 76) at 3-5 & Exhibit SQA-1, at 1-2; P.R. 132 at 22.  Defendant is thus incorrect that three percent deduction represents value that the Korean government "will" no longer collect from Hyundai Steel.  Def. Br. at 17.

Defendant also argues that the deduction of permits "placed" Hyundai Steel "in an initial advantageous position whereby it was relieved from having to purchase… permits from either the government auction or the private trading market."  Def. Br. at 17.  Defendant-Intervenor adds that "there is" allegedly no question that "Hyundai Steel is put in a better position" by the

---

can be allocated for free.  Accordingly, the ETS never provides for the allocation of allowances where a government is foregoing revenue that is otherwise due.

Rule 56.2 Memorandum In Support Of Motion For Judgment Upon The Agency Record at 33, *BGH Edelstahl Siegen GMBH v. United States*, No. 21-00080 (Ct. Int'l Trade Oct. 26, 2021), ECF No. 22 ("BGH Br.").

deduction of permits from third parties.  Def.-Int. Br. at 15.  But even if Hyundai Steel is in a

better position this is simply not relevant to whether the GOK is forgoing revenue otherwise due.

Rather, to the extent it is relevant, it is relevant to the separate determination of benefit.

Defendant and Defendant-Intervenor's claims conflate financial contribution and benefit.

Defendant-Intervenor argues that, had the GOK deducted 3 percent of Hyundai Steel's

permits and Hyundai Steel purchased the additional permits entirely from the private markets,

"Hyundai Steel would still be reducing the number of allowances available to be sold privately

and thus requiring another company to purchase additional allowances from the GOK."  Def.-Int.

Br. at 16.  This is simply not true.  As explained, companies have various options other than the

GOK auction and are not obligated to acquire permits from the GOK.  C.R. 74 (P.R. 75) at 5-6;

C.R. 77 (P.R. 76) at 3-5 & Exhibit SQA-1, at 1-2; P.R. 132 at 22.  There is no cap on the amount

of permits that can be sold on the private market and so Hyundai Steel purchasing additional

permits on the private market has no impact on the number of permits available to other

companies.  *See* C.R.95 (P.R. 93) at 7-8.

Defendant-Intervenor also argues that the GOK is forgoing revenue it is otherwise due

because the GOK could charge a penalty if a company fails to cover its emissions with sufficient

permits.  Def.-Int. Br. at 16.  Again, this does not demonstrate that revenue was "otherwise due"

to the GOK.  At best, this means that there is a *possibility* that the GOK could collect revenue in

the form of penalties if Hyundai Steel does not meet its emissions reduction targets and does not

otherwise surrender the required number of permits.  This does not satisfy the statute's plain

language requirement that the GOK was definitively owed something from Hyundai Steel and

forfeited it by deducting 3 percent from companies who did not meet the trade intensive or

production cost criteria but not from Hyundai Steel.  Defendant and Defendant-Intervenor have

thus not rebutted Hyundai Steel's argument that Commerce's interpretation of the "otherwise due" language is inconsistent with its plain meaning and is otherwise unreasonable.

    B.    *When Viewed In Its Entirety, The KETS Program Does Not Provide A Countervailable Benefit.*

In the *Preliminary Results*, Commerce determined that "{t}he benefit under this program exists in accordance with 19 C.F.R. § 351.503(b)(2) to the extent that the recipient is relieved of the obligation to purchase additional allowances."[3] P.R. 98 at 20.  In other words, Commerce found that, despite the emissions cap to which the KETS subjects Hyundai Steel, the GOK granted Hyundai Steel a benefit by deducting 3 percent of the permits from other subject companies who did not meet the trade intensity or production cost criteria but not making a similar deduction from Hyundai Steel.  P.R. 132 at 17, 20-23; C.R. 7 (P.R. 26), Exhibit SQA-1 at 2.  Hyundai Steel challenged this benefit determination by arguing that when the KETS program is viewed in its entirety, it is plain that the KETS imposes burdens and does not provide a countervailable benefit.

In response, Defendant claims that Commerce does not have to consider the burdens imposed by the program because Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists" pursuant to 19 U.S.C. § 1677(5)(C).  Def. Br. at 19 (quoting P.R. 132 at 18).  However, it "is not in accordance with Section 1677(5)(C)" for Commerce to "selectively analyze" benefit payments "in isolation" from the "overall program" as the court held in *Government of Sri Lanka v. United States*.  308 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2018) ("*GOSL*").  As described in the Statement of Administrative Action, 19 U.S.C. § 1677(5)(C) clarifies that, if the elements of a subsidy including benefit are met, *then*

_____

[3] Commerce did not find that another subsection from 19 U.S.C. § 1677(5)(E) or 19 C.F.R. § 351.503 applies in the *Final Results*.  P.R. 132 at 17-24.

Commerce is not required to take additional steps to consider or analyze the effect of a subsidy "on the price or output" of the merchandise under review.  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 159 (1994) reprinted in 1994 U.S.C.C.A.N. 4040, 4240 ("SAA").  But, Commerce may not selectively "dilute the requirement that countervailable subsidies benefit a recipient by reference to Section 1677(5)(C)'s elimination of any requirement to consider the subsidy's effects." *GOSL*, 308 F. Supp. 3d at 1382.

Section 1677(5)(C) does not mean that, when evaluating whether each element of a countervailable subsidy is met, Commerce is not required consider the program "overall" including the totality of the evidence and evidence that detracts from its determination.  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) ("The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight."); *Creswell Trading Co. v. United States*, 15 F.3d 1054, 1060 (Fed. Cir. 1994) ("The totality of the evidence must then be weighed to determine whether a countervailable subsidy exists.").  Commerce does not need to consider the effects of the alleged subsidy to recognize the undisputed fact that the carbon emission caps allocated in the form of permits, regardless of the relative restriction levels allocated, do not benefit Hyundai Steel.  C.R. 77 (P.R. 76), Exhibit SQA-1, at 1 n.3 (citing Exhibit CEP-1 Art. 2(3)) ("Article 2(3) of the AAGEP defines the term 'emission permit' as *an amount of GHG emissions permitted and allocated* to an individual business entity producing GHGs within the scope of total allowances set for GHG emissions… in order to achieve the national GHG reduction targets.") (emphasis added).

Defendant claims that the situation here was contemplated by the *CVD Preamble* where it states that "{a} subsidy that reduces a firm's costs of compliance remains a subsidy… even

though the overall effect of the two government actions, taken together, may leave the firm with higher costs." Def. Br. at 18 (quoting *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,631 (Dep't Commerce Nov. 25, 1998)). The statement that Defendant quotes from the *Preamble* discusses a hypothetical where "a government puts in place new environmental restrictions that require a firm to purchase new equipment" and that "the government provides the firm with subsidies to purchase that new equipment." *Countervailing Duties*, 63 Fed. Reg. at 65,361. The court in *BGH* cites the same example from the *CVD Preamble* to support that "Commerce determines benefit by the reduction or elimination of the obligation, without regard to the source of that obligation," *BGH*, 600 F. Supp. 3d at 1264, which both Defendant and Defendant-Intervenor claim further support Commerce's determination here because the court referenced it in relation to an allegedly similar program, the European Union's emission trading system, Def. Br. at 19; Def.-Int. Br. at 18. But the environmental equipment example from the *CVD Preamble* is inapposite and does not support the conclusion that this burdensome carbon reduction program provides a countervailable benefit to Hyundai Steel.

In the environmental equipment example from the *CVD Preamble*, a company receives a subsidy to decrease the cost of purchasing production equipment, an input cost reduction consistent with 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.503(b). Here, by contrast, the permit allocation does not result in an input cost reduction for Hyundai Steel like the equipment subsidy in the *Preamble*. Additionally, the *Preamble* presumes the imposition of the environmental requirements and the subsidization of the equipment are "two separate actions," whereas the emissions caps allocated in the form of permits here are the environmental restriction. C.R. 77 (P.R. 76), Exhibit SQA-1 at 1 n.3. Finally, pursuant to the *Preamble*, it is 19 U.S.C. § 1677(5B)(D), which addresses certain "greenlight" non-countervailable subsidies

provided for the adaptation of existing facilities to new environmental requirements, that "treats the imposition of new environmental requirements and the subsidization of compliance with those requirements as two separate actions," not 19 U.S.C. § 1677(5)(E)(i)-(iv) or 19 C.F.R. § 351.503(b)(2).  *Countervailing Duties*, 63 Fed. Reg. at 65,361.  It is thus inapposite.

The court in *GOSL* noted that both hypotheticals from the *CVD Preamble* (*i.e.*, subsidization that reduces the costs of environmentally-friendly equipment and installation of seatbelts) "required 'improvements' to the product" or "enhance{d} the product in some way and the government covered some of the cost of the enhancement."  *GOSL*, 308 F. Supp. 3d at 1383. The court found that the Guaranteed Pricing Scheme ("GPS") at issue in that case was "not separable" like those "acts described in the regulatory preamble" and that the reimbursement payments pursuant to the GPS did not provide the respondent with any additional "value" because "reimbursements bear no resemblance" to input cost reductions or situations where the company receives more revenue than it otherwise would have earned.  *Id.* at 1383-84.  Similarly, Hyundai Steel receives no enhancement, improvement, overpayment or additional value by having its emissions capped at 100 percent of its allocated permits, regardless of the permit deductions from third parties.  Instead, the record demonstrates, uncontrovertibly, that the permit allocation restricts Hyundai Steel's operations by capping its emissions and forcing it to internalize the costs of Korea's carbon emissions reductions pursuant to the Paris Agreement. C.R. 7 (P.R. 26), Exhibit 21 at 41; C.R. 77 (P.R. 76), Exhibit SQA-1 at 1 & n.2; C.R. 74-75 (P.R. 75) at 1-2, Exhibit NSA-1, at 1-2, & Exhibit NSA-4, at 1.  Just because the KETS restricts some other subject companies to slightly more onerous emissions caps, does not mean that Hyundai Steel benefits pursuant to 19 U.S.C. § 1677(5)(E).  Neither Defendant nor Defendant-Intervenor rebut these fundamental facts regarding the KETS program.

Like the reimbursement payments in *GOSL*, the permit allocation here does not benefit Hyundai Steel and instead operates to its detriment.  In *GOSL*, the court found that Commerce's assessment of certain government payments made to the respondent as reimbursement for above-market guaranteed prices that the respondent paid to small producers for rubber inputs was unlawful because Commerce analyzed the payments without regard to the program as a whole. *GOSL*, 308 F. Supp. 3d at 1379.  The court found that 19 U.S.C. § 1677(5)(C) "does not authorize Commerce" to "ignore" record evidence that contextualized the payments at issue. *GOSL*, 308 F. Supp. 3d at 1381.  The court reasoned that Commerce need not consider the pricing effect of the reimbursements "to recognize that the series of debts and repayments… yielded no benefit."  *GOSL*, 308 F. Supp. 3d at 1382.  Rather, the program, taken as a whole, operated to the respondent's detriment because the respondent was actually serving as a "payment vehicle" for the GPS program like how Hyundai Steel, here, bears the costs of Korea's carbon emissions reduction requirements.  *GOSL*, 308 F. Supp. 3d at 1382.  Therefore, pursuant to *GOSL*, Commerce must review the KETS program holistically when determining whether it benefits Hyundai Steel and, despite 19 U.S.C. § 1677(5)(C), Commerce cannot selectively view relative aspects of the KETS to conveniently find alleged benefits from a program that, as a whole, operates to Hyundai Steel's detriment.

According to Defendant, however, it does not matter how burdensome or detrimental the KETS program is to Hyundai Steel because Hyundai Steel allegedly "benefits from having a 'lesser burden'" compared to third party companies that are subject to lower emissions caps. Def. Br. at 19.  But Hyundai Steel's relative position vis-à-vis other participants in the KETS program is not relevant to the benefit determination.  For a subsidy to be countervailable, it must confer a benefit upon Hyundai Steel.  Commerce has not explained how the statutory or

14

regulatory requirements for a countervailable benefit have been met in this case.  *See* Pl.'s Br. at 20-22.

More fundamentally, Commerce has failed to ground its benefit determination in any primary authority.  In the *Preliminary Results*, Commerce found a benefit to exist "in accordance with 19 C.F.R. § 351.503(b)(2) to the extent that the recipient is relieved of the obligation to purchase additional allowances."  P.R. 98 at 20.  19 C.F.R. § 351.503(b)(2) states that Commerce "*will* determine whether a benefit is conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act."  19 C.F.R. § 351.503(b)(2) (emphasis added).  Despite relying on this regulation, Commerce has not explained how the relative allocation of emissions permits converts an otherwise costly and burdensome program into a countervailable benefit with common or similar elements to those listed in 19 U.S.C. § 1677(5)(E).  Defendant-Intervenor even acknowledges that "Commerce did not address each of the illustrative examples in the statute," Def.-Int. Br. at 18, which is required by the plain language of 19 C.F.R. § 351.503(b)(2), Pl. Br. at 22.  This alone demonstrates that Commerce's benefit determination is unlawful.

Neither Defendant nor Defendant-Intervenor dispute that the KETS burdens and increases costs for the companies subject to it.  Def. Br. at 18-20; Def.-Intervenor Br. at 16-18.  Commerce actually acknowledges that "the K-ETS program by its nature is designed to impose a cost on companies for their emission of greenhouse gases."  P.R. 132 at 21.  The fact that third parties need to purchase additional permits because the GOK deducts 3 percent from their permit allocation does not mean that Hyundai Steel received a benefit with common or similar elements to the four illustrative examples in 19 U.S.C. § 1677(5)(E).  Moreover, the burdens imposed by

15

the permit allocations are evident and contextualized by the fact that other companies are not subject to carbon emission caps like Hyundai Steel is,[4] but such a comparison is not necessary for the obvious conclusion that Hyundai Steel does not benefit from having its emissions capped, regardless of the relative cap level.

Defendant-Intervenor raises similar arguments,[5] Def.-Int. Br. at 18, but adds that, "by paying nothing for something of value" Hyundai Steel therefore receives emissions allowances for less than adequate remuneration.  Def.-Int. Br. at 18.  Commerce did not find that Hyundai Steel received carbon permits for less than adequate remuneration. P.R. 132 at 17-24.  The court "may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'" *Itochu Building Prods. Co., Inc. v. United States*, 163 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2016); *SEC v. Chenery*

---

[4] The amount of permits allocated to a company represents the amount of carbon emissions, or equivalents, that it may emit during a given year.  C.R. 77 (P.R. 76), Exhibit SQA-1, at 11-14.  The amount of permits issued is based on Korea's emissions during the 2014-2016 "base period," but the amount of permits issued decreases over time to limit greenhouse gas emissions. *Id.* at 1-2, 7-8; *see also id.*, Att. 1, at 3-5.  Both companies that receive 100 percent of the applicable permit allocations and those that receive 97 percent allocations have their annual emissions capped equal to an amount of permits that it receives.  C.R. 77 (P.R. 76), Exhibit SQA-1, at 11-14.  Companies whose emissions exceed the amount of permits received must acquire additional permits to cover the shortfall or face fines.  *Id.*; C.R. 93-94 (P.R. 92), Exhibit NSA-10.  Additionally, because the amount of permits allocated over time decreases, those subject to the KETS (regardless of relative allocation amounts) have to reduce operations or invest in ways to reduce annual carbon emissions.  C.R. 93-94 (P.R. 92) at 4-5; C.R. 74 (P.R. 75), Exhibit NSA-1, at 2 (requiring the submission of emissions reductions plans to the GOK).  These are only some of the costs and burdens that result from the KETS program.  *See also* C.R. 93-94 (P.R. 92) at 2-5; C.R. 74 (P.R. 75) at 1-2 & NSA-1 at 4-5.  Companies that are not subject to the KETS in Korea and abroad are not subject to these burdens.

[5] Defendant-Intervenor claims that Commerce fully explained its benefit determination with reference to 19 C.F.R. § 351.503(b)(2).  Def.-Int. Br. at 18.  But, the quotes that Defendant-Intervenor references in the Final Decision Memorandum discuss 19 U.S.C. § 1677(5)(C), not how the KETS program is similar to the examples from 19 U.S.C. § 1677(5)(E).  P.R. 132 at 18.

*Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 1577 (1947).  The court should decline to consider

Defendant-Intervenor's *post hoc* rationalization that was not articulated or argued by Commerce.

    C.    *Commerce's Finding That The KETS Is Specific Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law.*

        1.    *The KETS Program Is Not De Jure Specific Pursuant To 19 U.S.C. §1677(5A)(D)(i).*

In the *Final Results*, Commerce determined that the KETS program was *de jure* specific

because the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits

("AAGEP") and its Enforcement Decree allegedly "result in an express statutory limitation on

which industries qualify for the additional allocation" of permits, and the trade intensity and

production cost criteria "are not objective criteria or conditions."  P.R. 132 at 23.  Hyundai Steel

argued that the criteria in the AAGEP and the Enforcement Decree do not "expressly limit" such

treatment "to a specific enterprise or industry" as required to be *de jure* specific.  Hyundai Br. at

28-35 (citing *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,

523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ("*ASEMESA*")).  As such, Commerce's *de jure*

specificity determination is not supported by substantial evidence and is otherwise not in

accordance with law.

Defendant responds with a deep dive into the facts of the *ASEMESA* case in an effort to

distinguish it from Commerce's *de jure* specificity analysis here.  *See* Def. Br. at 20-22.  This

response is misplaced.  Hyundai Steel's reliance on *ASEMESA* is limited to the court's holding as

to the statutory interpretation of 19 U.S.C. § 1677(5A)(D), and not factual similarities—

specifically, the court's holding that what is required by the plain meaning of the statute is that

"the authority providing the current subsidy, or its operating legislation, directly and explicitly

prescribes limitations on the distribution of subsidies to an enterprise or industry."  *ASEMESA*,

523 F. Supp. 3d at 1404.  The facts of the *ASEMESA* case are unique and for this reason Hyundai

Steel drew no parallels between the facts of that case and the facts related to the KETS program. Defendant's argument that Hyundai Steel's reliance on *ASEMESA* is misplaced is thus non-responsive to Hyundai Steel's argument.  Def. Br. at 22-23.  As explained in Hyundai Steel's opening brief, *any* subsector may meet the trade intensity or production cost thresholds regardless of enterprise or industry, and the mere fact that businesses with low international trade intensity or production costs do not retain their 100 percent allocation does not amount to an "explicit limitation to a specific enterprise or industry" as required to be *de jure* specific.  C.R. 77 (P.R. 76), Exhibit CEP-1 at 12-13, 16; Pl. Br. at 30-31.

Hyundai Steel argued that the GOK could not have expressly limited the KETS allocations to an enterprise or industry because it did not know which subsectors met the criteria at the time it enacted them.  Pl. Br. at 31.  Defendant counters that "the statute does not require Commerce to consider the *intent* behind the subsidy, but the *result*."  Def. Br. at 23.  This is a red herring.  For this subsidy to be specific as a matter of law, the AAGEP must expressly limit the 100 percent allocations to specific enterprises or industries.  The fact that the GOK did not know what enterprises or industries would be included in the trade intensive or high production cost sectors at the time the law was drafted means it could not have expressly limited it to any particular enterprise or industry.  This has nothing to do with intent.

2.  *The Safe Harbor Has Been Met.*

In the *Final Results*, Commerce found that the AAGEP and the implementing rules "are not objective criteria or conditions, as defined by section 771(5A)(D)(ii)."  P.R. 132 at 23. Hyundai Steel argued that the Section 771(5A)(D)(ii) safe harbor has been met.  In response, Defendant argues that KETS program establishes "explicit limitations that are not objective" because "the rules clearly favor industries in trade-intensive or high production cost sectors." Def. Br. at 23.  Similarly, Defendant-Intervenor claims that it is not neutral, and therefore not

NON-CONFIDENTIAL

objective, because the GOK does not deduct 3 percent of the permit allocation from 37

subsectors, namely the industrial sector, and allegedly the "[

].''  Def.-Int.

Br. at 20.  However, following such logic, any eligibility criteria could be said to favor an

enterprise or industry because not everyone will meet the eligibility criteria.  What would be the

point of having eligibility criteria if everyone could qualify?  Defendant and Defendant-

Intervenor claim to demonstrate that the criteria are not objective.  Instead, the facts that the

GOK had to apply the criteria to determine which subsectors qualified, P.R. 77, CEP-8 at 5/15 &

Attachment 2, and that the number of subsectors who qualify over time will change depending

on imports, exports, sales, and production costs demonstrate that the criteria here are not

objective and do not favor one industry or enterprise over another, *see* Pl. Br. at 30.

Defendant and Defendant-Intervenor rely on the *BGH* decision to support Commerce's

determination that the criteria for ineligibility for the 3 percent deductions are not objective

criteria or conditions.  Def. Br. at 23-24; Def.-Int. Br. at 20-21.  But the eligibility criteria in

*BGH* limited eligibility to companies on a carbon leakage list, which, unlike here, would favor

specific companies on the list.  *BGH*, 600 F. Supp. 3d at 1264.  In contrast, eligibility under the

KETS for the 100 percent allocation was not limited to certain companies but instead is available

to any enterprise in the sectors or subsectors that met the trade intensity or production cost

criteria.  C.R. 77 (P.R. 76), Exhibit CEP-1 at 16 (Art. 14 of the Enforcement Decree).

To the extent the *BGH* case is relevant, it actually supports the conclusion that the

eligibility criteria under the KETS are objective.  The statutory language provides that objective

criteria are those that "are neutral and that do not favor one enterprise or industry over another."

19 U.S.C. § 1677(5A)(D).  In seeking to understand this language, the court references the SAA

that states that: "neutral in this context means economic in nature and horizontal in application, such as the number of employees or the size of the enterprise." *BGH*, 600 F. Supp. 3d at 1255 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4243 ("SAA")).  Using these examples, the KETS criteria are neutral.  Deciding eligibility based on the number of employees or size of an enterprise would result in some enterprises being favored over others, just as the trade intensity and production cost criteria would exclude companies with lower trade intensity or production costs.  If these examples are representative of neutral criteria then the KETS criteria are neutral.

Furthermore, the *BGH* court found that Commerce's determination that the safe harbor was not met for another subsidy program was not supported by substantial evidence.  The KAV program at issue in that case limited the alleged subsidy to "special contract customers whose average price per kWh in the calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers."  *Id.* at 1269.  The court faulted Commerce for not explaining how this program favors certain industries over others or explicitly limits who could apply, nor did Commerce address "whether criteria based on energy usage is economic in nature and horizontal in application," such that the program may be considered *de jure* specific. *Id.*  Here, as in *BGH*, Commerce has not explained how the trade intensity or production cost criteria favors certain companies over others or limits who can apply.

II.     *Conclusion.*

For the foregoing reasons, Hyundai Steel respectfully requests that the Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,496 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  June 16, 2023