Slip Op. 23-144

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| HYUNDAI STEEL COMPANY, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Chief Judge |
| Defendant, | Court No. 22-00170 |
| and | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final results for the 2019 administrative review of the countervailing duty order on hot-rolled steel flat products from the Republic of Korea.]

Dated: September 29, 2023

<u>Brady W. Mills</u> and <u>Nicholas C. Duffey</u>, Morris, Manning & Martin, LLP, of Washington, DC, argued for Plaintiff.  With them on the brief were <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Edward J. Thomas III</u>, and <u>Jordan L. Fleischer</u>.

<u>Sosun Bae</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.  Of counsel on the brief was <u>Hendricks Valenzuela</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Derick G. Holt</u>, Wiley Rein LLP, of Washington, DC, argued for Defendant-Intervenor. On the brief were <u>Alan H. Price</u>, <u>Christopher B. Weld</u>, and <u>Theodore P. Brackemyre</u>.

Barnett, Chief Judge:  This matter is before the court on a motion for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT") Rule 56.2. Confid. Pl. Hyundai Steel Co.'s Mot. for J. on the Agency R., ECF No. 25, and accompanying Confid. Br. in Supp. of its Mot. for J. on the Agency R. ("Hyundai's Mem."), ECF No. 25-2; Confid. Pl. Hyundai Steel Co.'s Reply Br. in Supp. of its Mot. for J. on the Agency R. ("Hyundai's Reply"), ECF No. 42.  Plaintiff Hyundai Steel Company ("Hyundai Steel") challenges the U.S. Department of Commerce's ("Commerce" or "the agency") decision to countervail the Government of the Republic of Korea's ("Government of Korea" or "GOK") emissions trading program in the final results of the 2019 administrative review of the countervailing duty order on hot-rolled steel flat products from the Republic of Korea ("Korea").  Hyundai's Mem. at 2; *see also Certain Hot-Rolled Steel Flat Prods. From the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't Commerce May 9, 2022) (final results of countervailing duty admin. review; 2019) ("*Final Results*"), ECF No. 20-4; and accompanying Issues and Decision Mem., C-580-884 (May 3, 2022) ("I&D Mem."), ECF No. 20-5.[1]

Defendant United States ("the Government") and Defendant-Intervenor Nucor Corporation ("Nucor") urge the court to sustain Commerce's determination.  Def.'s

---

[1] The administrative record for the *Final Results* is contained in a Public Administrative Record ("PR"), ECF No. 20-1, and a Confidential Administrative Record ("CR"), ECF No. 20-2.  Hyundai Steel submitted joint appendices containing record documents cited in parties' briefs.  Confid. J.A. ("CJA"), ECF No. 44; Public J.A., ECF No. 45.  The court references the confidential record documents unless otherwise specified.

Resp. to Pls.' Mots. for J. on the Agency R. ("Def.'s Resp."), ECF No. 34;[2] Confid. Nucor

Corp.'s Resp. to Hyundai Steel Co.'s Mot. for J. on the Agency R. ("Nucor's Resp."),

ECF No. 38.  For the following reasons, the court remands Commerce's *Final Results*.

BACKGROUND

In 2016, Commerce published the countervailing duty order covering hot-rolled

steel flat products from Korea. *Certain Hot-Rolled Steel Flat Prods. From Brazil and the*

*Republic of Korea*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (am. final

affirmative countervailing duty determinations and countervailing duty orders).  On

December 8, 2020, Commerce initiated an administrative review of the underlying order

for the 2019 period of review ("POR").  *Initiation of Antidumping and Countervailing Duty*

*Admin. Reviews*, 85 Fed. Reg. 78,990, 78,994 (Dep't Commerce Dec. 8, 2020), PR 62,

CJA Tab 4.  Commerce selected Hyundai Steel as the sole mandatory respondent for

the review.  Resp't Selection Mem. (Jan. 12, 2021), CR 6, PR 21, CJA Tab 1.

On May 17, 2021, Hyundai Steel and the Government of Korea each responded

to Commerce's carbon emissions questionnaire.  Hyundai Steel's Carbon Emission

New Subsidy Allegation Questionnaire Resp. (May 17, 2021) ("Hyundai Steel's NSA

Resp."), CR 74–75, PR 75, CJA Tab 7; GOK's Carbon Emissions New Subsidy

Allegation Questionnaire Resp. (May 17, 2021) ("GOK's NSA Resp."), CR 77, PR 76,

---

[2] At the time of filing the Government's response, this case was consolidated with another case commenced by Nucor such that two motions for judgment on the agency record were pending.  The court subsequently granted Nucor's motion to sever its case to enable dismissal of that case.  *See* Nucor Corp.'s Consent Mot. to Sever Ct. No. 22-00171 From Consol. Ct. No. 22-00170 at 1, ECF No. 40; Order (June 12, 2023), ECF No. 41.

CJA Tab 8.[3]  The questionnaire responses explained that, to reduce greenhouse gas emissions, the Government of Korea established the Emissions Trading System of Korea ("K-ETS") in the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits ("AAGEP"), with rules governing K-ETS implementation set forth in the AAGEP's accompanying Enforcement Decree.  GOK's NSA Resp., Ex. SQA-1 at 1; *see also id.*, Ex. CEP-1 (reproducing the AAGEP and the Enforcement Decree).[4]  The K-ETS applies to business entities that emit 125,000 tons or more of carbon dioxide or equivalents or have a single place of business that emits 25,000 tons or more of carbon dioxide or equivalents.  AAGEP, art. 8(1).

Relevant to this case, for each annual compliance year, the Government of Korea uses emissions data from the 2014 to 2016 baseline period[5] to determine the number of emissions permits[6] entities will be allocated, subject also to the phase of the program, the number of permits available, and the number of K-ETS participants.  *See* GOK's NSA Resp. at 3–4; Decision Mem. for the Prelim. Results of the Countervailing Duty Admin. Review (Oct. 29, 2021) ("Prelim. Mem.") at 17–18, PR 98, CJA Tab 15.[7]

---

[3] During the 2018 administrative review, Commerce determined to initiate an investigation into the Government of Korea's carbon emissions program but deferred the investigation until the 2019 review.  *See* GOK Carbon Emissions Program Questionnaire (Apr. 26, 2021), Attach. 1 at 1, PR 63, CJA Tab 5.

[4] For ease of reference, the court cites to the articles of the AAGEP and the Enforcement Decree, respectively.

[5] This method is called the "grandfathering method" and is the method the GOK applied to Hyundai Steel.  GOK's NSA Resp. at 4.

[6] Permits are also called Korean Allowance Units ("KAUs").  *Id.*, Ex. SQA-1 at 5.

[7] Compliance years correspond to calendar years, Prelim. Mem. at 17 n.121, and are also referred to as "commitment periods," GOK's NSA Resp. at 7.  Commerce explained

The 2019 POR fell within phase two of the K-ETS program,[8] during which time all K-ETS participants received a gratuitous allocation of 97 percent of their permits (referred to herein as "the standard allocation") with the remaining three percent held in reserve. Enforcement Decree, art. 13(2).[9]  However, the "types of businesses" that met certain "international trade intensity" or "production cost" criteria received a gratuitous allocation of 100 percent of their permits (referred to as "the full allocation").  *Id.*, art. 14.[10] Hyundai Steel qualified for the full allocation.  Hyundai Steel's NSA Resp., Ex. NSA-1 at 2.

Following the end of each compliance year, K-ETS participants must surrender permits in an amount equal to their emissions during that compliance year or incur penalties for any shortfall.  GOK's NSA Resp. at 4, 7.  Entities that require additional permits to cover their emissions have several options to avoid a penalty: 1) carry forward unused permits from prior years, 2) borrow permits from future years, 3) earn credits by reducing greenhouse gas emissions through external projects (carbon offset

---

that permits corresponding to compliance year 2019 "are allocated in late 2018." Prelim. Mem. at 17.

[8] Phase two ran from 2018 through 2020.  *Id.* at 18.

[9] The GOK uses the permits held in reserve for new entrants and for market stabilization.  AAGEP, art. 18.

[10] The "types of businesses" eligible for the full allocation are those that have either "an international trade intensity of at least 30 percent"; "production costs of at least 30 percent"; or "an international trade intensity of at least 10 percent and production costs of at least 5 percent."  I&D Mem. at 23; *see also* Enforcement Decree, art. 14. International trade intensity measures exports plus imports against sales plus imports for the period of 2013 through 2015; production costs are measured as the cost of compliance (emissions multiplied by the market price of permits) measured against the value added during the period of 2013 through 2015.  *See* GOK's NSA Resp. at 2.

programs), 4) purchase permits from nongovernmental parties either directly or through a trading exchange, or 5) purchase permits through a government-run auction.  Prelim. Mem. at 19 & nn.130–31 (citing GOK's NSA Resp. at 4–5, Ex. CEP-1, then citing GOK's First Suppl. Questionnaire Resp. (Sept. 17, 2021) at 2–3, 7, Ex. CEP-7.1, CR 95, PR 93, CJA Tab 14).  Companies that receive the full allocation may not participate in a government-run auction.  GOK's NSA Resp. at 6.  For compliance year 2019, Hyundai Steel purchased additional permits from private parties and borrowed against the company's compliance year 2020 allocation.  Hyundai Steel's NSA Resp. at 4; *see also* GOK's NSA Resp. at 7.

Commerce issued its preliminary results on October 29, 2021.  *Certain Hot-Rolled Steel Flat Prods. From the Republic of Korea*, 86 Fed. Reg. 60,797 (Dep't Commerce Nov. 4, 2021) (prelim. results of countervailing duty admin. review and rescission in part; 2019) ("*Prelim. Results*"), PR 100, CJA Tab 17.  For the *Preliminary Results*, Commerce found that the additional three percent of permits provided to recipients of the full allocation constituted a countervailable benefit.  Prelim. Mem. at 17–20.  Commerce preliminarily calculated a subsidy rate of 0.56 percent *ad valorem* for Hyundai Steel, *Prelim. Results*, 86 Fed. Reg. at 60,798, inclusive of a 0.10 percent *ad valorem* subsidy rate based on the K-ETS, Prelim. Mem. at 21.

On May 4, 2022, Commerce issued the *Final Results*.  87 Fed. Reg. at 27,570. Commerce made no relevant changes to Hyundai Steel's subsidy rate.  I&D Mem. at

17.  This appeal followed, and the court heard oral argument on September 7, 2023.

Docket Entry, ECF No. 51.[11]

### Jurisdiction and Standard of Review

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[12] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

To resolve questions concerning statutory interpretation, the court is guided by

the two-part framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 842–45 (1984).  Pursuant to *Chevron*, the court must first

determine "whether Congress has directly spoken to the precise question at issue."  467

U.S. at 842.  If Congress's intent is clear, "that is the end of the matter," and the court

"must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.

However, "if the statute is silent or ambiguous," the court must determine whether the

agency's action "is based on a permissible construction of the statute."  *Id.* at 843.

### Discussion

A countervailable subsidy "exists when . . . a foreign government provides a

financial contribution . . . to a specific industry" that confers "a benefit" on "a recipient

---

[11] Subsequent citations to the Oral Argument include the time stamp from the recording, which is available at https://www.cit.uscourts.gov/node/288/.

[12] Further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code.  All references to the U.S. Code are to the 2018 edition unless otherwise specified.

within the industry." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)).  Hyundai Steel challenges Commerce's determination with respect to the financial contribution, benefit, and specificity elements of a subsidy.  Although a lay observer may consider it clear that the GOK makes a financial contribution to Hyundai Steel by providing the additional KAUs, confers a benefit by providing those KAUs at no cost, and, by limiting the additional distribution to certain industries, does so with specificity, it is incumbent upon the agency to ground its determinations in the statute and regulations, consistent with the various requirements and limitations contained therein.  It is with this in mind that the court reviews and addresses each issue, in turn.

## I.   Financial Contribution

Section 1677(5) defines a financial contribution to include, *inter alia*, "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income."  19 U.S.C. § 1677(5)(D)(ii).  Commerce determined that Hyundai Steel received a financial contribution pursuant to this provision.  I&D Mem. at 21–22.

Referencing the agency's preliminary analysis, Commerce explained that "because companies receiving the standard 97 percent allocation were able to purchase KAUs via the GOK-run auction," the additional three percent allocated to other companies represented "something of value on which [the GOK] could collect revenue." *Id.* at 21–22 & n.113 (citing Prelim. Mem. at 20).  Commerce rejected Hyundai Steel's argument that the Government of Korea did not forgo revenue that was otherwise due. *Id.* at 22.  The agency reasoned that "it is not a matter of what the GOK would have

done with the KAUs had they not given them to qualifying entities like Hyundai Steel," but that "the key consideration is that, in lieu of giving these entities the additional KAUs for free, the GOK would have retained the ability to collect the three percent allocation from Hyundai Steel."  *Id.*  Commerce explained that because K-ETS participants must surrender the necessary permits at the end of each commitment period or incur a penalty, "through various means, the GOK has forgone revenue otherwise due – in the form of uncollected payments/fines, or through the non-collection of additional allocation from K-ETS participants (whether from Hyundai Steel or otherwise) – by providing the additional three percent allocation to certain industries."  *Id.* at 22.

### A.  Parties' Contentions

Hyundai Steel contends that Commerce has misinterpreted the plain language of the "revenue forgone" provision of the statute.  Hyundai's Mem. at 10.  Focusing on the phrase "otherwise due," Hyundai Steel contends that the phrase plainly requires the authority to forgo revenue it otherwise has a "'right' to collect."  *Id.* at 11.  Hyundai Steel asserts that the GOK's provision of the full allocation to certain companies does not result in the GOK forgoing revenue otherwise due because companies that receive the standard allocation are not required to purchase additional permits from the GOK.  *Id.* at 12–15.

The Government contends that, but for the provision of additional permits, "the [GOK] would have otherwise retained the ability to collect the three percent allocation."  Def.'s Resp. at 16; *see also id.* at 17 (arguing that the revenue forgone provision is met when the relevant authority "provid[es] something of value for which it *could* otherwise

*potentially* collect revenue") (emphasis added).  The Government relies on *BGH Edelstahl Siegen GmbH v. United States* ("*BGH I*"), 46 CIT __, __, 600 F. Supp. 3d 1241, 1262–63 (2022), to support its position.  *See id.* at 16–17.

Nucor contends that the statute does not require "the revenue [to] be due from the respondent in question."  Nucor's Resp. at 16.  Nucor thus posits that the GOK forgoes revenue because recipients of the full allocation are less likely to have to purchase additional permits on the private market, which, in turn, reduces the need for other companies to buy permits through the government-run auction.  *Id.*  Nucor also identifies the penalty paid by companies with insufficient permits as "revenue the GOK could potentially collect."  *Id.*[13]

In its reply brief, Hyundai Steel counters that *BGH I* is not persuasive because that opinion does not address arguments raised herein.  Hyundai's Reply at 6–8.  Hyundai Steel further asserts that Nucor's argument regarding the indirect impact on the number of permits purchased from the GOK is misplaced because "[t]here is no cap on the number of permits that can be sold on the private market."  *Id.* at 9.  Hyundai Steel argues that the GOK's authority to extract a penalty from companies with insufficient

---

[13] Nucor also asserts that Hyundai Steel is wrong to focus "on the timing of when Hyundai Steel would have owed any revenue to the GOK."  Nucor's Resp. at 15. Nucor's argument is not well-developed, but it appears to be rooted in Nucor's assertion that the permits themselves have value and, thus, the full allocation "placed [Hyundai Steel] in an *initial* advantageous position."  *Id.* (quoting Def.'s Resp. at 17).  Given that the initial permit allocation (whether full or standard) is gratuitous, AAGEP, art. 12(3)–(4); Enforcement Decree, art. 13, Nucor fails to support the argument that the GOK forgoes revenue that is otherwise due through the allocation process.

permits does not mean that revenue "is otherwise due" because such payments are not certain to occur.  *Id.*

## B. Commerce Must Reconsider the Legal Basis for its Financial Contribution Determination

Hyundai Steel contests Commerce's determination that the Government of Korea is forgoing revenue that "is otherwise due" when the GOK provides eligible entities with the full allocation of emissions permits.  Hyundai's Mem. at 9.  Commerce's financial contribution determination thus turns on the meaning of the phrase "is otherwise due."[14] Statutory interpretation requires the court to determine "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.[15]  The court readily concludes that the plain meaning of the phrase does not encompass revenue that could, but not necessarily would, have otherwise been collected by the relevant authority.

As set forth above, "[t]he term 'financial contribution' means-- . . . (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions

---

[14] Commerce did not take the position that the statutory term "revenue" is ambiguous and permissibly interpreted to cover the emissions permits *as a type of* monetary equivalent.  Rather, Commerce tied the value of the KAUs to their value on the governmental or private markets.  *See* I&D Mem. at 21 ("The record demonstrates that KAUs are market instruments with prices established for the purpose of trading KAUs both through the GOK-run auction and in private trading markets throughout the POR."). Thus, the revenue that is material to this case is the revenue associated with the sale of permits.  Accordingly, and consistent with Commerce's further explanation on financial contribution and its benefit calculation, *see id.* at 22, 25, the question before the court is whether the additional three percent allocation resulted in the GOK forgoing revenue from the sale of additional allocations that was otherwise due.

[15] Commerce did not state whether the agency considered the statute plain or ambiguous.  *See id.* at 21–22.

from taxable income."  19 U.S.C. § 1677(5)(D)(ii).  Congress's use of the simple present

tense "is" denotes an existent obligation that is due presently or would be due at some

time in the future.  *See, e.g.*, *Carr v. United States*, 560 U.S. 438, 448 (2010) (stating

that, "[c]onsistent with normal usage, we have frequently looked to Congress' choice of

verb tense to ascertain a statute's temporal reach"); *see also* 1 U.S.C. § 1 ("In

determining the meaning of any Act of Congress, unless the context indicates

otherwise--. . . words used in the present tense include the future as well as the

present[.]").  As such, the revenue that is forgone must be due either presently or on

some future date, but it must, nevertheless, be "otherwise due."

The parties do not dispute that the adverb "otherwise" means, in effect, "in

different circumstances," *see* Hyundai's Mem., Ex. B (appending a printout from an

online dictionary), or as is relevant here, "but for the subsidy program."

Dispositive for purposes of this case, however, is the meaning of "due."  The

Oxford English Dictionary defines "due," when used as an adjective as it is in the

statute, as something "[t]hat is owed or payable as an *enforceable obligation or debt*."

*Due*, Oxford English Dictionary, https://www.oed.com/dictionary/due_adj (last visited

Sept. 29, 2023) (emphasis added).  Other dictionary definitions are in accord.  *See Due*,

Dictionary.com, https://www.dictionary.com/browse/due (last visited Sept. 29, 2023)

(defining "due" as "owed at present; having reached the date for payment" or, "owing or

owed, irrespective of whether the time of payment has arrived"); Hyundai's Mem., Ex. A

(appending a printout from Merriam-Webster's online dictionary defining "due" as "owed

or owing as a debt").  These definitions indicate that the statute requires the forgoing of

revenue that the recipient of the financial contribution would—not merely could—
otherwise *owe* the authority.

The statutory text and legislative history are consistent with this view.  *See*
*Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) (directing the court to examine
"the statute's text, structure, and legislative history," applying, if necessary, "the relevant
canons of interpretation").  The statute and the Statement of Administrative Action
accompanying the Uruguay Round Agreements Act provide nonexhaustive examples in
the form of tax credits or deductions from taxable income that operate to reduce the
amount of tax revenue a recipient would owe the authority.  *See* 19 U.S.C.
§ 1677(f)(D)(ii); Uruguay Round Agreements Act, Statement of Administrative Action
("SAA"), H.R. Doc. No. 103–316, vol. 1, at 912 (1994), reprinted in 1994 U.S.C.C.A.N.
4040, 4229.[16]

Neither Commerce nor the Government[17] offer a contrary interpretation of the
phrase "is otherwise due" or specifically explain why the potential collection of
revenue—either from permits or penalties—fulfills this statutory requirement.

---

[16] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d).
[17] Cases cited by the Government for the statutory framework also do not suggest a
different interpretation.  *See* Def.'s Resp. at 15–16 (citing *Gov't of Québec v. United
States*, 46 CIT __, __, 567 F. Supp. 3d 1273, 1278 (2022); *Essar Steel, Ltd. v. United
States*, 29 CIT 1311, 1313, 395 F. Supp. 2d 1275, 1277 (2005)).  Such cases address
financial contribution determinations analogous to the statutory examples.  *See Gov't of
Québec*, 567 F. Supp. 3d at 1296 (revenue forgone when the authority provided
"additional depreciation [thereby reducing the tax burden] for buildings used in
manufacturing by comparison to the rate applicable if the additional depreciation were
not claimed"); *Essar Steel*, 29 CIT at 1313, 395 F. Supp. 2d at 1277 (revenue forgone
when the authority provided credits to be used "for the future payment of import duties").

Commerce's brief discussion of its decision in *FEBs From Germany* involving the

European Union Emissions Trading System ("EU ETS") does not illuminate

Commerce's statutory interpretation.[18]  *See* I&D Mem. at 22 & nn.114–17 (discussing

Issues and Decision Mem. for Fluid End Blocks from Germany, C-428-848 (Dec. 7,

2020), Cmt. 10).[19]

　　　　At oral argument, the court asked the parties to provide examples of prior

Commerce decisions, if they exist, in which the agency relied on the revenue forgone

provision when the authority provided something of value to a recipient (i.e., something

other than a tax credit or similar fiscal incentive).  *See* Letter to Counsel (Aug. 31,

2023), ECF No. 50.  The Government identified *Hyundai Steel Co. v. United States*

("*Hyundai Steel II*"), Slip Op. 23-121, 2023 WL 5352235, at *1 (CIT Aug. 1, 2023), as

such an example.  Oral Arg. 26:00–27:30.  Nucor identified a Commerce decision

concerning silicon metal from Australia.  *Id.* 32:00–34:03.[20]

---

[18] Commerce quoted from a portion of its *FEBs From Germany* decision in which the agency analogized the EU ETS to a tax rebate system.  *See* I&D Mem. at 22 n.114. However, beyond declaring that in each situation "the government has forgone revenue that would otherwise have been due," Commerce does not explain precisely *why* the EU ETS is analogous to a tax rebate system.  *See id.*  While the *BGH I* court sustained Commerce's financial contribution determination with respect to the EU ETS, 600 F. Supp. at 1262–63, Hyundai Steel raises different arguments grounded in statutory interpretation that the *BGH I* court did not have occasion to address and, in any case, CIT opinions are not binding, *see Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

[19] Commerce's decision memoranda are publicly available at https://access.trade.gov/ public/FRNoticesListLayout.aspx, with separate links for pre- and post-June 2021 memoranda.

[20] Nucor did not provide a specific citation, but the court understands Nucor to refer to the agency's preliminary determination in the countervailing duty investigation

While the relevant determinations were not subject to judicial review,[21] it appears that the revenue the respective authorities declined to collect in each case would otherwise have been due (owed) to the authority.  In *Hyundai Steel II*, Commerce relied on the revenue forgone provision when, following Hyundai Steel's construction of port facilities and subsequent transfer of port ownership to the Government of Korea, the GOK assigned its right to collect port fees to Hyundai Steel.  2023 WL 5352235, at *3 (explaining that the port fees "would otherwise have been collected by the [Government of Korea] absent the agreement between the parties") (alteration in original).  In *Silicon Metal From Australia*, Simcoa, an electricity retailer, obtained certificates exempting it from certain renewable energy liabilities and provided those certificates to Synergy, an electricity provider and "authority" pursuant to the statute, that functioned as a credit on Simcoa's electricity account.  Silicon Metal Prelim. Mem. at 10–11.  Commerce found a financial contribution in the form of reduced electricity payments from Simcoa to Synergy.  *Id.* at 11 (unchallenged in the final decision memorandum).  Commerce's determinations in these two instances are more clearly reconcilable with the above

_____

concerning silicon metal from Australia.  *See* Prelim. Decision Mem. for Silicon Metal from Australia, C-602-811 (Aug. 7, 2017) ("Silicon Metal Prelim. Mem.").

[21] The court's opinion ordering the remand determination reviewed in *Hyundai Steel II* made clear that Hyundai Steel's challenge was limited to the benefit determination and did not include the financial contribution or specificity determinations.  *See Hyundai Steel Co. v. United States*, 47 CIT __, __, 615 F. Supp. 3d 1351, 1354 (2023).  In another recent case involving the countervailability of port-usage fees, Hyundai Steel likewise challenged only Commerce's benefit determination.  *See Hyundai Steel Co. v. United States*, Slip Op. 23-142, 2023 WL 6240149, at *3–4 (CIT Sept. 26, 2023) (ordering remand for further consideration of the issue).  A review of the court's docket does not disclose litigation concerning *Silicon Metal From Australia*, nor did Nucor provide such a citation.

definitions of the term "due" in connection with enforceable payment obligations or

debts.

Commerce's construction of the statute in this case *might* fare better if the statute

provided for a financial contribution in the form of revenue forgone without further

qualification, but by adding the phrase "that is otherwise due," Congress added a

constraint for which Commerce must account.  *See United States v. Nordic Vill. Inc.*,

503 U.S. 30, 36 (1992) (stating that courts must construe statutes "in such a fashion

that every word has some operative effect").  Because Commerce did not do so here,

the agency's financial contribution determination is not in accordance with law.[22]

Additionally, as a factual matter,[23] the full allocation provided by the K-ETS as

compared to the standard allocation does not meet the plain language of the revenue

---

[22] Commerce's interpretive approach (pursuant to which the potential forgoing of
revenue suffices for purposes of section 1677(5)(D)(iii)) is problematic because it could
subsume other provisions of the financial contribution statute.  Because Commerce
considers money to be fungible for purposes of administering the countervailing duty
statute, *see, e.g.*, *Kiswok Indus. Pvt. v. United States*, 28 CIT 774, 787 (2004) ("A cash
subsidy, regardless of its intended or actual use, frees up revenue, which in turn may be
applied for other purposes, and thus entails general benefit."), Commerce could, in
theory, find that a grant, which typically falls under a different statutory provision,
constitutes revenue forgone to the extent that the grant money may be used to offset a
recipient's tax liability.  In such a case, the authority is forgoing revenue in an amount
equal to the amount of the grant, and such amount is potentially due to the authority
even if the grant is provided without regard to when (or if) the tax may be due.  Given
that Commerce considers the KAUs to be market instruments, *see* I&D Mem. at 21, the
possibility that Commerce's determination conflates otherwise distinct statutory
provisions bolsters the need for the agency to reconsider its interpretive approach.
[23] The overall thrust of Commerce's decision appears to rest on the agency's conclusion
that the potential for collecting revenue fulfills the revenue forgone provision.  *See id.* at
18 (recognizing that "the assistance provided by the additional three percent KAU
allocation is intended to cover *potential liability* owed by, not to, the respondent under

forgone provision.  While "the three percent allocation represents a value that the GOK
will no longer collect" because companies that receive the additional permits will not
have to purchase those permits from the GOK to cover their annual emissions (or obtain
them elsewhere), I&D Mem. at 22, the value embodied by those permits does not
represent revenue that, but for the permits being given to Hyundai Steel gratis, "is
otherwise due" to the GOK.  K-ETS participants that receive the standard allocation do
not automatically incur any enforceable debt or financial obligation that recipients of the
full allocation avoid by reason of the additional allocation, all other things being equal.
Companies that receive the standard allocation might not incur any permit shortfall and,
if they do, they have various options to remedy the shortfall besides sending payment to
the GOK.  *See, e.g.*, Prelim. Mem. at 19.  That the GOK *might* obtain revenue from the
sale of additional KAUs does not mean that the GOK has, in the case of companies like
Hyundai Steel, forgone revenue that "is otherwise due."[24]

---

the K-ETS program") (emphasis added; other emphasis omitted); *id.* at 22 (noting that
"the GOK is providing something of value on which it *could* collect revenue" and that
without the additional allocation "the GOK would have *retained the ability* to collect the
three percent allocation from Hyundai Steel") (emphasis added).  However, after
recounting these scenarios, Commerce concluded that "the GOK *has* forgone revenue
otherwise due."  *Id.* (emphasis added).  As a result of this conclusory reasoning, and as
discussed herein, the court is unable to find that substantial evidence supports
Commerce's finding that the full allocation fulfills the plain meaning of the revenue
forgone provision.

[24] Nucor's argument that the additional allocation indirectly reduces the number of
permits that need to be purchased from the GOK because it relieves pressure on the
private permit market, *see* Nucor's Resp. at 16, is not persuasive.  Nucor identifies no
record evidence demonstrating that, but for the full allocation, additional private
purchases by companies otherwise eligible for the full allocation would *require* other,
companies to purchase permits from the GOK to avoid a penalty or that other sources
of permits (including those earned through offset projects) would be exhausted.

Accordingly, Commerce's determination with respect to financial contribution is not in accordance with the law to the extent that it rests on an incorrect interpretation of the statute and lacks substantial evidence to the extent that the full allocation does not result in revenue forgone that is otherwise due.  Thus, Commerce's determination will be remanded for Commerce to reconsider whether the full allocation constitutes a financial contribution.

## II.  Benefit

"A benefit shall normally be treated as conferred where there is a benefit to the recipient."  19 U.S.C. § 1677(5)(E).  As a practical matter, the statute provides rules to guide Commerce's benefit determination in the case of an equity infusion, loan, loan guarantee, or the provision of a good or service, but these examples are not exhaustive.  *See id.* § 1677(5)(E)(i)–(iv).  Commerce's regulations also guide the agency's identification and measurement of a benefit.  *See* 19 C.F.R. §§ 351.503–351.520.  For subsidy programs not specifically covered by Commerce's regulations, Commerce "normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program . . . ."  *Id.* § 351.503(b)(1).  When subsection (b)(1) does not apply, Commerce "will determine whether a benefit is conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in [19 U.S.C. § 1677(5)(E)(i)–(iv)]."  *Id.* § 351.503(b)(2).

For the *Preliminary Results*, Commerce relied on 19 C.F.R. § 351.503(b)(2) to find a benefit "to the extent that the recipient is relieved of the obligation to purchase

additional allowances."  Prelim. Mem. at 20.  Hyundai Steel did not challenge

Commerce's reliance on subsection (b)(2) but instead focused solely on Commerce's

claimed failure to consider the burdens imposed by the K-ETS.  *See* Hyundai Steel's

Case Br. (Jan. 11, 2022) at 3–9, CR 120, PR 122, CJA Tab 19.

      For the *Final Results*, Commerce found that the full allocation constituted a

benefit despite the costs incurred by Hyundai Steel to comply with K-ETS requirements.

I&D Mem. at 20.  Commerce explained that "[a] subsidy that reduces a firm's cost of

compliance remains a subsidy . . . even though the overall effect of the two government

actions, taken together, may leave the firm with higher costs."  *Id.* at 18 & n.94 (quoting

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't Commerce Nov. 25, 1998)

(final rule) ("*Preamble*") (alterations in original).  According to Commerce, "[t]he

[*Preamble*] describes a relevant example" as when "a government implements new

environmental restrictions that require a firm to purchase new equipment" and "[t]he

government then provides that firm with subsidies to purchase the new equipment" but

the subsidy "does not fully offset the cost of the equipment."  *Id.* at 18 & n.96 (citing

*Preamble*, 63 Fed. Reg. at 65,361).

## A.  Parties' Contentions

      Hyundai Steel contends that Commerce's benefit determination is unlawful

insofar as Commerce "ignore[d] the immense burden this program places on companies

like Hyundai Steel" as compared to companies that are not subject to the K-ETS.

Hyundai's Mem. at 20–21.  Hyundai Steel cites *Gov't of Sri Lanka v. United States*, 42

CIT __, __, 308 F. Supp. 3d 1373, 1380 (2018) ("*GOSL*"), to support its position.  *Id.* at

24, 27.  Hyundai Steel also contends that Commerce failed to conduct the examination required by 19 C.F.R. § 351.503(b)(2).  *Id.* at 22.

The Government contends that Commerce need not consider "any related 'burdens' imposed on a firm" in connection with the subsidy program, "such as those pertaining to compliance with certain environmental obligations."  Def.'s Resp. at 18; *see also id.* at 19 (discussing *BGH I*, 600 F. Supp. 3d at 1264).  Nucor contends that Commerce explained its benefit determination pursuant to 19 C.F.R. § 351.503(b)(2) when it concluded that "the recipient is relieved of the obligation to purchase additional allowances."  Nucor's Resp. at 18 (quoting Prelim. Mem. at 20; I&D Mem. at 24).[25]

### B. Commerce Must Reconsider Its Determination of Benefit Consistent with the Agency's Reconsideration of Financial Contribution

Because Commerce must reconsider the legal basis, if any, for its financial contribution determination, the agency may, if necessary, reconsider the regulatory basis for its benefit determination.[26]  For the sake of completeness, however, and insofar as it may remain relevant to the matters addressed on remand, the court

---

[25] Nucor also argues that Hyundai Steel received the additional permits for less than adequate remuneration, Nucor's Resp. at 18, but Commerce did not make a benefit determination pursuant to 19 U.S.C. § 1677(5)(E)(iv).

[26] Commerce's regulations contain specific rules for measuring the benefits conferred through various types of subsidy programs in addition to the catchall provision Commerce relied on here.  *See* 19 C.F.R. § 351.503(a), (b)(2).  Thus, any change in Commerce's basis for finding a financial contribution may alter Commerce's benefit analysis, requiring application of a different regulation.  Accordingly, the court need not address Hyundai Steel's challenge to the adequacy of Commerce's explanation of its reliance on 19 C.F.R. § 351.503(b)(2) at this time.  *See* Hyundai's Mem. at 22; Hyundai's Reply at 15.

considers—and rejects—Hyundai Steel's primary claim that Commerce impermissibly

ignored the burdens imposed by the K-ETS program.

　　The statute addresses the circumstances in which environmental compliance is

non-countervailable, and those circumstances are not present here nor does Hyundai

Steel claim that they are present.  *See* 19 U.S.C. § 1677(5B)(D)(i) (governing

nonrecurring subsidies provided for "the adaptation of existing facilities to new

environmental requirements" that "result in greater constraints and financial burdens on

the recipient").[27]  Further, as Commerce explained, the *Preamble* expressly

contemplates the countervailability of subsidies that are intended to offset a firm's cost

of complying with environmental restrictions.  *See* I&D Mem. at 18 & n.93 (citing

*Preamble*, 63 Fed. Reg. at 65,361).[28]  Hyundai Steel identifies no legal requirement for

Commerce to compare Hyundai Steel's experience to that of other companies, foreign

---

[27] The statute also lists permissible offsets from Commerce's calculation of the gross countervailable subsidy, *see* 19 U.S.C. § 1677(6), though Hyundai Steel does not argue that any such offsets apply here, *see* Hyundai's Mem. at 27.

[28] Hyundai Steel argues that the *Preamble*'s discussion is inapposite because it relates to input cost reductions, which was not the basis for Commerce's decision here, and because the *Preamble* refers to the imposition and the subsidization of the requirements as "two separate actions," whereas the "emissions caps allocated in the form of permits here are the environmental restriction."  Hyundai's Reply at 12.  Those distinctions are immaterial.  There is no indication in the *Preamble* that the agency intended to constrain its ability to find a benefit when a company ultimately incurs higher costs to only those situations involving input cost effects.  In fact, the reference to "two separate actions" occurs with respect to an example in which a firm is required to purchase new equipment to adapt its facilities and receives a subsidy to purchase "that new equipment."  *Preamble*, 63 Fed. Reg. at 65,361.  Additionally, statutory *treatment* of an imposition and corresponding subsidization of compliance with that imposition "as two separate actions" does not mean that Commerce cannot consider one aspect of a larger government action to confer a benefit when other aspects of that same action may result in higher overall costs.  *Id.*

or domestic, that do not incur similar compliance costs, nor is the court aware of any.
*Cf. BGH I*, 600 F. Supp. 3d at 1255 (rejecting a similar argument with the observation
that "[n]either the statute nor the regulations allow for such a comparison").

Hyundai Steel's reliance on *GOSL* to persuade the court otherwise is also
misplaced.  There, the court remanded Commerce's benefit determination when the
agency countervailed payments made by the Government of Sri Lanka ("GSL")
reimbursing tire manufacturers/rubber buyers for payments made to rubber
smallholders.  *GOSL*, 308 F. Supp. 3d at 1379–84.  The program being examined in
that case involved an above-market "guaranteed price" to smallholders that rubber
buyers were required to pay, subject to reimbursement by the GSL for any difference
between the "market price" and the "guaranteed price," i.e., the value of the guarantee
to the smallholders.  *Id.* at 1379–80.  The court concluded that Commerce erred in
ignoring evidence that the rubber buyers had effectively extended "interest-free loans"
to the GSL such that the "reimbursement payments" at issue were not properly
considered a benefit.  *Id.* at 1382.

*GOSL* is inapposite.  There, the court faulted Commerce for disregarding
evidence demonstrating that the payments at issue did not meet the statutory or
regulatory criteria for finding a benefit; the court was not concerned with whether related
burdens from complying with a program that otherwise conferred a benefit undermined
any such finding.  *See id.* at 1381–84.  Hyundai Steel's emphasis on contextualizing any
benefit within a governmental action's overall burden stretches the *GOSL* court's
holding too far and overlooks that Commerce routinely countervails benefits that reduce

otherwise greater liabilities.  *See, e.g.*, 19 C.F.R. § 351.509(a) (in the case of tax

credits, stating that "a benefit exists to the extent that the *tax paid* by a firm as a result of

the program *is less than* the tax the firm *would have paid* in the absence of the

program") (emphases added).  The absence of any limiting principle to Hyundai Steel's

characterization of *GOSL* is another reason to reject the argument.  Accordingly, the

court will sustain this aspect of Commerce's benefit determination and will defer

addressing any remaining benefit arguments pending the agency's redetermination on

remand.

### III. Specificity

Domestic subsidies[29] may be specific as a matter of law (*de jure* specific) or as a

matter of fact (*de facto* specific).  19 U.S.C. § 1677(5A)(D).  Commerce concluded that

the distribution of the full allocation of emissions permits pursuant to the K-ETS is *de

jure* specific.  I&D Mem. at 22.

The statute provides that a "subsidy is specific as a matter of law" when "the

authority providing the subsidy, or the legislation pursuant to which the authority

operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C.

§ 1677(5A)(D)(i).[30]  Pursuant to the statutory safe harbor provision, however, a subsidy

is not *de jure* specific when "the authority providing the subsidy, or the legislation

---

[29] In addition to domestic subsidies, the statute defines import substitution subsidies and export subsidies as *per se* specific, neither of which are relevant here.  19 U.S.C. § 1677(5A)(B),(C).

[30] For purposes of subsection (5A), "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."  *Id.* § 1677(5A).

pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy." *Id.* § 1677(5A)(D)(ii).[31] "[T]he term 'objective criteria or conditions' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another." *Id.* § 1677(5A)(D). "Neutral in this context means economic in nature and horizontal in application, such as the number of employees or the size of the enterprise." *BGH I*, 600 F. Supp. 3d at 1255 (citing SAA at 930, 1994 U.S.C.C.A.N. at 4243).

Commerce found that the AAGEP and the Enforcement Decree "establish criteria" that "result in an express statutory limitation on which industries qualify for the additional allocation by setting thresholds that industries must meet." I&D Mem. at 23. While Commerce acknowledged that "the rules do not name specific industries," Commerce considered the governing documents sufficiently determinative for purposes of section 1677(5A)(D)(i) because they "establish that some industries may benefit from the additional assistance in the form of the allocation of additional KAUs, while others do not." *Id.* In addition to establishing "explicit limitations," Commerce found that the enumerated criteria are "not objective" for purposes of the safe harbor provision in section 1677(5A)(D)(ii). *Id.*

---

[31] For a subsidy to avoid a specificity finding, subsection (ii) further requires that "(I) eligibility is automatic, (II) the criteria or conditions for eligibility are strictly followed, and (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification." *Id.* § 1677(5A)(D)(ii). Such requirements are not at issue here.

### A.  Parties' Contentions

Hyundai Steel contends that the relevant provisions of the AAGEP and the Enforcement Decree are not *de jure* specific because they do not "explicitly limit" the full allocation "to a specific enterprise or industry."  Hyundai's Mem. at 29 (citing *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 45 CIT __, __, 523 F. Supp. 3d 1393 (2021) ("*Asemesa*")).  Hyundai Steel further contends that Commerce provided no explanation for its finding pursuant to section 1677(5A)(D)(ii). *Id.* at 34.

The Government contends that *Asemesa* is factually distinguishable.  Def.'s Resp. at 21–22.  For the Government, it is enough that the AAGEP and the Enforcement Decree "establish that specific types of industries may benefit from the additional assistance . . . while others do not."  *Id.* at 22–23.  The Government further contends that the safe harbor provision does not apply because the criteria "clearly favor industries in trade-intensive or high production cost sectors."  *Id.* at 23.  The Government analogizes Commerce's specificity finding to the agency's determination sustained in connection with the EU ETS in *BGH I*.  *See id.* at 24.  Nucor advances similar arguments.  *See* Nucor's Resp. at 19.[32]

---

[32] Nucor raises additional arguments concerning the subsectors that qualified for the full allocation in an effort to demonstrate specificity.  Nucor's Resp. at 20 (discussing GOK's NSA Resp., Exs. CEP-7, CEP-8).  Commerce did not explicitly rely on, or otherwise discuss, the facts contained in these exhibits and, therefore, the court need not further discuss Nucor's arguments.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (explaining that the court may only sustain Commerce's decision "on the same basis articulated in the order by the agency itself" and not on the basis of "counsel's post hoc rationalizations").

Hyundai Steel replies that the Government's attempt to distinguish the facts of *Asemesa* is misplaced because the court's holding nevertheless applies.  Hyundai's Reply at 17.  Hyundai Steel further asserts that the *BGH I* court's specificity holding with respect to the EU ETS program is distinguishable and that the court's holding with respect to a different subsidy program is more persuasive.  *Id.* at 19–20.[33]

### B. Commerce Must Reconsider or Further Explain the Agency's Specificity Finding

For a subsidy to be specific pursuant to section1677(5A)(D)(i), the authority or the implementing legislation must "expressly limit[] access to the subsidy to an enterprise or industry," 19 U.S.C. § 1677(5A)(D)(i), or a "a group of such enterprises or industries.," *id.* § 1677(5A).  The court has interpreted the statute to mean "that a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry," *Asemesa*, 523 F. Supp. 3d at 1403 (stating that "[t]here is no ambiguity in this reading"), or in other words, when the

---

[33] Hyundai Steel relies on the *BGH I* court's discussion of the KAV program, pursuant to which benefits were limited "to special contract customers whose average price per [kilowatt hour ("kWh")] in the calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers."  600 F. Supp. 3d at 1269.  The court remanded Commerce's determination for further explanation or reconsideration.  *Id.*  Commerce subsequently provided additional explanation to support its specificity finding, and the court again remanded.  *BGH Edelstahl Siegen GmbH v. United States* ("*BGH II*"), 47 CIT __, __, 639 F. Supp. 3d 1237, 1244 (2023).  The *BGH II* court reasoned that the criteria governing the KAV program "do not expressly limit the program's application to specific enterprises or industries" and Commerce had not "explain[ed] how the program's criteria are neither economic in nature nor horizontal in application."  *Id.*

program is limited "to specifically named enterprises or industries or group of

enterprises or industries," *BGH II*, 639 F. Supp. 3d at 1244.  Nonuniform treatment

across the economy is not enough; instead, the authority or its implementation

legislation must "explicit[ly] restrict[]" the "benefits to a specific enterprise or industry."

*Asemesa*, 523 F. Supp. 3d at 1403.

  Commerce does not offer a convincing explanation for why the "international

trade intensity" or "production cost" criteria governing the full allocation establish *de jure*

specificity pursuant to section 1677(5A)(D)(i).  *See* I&D Mem. at 23 (expressing

disagreement with Hyundai Steel's reliance on *Asemesa* without directly addressing the

court's opinion).[34]  Commerce's observation that "some industries may benefit from the

additional assistance in the form of the allocation of additional KAUs, while others do

not," I&D Mem. at 23, merely reflects the truism that not all industries will "qualif[y] under

the criteria," *BGH II*, 639 F. Supp. 3d at 1244.  While the statute "does not attempt to

provide a precise mathematical formula for determining when the number of enterprises

or industries eligible for a subsidy is sufficiently small so as to properly be considered

specific," SAA at 930, 1994 U.S.C.C.A.N. at 4243, Commerce did not make any findings

regarding the nature of the eligibility criteria that supported the *de jure* specificity finding.

Rather, Commerce relied on the existence of the criteria *per se* to establish specificity.

---

[34] Commerce's determination suggests that a subsidy would be *de jure* specific pursuant to section 1677(5A)(D)(i) whenever an authority sets eligibility criteria that operate to exclude certain industries from receiving a benefit.  *See* I&D Mem. at 23. Commerce does not explain why the statute plainly allows for such a broad interpretation or why the agency's interpretation represents a permissible construction of ambiguous language.  *See id.*

*See* I&D Mem. at 23.  *But cf. Taizhou United Imp. & Exp. Co. v. United States*, 44 CIT

__, __, 475 F. Supp. 3d 1305, 1315 (2020) (sustaining Commerce's *de jure* specificity

finding when "eight *specified* industries" qualified for a subsidy that was "limited as a

matter of law to *certain* new and high technology companies") (emphases added).

However, the existence of criteria alone, and absent any analysis of those criteria, is not

enough to demonstrate an explicit limitation *to an enterprise or industry* or group

thereof.  *See* 19 U.S.C. § 1677(5A)(D)(i).[35]

      Commerce's application of section 1677(5A)(D)(ii) does not save the agency's

determination.  Commerce merely declared that "the AAGEP and implementing rules . .

. are not objective criteria or conditions," I&D Mem. at 23, but did not provide the

explanation necessary to support its decision.  Commerce did not explain why the

criteria *inherently* favor a given enterprise or industry or address whether the criteria are

economic in nature or horizontal in application.  *See id.*; SAA at 930, 1994 U.S.C.C.A.N.

at 4243; *cf., e.g.*, *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)

("Commerce must explain the basis for its decisions; while its explanations do not have

to be perfect, the path of Commerce's decision must be reasonably discernable to a

---

[35] The *BGH I* court's decision with respect to the EU ETS is factually distinguishable to the extent that the court relied on Commerce's finding that eligibility for the EU ETS is "limited by law to the companies on the carbon leakage list."  600 F. Supp. 3d at 1264.  Furthermore, Commerce did not analogize this aspect of its decision in *FEBs From Germany* to the facts underlying this case.

reviewing court.").[36]  Accordingly, Commerce must reconsider or further explain its finding of *de jure* specificity.

CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are remanded for further explanation or reconsideration consistent with this opinion with respect to the agency's determination that the full allocation pursuant to the K-ETS constitutes a countervailable subsidy; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before January 5, 2024; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

---

[36] During oral argument, Nucor averred that Commerce's rationale for finding *de jure* specificity is discernable through the agency's citations to record documents in footnotes 120 and 121 of the Issues and Decision Memorandum.  Oral Arg. 2:07:00–2:08:20.  Those footnotes contain citations to the AAGEP and the Enforcement Decree in their entirety and to specified pages of the GOK's case brief to the agency.  *See* I&D Mem. at 23 nn.120–21 (citing GOK's NSA Resp., Ex. CEP-1, and Case Br. of the [GOK] (Jan. 11, 2022) at 8–9, CR 119, PR 121, CJA Tab 18).  While these citations substantiate the fact that not all industries qualify for the full allocation (and the GOK's view that Commerce reached an incorrect preliminary determination on specificity), the court is unable to discern Commerce's rationale for connecting these facts found to the choice made.  *See, e.g.*, *Burlington Truck Lines*, 371 U.S. at 168.

Court No. 22-00170                                                                    Page 30

      **ORDERED** that any comments or responsive comments must not exceed 4,000

words.


                                           /s/      Mark A. Barnett
                                           Mark A. Barnett, Chief Judge

Dated: September 29, 2023
          New York, New York