C-580-884
Remand
Slip Op. 23-144
POR:  01/01/2019 – 12/31/2019
**Public Document**
E&C/OV:  RG, KH

***Hyundai Steel Company v. United States*, 659 F.Supp.3d 1327 (CIT 2023)**
**Certain Hot-Rolled Steel Flat Products from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.      SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of
redetermination pursuant to the remand opinion and order of the U.S. Court of International
Trade (CIT) issued on September 29, 2023.[1]  These final results of redetermination concern
Commerce's final results in the administrative review of the countervailing duty (CVD) order on
certain hot-rolled steel flat products (hot-rolled steel) from the Republic of Korea (Korea)
covering the period of review (POR) January 1, 2019, through December 31, 2019.[2]  The CIT
remanded Commerce's determination to countervail the Government of Korea (GOK)'s
provision of additional emission allowances (KAUs) to certain participants in the Korean
Emissions Trading System (K-ETS).  Specifically, the CIT remanded for Commerce to further
explain or reconsider its findings that:  (1) the financial contribution from the GOK under this
program constituted revenue forgone within the meaning of section 771(5)(D)(ii) of the Tariff
Act of 1930, as amended (the Act); and (2) the program was *de jure* specific within the meaning
of section 771(5A)(D)(i) of the Act.[3]

---

[1] *See Hyundai Steel Company v. United States*, 659 F.Supp.3d 1327 (CIT 2023) (*Remand Order*).
[2] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty
Administrative Review; 2019*, 87 FR 27570 (May 9, 2022) (*Final Results*), and accompanying Issues and Decision
Memorandum (IDM).
[3] *See Remand Order*, 659 F.Supp.3d at 1343.

On remand, Commerce, under respectful protest,[4] has reexamined its financial

contribution analysis for the K-ETS program and has found, consistent with the *Remand Order*,

that the program constitutes a financial contribution in the form of a direct transfer of funds

(under section 771(5)(D)(i) of the Act) rather than revenue forgone (under section 771(5)(D)(ii)

of the Act). Commerce's determination in this regard is informed by the facts of this case and

the CIT's holding that "Commerce's determination with respect to financial contribution is not in

accordance with law to the extent that it rests on an incorrect interpretation of the Act and lacks

substantial evidence to the extent that the full allocation does not result in revenue forgone that is

otherwise due."[5] We have also provided a revised benefit analysis to reflect this modification to

our financial contribution finding. Additionally, Commerce has further explained its *de jure*

specificity analysis for the K-ETS program. These changes, on remand, had no effect on

Commerce's subsidy rate calculation for Hyundai Steel Company (Hyundai Steel).[6]

Consequently, the subsidy rate for the company remains unchanged from that in the *Final*

*Results* (*i.e.*, 0.56 percent).[7]

## II.    BACKGROUND

On December 8, 2020, Commerce initiated an administrative review of the CVD order[8]

on hot-rolled steel from Korea during the POR January 1, 2019, through December 31, 2019.[9]

On January 12, 2021, we selected Hyundai Steel as the mandatory respondent in the

administrative review.[10] In the *Preliminary Results*, Commerce determined that Hyundai Steel

---

[4] *See, e.g.*, *Viraj Group Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003) (*Viraj v. United States*).
[5] *See Remand Order*, 659 F.Supp.3d at 1331.
[6] *See* Memorandum, "Calculations for the Preliminary Results:  Hyundai Steel," dated October 29, 2021 (Hyundai Steel Calculation Memorandum).
[7] *See Final Results*, 87 FR at 27570.
[8] *See Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea:  Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 FR 67960 (October 3, 2016).
[9] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 78990 (December 8, 2020).
[10] *See* Memorandum, "Respondent Selection," dated January 12, 2021.

received countervailable subsidies from the GOK pursuant to various programs, including

through its receipt of an additional allocation of KAUs as a participant in the K-ETS program.[11]

In the *Final Results*, Commerce continued to countervail the program.[12]

With respect to the K-ETS program, we found that Hyundai Steel received a financial

contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the

Act.[13]  We explained that:

> the GOK is able to collect revenue on additional KAUs that {participating} entities
> may need to purchase; therefore, the GOK is providing something of value on
> which it could collect revenue.… the three percent allocation represents a value that
> the GOK will no longer collect.…  Therefore, through various means, the GOK has
> forgone revenue otherwise due – in the form of uncollected payments/fines, or
> through the non-collection of additional allocation from K-ETS participants
> (whether from Hyundai Steel or otherwise) – by providing the additional three
> percent allocation to certain industries.[14]

Therefore, consistent with prior determinations regarding the program,[15] we found that the

provision of additional K-ETS allocations constituted revenue forgone.

With respect to specificity, we concluded that the additional three percent KAU

allocation was *de jure* specific based on the Act on the Allocation and Trading of Greenhouse

Gas Emissions Permits (AAGEP), and its implementing rules, which present the criteria for

determining which industries qualify for the additional allocation.[16]  We explained:

> the criteria included in the AAGEP and implementing rules establish that some
> industries may benefit from the additional assistance in the form of the allocation

---

[11] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review and Rescission in Part; 2019*, 86 FR 60797 (November 4, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 17-21.
[12] *See Final Results* IDM at Comment 1.
[13] *Id.*
[14] *Id.*
[15] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 79 (January 3, 2022) (*CTL Plate from Korea 2019*), and accompanying IDM at Comment 1; and *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 FR 6842 (February 7, 2022), and accompanying IDM at Comment 3.
[16] *See Final Results* IDM at Comment 1.

of additional KAUs, while others do not.  More specifically, article 14 of the
enforcement decree for the AAGEP states that the types of business eligible for
gratuitous allocation of all emissions permits … shall be any of the following
types of businesses ….  (1) a business with an international trade intensity of at
least 30 percent; (2) a type of business with production costs of at least 30
percent; or (3) a type of business with an international trade intensity of at least 10
percent and production costs of at least 5 percent.  As such, the AAGEP and
implementing rules not only establish explicit limitations but also are not
objective criteria or conditions, as defined by section 771(5A)(D)(ii) of the Act.[17]

Accordingly, consistent with Commerce's decision in other cases,[18] we continued to find that the

additional three percent KAU allocation was *de jure* specific within the meaning of section

771(5A)(D)(i) of the Act.[19]  We calculated a subsidy rate of 0.10 percent *ad valorem* for the

program.[20]

Hyundai Steel challenged Commerce's findings regarding the countervailability of the K-

ETS program at the CIT.  On September 29, 2023, the CIT remanded the *Final Results* for

Commerce to reconsider whether the additional three percent allocation to Hyundai Steel

constituted a financial contribution, and ordered that Commerce reconsider or further explain its

finding of *de jure* specificity.[21]  The CIT elaborated that, if a revised finding with respect to

financial contribution would impact Commerce's benefit analysis, Commerce may, if necessary,

reconsider the regulatory basis for its benefit determination.[22]

With respect to Commerce's financial contribution analysis, the CIT held that Commerce

improperly determined that the additional three percent KAU allocation to Hyundai Steel

represented revenue forgone, *i.e.*, that the additional allocation constituted revenue that was

otherwise due to the GOK.  The CIT explained that the plain meaning of the phrase "is otherwise

---

[17] *Id*. (citing GOK's Letter, "GOK's Carbon Emissions New Subsidy Allegation Questionnaire Response," dated May 17, 2021 (GOK May 17, 2021 SQR), at Exhibit CEP-1 (internal quotations omitted)).
[18] *See, e.g.*, *CTL Plate from Korea 2019* IDM at Comment 1.
[19] *See Final Results* IDM at Comment 1.
[20] *Id*. at 7.
[21] *See Remand Order*, 659 F.Supp.3d at 1337 and 1343.
[22] *Id*., 659 F.Supp.3d at 1338.

4

due" does not "encompass revenue that could, but not necessarily would, have otherwise been collected by the relevant authority."[23]  The CIT elaborated that "{t}he statutory text and legislative history are consistent with this view," and concluded that "the potential collection of revenue—either from permits or penalties" does not fulfill the statutory requirement that the revenue be "otherwise due" for a program to be examined under the revenue forgone provision of the Act.[24]  Moreover, the CIT explained that, as a factual matter, the value embodied by the additional KAU allocation to Hyundai Steel does not represent revenue otherwise due because K-ETS participants that receive the standard (97 percent) allocation "do not automatically incur any enforceable debt or financial obligation that recipients of the full allocation avoid by reason of the additional allocation."[25]

With respect to Commerce's specificity analysis, the CIT remanded for Commerce to reconsider or further explain its reliance on the *de jure* specificity provision of the Act.  The CIT explained that "Commerce does not offer a convincing explanation for why the 'international trade intensity' or 'production cost' criteria governing the full allocation establish *de jure* specificity" and elaborated that "Commerce did not make any findings regarding the nature of the eligibility criteria that supported the *de jure* specificity finding."[26]

The CIT observed that, "although a lay observer may consider it clear that the GOK makes a financial contribution to Hyundai Steel by providing additional KAUs, confers a benefit by providing those KAUs at no cost, and, by limiting the additional distribution to certain

---

[23] *Id.*, 659 F.Supp.3d at 1334.
[24] *Id.*, 659 F.Supp.3d at 1335.
[25] *Id.*, 659 F.Supp.3d at 1337.
[26] *Id.*, 659 F.Supp.3d at 1342 (internal citations omitted).

industries, does so with specificity, it is incumbent upon the agency to ground its determinations in the statute."[27]  Below, we provide additional analysis required by the CIT's *Remand Order*.

III.   **ANALYSIS**

    **A. Financial Contribution**

At the outset, we note that the agency continues to develop its theory of financial contribution in other administrative proceedings under the unique context of such emissions trading schemes guided by the language in the SAA that states that "{s}ection 771(5)(D) lists the four broad generic categories of government practices that constitute a 'financial contribution'" and notes that "{t}he examples of particular types of practices falling under each of the categories are not intended to be exhaustive."[28]  As a result of our revised analysis regarding financial contribution, we have also provided additional discussion of the benefit finding contained in the *Final Results*.[29]

We continue to find that the GOK's additional three percent allocation of KAUs, provided to a select group of polluters under the K-ETS program, provides a financial contribution to recipients.  Consistent with the *Remand Order*, we have modified our analysis of financial contribution in these final results of redetermination.  On remand, we find that the GOK provides a financial contribution in the form of a direct transfer of funds, within the meaning of section 771(5)(D)(i) of the Act, to companies receiving the additional three percent KAU allocation under this program.

Notwithstanding our revised finding in these remand results, we note Commerce's concerns surrounding an interpretation of the revenue forgone statutory provision that unduly

---

[27] *Id.*, 659 F.Supp.3d at 1332.
[28] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA) at 927.
[29] *See Final Results* IDM at Comment 1.

restricts its application.  In the *Remand Order*, the CIT examined the phrase "is otherwise due" in the context of the revenue forgone provision of the Act and held that the phrase "indicates that the statute requires the forgoing of revenue that the recipient of the financial contribution would – not merely could – otherwise *owe* the authority."[30]  Therefore, the CIT held Commerce's financial contribution determination was not in accordance with law because, while the three percent allocation represents a value that the GOK will no longer collect because companies that receive the additional KAUs will not have to purchase those from the GOK to cover their annual emissions (or obtain them elsewhere), the value embodied by those permits does not represent revenue that, but for the permits being given to Hyundai Steel *gratis*, "is otherwise due" to the GOK.[31]

It is worthwhile to consider the larger context and aims behind the K-ETS program in this discussion.  In the design of the K-ETS program, the GOK created a closed and controlled economy where, for the purposes of a gradual reduction in the total level of greenhouse gas (GHG) emissions in Korea, the GOK manages the market for KAUs through scarcity.[32]  While there are private trading markets, those markets are secondary, or resale, markets.  There are no KAUs in the market that the GOK has not either freely allocated or initially sold.[33]  Any KAU that is not freely allocated and is released into the market by the GOK generates revenue for the GOK.

Thus, when interpreting the "is otherwise due" language in the Act, one potential tool to consider is that of "statutory implementation" which asks how a particular interpretation of the

---

[30] *See Remand Order*, 659 F.Supp.3d at 1334 (emphasis in original).
[31] *Id*., 659 F.Supp.3d at 1337.
[32] *See* GOK May 17, 2021 SQR at SQA-1 ("The K-ETS imposes a burden on the participants to limit their carbon emission to the amount allocated by the GOK …").
[33] *Id*. (noting that "the GOK allocates carbon emission permits to the participants in accordance with the {AAGEP}.").

law might operate or be applied in agency determinations, past or future.[34]  Moreover, as a matter of policy, what is *otherwise due* should generally be discerned within the context of the overall structure, framework, and goals of the tax or other legal regime that is the source of the program.[35]  To that end, in examining the K-ETS program in the context of its overall economic rationale, we note that, fundamentally, carbon emissions create a negative externality to society via the environmental harm they cause.  Because this larger "cost" to society is not being internalized into the decision-making processes of the parties emitting carbon, governments have a variety of mechanisms to address this larger societal "cost."

One potential regime to address this externality is one wherein a government imposes/collects these costs on behalf of the society at large that is being affected by the pollution, *i.e.*, an emissions trading scheme such as the one implemented here by the GOK.  Such a system ensures that every ton of carbon emissions has a price (or "cost") associated with it and, by putting a price on carbon, the government is ensuring that polluters are paying a cost to the government acting on behalf of society.  By providing additional free allowances to a select group of polluters at issue here, the GOK is choosing *not* to collect payments from polluters to cover such costs, *i.e.*, payments that are "otherwise due" under the overall framework and purpose of that system.  Thus, the payments that are due here are not merely hypothetical and, by not forcing companies to pay the costs associated with these emissions, the provision of additional free allowances is forgoing revenue that otherwise *would* be due.  While Hyundai Steel and other similarly situated companies may not purchase additional allowances directly

---

[34] *See* U.S. Congressional Research Service.  *Statutory Interpretation: Theories, Tools, and Trends* (R45153; March 10, 2023), by Valerie C. Brannon, available at https://crsreports.congress.gov/product/pdf/R/R45153 (Accessed: December 11, 2023).
[35] Similarly, in considering practical consequences of a disputed statutory interpretation, the Supreme Court has recognized that the meaning of the disputed language "may not be as clear as it appears when read out of context." *See King v. Burwell*, 576 U.S. 473, 488 (2015).

from the government to meet their obligation—instead buying them from private parties, carrying forward KAUs from past years, or borrowing them from future years—the fact remains that each ton of carbon has a price and, absent the government-issued additional free KAUs, this "cost" (*i.e.*, a carbon payment) would have been otherwise due by some company, at some point. The creation of this system and subsequent provision of additional free allowances with an established market value that would otherwise represent a cost to a select group of polluters meets the definition of an obligation (consistent with the CIT's prior rulings[36]) that *would* otherwise be due to the GOK within the overall operation of this program, regardless of how individual companies may be situated in any given year. Thus, we believe that the unique fact pattern of free allowances provided under this emissions trading scheme would qualify as forgone revenue. In this regard, we emphasize that Commerce continues to develop its theory of financial contribution in the examination of this, and other similar, schemes.

However, in light of the CIT's *Remand Order*, we have reconsidered whether the additional three percent KAU allocation constitutes a financial contribution under a different provision of the Act. We, now, find that the additional KAUs are a direct transfer of funds under section 771(5)(D)(i) of the Act. Although the GOK's allocation of additional free KAUs may not be a *traditional* transfer of "funds" (*e.g.*, a cash grant), the fungibility and marketable nature

---

[36] For instance, we note that such an outcome is conceptually similar to other programs that are unambiguously treated under the revenue forgone provision. For example, Commerce has treated the provision of tax credits as revenue forgone, despite the fact that the ultimate value of the credit to the respondent (or even the existence of a value at all) may be unknown at the time of issuance. *See, e.g.*, *Essar Steel, Ltd. v. United States*, 395 F. Supp. 2d 1275, 1277 (CIT 2005) (*Essar Steel*). In *Essar Steel*, the CIT explained that "{a} financial contribution is conferred when a government foregoes or does not collect revenue that is otherwise due, such as by granting tax credits or deductions from taxable income," and found that "{the Government of India (GOI)} provided Essar with credits for the future payment of import duties.… {and the} credits can be used for any subsequent imports, regardless of whether they are consumed in the production of an export product, and the credits are valid for twelve months and transferable." Thus, there, Commerce properly found that the GOI made a financial contribution to the respondent, in the form of revenue forgone, regardless of whether the respondent ultimately incurred import duty obligations that were "due" to the GOI. *Id.* 395 F. Supp. 2d at 1277 and 1279 (rejecting the respondent's argument that a benefit did not exist because "it never used its {} credits" and noting that "Essar could have used the credits or traded them at any time in the future.").

of the KAUs makes the issuance of such allocations, nonetheless, analogous.[37]  In the context of the K-ETS program, we have previously explained that KAUs constitute an instrument of monetary value, *akin* to a stock; they are tradable on private markets and can be transferred among private parties via contract.  Consequently, we determined that "{t}he record demonstrates that KAUs are market instruments with prices established for the purpose of trading KAUs both through the GOK-run auction and in private trading markets throughout the POR."[38]

Commerce has previously determined that similar transfers can constitute a direct transfer of funds, for example, in the context of the GOI's renewable energy program.[39]  In *PTFE Resin from India*, we stated that a renewable energy credit is "an instrument with monetary value and the GOI's bestowal of {such credits} to {respondents} constitutes a financial contribution in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act."[40]  We arrived at the same conclusion in *FEBs from India*, concluding that such credits "have monetary value, even if the amount of that value may not be known at the time of bestowal" and finding "that the GOI bestowing {credits}, an instrument with monetary value, to {respondent} Bharat Forge constitutes a financial contribution in the form of a direct transfer of funds."[41]  While the facts of those cases are somewhat distinct—*i.e.*, in the Indian context, the question focused on the treatment of earned credits, rather than the value of credits provided gratuitously—we find

---

[37] While section 771(5)(D)(i) of the Act provides examples of direct transfers of funds, "such as grants, loans, and equity infusions," the examples of particular types of subsidy programs falling under each of the categories of financial contribution are not intended to be exhaustive.  *See* SAA at 927.

[38] *See Final Results* IDM at Comment 1.

[39] *See, e.g.*, *Granular Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 FR 3765 (January 25, 2022) (*PTFE Resin from India*), and accompanying IDM at Comment 7.

[40] *Id.*

[41] *See Forged Steel Fluid End Blocks from India:  Final Affirmative Countervailing Duty Determination*, 85 FR 79999 (December 11, 2020) (*FEBs from India*), and accompanying IDM at Comment 8.

the underlying rationale applied in *PTFE Resin from India* and *FEBs from India* relevant, here, supporting Commerce's adopting of an analogous approach. Specifically, in both instances, the respective governments were providing instruments of monetary value to respondent companies which, we find, satisfy the statutory definition of a "direct transfer of funds."[42] Thus, for these final results of redetermination, we find that the GOK's provision of additional three percent KAU allocations to a select group of polluters under this program, including Hyundai Steel, constituted a direct transfer of funds.

### B. Benefit

In its *Remand Order*, the CIT explained that Commerce's modification of its financial contribution analysis might result in a revised determination regarding benefit. Specifically, the CIT held that the Act and Commerce's regulations provide for certain rules to guide Commerce's benefit determination based on the nature of the financial contribution in question.[43] We provide additional discussion of this point to reflect the modification to our financial contribution analysis, above.

For the *Final Results*, we relied on the catchall benefit provision of 19 CFR 351.503(b)(2), in finding that this provision governed our benefit analysis "to the extent that the recipient is relieved of the obligation to purchase additional allowances."[44] This language reflected Commerce's revenue forgone theory of financial contribution, and was based on our understanding that the benefit calculation for this unique program was not governed by 19 CFR 351.503(a), which covers benefit calculations for subsidy programs for which there are designated regulatory provisions for such calculations.

---

[42] *See* section 771(5)(D)(i) of the Act.
[43] *See Remand Order*, 659 F.Supp.3d at 1337.
[44] *See Final Results* IDM at Comment 1.

On remand, we now find that 19 CFR 351.503(b)(1) applies.  The "other benefit" regulation under 19 CFR 351.503(b)(1) establishes that a benefit is conferred "where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."  This is consistent with the facts here, where the GOK charged certain entities no cost for an additional KAU allocation[45] that has a market value.[46]

Given a market price to value KAUs exists on the underlying administrative record,[47] we have continued to rely on such pricing to value the additional free KAU allocation provided to Hyundai Steel.  We described this calculation methodology in the *Final Results*:

> {i}n order to evaluate whether, and to what extent, Hyundai Steel received a benefit under this program, we compiled all of the allowances received from the GOK for compliance year 2019 (*i.e.*, KAUs allocated for emissions related to calendar year 2019), which covered the POR, and then calculated three percent of that to determine the total number of KAUs conferred under the preferential provision of the AAGEP.  We calculated an average unit KAU value benchmark from the quantity and value of the private market purchases reported by Hyundai Steel for compliance year 2019 and then multiplied the number of {the additional three percent of the} KAUs by the calculated benchmark to determine the total program benefit.[48]

Thus, our benefit calculation is unchanged for these final results of redetermination.

We also note that, because Commerce's treatment of the additional three percent allocation of KAUs as a "direct transfer of funds," on remand, is analogous to a traditional grant and, therefore, potentially subject to Commerce's regulations at 19 CFR 351.504(a) (through application of 19 CFR 351.503(a)), Commerce may continue to conduct a similar analysis in

---

[45] The regulations provide "money" as an example of a type of input for which a firm may pay less.  *See* 19 CFR 351.503(a).  Additionally, as we have explained above, the fungibility and marketable nature of the KAUs makes the issuance of such allocations similar to the transfer of money, or monetary instruments.

[46] *See Preliminary Results* PDM at 20 ("For entities, including Hyundai Steel, that received the additional three percent KAU allocation from the GOK at no cost…").

[47] *See Final Results* IDM at Comment 2.

[48] *Id.* (internal citations omitted).

determining the "amount of the grant," as contemplated by that regulation. Such an approach is consistent with that adopted in *PTFE Resin from India* and *FEBs from India*, wherein we relied on the value of renewable energy credits sold by the respondents in calculating a benefit.[49]

### C.  **Specificity**

Commerce has provided further explanation regarding its *de jure* specificity analysis, consistent with the *Remand Order*. We continue to find the GOK's provision of an additional three percent KAU allocation to participants in designated subsectors to be specific as a matter of law, *i.e.*, *de jure* specific, pursuant to section 771(5A)(D)(i) of the Act.

Section 771(5A)(D)(i) of the Act provides that, when "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law." Section 771(5A) of the Act also states that, for the purposes of this provision, "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."[50]

Section 771(5A)(D)(ii) of the Act, the corollary of the *de jure* test, provides that a subsidy is not specific as a matter of law when three different enumerated conditions are satisfied. Pursuant to this section, a subsidy is not *de jure* specific if the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, where:  (I) eligibility is

---

[49] *See PTFE Resin from India* IDM at Comment 7 (finding that a renewal energy credit "has value at the time of bestowal, though the exact amount of value is not yet known" and "{t}he exact value of the {renewal energy credit} in this instance, and therefore the benefit received by {the respondent}, can be measured in the amount for which {the respondent} sells its {renewal energy credit} to other entities"); and *FEBs from India* IDM at Comment 8 (relying on the sale value of renewable credits during the period of investigation to calculate a benefit).
[50] *See, e.g.*, *Non-Oriented Electrical Steel from the Republic of Korea:  Final Negative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 79 FR 61605 (October 14, 2014), and accompanying IDM at Comment 9.

automatic; (II) the criteria or conditions for eligibility are strictly followed; and (III) the criteria

or conditions are clearly set forth in the relevant statute, regulation, or other official document so

as to be capable of verification.  The term "objective criteria or conditions" in this section of the

Act denotes the criteria or conditions that are neutral and that do not favor one enterprise or

industry over another.[51]  Indeed, the SAA elaborates that such criteria, in this context, signify

criteria that are economic in nature and horizontal in application, such as the number of

employees or the size of the enterprise.[52]

In the *Final Results*, we described the rules establishing eligibility criteria for the

additional three percent allocation under the K-ETS program in the following manner:

> the AAGEP and implementing rules do establish criteria, {and} those criteria result
> in an express statutory limitation on which industries qualify for the additional
> allocation by setting thresholds that industries must meet in order to qualify.  While
> the rules do not name specific industries, the criteria included in the AAGEP and
> implementing rules establish that some industries may benefit from the additional
> assistance in the form of the allocation of additional KAUs, while others do not.
> More specifically, article 14 of the enforcement decree for the AAGEP states that
> the "types of business eligible for gratuitous allocation of all emissions permits …
> shall be any of the following types of businesses …"   (1) a business with an
> international trade intensity of at least 30 percent; (2) a type of business with
> production costs of at least 30 percent; or (3) a type of business with an international
> trade intensity of at least 10 percent and production costs of at least 5 percent.[53]

Given that the AAGEP and implementing rules establish limits on eligibility for the additional

KAU allocation provided to select subsectors under the K-ETS program, the question, here, is

whether the program satisfies the criteria of section 771(5A)(D)(ii) of the Act, *i.e.*, whether those

eligibility criteria are neutral and do not favor a set of subsectors over others.  We find that,

because the criteria establishing eligibility for the program are not neutral and objective, section

---

[51] *See* section 771(5A)(D)(ii) of the Act.
[52] *See* SAA at 930.
[53] *See Final Results* IDM at Comment 1.

771(5A)(D)(ii) of the Act does not apply.  Consequently, on remand, we continue to find this program to be *de jure* specific.

The "international trade intensity" criterion under the AAGEP is calculated based on the sum of exports and imports as a percentage of the sum of sales and imports, and the "production cost" criterion is calculated based on the industry's GHG emissions volume multiplied by the market price of KAUs, as a percentage of the amount of value added for that industry during a defined base period.[54]  These two factors, *i.e.*, "international trade intensity" and "production costs," are not horizontal in application and, thus, are not neutral as described in the SAA. Unlike the examples of neutral criteria in the SAA (*i.e.*, the number of employees or size of the enterprise), the criteria for the additional KAU allocation, here, inherently favors certain subsectors, including those covering primary steel producers like Hyundai Steel, over other subsectors.[55]  The favored subsectors, by their nature, have more GHG-intensive (*i.e.*, heavy polluting) production processes (the production cost factor) and/or are more dependent on international markets for sales and/or sourcing (the international trade intensity factor) than other subsectors that are subject to the K-ETS but do not qualify for the additional KAU allocation.[56] In contrast, *objective* criteria of the kind described in the SAA—criteria with a horizontal application—would be those that apply to subsectors across an economy, rather than criteria that are characteristic of certain types of subsectors, as is the case, here.

We examined the list of subsectors that, based on the GOK's response, satisfy the "international trade intensity" and/or "production costs" criteria.[57]  This list shows that a subset

---

[54] *See* GOK May 17, 2021 SQR at 2; and GOK's Letter, "Additional Translations Accompanying GOK's Carbon Emissions New Subsidy Allegation Questionnaire Response," dated May 20, 2021 (GOK May 20, 2021 SQR), at Exhibit CEP-8.
[55] *See* GOK May 17, 2021 SQR at 2; and GOK May 20, 2021 SQR.
[56] *See* GOK May 20, 2021 SQR at Exhibit CEP-8.
[57] *Id.*

of 37 subsectors (of the 63 subsectors that are subject to the K-ETS) receive the 100 percent

allocation of KAUs.[58]  Of these 37 subsectors, the vast majority are included because they satisfy

the trade intensity criteria.[59]  Such subsectors, for instance, are related to "iron and steel,"

"manufacture of semiconductors," "manufacture of basic chemicals," "manufacture of aircraft"

and a variety of other internationally-oriented manufacturing subsectors.[60]  A small number

qualify based on the production cost criteria, including "group energy" and "waste treatment."[61]

Thus, the subset of subsectors that qualify for the additional allocation are manufacturing sectors

of a certain type, *i.e.*, trade and/or emission intensive subsectors.

In contrast, the range of subsectors that receive the 97 percent allocation covers a broader

spectrum of manufacturing groupings in addition to a broad set of service industries, such as

"electricity," "telecommunications," "computer programming," "insurance," and "hospital

activities."[62]  Comparing the subsectors that receive the 97 percent allocation with those that

receive the 100 percent allocation under the AAGEP and its Enforcement Decree demonstrates

that the criteria are not horizontal in application and limit eligibility to select group of subsectors.

Such a finding would be consistent with numerous prior *de jure* specificity determinations.[63]

---

[58] *Id.*

[59] *Id.*  We have not examined whether the additional three percent allocation, insofar as it relates specifically to the allocation of KAUs to companies within subsectors qualifying on the basis of "international trade intensity," is export contingent, as we are finding the provision of the additional three percent allocation to be *de jure* specific as a domestic subsidy to companies within subsectors that qualified for the allocation based on "international trade intensity" and/or "production costs" criteria.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *See, e.g., Silicon Metal from Australia:  Final Affirmative Countervailing Duty Determination*, 83 FR 9834 (March 8, 2018), and accompanying IDM at Comment 3 ("With respect to the RET program, the criteria used by the {Government of Australia} are not neutral because the criteria favor enterprises or industries that conduct 'emission-intensive' activities and are 'trade-exposed' over industries or enterprises that do not conduct such activities and are not trade exposed which thus constitutes an explicit limitation on access to the subsidy.  Therefore, we continue to find that the issuance of RET exemption certificates is *de jure* specific under section 771(5A)(D)(i) of the Act."); *Aluminum Extrusions from the People's Republic of China:  Final Results, and Partial Rescission of Countervailing Duty Administrative Review; 2013*, 80 FR 77325 (December 14, 2015), and accompanying IDM at Comment 5

That the program criteria result in the allocation of additional KAUs to a select group of subsectors of similar types—as compared with the substantive breadth of subsectors that received the 97 percent allocation under the K-ETS program—is consistent with the GOK's intent in establishing the program.  The GOK summarized the motivation underlying its provision of the additional three percent allocation to a targeted groups of subsectors as follows:

> {C}ompanies that are subject to this or similar carbon emission programs are disadvantaged from market competition perspective, and equal opportunity to compete in the market becomes broken.  *In order to rehabilitate and provide equal market opportunity to the participants in markets in which there are other competitors who are not subject to restrictions similar to those imposed under this program, the GOK does not deduct permits in case of sectors or sub-sectors that meet the (i) trade intensity and (ii) production costs criteria.*[64]

Elsewhere, specifically regarding the "international trade intensity" criteria, the GOK explained that "the trade intensity criteria shows whether the product or service provided by a specific industry is disclosed to competition in foreign markets."[65]  In other words, the explicit eligibility limitations included in the GOK's provision of the additional allocation under the K-ETS program favors trade-intensive and/or emission-intensive subsectors, and are not horizontal in nature.

---

("Record evidence shows that this program is limited to eight industries:  1) Electronics and Information Technology; 2) Biology and New Medicine Technology; 3) Aerospace Industry; 4) New Materials Technology; 5) High-tech Service Industry; 6) New Energy and Energy-Saving Technology; 7) Resources and Environmental Technology; and 8) High-tech Transformation of Traditional Industries. … By specifically identifying eight particular industries for subsidization, the criteria or conditions are not neutral and favor these eight industries."); *Certain Steel Nails from the Sultanate of Oman:  Final Negative Countervailing Duty Determination*, 80 FR 28958 (May 20, 2015), and accompanying IDM at Comment 1 ("The SIMR expressly limits the tariff exemption to 'industrial establishments,' which are defined as enterprises that transform or convert raw materials into semi-finished goods or convert the latter into finished products, *i.e.*, manufacturing industries.  Because enterprises that only produce raw materials but do not convert them into semi-finished or finished products are denied access to the tariff exemption program, the SIMR favors industrial establishments that produce semi-finished or finished products."); and *Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM at Comment 56 ("Under this program, the eligibility criteria limit access to the subsidy to only those users purchasing fuel for a prescribed list of approved activities.  Therefore, the eligibility criteria do not meet the statutory definition of 'objective criteria,' because they favor certain enterprises, that is, those enterprises or industries that use coloured fuel for one of the limited, prescribed purposes.").

[64] *See* GOK May 17, 2021 SQR at 5 (emphasis added).

[65] *Id*. at 2.

Additionally, with regard to the GOK's selection of subsectors for the preferential KAU allocation, the Ministry of the Environment (MOE) determines which industrial subsectors qualify for additional permits and this selection process happens in advance of the distribution of the allocation; the MOE identifies which subsectors will receive an additional/preferential allocation at the outset of each phase of the program.[66]   Thus, although the underlying AAGEP legislation itself does not *explicitly* identify each of the subsectors that qualify for the additional allocation by name, the government's administering authority (*i.e.*, the MOE) pre-selects such subsectors in defined intervals.   Under the Act, the limiting criterion in the governing legislation is not required to contain a list of sector names to be considered *de jure* specific:  under the Act, if "*the authority providing the subsidy*, or the legislation pursuant to which the authority operates, *expressly limits access to the subsid*y to an enterprise or industry, the subsidy is specific as a matter of law."[67]   Here, the MOE imposes the "international trade intensity" and "production cost" qualifying criteria in an explicit manner, on a recurring basis.   Such a limitation on eligibility for the additional three percent KAU allocation constitutes *de jure* specificity within the meaning of the Act.   Furthermore, as the CIT explained, "{t}he *BGH I* court's decision with respect to the {European Union (EU) Emissions Trading System (ETS)} is factually distinguishable to the extent that the court relied on Commerce's finding that eligibility for the EU ETS is 'limited by law to the companies on the carbon leakage list'" and that "Commerce did not analogize this aspect of its decision in *FEBs from Germany* to the facts underlying this case."[68]   We note that in *FEBs from Germany*, Commerce explained that, in order

---

[66] *Id*. at 3.
[67] *See* section 771(5A)(D)(i) of the Act (emphasis added),
[68] *See Remand Order*, 659 F.Supp.3d at 1342, n.35 (citing *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1264 (CIT 2022) (*BGH I*) (internal citations omitted)).

for an industry to be considered at significant risk of carbon leakage during the relevant period

under the EU ETS program, it must satisfy one of the following three criteria:

1. The sum of direct and indirect costs (*i.e.*, induced by the implementation of the EU ETS) would increase production cost, calculated as a proportion of the gross value added, by at least five percent; and at the same time the sector's trade intensity with non-EU countries is greater than 10 percent;
2. The sum of direct and indirect additional costs (*i.e.*, induced by the implementation of the EU ETS) would increase production cost, calculated as a proportion of the gross value added by at least 30 percent; or
3. The sector's trade intensity with non-EU countries is greater than 30 percent.[69]

Notably, these criteria are identical to those used in the K-ETS program to identify the entities

and subsectors eligible for the additional three percent free allocation.[70]  The fact that the EU

maintains a "carbon leakage list" and the GOK does not, but it utilizes the same criteria in

determining which subsectors are eligible for additional free allowances, is a distinction without

a difference.[71]  Both programs are expressly limited to a select group of subsectors, as

recognized by the CIT in *BGH I*.[72]  To reach different conclusions regarding these two programs,

which use virtually identical eligibility criteria (because one program has a specifically

enumerated list and one does not), creates a potential loophole whereby a foreign government

could thwart investigating authorities and administer programs that would evade capture by the

CVD law through a simple rephrasing of the implementing legislation.[73]  Such a result would be

---

[69] *See Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 FR 31454 (May 26, 2020) (*FEBs from Germany*), and accompanying PDM at 26.
[70] *See* GOK May 17, 2021 SQR at 2.
[71] *Id.*
[72] *Id.* at 2 and Exhibit CEP-8; and *see BGH I*, 600 F. Supp. 3d at 1264 ("Commerce reasonably determined the ETS additional free allowances program is *de jure* specific because it is expressly limited to a group of companies" and "{i}t is reasonably discernible that Commerce determined the restrictions of the carbon leakage list to favor certain enterprises or industries or groups of certain industries or enterprises.").
[73] *See* SAA at 929 ("the specificity test was not intended to function as a loophole through which narrowly focused {sic} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.").

antithetical to the purpose of the CVD law and withhold the relief to which an injured domestic industry is entitled.

## IV.    INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on December 12, 2023.[74]  We received comments from Hyundai Steel and Nucor Corporation (Nucor) (a petitioner in the underlying proceeding) relating to Commerce's analysis of financial contribution, benefit, and specificity for the GOK's provision of an additional three percent allocation to certain recipients under the K-ETS program.[75]  We summarize and address these arguments, in turn.

*Hyundai Steel's Comments*[76]

- Commerce's analysis of the K-ETS program is flawed.  With respect to financial contribution, section 771(5)(D)(i) of the Act provides that a direct transfer of funds includes "grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees."  The GOK's provision of additional KAUs to Hyundai Steel does not fall within these enumerated examples.  While there may be room to expand the types of actions that constitute the direct transfer of funds, any expansion must involve actions that are similar to (or consistent with) the types of financial contributions enumerated in the Act.  The additional provision of emissions permits bears no similarity to grants, loans, equity infusions, or loan guarantees.

- The provision of KAUs is part of the overall cap and trade system adopted by the GOK.  Under this system, Korean entities that emit over a certain volume of GHG over a three-

---

[74] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 22-00170, Slip Op. 23-144 (CIT September 29, 2023), dated December 12, 2023 (Draft Results).
[75] *See* Hyundai Steel's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated December 19, 2023 (Hyundai Steel's Comments); and Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated December 19, 2023 (Nucor's Comments).
[76] *See* Hyundai Steel's Comments at 2-14.

year period are mandatorily subject to the K-ETS.  All companies subject to the program are allocated KAUs by the GOK, the level of which is representative of the emissions limits the GOK imposes on each company.  The allocation of emissions permits, therefore, acts as an effective cap on the emissions volumes of the subject companies and is a restriction on those forced to participate.

- In this overall context, it is plain that KAUs are not like grants, loans, equity infusions, or loan guarantees, and are not akin to a stock.  A grant is a gift-like transfer.  The provision of additional permits is not a gift-like transfer but, instead, just results in the emissions cap under a costly and burdensome program being three percent higher for companies like Hyundai Steel when compared with other companies not in a trade intensive or high production cost subsector.  To the extent certain sectors that are subject to the emissions reduction requirements are allocated more emissions permits, this just means they are burdened slightly less than companies with lower emissions permit allocations.

- KAUs are not "funds," and are not like loans, loan guarantees, or equity infusions, as the provision of KAUs does not involve the transfer of money or equity.  Similarly, the KAUs are nothing like a stock; the KAUs do not represent ownership interest in anything, but instead are just instruments designed to set caps on emissions.

- Commerce's citation to its practice concerning the GOI's renewable energy program is misplaced.  In the case of the Indian program, the renewable energy credits were earned by the program participants, whereas the KAUs in this case are provided at the start of each compliance phase in order to set caps on a participant's emissions.  They are not provided as market instruments but, instead, are designed to set emissions caps.  In any case, the Indian program does not provide authority for its treatment of KAUs as direct

financial contributions.  Commerce's treatment of the program at issue in the Indian cases was not subject to judicial review and, thus, Commerce's determination for this purportedly analogous program just represents Commerce's findings in another case and is not authority.

- With respect to benefit, Commerce's reliance upon 19 CFR 351.503(b)(1)is unlawful, as the provision of an additional three percent KAU allocation in the context of the overall K-ETS program does not result in Hyundai Steel paying less for its inputs or receiving more revenue than it would otherwise earn.  Fundamentally, the KAUs are not inputs but, instead, are instruments created by the GOK to set caps on carbon emissions.  The KAUs are not a good or service and Commerce's attempt to equate them to money is unpersuasive.  In the context of the statutory structure for financial contribution and benefit, the reference to money in the regulation plainly refers to actual money such as the lending of money or the infusion of money.  The mere fact that KAUs can be traded in the market does not make them equivalent to money.

- Moreover, the entire point of the KAUs is to set a cap on a participant's carbon emissions and not to generate money.  Companies like Hyundai Steel, which receive three percent more KAUs than other mandatory participants, just have a higher cap than the companies receiving 97 percent.  This is neither the provision of money, nor a provision of inputs.

- Pursuant to section 771(5)(E) of the Act, a countervailable benefit is conferred where there is a benefit to the recipient.  Hyundai Steel does not benefit from the allocation of KAUs -- which limits it production and increases costs -- regardless of the relative allocation amount.  Commerce's determination that Hyundai Steel benefits from the

GOK's limitation on its carbon emissions is nonsensical. The statutory requirement that there be a benefit to Hyundai Steel is not present.

- With regards to specificity, Commerce has failed to explain how the program's eligibility criteria establish *de jure* specificity under section 771(5A)(D)(i) of the Act.

- Under section 771(5A)(D)(i) of the Act, a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to (or restricts the bounds of) a particular subsidy to a given enterprise of industry. Non-uniform treatment across the economy is not enough; instead, the authority or its implementing legislation must explicitly restrict the benefits to a specific enterprise or industry. Commerce has not demonstrated that these criteria have been met and also has not properly analyzed the so-called safe harbor provision, under section 771(5A)(D)(ii) of the Act.

- In the Draft Results, Commerce reiterates its original determination in the *Final Results* and claims that section 771(5A)(D)(ii) of the Act does not apply because the program eligibility criteria are allegedly not neutral and objective. Commerce has framed the issue incorrectly and has combined the two separate statutory inquiries (*i.e.*, those falling under subsection (i) and (ii) of this provision) and has failed to address the CIT's concerns. Commerce's reiteration of the *Final Results* is not enough to demonstrate an explicit limitation to an enterprise or industry. The only additional explanation Commerce offers for how the program is *de jure* specific under section 771(5A)(D)(i) of the Act is that, according to Commerce, the MOE imposes the trade intensity and production cost qualifying criteria in an explicit manner.[77] However, the MOE simply

---

[77] *Id*. at 12 (citing Draft Results at 17-18).

applies the trade intensity and production cost criteria to determine which subsectors qualify. In particular, the criteria set standards that required collection and analysis of data from 2013 to 2016 regarding each subsector's imports, exports, sales, production, and emissions. Those factors determine (a) which subsectors were exposed to competition from markets that were not subject to similar emissions caps and (b) the impact that the K-ETS emission cap may have on each potentially affected subsector.

- Notably the GOK set the criteria with the legislation's Enforcement Decree on December 29, 2017, and then determined which subsectors received the 100 percent allocation using the above-referenced criteria on July 9, 2018.[78] In order to implement Phase Two of the K-ETS, the GOK had to further divide the 26 subsectors from Phase One into 63 subsectors for Phase Two such that it could determine which subsectors met the criteria of the AAGEP. The MOE could not have expressly limited the K-ETS allocations to an enterprise or industry at the outset of the program because it did not yet know which subsectors met the criteria.

- Commerce also claims that the trade intensity and production cost criteria are allegedly similar to those that the European Union uses to identify companies on its carbon leakage list, which the CIT recognized as expressly limiting the EU emissions program to a select group of subsectors in *BGH I*. *BGH I*, while discussing a similar program, did not address the precise arguments that Hyundai Steel has raised in this case and involves a distinct program with a different administrative record. Additionally, despite Commerce's observations about potential evasion, there is no evidence that the GOK has attempted to thwart or evade U.S. CVD law in this case.[79]

---

[78] *Id*. (citing GOK May 20, 2021 SQR at Exhibit CEP-8).
[79] *Id*. at 13 (citing *BGH I*, 600 F. Supp. 3d at 1241, 1264).

- Commerce has also failed to demonstrate that the safe harbor provision does not apply. In the Draft Results, Commerce claims that the trade intensity and production cost criteria are not horizontal in application and, thus, not neutral as described by the SAA.[80] According to Commerce, comparing the subsectors that receive 97 percent allocation with those that receive the 100 percent allocation demonstrates that the criteria are not horizontal in application and serve to limit eligibility to select groups of subsectors.[81] However, Commerce's observation that some industries may benefit from the additional assistance in the form of the additional KAUs, while others do not, merely reflects the truism that not all industries will qualify under the same criteria. Non-uniform treatment across the economy without more is not enough; instead, the authority or its implementing legislation must explicitly restrict the benefits to a specific enterprise or industry.[82]

- The Draft Results disregard the fact that the trade intensity and production cost criteria are applied to all subsectors. The criteria do not have thresholds that vary by enterprise or industry such that the criteria would not be horizontally applied, unlike the examples from the SAA (*e.g.*, number of employees in a firm).[83] Accordingly, the Draft Results fail to demonstrate that the trade intensity or product cost criteria expressly limit access to a subsidy or that the eligibility criteria are not objective.

---

[80] *Id.* (citing SAA at 930).
[81] *Id.* at 13-14 (citing Draft Results at 15-16).
[82] *Id.* at 14 (citing *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393, 1403 (CIT 2021)).
[83] *Id.* (citing SAA at 930).

*Nucor's Comments*[84]

- Commerce's analysis of the GOK's provision of additional KAUs to companies in select subsectors was appropriate and consistent with the *Remand Order*.

- With respect to Commerce's revised financial contribution analysis, to the extent Commerce treats subsidies provided through emissions trading schemes like the K-ETS as a direct transfer of funds, Commerce should take an expansive view of what constitutes a transfer of funds.  The free KAUs provided to Hyundai Steel through the K-ETS program have monetary value and can be used or sold to other companies.  As Commerce noted in its Draft Results analysis, Commerce has found similar freely provided emissions credits to constitute a direct transfer of funds in other proceedings.  To ensure Commerce can fully account for the countervailable subsidies provided through novel and complex emissions trading systems, like the K-ETS, it is vital that Commerce maintains the flexibility to treat these subsidies as direct transfers where appropriate.

- Commerce also properly explained why it is concerned about interpreting the revenue forgone provision in a manner that unduly restricts its application.  Indeed, the CIT should not restrict Commerce's ability to apply its expertise and consider a broad range of factors as it evaluates foreign subsidy programs.  Commerce should not find that the CIT's *Remand Order* in this case limits the ability of the agency to find similar emissions trading programs to provide countervailable subsidies as revenue forgone, as it develops its practice in this regard.

---

[84] *See, generally*, Nucor's Comments.

- Regarding its benefit analysis, Commerce properly treated the value of the additional allocation given to Hyundai Steel as the benefit provided and, accordingly, did not alter its benefit calculations. If anything, Commerce's analysis is conservative, as it could have relied on the value of the KAUs sold by Hyundai Steel, but instead relied on Hyundai Steel's average purchase price for KAUs.

- On specificity, Commerce continued to find the provision of additional KAUs was *de jure* specific under section 771(5A)(D)(i) of the Act, providing additional reasoning to support its conclusion that the trade intensity and cost eligibility criteria render the program specific. The record of this proceeding shows that the steel industry is one of the industries enumerated as receiving the extra three percent allotment of KAUs.[85] Further, the provision of such free allowances is limited to 37 subsectors, and the Industrial sector, which includes the Korean steel industry, is by far the largest recipient of free allowances, receiving more than 17 times more allowances than any non-energy sector in Korea.[86]

- Moreover, Commerce analogized its specificity finding to the analysis in *FEBs from Germany*, and the subsequent litigation. In that case, the EU provided trade and cost criteria to determine which companies qualified for the carbon leakage list. There, Commerce concluded that the EU emissions trading system establishes a distinct set of rules for the companies on the carbon leakage list that is unique from the set of rules for other companies under this program and was specific. The K-ETS program is no different.[87]

---

[85] *Id*. at 4 (citing GOK May 20, 2021 SQR at Exhibit CEP-8).
[86] *Id*. (citing May 20, 2021 SQR at Exhibit CEP-8).
[87] *Id*. (citing *BGH I*, 600 F. Supp. 3d at 1241, 1262-63; and *FEBs from Germany* PDM at 26).

**Commerce Position**:  We continue to find that the GOK's provision of additional KAUs to firms operating in select subsectors under the K-ETS program constitutes a countervailable subsidy.  Consistent with the *Remand Order*, we have modified our financial contribution determination and have further explained our corresponding benefit analysis.  We have also provided additional explanation regarding our *de jure* specificity determination.  We address the parties' comments regarding financial contribution, benefit, and specificity, in turn.

*Financial Contribution*

As discussed above, we have modified our analysis of revenue forgone to treat the provision of additional KAUs under the K-ETS program as a direct transfer of funds under section 771(5)(D)(i) of the Act.  This approach is consistent with the *Remand Order* as well as the administrative precedent discussed by Commerce, above.  Hyundai Steel asserts that the provision of such allocations is not a direct transfer of funds because the list of direct transfers contained in the Act specifically references certain types of funds, "such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees."[88] Despite conceding that the examples in section 771(5)(D)(i) of the Act are non-exhaustive[89]— *i.e.*, the list starts with "such as" and the SAA confirms that "{s}ection 771(5)(D) {of the Act} lists the four broad generic categories of government practices that constitute a 'financial contribution' … {and t}he examples of particular types of practices falling under each of the categories are not intended to be exhaustive"[90]—Hyundai Steel, nonetheless, emphasizes that KAUs do not fall within these four enumerated examples and asserts that such allocations are not

---

[88] *See* Hyundai Steel's Comments at 3.
[89] *Id.*
[90] *See* SAA at 927.

"similar to or consistent with the types of financial contributions enumerated in the {Act}."[91]
We disagree.

Above, we explained that the free provision of additional KAUs to select enterprises in certain subsectors constituted a transfer of funds because of the marketable/fungible nature of such allocations. Hyundai Steel argues that, because the additional three percent of KAUs is not a gift-like transfer, it cannot be a grant.[92] As an initial matter, as explained above, a subsidy need not be a "grant" to be considered a financial contribution in the form of a direct transfer of funds, since the list of enumerated examples in the Act is merely illustrative, and non-exhaustive. However, while we analogize the KAUs to a grant, we also acknowledged that they are not exactly like a traditional cash grant.[93] In any case, Hyundai Steel fails to provide any legal support for its claim that grants are limited to "gifts" bestowed without consideration. Neither section 771(5)(D)(i) of the Act nor our regulations at 19 CFR 351.504(a) limit grants to "gifts" bestowed without consideration. Hyundai Steel also asserts that KAUs do not satisfy the definition of "funds" and "are nothing like stock," but the purported distinctions that it proposes are unconvincing. We disagree with Hyundai Steel that the transfer of "funds," within the meaning of the Act, must necessarily relate to the transfer of money itself. As an initial matter, the direct transfer of funds provision also relates to the "potential direct transfer of funds or liabilities, such as loan guarantees."[94] Guarantees, for instance, do not themselves constitute money; rather, they impact the total amount a firm pays for the loan in the period(s) following

---

[91] *See* Hyundai Steel's Comments at 3.
[92] *Id*. at 5.
[93] Although we acknowledge that KAUs are not a traditional cash grant and we do not agree a grant need be "gift-like" to be countervailable, companies like Hyundai Steel are provided the additional KAU allocation at no cost and without any exchange for consideration at the beginning of the compliance year. *See Preliminary Results* PDM at 20; *see also Final Results* IDM at 23 (explaining that "article 14 of the enforcement degree for the AAGEP states that the 'types of business eligible for *gratuitous allocation* of all emissions permits….").
[94] *See* section 771(5)(D)(i) of the Act.

the receipt of the guarantee.[95]  The same is true of KAUs in this case.  Regardless, the list contained in section 771(5)(D) of the Act is, on its face, not intended to be exhaustive; the Act was not written to list *every* type of monetary instrument.

Additionally, Hyundai Steel's discussion of Commerce's analogy between stocks and KAUs is misrepresentative of Commerce's analogy.  Commerce did not contend that KAUs represent an ownership interest in a company; rather, we used stocks as an example of a monetary instrument that represents an underlying value.[96]  In our view, the Act cannot be construed to permit a government to, for example, provide stocks to a recipient free of charge while being insulated from application of the CVD laws simply because a stock is not cash. Similarly, to find that the grant of a KAU—which unambiguously has a market value (and can readily be transferred for that value)—does not constitute a transfer of funds, as Hyundai Steel suggests, would place form over substance, and present clear avenues for escaping the countervailability of subsidy programs.  Under Hyundai Steel's interpretation, only the most straightforward types of cash hand-outs would constitute a financial contribution, whereas a government would be permitted to provide a monetary instrument, whether a stock, KAU, or some other type of credit, to recipient companies, and Commerce would be unable to treat the transfers as what they are:  transfers of funds.  Such a restrictive interpretation has no support in the CVD law.

Furthermore, Hyundai Steel opposes Commerce's financial contribution analysis partly on the basis that compliance efforts are not considered.  However, the CIT has nevertheless previously rejected claims akin to Hyundai Steel's assertion here, *i.e.*, that "{t}he allocation of emissions permits … acts as a restriction on those forced to participate," and is the result of a

---

[95] *See, e.g.*, 19 CFR 351.506.
[96] *See* page 10, *supra*.

"costly and burdensome" program imposed by the GOK.[97]  As the CIT explained in the *Remand*

*Order*:

> {T}he court considers—and rejects—Hyundai Steel's primary claim that
> Commerce impermissibly ignored the burdens imposed by the K-ETS program.
> … {The Act} addresses the circumstances in which environmental compliance is
> non-countervailable, and those circumstances are not present here nor does
> Hyundai Steel claim that they are present. … {and} the *Preamble* expressly
> contemplates the countervailability of subsidies that are intended to offset a firm's
> cost of complying with environmental restrictions.[98]

Although this discussion was contained in the context of the CIT's analysis of Commerce's

benefit determination,[99] it is relevant to our discussion of financial contribution insofar as

Hyundai Steel asserts that a direct transfer should not be treated as a financial contribution

simply because a regulatory regime (in this case, environmental regulations) also requires

companies to take steps to comply.[100]  Any burden of compliance with environmental laws does

not undermine a finding that the GOK is providing a financial contribution here.[101]

Moreover, as discussed above, Commerce has previously treated analogous allocations of

renewable permits as direct transfers of funds.[102]  And, Hyundai Steel's attempts to dismiss such

precedent are without merit.[103]  Indeed, the fact that Commerce's treatment of renewal credits in

*PTFE Resin from India* and *FEBs from India* was not subsequently appealed does not diminish

their precedential value here.  Hyundai Steel's purported distinction between those cases and the

K-ETS program is similarly unconvincing.  Whether considering the Indian renewal program or

---

[97] *See* Hyundai Steel's Comments at 4 and 7.
[98] *See Remand Order,* 659 F.Supp.3d at 1339-1340 (citing *Countervailing Duties; Final Rule*, 63 FR 65348, 65361 (November 25, 1998)).
[99] *Id.,* 659 F.Supp.3d at 1339-1340.
[100] *See* Hyundai Steel's Comments at 4-5.
[101] As Hyundai Steel concedes, by participating in the program, the company was "burdened slightly less than companies with lower emissions permit allocations."  *Id.* at 7.
[102] *See* page 10, *supra* (discussing Commerce's treatment of renewal energy credit in *PTFE Resin from India* and *FEBs from India*).
[103] *See* Hyundai Steel's Comments at 6.

the Korean program here, the government is transferring an instrument of value to the recipient—thus, although there may be differences across the programs, whether the company earned the credits or received the credits for free does not alter the basic nature of the allocation or credit granted.  That is, the allocations and credits have value, and they are provided to the companies by the relevant government.

*Benefit*

With respect to our benefit determination, we have relied on 19 CFR 351.503(b)(1), which provides that a benefit is conferred "where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it would otherwise earn."  Hyundai Steel asserts that Commerce's reliance on this provision is incorrect because KAUs are not "money."[104]  Hyundai Steel's interpretation is flawed for similar reasons highlighted in the context of our financial contribution analysis—*i.e.*, the examples here are meant to be illustrative (not exhaustive) and, furthermore, a tradable monetary instrument with an underlying value can be considered akin to money.  Hyundai Steel also asserts that the K-ETS program "does not result in Hyundai Steel … receiving more revenue that it would otherwise earn."[105]  The basis for Hyundai Steel's claim, however, is unclear; Hyundai Steel receives KAUs that relieve the company from additional purchases of necessary KAUs, they can be transferred or sold, and the company receives an allotment in excess of that received by other participating companies, through the preferential 100 percent allocation.[106]

---

[104] *Id*. at 8.
[105] *Id*. at 7.
[106] *See* Hyundai Steel's Letter, "Hyundai Steel's Carbon Emissions New Subsidy Allegation Questionnaire Response," dated May 17, 2021, at Exhibit NSA-1.

In its comments on our benefit analysis, Hyundai Steel also reemphasizes that KAUs reflect a cap on emissions, asserting that such an arrangement undermines an affirmative finding of benefit.[107]  We reiterate that the CIT has rejected this argument—that Commerce should have construed the K-ETS program as a burden rather than a benefit.[108]  Indeed, as the CIT explained, "Hyundai Steel's emphasis on contextualizing any benefit within a governmental action's overall … overlooks that Commerce routinely countervails benefits that reduce otherwise greater liabilities," such as here, where Hyundai Steel's liabilities under the K-ETS program would have been higher in the absence of the additional three percent allocation of KAUs.[109]

*Specificity*

With respect to our discussion of *de jure* specificity, Hyundai Steel asserts that Commerce failed "to explain how the AAGEP's eligibility criteria lead to the explicit limitation of the {provision of} additional KAUs to an enterprise or industry."[110]  Contrary to Hyundai Steel's claim, we *did* provide the basis for our conclusion that "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry," rendering the subsidy specific as a matter of law, pursuant to section 771(5A)(D)(i) of the Act.

The GOK identified select subsectors for the additional KAU allocation based on the program's trade intensity and production cost criteria.[111]  Additionally, we described how the MOE selects, in advance, the set of subsectors who will qualify for this preferential treatment in the upcoming phase of the program's operation.[112]  Hyundai Steel's observation that "{t}he

---

[107] *See* Hyundai Steel's Comments at 8-9.
[108] *See Remand Order,* 659 F.Supp.3d at 1339.
[109] *Id.*, 659 F.Supp.3d at 1339-1340.
[110] *See* Hyundai Steel's Comments at 11.
[111] *See* GOK May 17, 2021 SQR at 2 and Exhibit CEP-8.
[112] *Id.* at 3.

MOE simply applies the trade intensity and production cost criteria to determine what sectors qualify" fails to undermine this finding.  The fact that the GOK applies explicit criteria in the context of the K-ETS program does not prevent the GOK's provision of additional allocations from being treated as expressly limited to certain sectors.[113]

Hyundai Steel's assertion that "{t}he MOE could not have 'expressly limited' the KETS allocations to an enterprise or industry because it did not yet know {*i.e.*, at the time of the enforcement decree for the legislation} which subsectors met the criteria," also rings hollow.[114] The fact that the GOK subsequently announced that particular subsectors benefited from the underlying legislation does not serve to undermine a *de jure* specificity finding, here.[115]  Indeed, under Hyundai Steel's interpretation, a government could enact its law in phases to escape countervailability—so long as the initial underlying legislation did not outright name the recipient companies or subsectors, there could be no *de jure* specificity.  There is no basis to conclude that a law must enumerate specific subsectors by the formal name of the sectoral division in order to constitute a *de jure* specific law.  We discussed numerous administrative precedents in this regard, above, most of which Hyundai Steel fails to address in its comments.[116]

Hyundai Steel's dismissal of the CIT's decision in *BGH I*, on the grounds that the CIT did not address the arguments at issue, also falls short.  While Hyundai Steel attempted to distinguish *BGH I*, it did not actually address the substance of Commerce's finding – that the criteria governing the relevant program in *BGH I* and the K-ETS program here are identical –

---

[113] *Id*. at 2.
[114] *See* Hyundai Steel's Comments at 13.
[115] *See* GOK May 17, 2021 SQR at 2-3.
[116] *See* n.63, *supra* (noting subsidy programs that were found to be *de jure* specific because the government in question identified qualifying recipients on the basis of characteristics of relevant industries, *e.g.*, targeting enterprise or industries that perform certain types of activities or use certain types of resources).

and, thus, that Commerce has acted consistent with prior practice in rendering a specificity determination in this case.

Hyundai Steel's assertion that "there is no evidence that the GOK has attempted to thwart or evade U.S. CVD law in this case," is similarly unavailing.[117]  Commerce has highlighted the adverse implications for adopting such a restrictive interpretation of the *de jure* specificity provision.[118]  Consequently, and consistent with the SAA's guidance concerning the purpose of the specificity test, we do not require affirmative evidence of a foreign government's intent to evade the U.S. CVD legal regime before considering the implications of, and potential loopholes resulting from, an interested party's proposed application of our laws.

Finally, Hyundai Steel asserts that Commerce failed to demonstrate that section 771(5A)(D)(ii) of the Act does not apply, contending that "the trade intensity and production cost criteria are applied to all subsectors."[119]  This characterization misconstrues the nature of the program.  The trade intensity and production cost criteria are applied, *ex ante*, in order to select eligible subsectors on a phase-specific basis.[120]  Once those subsectors are selected, it is only companies within those subsectors that can receive the preferential allocation of KAUs.[121]  Thus, the program is limited to such subsectors.  Additionally, the criteria are not uniform across the economy or horizontal in application, as Commerce explained in detail above.  The application of these criteria – and the distinct breadth of subsectors subject to the standard allocation on the one hand, and those receiving the preferential allocation on other, demonstrates that the criteria

---

[117] *See* Hyundai Steel's Comments at 13.
[118] *See* pages 17-20, *supra*.
[119] *See* Hyundai Steel's Comments at 14.
[120] *See* GOK May 17, 2021 SQR at 3.
[121] *Id*. at 3-5.

are neither neutral nor horizontal in application.  Accordingly, the preferential allocation of KAUs under the K-ETS program is *de jure* specific.

## V.      FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, Commerce, under respectful protest,[122] has reexamined its financial contribution analysis, explained its corresponding benefit analysis, and provided further explanation for its *de jure* specificity finding with respect to the K-ETS program.  These changes, however, did not change Commerce's subsidy rate calculation for this program,[123] or for the Hyundai Steel's overall subsidy rate, from the *Final Results* (*i.e.*, 0.56 percent).[124]

1/5/2024

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[122] *See Viraj v. United States*, 343 F.3d at 1371.
[123] *See* Hyundai Steel Calculation Memorandum.
[124] *See Final Results*, 87 FR at 27570.