**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

|  |  |
|---|---|
| HYUNDAI STEEL COMPANY, <br><br>     Plaintiff, <br><br>   v. <br><br> UNITED STATES, <br><br>     Defendant, <br><br>   and <br><br> NUCOR CORPORATION and GOVERNMENT OF THE REPUBLIC OF KOREA, <br><br>     Defendant-Intervenors. | Court No. 22-00170 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS ON COMMERCE'S**
**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

February 5, 2024

## **TABLE OF CONTENTS**

I.    Commerce's Financial Contribution Continues To Be Unsupported By Substantial
      Evidence And Otherwise Not In Accordance With Law ...................................................... 2

II.   Commerce's Revised Benefit Determination Is Unsupported By Substantial Evidence
      And Is Otherwise Not In Accordance With Law .................................................................. 6

III.  Commerce's Specificity Determination Continues To Be Unsupported By Evidence And
      Is Otherwise Not In Accordance With The Law ................................................................. 9

IV.   Conclusion .......................................................................................................................... 13

V.    Certificate of Compliance ................................................................................................. 14

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*BGH Edelstahl Siegen GmbH v. United States*,
600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) .........................................................11

*Commissioner of Internal Revenue v. Brown*,
380 U.S. 563, 85 S.Ct. 1162 (1965) ........................................................................8

*Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*,
415 F. Supp. 3d 1216 (Ct. Int'l Trade 2019) ...........................................................6

*Government of Sri Lanka v. United States*,
308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ........................................................3, 5

*Jarecki v. G.D. Searle & Co.*,
367 U.S. 303, 81 S.Ct. 1579 (1961) ........................................................................2

*Zenith Radio Corp. v. United States*,
437 U.S. 443, 98 S. Ct. 2441 (1978) ...................................................................8, 11

**Statutes**

19 U.S.C. §1677(5)(D)(i) ...........................................................................................2, 3, 5

19 U.S.C. §1677(5)(E) ......................................................................................................7

19 U.S.C. §1677(5A)(D)(ii) ...................................................................................9, 10, 13

**Other Authorities**

19 C.F.R. §351.503(b) ...................................................................................................6, 7

19 C.F.R. §351.504(a) ........................................................................................................8

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final
Results of Countervailing Duty Administrative Review; 2019*,
87 Fed. Reg. 27,570 (May 9, 2022) ...........................................................................1

*Forged Fluid End Blocks from India: Final Affirmative Countervailing Duty
Determination*,
85 Fed. Reg. 79,999 (December 11, 2020) ...............................................................4, 5

*Granular Polytetrafluoroethylene Resin from India: Final Affirmative Countervailing
Duty Determination and Final Affirmative Critical Circumstances Determination*,
87 Fed. Reg. 3765 (Jan. 25, 2022) ...........................................................................4, 5

*Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative*
   *Countervailing Duty Determination, Preliminary Affirmative Critical*
   *Circumstances Determination, and Alignment of Final Determination With Final*
   *Antidumping Duty Determination,*
   86 Fed. Reg. 35,479 (Dep't Commerce June 28, 2021) .......................................................4, 5

Merriam-Webster Dictionary.................................................................................................................6

Oxford Learner's Dictionary.................................................................................................................4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>       Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>NUCOR CORPORATION and<br>GOVERNMENT OF THE REPUBLIC OF<br>KOREA,<br><br>       Defendant-Intervenors. | Court No. 22-00170 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS ON COMMERCE'S**
**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

     Plaintiff Hyundai Steel Company ("Hyundai Steel") hereby comments on the U.S.

Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court

Remand, *Hyundai Steel Co. v. United States*, Ct. No. 22-00170 (Ct. Int'l Trade Jan. 5, 2024),

ECF No. 54-1, PRR 4 ("Final Remand").[1]  The administrative determination at issue is *Certain*

*Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing*

*Duty Administrative Review; 2019*, 87 Fed. Reg. 27,570 (May 9, 2022) ("*Final Results*"), PR

133, and accompanying Issues and Decision Memorandum ("*Final Results IDM*"), PR 132.

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR" or "CR") followed by the page or exhibit number.  Citations to the remand administrative record shall be to the public or confidential remand record document number ("PRR" or "CRR") followed by the page or exhibit number.

As discussed below, the Final Remand fails to comply with the Court's instructions and is otherwise unsupported by substantial evidence and not in accordance with law.

## I.   Commerce's Financial Contribution Continues To Be Unsupported By Substantial Evidence And Otherwise Not In Accordance With Law

In the Final Remand, Commerce abandoned its revenue foregone analysis in favor of a financial contribution determination involving the direct transfer of funds under 19 U.S.C. §1677(5)(D)(i).[2]  This attempt to salvage its financial contribution determination fails because the 100 percent allocation of Korean Allowance Units ("KAUs" or "emissions permits") does *not* constitute the direct transfer of funds.

19 U.S.C. §1677(5)(D)(i) provides that the term "financial contribution" means "the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees."  Although the examples of financial contribution in the statute are not exhaustive, the fact they are not exhaustive does not mean that Commerce can disregard the examples in the statute, or that Commerce has discretion to create new types of financial contributions that are inconsistent with the examples in the statute.  Any expansion of the types of financial contributions must be similar to or consistent with the statutorily enumerated types of financial contributions. *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S. Ct. 1579, 1582 (1961) ("The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to Acts of Congress.").

---

[2] Although Commerce expresses its concern about what it views as this Court's narrow interpretation of what constitutes revenue foregone under the statute, Final Remand at 7-9, Hyundai Steel does not comment on that aspect of the Final Remand given Commerce's abandonment of the revenue foregone financial contribution.  Hyundai Steel believes that this Court was correct in finding that Commerce's treatment of the KAU allocation as revenue foregone that was otherwise due is unlawful.

The 100 percent allocation does not fall within the examples enumerated in §1677(5)(D)(i).  The KAUs do not involve the provision of loans or infusions of equity.  Commerce attempts to liken the KAU allocation to "loan guarantees," Final Remand at 29-30, but a loan guarantee involves the potential direct transfer of "funds" because if the loan recipient defaults on the loan then the government guarantor is liable to pay for the loans using funds (money).  In contrast, the 100 percent allocation does not involve the actual or potential transfer of funds, but instead allocates the emissions permitted from the mandatory participant.

Nor are the allocations grants or like grants.  A grant is a "gift-like transfer." *Government of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1383 (Ct. Int'l Trade 2018) ("*GOSL*") (citing dictionary definitions).  The KAU allocation is not a gift-like transfer, but instead takes the total amount of carbon emissions permitted for Korea and allocates the permitted emission amounts to participants.  CR 76 (PR 77) at Ex. CEP-1 (Articles 2(3), 5(1)(1), and 12(1)).  The fact that the Government of Korea ("GOK") applies a "ratio" to reduce the emissions permitted from companies that are not in the trade intensive or high production cost sector just results in the emissions permitted and allocated to those companies being 3 percent lower than companies like Hyundai Steel.  CR 76 (PR 77) at Ex. CEP-1 (Article12(3)).

Commerce claims that although the allocation "may not be a traditional transfer of 'funds'," KAUs allegedly "constitute an instrument of monetary value, akin to a stock" and "are tradable on private markets and can be transferred among private parties via contract…."  Final Remand at 9-10.  KAUs are not "akin to a stock," which is defined as a "security that represents the ownership of a fraction of the issuing corporation."  Adam Hayes, *Stocks: What They Are, Main Types, How They Differ From Bonds*, Investopedia (updated Dec. 14, 2023), https://www.investopedia.com/terms/s/stock.asp (last visited Feb. 2, 2024) (**Attachment 1**).

3

KAUs do not represent an ownership interest in anything, but instead are just instruments designed to allocate the amount of emissions permitted to entities who otherwise would not subject themselves to emissions limits.  Nor are the KAUs even "funds" as that term is defined: "an amount of money saved or made available for a particular purpose," *Funds*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/ definition/english/fund_1 (last visited Feb. 1, 2024) (**Attachment 2**).

Commerce's citation to its practice with regard to India's renewable energy credit ("REC") program is misplaced.  *See* Final Remand at 10-11 (citing *Granular Polytetrafluoroethylene Resin from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3765 (Jan. 25, 2022) (*PTFE Resin from India*), and accompanying decision memorandum at Comment 7 and *Forged Fluid End Blocks from India: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 79,999 (December 11, 2020) and accompanying decision memorandum at Comment 8 ("*FEBs from India*")).  The RECs are earned based on the amount of electricity generated from renewable sources and injected into the electricity grid by the recipients.  *Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 86 Fed. Reg. 35,479 (Dep't Commerce June 28, 2021) and accompanying decision memorandum at 23 ("*PTFE Resin from India PDM*").  In contrast, the KAUs are an amount of emissions permitted and allocated to mandatory participants.  CR 77 (PR 76) at Appendix SQA-1 (pp.1-2), Ex. CEP-1 (Article 2(3)).

Additionally, in *FEBs from India*, the recipients of the RECs were not subject any environmental obligations and thus the RECs they received were only for sale to companies that

were subject to environmental obligations.  Mem. from James Maeder, Deputy Assistant Sec'y for Enf't and Compliance, Dep't Commerce, "Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India: Post-Preliminary Analysis" at 5 (Aug. 10, 2020).  The RECs were thus akin to grants as the sole purpose of them was for sale in the market to generate funds for the recipient.  By contrast, KAUs are allocated to companies that are subject to the KETS program and the requirement to reduce carbon emissions.  CR 77 (PR 76) at Appendix SQA-1 (pp.1-2).  KAUs are designed to set the emissions cap and are only provided to companies who are required to incur costs to reduce their carbon emissions.  *Id.*  Similarly, in *PTFE Resin from India* it was plain that the RECs were akin to grants because the value of RECs (and the benefit) was based on the price at which the recipient *sold* them in the market.  *PTFE Resin from India PDM* at 24.  If the RECs were used to reduce the recipients' environmental obligations, then they would not be treated as part of any countervailable benefit.  Moreover, the program in the Indian cases was not subject to judicial review.  Thus, Commerce's determination for this allegedly analogous program is not primary authority and is in no way "precedential" for purposes of this Court's review of the *Final Results* under the standard of review despite Commerce's claim that they hold "precedential value."  Final Remand at 31.

Finally, Commerce's treatment of the KAU allocation as a direct transfer of funds is based on a narrow view of the KAUs and ignores the overall context in which they are provided.  *See GOSL,* 308 F. Supp. 3d at 1380 (It "is not in accordance with Section 1677(5)(C)" for Commerce to "selectively analyze" benefit payments "in isolation" from the "overall program").  Viewed in context, the 100 percent allocation is not the direct transfer of funds pursuant to 19 U.S.C. §1677(5)(D)(i) and bears no similarity to the statutory examples.

**II.      Commerce's Revised Benefit Determination Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law**

In the Final Remand, Commerce abandoned its reliance on 19 C.F.R. §351.503(b)(2), and instead relied upon 19 C.F.R. §351.503(b)(1), which provides that a benefit is conferred "where a firm pays less for its inputs (*e.g.,* money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it would otherwise earn." Final Remand at 12.  Commerce asserts that "{t}his is consistent with the facts here, where the GOK is charging certain entities no cost for an additional KAU allocation that has a market value." *Id.*  This benefit determination is unlawful.

The 100 percent allocation does not result in Hyundai Steel paying less for its inputs (*e.g.*, money, a good, or a service) or receiving more revenue than it would otherwise earn.  First, KAUs are not "inputs."  "Inputs" are defined as "something that is put in."  *Input*, Merriam-Webster, https://www. merriam-webster.com/dictionary/input (last visited Jan. 31, 2024) (**Attachment 3**).  The AAGEP defines the KAU "emission permit" as "an amount of greenhouse-gas emissions permitted and allocated to an individual business entity producing greenhouse gases within the scope of the total allowances set for greenhouse gas emissions."  CR 77 (PR 76) at Exhibit CEP 1 (Article 2(3)).  KAUs are "*emissions* permitted and allocated,"—a production output, not "input,"—and Commerce's determination that KAUs are "inputs" is inconsistent with the plain language of its regulations.  *See Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*, 415 F. Supp. 3d 1216, 1230 (Ct. Int'l Trade 2019) ("Commerce's determination in the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits no deference.").

Commerce's attempt to equate KAUs to "money" is unpersuasive.[3]  In the context of the statutory structure for financial contribution and benefit, which both refer to "loans," "loan guarantees" and "equity infusions" as the prototypical examples, the reference to "money" in the regulation plainly refers to actual money such as the lending of money or the infusion of money (equity).  The mere fact that KAUs can be traded at some future time does not make them equivalent to "money" or "inputs."  Companies like Hyundai Steel, which are allocated 100 percent of their KAUs, simply have a higher cap than the companies receiving 97 percent.

Second, Commerce did not determine with substantial evidence that Hyundai Steel received more revenue than it would otherwise earn.  In response to Hyundai Steel's argument that the language of 19 C.F.R. §351.503(b)(1) had not been met, PRR 2 at 7, Commerce suggests that Hyundai Steel "received more revenue than it would otherwise earn" because Hyundai Steel was allegedly relieved "from additional purchases of necessary KAUs," the KAUs "can be transferred or sold," and "the companies receives an allotment in excess of that received by other participating companies." Final Remand at 32.  But Commerce did not determine or explain how Hyundai Steel received more revenue as a result of the KAU allocation.  None of these facts provide more than a conclusory insinuation, let alone substantial evidence, that Hyundai Steel in fact received more revenue from the KAU allocation.  As discussed, the KAUs are designed to set caps on emissions.  They are not allocated to generate revenue or provide revenue to the recipients.

Finally, the Final Remand is inconsistent with 19 U.S.C. §1677(5)(E), which provides that a countervailable benefit is conferred only where "there is a benefit to the recipient."  The interpretation of §1677(5)(E) finding that Hyundai Steel received a countervailable benefit leads

---

[3] Commerce does not determine that KAUs are goods or services.  Final Remand at 12 n.45.

to an absurd result contrary to the purpose of the countervailing duty law.  *See Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 572, 85 S.Ct. 1162, 1166 (1965) ("Unquestionably the courts, in interpreting a statute, have some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results… or would thwart the obvious purpose of the statute.'"); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 455-56, 98 S. Ct. 2441, 2448 (1978) ("The countervailing duty {law} was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments.").  Hyundai Steel does not benefit from the allocation of KAUs that limit its production and increase costs, regardless of the relative allocation percentage.  In this limited case, the determination that Hyundai Steel was conferred a countervailable benefit is unsupported by substantial evidence and contrary to law.

However, to the extent that the Court affirms Commerce's benefit determination, it should instruct Commerce to adjust its method for calculating the benefit.  In the Final Remand, Commerce notes that its treatment of the 100 percent allocation as a direct transfer of funds is more analogous to a traditional grant and thus is "potentially subject to… 19 C.F.R. §351.504(a)…."  Final Remand at 12.  Under §351.504(a), the benefit is the amount of the grant received.  Here, any actual "benefit" from the KAUs if treated as a direct transfer of funds occurs when the participant sells any excess KAUs and receives funds.  If the Court affirms Commerce's determination, it should instruct Commerce to calculate the benefit based on the value of the KAUs actually sold by Hyundai Steel in the review period.  As Commerce itself recognizes, this method would be consistent with how Commerce calculated the benefit from the RECs in the *PTFE Resin from India* and *FEBs from India* cases.  *See* Final Remand at 13 ("Such an approach {of treating the program as providing a grant} is consistent with that adopted in

*PTFE Resin from India* and *FEBs from India*, wherein we relied on the value of renewable energy credits sold by the respondents in calculating the benefit.").

### III.    Commerce's Specificity Determination Continues To Be Unsupported By Evidence And Is Otherwise Not In Accordance With The Law

In the Final Remand, Commerce parrots its original determination from the *Final Results* and then claims that "given that the AAGEP and implementing rules clearly establish limits on eligibility for the additional KAU allocation to select subsectors under the KETS program, the question here is whether the program meets the criteria of section 771(5A)(D)(ii) of the Act." Final Remand at 14. So framed, Commerce then claims §1677(5A)(D)(ii) "does not apply" because the criteria are allegedly "not neutral and objective." *Id.* Commerce has put the cart before the horse by structuring its analysis so that if the safe harbor criteria are not met then a subsidy is *de jure* specific. As a result, Commerce has not addressed the Court's concerns and has failed to demonstrate that the program is *de jure* specific under §1677(5A)(D)(i).

This Court held that the *Final Results* do "not offer a convincing explanation for why the 'international trade intensity' or 'production cost' criteria governing the full allocation establish *de jure* specificity pursuant to §1677(5A)(D)(i)." *Hyundai Steel*, 659 F. Supp. 3d at 1342. The Court reasoned that in the *Final Results* "Commerce relied on the existence of the criteria *per se* to establish specificity" and that "the existence of criteria alone, and absent any analysis of those criteria, is not enough to demonstrate an explicit limitation *to an enterprise or industry*." *Id.* In other words, the Court found that Commerce's determination that the 100 percent KAU allocation was *de jure* specific under §1677(5A)(D)(i) was unsupported by substantial evidence and was otherwise not in accordance with law. Commerce was thus required to explain how the AAGEP's eligibility criteria result in the explicit limitation of the 100 allocations to an enterprise or industry (or group thereof). If not, then the question of whether the safe harbor criteria in

§1677(5A)(D)(ii) apply is not relevant.  The mere reiteration of the justification provided in the *Final Results* that Commerce quotes in the Final Remand is not "enough to demonstrate an explicit limitation to an enterprise or industry."  *Id.*

The only additional explanation that Commerce offers for how the program is allegedly *de jure* specific under §1677(5A)(D)(i) is that, according to Commerce, the GOK's administering authority, the Ministry of Environment ("MOE"), "imposes the 'trade intensity and production cost' qualifying criteria in an explicit manner."  Final Remand at 18.  This argument is unpersuasive.  The MOE simply applies the trade intensity and production cost criteria to determine what sectors qualify.  The criteria set standards that required collection and analysis of data from 2013 to 2016 regarding each subsector's imports, exports, sales, production, and emissions.  CR 77 (PR 76) at 2-3; PR 77 at 5, 15.  Those factors determine (a) whether subsectors were exposed to competition from markets that were not subject to similar emissions caps, and (b) the impact that the KETS emission cap may have on each potentially affected subsector.  *Id.* at 2-3.  Notably, the GOK set the criteria with the Enforcement Decree on December 29, 2017, *id.* at Ex. CEP-1, and then determined which subsectors received the 100 percent allocation using the criteria; the subsectors were not determined until July 9, 2018.  PR 77 at 1, 9, 15.  In Phase Two, the GOK had to further divide the 26 subsectors from Phase One into 63 subsectors for Phase Two such that it could determine which subsectors met the criteria of the AAGEP.  CR 77 (PR 76) at 2-3; PR 77 at 5, 15.  The MOE thus could not have "expressly limited" the KETS allocations to an enterprise or industry because it did not yet know which subsectors met the criteria.

Commerce's claims in the Final Results that "GOK applies explicit criteria in the context of the KETS program does not prevent {the KAU allocation} from being treated as expressly

limited to certain sectors" and that "a government could enact its law in phases to escape countervailability," Final Remand at 34, do not address the substance of Hyundai Steel's arguments.  Nor is there any evidence that the GOK attempted to escape the CVD law by publishing its analysis pursuant to the criteria to see who qualified in this case.

Commerce also claims that the trade intensity and production cost criteria are allegedly similar to those that the European Union uses to identify companies on its "carbon leakage list," which the court recognized as expressly limiting the EU-ETS program to a select group of subsectors in *BGH Edelstahl Siegen GmbH v. United States*.  Final Remand at 18-20 (citing *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1264 (Ct. Int'l Trade 2022)).  Commerce then claims: "to reach different conclusions regarding these two programs… creates a loophole" that could be exploited by foreign governments to "evade capture by CVD law."  Final Remand at 19.  *BGH*, although discussing a similar program, did not address the precise arguments that Hyundai Steel raises in this appeal and involves a distinct program with a different administrative record.

In making its "loophole" argument, Commerce claims that reaching different results in *BGH* and this case "would be antithetical to the purpose of the CVD law and withhold the relief to which an injured domestic industry is entitled."  Final Remand at 19-20.  A review of this program reveals that it is "antithetical" to the purpose of the CVD law to treat this program as providing a subsidy.  "The countervailing duty {law} was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments."  *Zenith Radio Corp.*, 437 U.S. at 455-56.  Treating the differing KAU allocations as a countervailable subsidy in this case does not further the purpose of the CVD law. Hyundai Steel, and all the Korean companies who are required to participate in the KETS

program, have to incur unwanted costs to reduce their carbon emissions.  On the other hand, U.S. companies are not subject to a cap and trade system and thus do not have to incur the same carbon reduction costs.  To impose countervailing duties on Korean companies based on a 3 percent difference in KAU allocations does not level the playing field for U.S. companies that the CVD law is designed to protect.  Instead, it creates an *uneven* playing field whereby companies like Hyundai Steel have to incur carbon reduction costs that are not incurred by U.S. companies.  This uneven playing field is exaggerated by imposing countervailing duties on their exports to the United States.  Commerce's treatment of this program as a countervailable subsidy is not consistent with the purpose of the CVD law.

Finally, Commerce also failed to demonstrate that the safe harbor does not apply. Commerce asserts that since only 37 subsectors out of 63 receive the 100 percent allocation, and the 37 subsectors are mostly manufacturing sectors while the other subsectors cover a "broader spectrum" shows that the criteria are not horizontal in application.  Final Remand at 15. According to Commerce, the "distinct breadth of subsectors" subject to the relative KAU allocations "demonstrates that the criteria are neither neutral nor horizontal in application."  *Id.* at 36.  But, as the Court noted, "Commerce's observation that 'some industries may benefit from the additional assistance in the form of the additional KAUs, while others do not,' merely reflects the truism that not all industries will 'qualify under the criteria.'"  *Hyundai Steel Co.*, 659 F. Supp. 3d 1327, 1342 (Ct. Int'l Trade 2023).  Indeed, "non-uniform treatment across the economy," without more "is not enough; instead, the authority or its implementing legislation must 'explicitly restrict' the 'benefits to a specific enterprise or industry.'"  *Id.* (citing *Asemesa*, 523 F. Supp. 3d 1393).  The Final Remand disregards that the trade intensity and production cost criteria are applied to *all* subsectors and that any sector could qualify if they meet the criteria like

12

the "number of employees" or "size of an enterprise" examples from the SAA. The fact that 37 out of 63 subsectors – or more than half – qualify for the 100 percent allocation undercuts the notion that the criteria here are not objective criteria for purposes of the 19 U.S.C. §1677(5A)(D)(ii) safe harbor.

Accordingly, the Final Remand fails to demonstrate that the trade intensity or production cost criteria expressly limit access to a subsidy or that the eligibility criteria are not objective. The Final Remand thus fails to comply with this Court's remand order and is unsupported by substantial evidence and not in accordance with law.

## IV.    <u>Conclusion</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court again remand Commerce's decision with instructions to reconsider the *Final Results*, and for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

13

**V.**   **<u>Certificate of Compliance</u>**

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 3,860 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

**Attachment 1**

LIVE

TABLE OF CONTENTS

TRADING › TRADING SKILLS

# Stocks: What They Are, Main Types, How They Differ From Bonds

By **ADAM HAYES** Updated December 14, 2023

Reviewed by **SAMANTHA SILBERSTEIN**

Fact checked by **MELODY KAZEL**



## Stock
[ˈstäk]

A stock, also known as equity, is a security that represents the ownership of a fraction of the issuing corporation.

Investopedia / Nez Riaz

## What Are Stocks?

A stock, also known as equity, is a security that represents the ownership of a fraction of the issuing corporation. Units of stock are called "shares" which entitles the owner to a proportion of the corporation's assets and profits equal to how much stock they own.

Stocks are bought and sold predominantly on stock exchanges and are the foundation of many individual investors' portfolios. Stock trades have to conform to government regulations meant to protect investors from fraudulent practices.

---

**KEY TAKEAWAYS**

- A stock is a form of security that indicates the holder has proportionate ownership in the issuing corporation and is sold predominantly on stock exchanges.
- Corporations issue stock to raise funds to operate their businesses.

---

Advertisement

TABLE OF CONTENTS

and earnings.

A shareholder is considered an owner of the issuing company, determined by the number of shares an investor owns relative to the number of outstanding shares. If a company has 1,000 shares of stock outstanding and one person owns 100 shares, that person would own and have a claim to 10% of the company's assets and earnings. [2]

Stockholders do not *own* a corporation but corporations are a special type of organization because the law treats them as legal persons. Corporations file taxes. can borrow, can own property, and can be sued. The idea that a corporation is a "person" means that the corporation *owns its assets*. A corporate office full of chairs and tables belongs to the corporation, and *not* to the shareholders. [3]

## Take the Next Step to Invest

Advertiser Disclosure

### J.P.Morgan
WEALTH MANAGEMENT

J.P. Morgan Personal Advisors

Personalized financial plans from fiduciary advisors. Get started today.

LEARN

### Betterment

Betterment

Investing built to help you weather any market.

*Investing involves risk.*

LEARN

### acorns

Acorns

Get $10 when you complete registration for Acorns!

LEARN

Corporate property is legally separated from the property of shareholders, which limits the liability of both the corporation and the shareholder. If the corporation goes bankrupt, a judge may order all of its assets sold but a shareholder's assets are not at risk. The court cannot force you to sell your shares, although the value of your shares may have fallen. Likewise, if a major shareholder goes bankrupt, they cannot sell the company's assets to pay their creditors.

Advertisement

TABLE OF CONTENTS

What shareholders own are shares issued by the corporation, and the corporation owns the assets held by a firm. If you own 33% of the shares of a company, it is incorrect to assert that you own one-third of that company. However, you do own one-third of the company's shares. This is known as the "separation of ownership and control."

Owning stock gives you the right to vote in shareholder meetings, receive dividends if and when they are distributed, and the right to sell your shares to somebody else.

If you own a majority of shares, your voting power increases so that you can indirectly control the direction of a company by appointing its board of directors. [4] This becomes most apparent when one company buys another. The acquiring company buys all the outstanding shares.

The board of directors is responsible for increasing the value of the corporation and often does so by hiring professional managers, or officers, such as the chief executive officer, or CEO. Ordinary shareholders do not manage the company.

The importance of being a shareholder is that you are entitled to a portion of the company's profits, which is the foundation of a stock's value. The more shares you own, the larger the portion of the profits you get. Many stocks, however, do not pay out dividends and instead reinvest profits back into growing the company. These retained earnings, however, are still reflected in the value of a stock.

> **Tip:** Read about Investopedia's 10 Rules of Investing by picking up a copy of our special issue print edition.

## How to Compare Common and Preferred Stock

There are two main types of stock: common and preferred. Common stock usually entitles the owner to vote at shareholders' meetings and to receive any dividends paid out by the corporation.

Preferred stockholders generally do not have voting rights, though they have a higher claim on assets and earnings than common stockholders. For example, owners of preferred stock receive dividends before common shareholders and have priority if a company goes bankrupt and is liquidated. [2]

> **FAST FACT**
>
> *The first common stock ever issued was by the Dutch East India Company in 1602.* [5]

Companies can issue new shares whenever there is a need to raise additional

cause their shares to appreciate in value.

LIVE

TABLE OF CONTENTS

somebody buys shares directly from the company when it issues them in the [primary market](#) or from another shareholder in the [secondary market](#). When the corporation issues shares, it does so in return for money.

Bonds vary from stocks in several ways. Bondholders are creditors to the corporation and are entitled to interest as well as repayment of the principal invested. Creditors are given legal priority over other stakeholders in the event of a bankruptcy and will be made whole first if a company is [forced to sell assets](#).

Conversely, shareholders often receive nothing in the event of bankruptcy, implying that stocks are inherently riskier investments than bonds. [2]

## How Do You Buy Stock?

Most often, stocks are bought and sold on stock exchanges, such as the Nasdaq or the New York Stock Exchange (NYSE). After a company goes public through an initial public offering (IPO), its stock becomes available for investors to buy and sell on an exchange. Typically, investors will use a brokerage account to purchase stock on the exchange, which will list the purchasing price (the bid) or the selling price (the offer). The price of the stock is influenced by supply and demand factors in the market, among other variables.

## How Can You Earn Income From Owning Stock?

There are two ways to earn money by owning shares of stock is through dividends and capital appreciation. Dividends are cash distributions of company profits. If a company has 1,000 shares outstanding and declares a $5,000 dividend, then stockholders will get $5 for each share they own. Capital appreciation is the increase in the share price itself. If you sell a share to someone for $10, and the stock is later worth $11, the shareholder has made $1. [6]

## Is It Risky to Own Stock?

All investments have a degree of risk. Stocks, bonds, mutual funds, and exchange-traded funds can lose value if market conditions decline. When you invest, you make choices about what to do with your financial assets. Your investment value might rise or fall because of market conditions or corporate decisions, such as whether to expand into a new area of business or merge with another company. [7] Historically, stocks have outperformed most other investments over the long run. [1]

## The Bottom Line

A stock represents [fractional ownership of equity](#) in an organization. It is different from a bond, which operates like a loan made by creditors to the company in return for periodic payments. A company issues stock to raise capital from investors for new projects or to expand its business operations. [The](#)

Advertisement

LIVE

TABLE OF CONTENTS

Investing. Learn more at Fundrise.com/Income. Before investing, consider the Fund's objectives, risks, charges, and expenses. Prospectus available at Fundrise.com/Income.

ARTICLE SOURCES ▼

## Take the Next Step to Invest

Advertiser Disclosure



**Unbiased**

LEARN MORE

Get matched with your perfect finan
advisor today



**Plus500**

LEARN MORE

Start Trading with Plus500 and take
advantage of a $0 Commission Bon

**Vanguard**

**Vanguard Personal Advisor**

LEARN MORE

Get trusted advice at a low cost. Sta
conversation with a Vanguard Perso
Advisor.

PART OF

## Day Trading Introduction

| | | | |
|---|---|---|---|
| CURRENTLY READING | UP NEXT | | |
| **Stocks: What They Are, Main Types, How They Differ From Bonds** | **Getting Acquainted With Options Trading** | **Forex (FX): Definition, How to Trade Currencies, and Examples** | **Best Day Platforms** |
| 4 of 24 | 5 of 24 | 6 of 24 | 7 of 24 |

Advertisement

Stock

LIVE

TABLE OF CONTENTS

Voting rights are given to a stockholder to vote on matters of corporate policy. It is common for votes to be voiced by proxy. Learn why stockholder voting matters.  more

### Bearer Form: What It Meant and How It Worked

A bearer form was a security not registered in the issuing corporation's books, but payable to its bearer, that is, the person possessing it.  more

### Corporation: What It Is and How to Form One

A corporation is a legal entity that is separate and distinct from its owners and has many of the same rights and responsibilities as an individual.  more

### Publicly Traded Company: Definition, How It Works, and Examples

A public company's ownership is distributed among general public shareholders through publicly-traded stock shares. It must undergo a process known as an IPO.  more

### Shareholder (Stockholder): Definition, Rights, and Types

A shareholder is any person, company, or institution that owns at least one share in a company.  more

## Related Articles

**STOCKS**
Common Stock: What It Is, Different Types, vs. Preferred Stock

**SMALL BUSINESS REGULATIONS**
What Are Stockholder Voting Rights, and Who Gets a Vote?

**SMALL BUSINESS INSURANCE**
Mutual vs. Stock Insurance Companies: What's the Difference?

**DIVIDEND STOCKS**
How Does Preferred Stock Work?

**TRADING BASIC EDUCATION**
Bearer Form: What It Meant and How It Worked

Advertisement



TABLE OF CONTENTS

Partner Links





About Us

Dictionary

Advertise

Privacy Policy

Careers

Terms of Service

Editorial Policy

News

Contact Us

Your Privacy Choices

Investopedia is part of the Dotdash Meredith publishing family.

Please review our updated Terms of Service.

**Attachment 2**

Case 1:22-cv-00176-MAB   Document 80   Filed 02/05/24   Page 28 of 41

English        Search Oxford Advanced Learner's Dictionary        

Definition of **fund noun** from the Oxford Advanced American Dictionary

fund *noun*

/fʌnd/

1  [countable] an amount of money that has been saved or has been made available for a particular purpose

> *a disaster relief fund*
> *the company's retirement fund*
> *the International Monetary Fund*

**Take your English to the next level**

The ***Oxford Learner's Thesaurus*** explains the difference between groups of similar words. Try it for free as part of the *Oxford Advanced Learner's Dictionary* app

 

2  **funds** [plural] money that is available to be spent

> *government funds*

Case 1:22-cv-00101-MAB   Document 80   Filed 02/05/24   Page 29 of 41

*The hospital is trying to raise funds for a new kidney machine.*

*The project has been canceled because of lack of funds*

*I'm **short of funds** right now—can I pay you back next week?*

*a fund of knowledge*

---

**Oxford Learner's Dictionaries**

Browse Dictionaries & Grammar

Search Box

System Requirements

Contact Us

**More from us**

Oxford Learner's Dictionaries API

English Language Teaching

Oxford Teacher's Club

Oxford Learner's Bookshelf

Oxford Languages

**Who we are**

About Us

Our history

Annual report

The way we work

Working for OUP

Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide



Privacy Policy    Cookie Policy    **Cookies Settings**    Terms & Conditions    Accessibility    Legal Notice    English (US) ✔

© 2024 Oxford University Press

**Attachment 3**

 **input**

**noun** **2** ⌄    Synonyms    Example Sentences    Word History    Related Articles    Entries

# input  1 of 2  noun

in·put    ˈin-ˌpu̇t 🔊

[Synonyms of *input* ›]

**1**    : something that is put in: such as

   **a** : ADVICE, OPINION, COMMENT

   **b** : information fed into a data processing system or computer

   **c** : power or energy put into a machine or system for storage, conversion in kind, or conversion of characteristics usually with the intent of sizable recovery in the form of output

   **d** : an amount put in

      increased *input* of fertilizer increases crop yield

   **e** : a stimulus that acts on and is integrated into a bodily system

      sensory *input*

   **f** : a component of production (such as land, labor, or raw materials)

**2**    : the means by which or the point at which an input (as of energy, material, or data) is made

**3**    : the act or process of putting in

# input  2 of 2  verb

**inputted** *or* **input; inputting**

*transitive verb*



noun  **2**  ⌄          Synonyms     Example Sentences     Word History     Related Articles     Entries



**Noun**

intake

[ See all Synonyms & Antonyms in Thesaurus > ]

## Noun

I need your *input* on what to have for dinner.

She provided some valuable *input* at the start of the project.

The computer gets its *input* from a keyboard or mouse.

**See More** ⌄



The study's extensive symptom surveys were created with patient *input*, and participants are invited to freewrite about their illness experience in online journals.

— Rachael Bedard, *The New Yorker*, 23 Jan. 2024

Additionally, staffers had assembled it without *input* from Native American groups, which led to a number of mistakes—such as displaying garments and artifacts backwards or upside down.

— Sarah Kuta, *Smithsonian Magazine*, 19 Jan. 2024

**See More** ⌄

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'input.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples.

## First Known Use

### Noun

1653, in the meaning defined at sense 1



### noun  2 ⌄    Synonyms    Example Sentences    Word History    Related Articles    Entries

## Time Traveler

**The first known use of *input* was in 1653**

See more words from the same year

```
┌
│
```

┌─────────────────────────────────────────────────────────┐
│                                                         │
│              **Is 'Inputted' a Real Word?**              │
│                                                         │
└─────────────────────────────────────────────────────────┘

```
┌
│
```

in pursuit of

**input**

input well

┌─────────────────────────────────────────────────────────┐
│                   See More Nearby Entries ›             │
└─────────────────────────────────────────────────────────┘

Case 1:22-cv-00170-MAB     Document 56     Filed 02/05/24     Page 35 of 41



**noun** **2** ⌄     Synonyms     Example Sentences     Word History     Related Articles     Entries

**Style**     | MLA |

"Input." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/input. Accessed 31 Jan. 2024.

▢ Copy Citation



**Facebook**



**Twitter**

# input   1 of 2   **noun**

in·put   | ˈin-ˌpu̇t 🔊 |

**1** : power, energy, a signal, or information put into a machine or system

**2** : ADVICE, COMMENT

**3** : a point at which an input is put in

**4** : the act or process of putting in

# input   2 of 2   **verb**

**inputted** *or* **input; inputting**



**noun  2** ⌄

Synonyms    Example Sentences    Word History    Related Articles    Entries

Nglish: Translation of *input* for Spanish Speakers

Britannica English: Translation of *input* for Arabic Speakers

Last Updated: 26 Jan 2024 - Updated example sentences

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**M E R R I A M - W E B S T E R   U N A B R I D G E D**



**noun** 2 ⌄

Synonyms    Example Sentences    Word History    Related Articles    Entries



Can you solve 4 words at once?

Play



**WORD OF THE DAY**

# quotidian 🔊

See Definitions and Examples »

Get Word of the Day daily email!

Your email address          SUBSCRIBE

noun  2  ⌄

Synonyms    Example Sentences    Word History    Related Articles    Entries

## 8 Grammar Terms You Used to Know, But Forgot

## Homophones, Homographs, and Homonyms

## 'Geminates': Twin Sounds

## Your vs. You're: How to Use Them Correctly

## Every Letter Is Silent, Sometimes: A-Z List of Examples

**See All**



**Nine Obscure Beer-Related Words**

**The Words of the Week - Jan. 26**

**7 Especially Fitting Common Names for Plants**

**9 Whiskery Words for Facial Hair**

**Rare and Amusing Insults, Volume 3**

**See All**



### Quordle
Can you solve 4 words at once?

Play

### Blossom Word Game
You can make only 12 words. Pick the best ones!

Play

### Missing Letter
A crossword with a twist

Play

### Spelling Bee Quiz
Can you outdo past winners of the National Spelli...

Take the quiz



**noun** **2** ∨    Synonyms    Example Sentences    Word History    Related Articles    Entries

Help  |  About Us  |  Advertising Info  |  Contact Us  |  Diversity  |  Privacy Policy  |
Terms of Use

© 2024 Merriam-Webster, Incorporated