IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, <br>          Plaintiff, <br> v. <br> UNITED STATES, <br>          Defendant, <br> and <br> NUCOR CORPORATION, <br>          Defendant-Intervenor. | Court No. 22-00170 |

**DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

OF COUNSEL:

HENDRICKS VALENZUELA
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (202) 329-3648
Email: Hendricks.Valenzuela@trade.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

SOSUN BAE
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7568
Fax: (202) 305-7644
Email: Sosun.Bae@usdoj.gov

March 6, 2024                                                             Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. ii

BACKGROUND ..................................................................................................................... 1

    I.    Commerce's Final Results ........................................................................................ 1

    II.    The Court's Remand Order And Commerce's Remand Results ............................. 2

ARGUMENT ........................................................................................................................... 3

    I.    Standard Of Review .................................................................................................. 3

    II.    Commerce's Financial Contribution Determination Is Lawful And Supported By Substantial Evidence ........................................................................ 3

    III.    Commerce's Benefit Determination Is Lawful And Supported By Substantial Evidence ................................................................................................ 6

    IV.    Commerce's Specificity Determination Is Lawful And Supported By Substantial Evidence ................................................................................................ 9

CONCLUSION ...................................................................................................................... 14

# TABLES OF AUTHORITIES

## CASES

*BGH Edelstahl Siegen GmbH v. United States*,
  600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) .................................................................. 13

*Boomerang Tube LLC v. United States*,
  856 F.3d 908 (Fed. Cir. 2017) ........................................................................................ 8

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1996) ....................................................................................................... 3

*Hyundai Steel Company v United States*,
  659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) .................................................................. 1

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .................................................................. 3

## STATUTES

19 U.S.C. § 1677(5A)(D)(i) ................................................................................................ 9

19 U.S.C. § 1677(5A)(D)(ii) ..............................................................................................11

19 U.S.C. § 1677(5)(D)(i) .......................................................................................... 2, 3, 9

19 U.S.C. § 1677(5)(D)(ii) .................................................................................................. 2

## REGULATIONS

19 C.F.R. § 351.503(b)(1) ............................................................................................... 2, 6

19 C.F.R. § 351.503(b)(2) ................................................................................................... 6

## FEDERAL REGISTER NOTICES

*Certain Steel Nails from the Sultanate of Oman*,
  80 Fed. Reg. 28,958 (Dep't of Commerce May 20, 2015) .......................................... 13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  81 Fed. Reg. 78,990 (Dep't of Commerce Dec. 8, 2020). ............................................ 1

*Silicon Metal from Australia*,
    83 Fed. Reg. 9,834 (Dep't of Commerce Mar. 8, 2018) .......................................................... 13

*Forged Steel Fluid End Blocks from India*,
    85 Fed. Reg. 79,999 (Dep't of Commerce Dec. 11, 2020). ....................................................... 5

*Granular Polytetrafluoroethylene Resin from India*,
    87 Fed. Reg. 3,765 (Dep't of Commerce Jan. 25, 2022) ........................................................... 5

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
    87 Fed. Reg. 27,570 (Dep't of Commerce May 9, 2022) .......................................................... 2

## OTHER AUTHORITIES

Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act,
    H.R. Doc. 103-316, Vol. 1 (1994), at 927 (SAA) ............................................................................ 3

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| Plaintiff, | ) |
| v. | ) Court No. 22-00170 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| NUCOR CORPORATION, | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to plaintiff Hyundai Steel Company's (Hyundai Steel) comments concerning the Department of Commerce's remand redetermination, filed in accordance with this Court's order in *Hyundai Steel Company v United States*, 659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) (remand order). *See* Hyundai Steel Comments, ECF No. 56; Final Results of Redetermination Pursuant to Court Remand (remand results), ECF No. 54-1 (Remand P.R. 4). For the reasons described below, we respectfully request that the Court sustain the remand results and enter judgment for the United States.

BACKGROUND

I. Commerce's Final Results

In 2020, Commerce initiated an administrative review of the countervailing duty order covering certain hot-rolled steel flat products from Korea. *See Initiation of Antidumping and*

1

*Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 78,990 (Dep't of Commerce Dec. 8, 2020). In its final results, Commerce determined that Hyundai Steel had received countervailable subsidies from the Korean government with regard to Korea's carbon emissions credit program (K-ETS). *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 27,570 (Dep't of Commerce May 9, 2022) (final results) (P.R. 133), and accompanying Issues and Decision Memorandum (IDM) (P.R. 132). Specifically, Commerce found that Hyundai Steel's receipt of an additional allocation of Korean Allowance Units (KAUs), *i.e.*, emissions permits, constituted a financial contribution in the form of revenue foregone pursuant to 19 U.S.C. § 1677(5)(D)(ii). *See id.* at 17-24.

II.  The Court's Remand Order And Commerce's Remand Results

Hyundai Steel filed a complaint challenging Commerce's determination. On September 29, 2023, the Court remanded to Commerce to reconsider the basis for its financial contribution determination, reconsider or further explain its finding of *de jure* specificity, and if necessary, reconsider the regulatory basis for its benefit determination. *See* Remand Order at 1334-43.

On remand, and under respectful protest, Commerce determined that, rather than the financial contribution from the Korean government constituting revenue foregone, the financial contribution was "in the form of a direct transfer of funds," pursuant to section 1677(5)(D)(i), "to companies receiving the additional three percent KAU allocation." Remand Results at 6. Commerce also explained that, pursuant to 19 C.F.R. § 351.503(b)(1), a benefit was conferred because the Korean government "charged certain entities no cost for an additional KAU allocation that has a market value." *Id.* at 12. Finally, Commerce provided further explanation for its finding that the provision of an additional three percent KAU allocation to participants in designated subsectors is *de jure* specific. *Id.* at 13-19. Commerce's overall benefit calculation

remained unchanged. *Id.* at 36.

ARGUMENT

I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996).

II. Commerce's Financial Contribution Determination Is Lawful And Supported By Substantial Evidence

Consistent with the Court's order, Commerce reconsidered its financial contribution analysis, departed from its conclusion that the financial contribution was revenue foregone, and determined that the Korean government had provided a financial contribution in the form of a direct transfer of funds, within the meaning of section § 1677(5)(D)(i), to companies receiving the additional KAU allocation. Remand Results at 6-11, 28-32.

"{F}inancial contribution" includes "the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees." 19 U.S.C. § 1677(5)(D)(i). Importantly, the examples of financial contributions listed in the statute are not meant to be exhaustive. *See* Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act, H.R. Doc. 103-316, Vol. 1 (1994), at 927 (SAA). Recognizing that future scenarios may present unique facts not previously considered or subsumed by the broad examples, the SAA explains that "determinations with respect to

particular programs will have to be made on a case-by-case basis." *Id.* An emission permits program is a unique program that Commerce has not often examined, and, as discussed in more detail below, Commerce reasonably determined that a subsidy need not be one of the examples explicitly listed "to be considered a financial contribution in the form of a direct transfer of funds, since the list of enumerated examples in the {statute} is merely illustrative, and non-exhaustive." Remand Results at 29.

As Commerce explained, "KAUs constitute an instrument of monetary value, *akin* to a stock; they are tradeable on private markets and can be transferred among private parties via contract." Remand Results at 10 (citing IDM at 22, P.R. 132) (emphasis in original). Commerce further explained that "KAUs are market instruments with prices established for the purpose of trading KAUs both through the {government}-run auction and in private trading markets{.}" *Id.* Therefore, while the "allocation of additional free KAUs may not be a *traditional* transfer of 'funds' (*e.g.*, a cash grant), the fungibility and marketable nature of the KAUs makes the issuance of such allocations, nonetheless, analogous." *Id.* at 9-10 (emphasis in original). Commerce also acknowledged that, while KAUs "are not exactly like a traditional cash grant," the free provision of additional KAUs to select companies in certain subsectors bore a similarity to grants due to their marketable and fungible nature. Commerce thus concluded that the provision of KAUs constituted a direct transfer of funds for the purposes of defining a financial contribution. *Id.* at 9-11, 29.

Hyundai Steel complains that KAUs are too dissimilar to the statutory examples to constitute a direct transfer of funds. Hyundai Steel Comments at 3-5. Specifically, it claims that the KAUs are dissimilar to grants because they are not a "gift-like transfer." *Id.* at 3. But the statute does not limit grants to "gifts" bestowed without consideration. Remand Results at 29.

4

Moreover, Hyundai Steel *was actually provided* the additional KAU allocation at no cost and without any exchange for consideration. *Id.* at n.93 (citing IDM at 23 ("article 14 of the enforcement decree for the for the AAGEP states that the 'types of business eligible for ***gratuitous allocation*** of all emissions permits'" (quoting GOK Carbon NSAQR at Exh. CEP-1 (P.R. 76, C.R. 77)))).

Hyundai Steel also claims that KAUs are not "akin to a stock," which it defines as a "security that represents the ownership of a fraction of the issuing corporation." Hyundai Steel Comments at 3. This argument misunderstands Commerce's comparison of KAUs to stocks. Commerce did not contend that "KAUs represent an ownership interest in a company; rather, {it} used stocks as an example of a monetary instrument that represents an underlying value." Remand Results at 30. Hyundai Steel's restrictive view of what constitutes a direct transfer of funds, wherein only the most straightforward types of cash handouts would constitute a financial contribution, places form over substance and is unsupported by authority. Hyundai Steel's overly narrow interpretation of "financial contribution" would encourage foreign governments to evade a finding of countervailability by providing companies fungible items with monetary value and then arguing that those items are not akin to cash. *Id.* Commerce reasonably determined that the additional allocation of KAUs, which have market value and can be readily transferred for that value, constitutes a direct transfer of funds. *Id.* at 30.

In making its determination, Commerce also noted that it had previously found that similar renewable energy credit transfers constitute a direct transfer of funds. *See* Remand Results at 10-11, 31-32 (citing *Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg. 3,765 (Dep't of Commerce Jan. 25, 2022), and accompanying IDM at Cmt. 7; *Forged Steel Fluid End Blocks from India*, 85 Fed. Reg. 79,999 (Dep't of Commerce Dec. 11, 2020) and

5

accompanying IDM at Cmt. 8). As with the present case, the foreign government provided similar instruments of monetary value to respondent companies, which Commerce found constituted a "direct transfer of funds."

Commerce acknowledged certain differences between the Indian and Korean programs—*e.g.*, whether the recipients earned the credits or received them for free—but concluded that such differences did not alter its conclusion with regard to K-ETS because, ultimately, the Korean government had transferred an instrument of value to the recipient. *Id.* Hyundai Steel claims that the Court need not heed these prior determinations because they were not subject to judicial review, but parties and the Court regularly rely on Commerce's administrative determinations for guidance. That Commerce's treatment of renewal credits from India was not challenged before this Court does not diminish Commerce's reliance on the determinations, which, as described above, involve similar instruments as the present case.

Commerce's determination that the KAUs constituted a direct transfer of funds is reasonable, supported by substantial evidence, and accords with the Court's order and the law. Thus, it should be sustained.

III. <u>Commerce's Benefit Determination Is Lawful And Supported By Substantial Evidence</u>

On remand, Commerce reconsidered its benefit determination and departed from its original finding that the catch-all benefit provision of 19 C.F.R. § 351.503(b)(2) applied. Instead, Commerce determined that subsection (b)(1) governed its benefit determination. *Id.* at 11-12. This determination was supported by substantial evidence and lawful.

19 C.F.R. § 351.503(b)(1) states:

> {Commerce} normally will consider a benefit to be conferred where a firm pays less for its inputs (e.g., money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn.

6

The regulation uses money as a non-exhaustive example of a type of input for which a firm may pay less in order for a benefit to be found. As Commerce explained, the "fungibility and marketable nature of the KAUs makes the issuance of such allocations similar to the transfer of money, or monetary instruments." Remand Results at 9-10. Commerce's finding of a benefit conferred is consistent with subsection (b)(1) and is reasonable given the underlying factual situation, where the Korean government allotted companies an additional KAU allocation—which undisputedly has market value—at zero cost. *Id.* at 12.

Hyundai Steel challenges Commerce's benefit determination as "unlawful" because KAUs are not "money" or "inputs." Hyundai Steel Comments at 6-7. This argument is unpersuasive. Hyundai Steel's "interpretation is flawed" because, as with the financial contribution analysis, the examples listed in the regulation are not meant to be exhaustive and, furthermore, "a tradable monetary instrument with an underlying value can be considered akin to money." Remand Results at 32.

Hyundai Steel also argues that Commerce did not demonstrate that Hyundai Steel received more revenue than it would otherwise earn as a result of its additional allocation. Hyundai Steel Comments at 7. But that allocation relieved Hyundai Steel from having to purchase additional KAUs; moreover, the KAUs can be transferred or sold, and Hyundai Steel receives an allotment in excess of that received by other companies. Remand Results at 32; *see also* Hyundai Steel's Carbon Emissions New Subsidy Allegation Questionnaire Response, dated May 17, 2021, at Exhibit NSA-1 (P.R. 76, C.R. 74) (Hyundai Steel NSAQR).

Hyundai Steel repeats its argument that Commerce should consider the burden imposed by the K-ETS program, but this Court has already rebuffed that claim. Hyundai Steel Comments at 7-8; Remand Order at 1339-40. There is no reason to revisit this argument, because, as the

Court already held, "Hyundai Steel's emphasis on contextualizing any benefit within a governmental action's overall burden . . . overlooks that Commerce routinely countervails benefits that reduce otherwise greater liabilities." Remand Order at 1339-40.

Finally, Hyundai Steel, for the first time, argues that, even if the Court affirms Commerce's benefit determination, it should instruct Commerce to adjust its calculation of the benefit based on the value of the KAUs actually sold by Hyundai Steel in the review period. Hyundai Steel Comments at 8. Hyundai Steel did not raise this argument during remand proceedings, and it does not argue that any of the exceptions to the administrative exhaustion requirement apply. Thus, the Court should not entertain it. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017).

If the Court were to entertain this argument, it should reject the proposal, given that Hyundai Steel as failed to demonstrate Commerce's methodology is unreasonable. While Hyundai Steel may not have sold the KAUs allocated to it during the period of review, its costs were still decreased because it had to purchase fewer permits than other participants in order to maintain compliance. PDM at 20 ("For entities . . . that received the additional three percent KAU allocation . . . , we preliminary determine that the GOK has relieved those entities of the financial burden of purchasing the additional credits."); *see also* Hyundai Steel NSAQR at 4, 7 (P.R. 75, C.R. 74) (explaining that "Hyundai Steel also purchased KAU19 and borrowed from KAU20 in order to surrender the total amount of carbon emissions credits owed to the GOK" and adding that "Hyundai Steel did not sell any carbon emission credits during the POR."). Accordingly, Commerce's methodology for calculating benefit is reasonable and should be sustained.

8

IV.  Commerce's Specificity Determination Is Lawful And Supported By Substantial Evidence

Consistent with the remand order, Commerce provided further explanation for its finding that the provision of an additional KAU allocation to participants in designated subsectors is *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i).  Remand Results at 13-20, 33-36.  Hyundai Steel claims that Commerce did "not address the Court's concerns{.}" Hyundai Steel Comments at 9.  It further posits that Commerce merely reiterated the justification provided in the final results, and that the only additional explanation Commerce offered was that the Korean Ministry of Energy (MOE) imposes the qualifying criteria in an explicit manner.  *Id.* at 10 (citing Remand Results at 18).  These arguments are plainly contradicted by the remand results.

The Court held that "Commerce did not make any findings regarding the nature of the eligibility criteria that supported the *de jure* specificity finding" and that "the existence of criteria alone, and absent any analysis of those criteria, is not enough to demonstrate an explicit limitation *to an enterprise or industry* or group thereof."  Remand Order at 1342 (emphasis in original) (cleaned up).  The Court also stated that "Commerce merely declared that 'the AAGEP and implementing rules . . . are not objective criteria or conditions,' . . . but did not provide the explanation necessary to support its decision."  *Id.* (cleaned up).  On remand, Commerce addressed the Court's concerns and provided more than sufficient explanation to support its *de jure* specificity determination.

The statute implementing the K-ETS program established an exception to the 97 percent allocation rule, permitting certain entities to receive the full 100 percent allocation of KAUs for a specified year.  Specifically:

> The "types of business eligible for gratuitous allocation of all emissions permits . . . shall be any of the following types of businesses"{:} (1) a business with an international trade intensity of at least 30 percent; (2) a type of business with production costs of at

9

> least 30 percent; or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent.

Remand Results at 14 (citing IDM at 23). As Commerce explained, the "international trade intensity" criterion is calculated based on the sum of exports and imports as a percentage of the sum of sales and imports, and the "production cost" criterion is calculated based on the industry's greenhouse gas (GHG) emissions volume multiplied by the market price of KAUs, as a percentage of the amount of value added for that industry during the defined base period. *Id.* at 15. Commerce found that the subsectors that qualify for the additional allocation are manufacturing sectors of a certain type—trade and/or emissions-intensive subsectors. *Id.* at 16.

Commerce examined the list of subsectors that satisfied the "international trade intensity" and/or "production costs" criteria. Commerce found that the "favored subsectors, by their nature, have more GHG-intensive, *i.e.*, heavy polluting, production processes (the production cost factor) and/or are more dependent on international markets for sales and/or sourcing (the international trade intensity factor) than other subsectors that . . . do not qualify for the additional KAU allocation." *Id.* As Commerce found, 37 subsectors (out of the 63 subsectors subject to K-ETS) qualified for the 100 percent KAU allocation, and the vast majority of these qualified because they satisfied the trade intensity criteria. *Id.* at 16. Commerce cited examples of these subsectors as "iron and steel," "manufacture of semiconductors," "manufacture of basic chemicals," "manufacture of aircraft" and other internationally-oriented manufacturing subsectors. *Id.*

This allocation of additional KAUs to a select group of trade and/or emission intensive subsectors is consistent with the Korean government's expressed intent in establishing K-ETS:

> companies that are subject to this or similar carbon emissions programs are disadvantaged from a market competition perspective,

> and equal opportunity to compete in the markets becomes broken. In order to rehabilitate and provide equal market opportunity to the participants in markets in which there are other competitors who are not subject to restrictions similar to those imposed under this program, the GOK does not deduct permits in case of sectors or sub-sectors that meet the (i) trade intensity and (ii) production cost criteria.

Remand Results at 17. Commerce also noted that the Korean government explained that "the trade intensity criteria shows whether the product or service provided by a specific industry is disclosed to competition in foreign markets." *Id.* Therefore, "the explicit eligibility limitations included in the GOK's provision of the additional allocation under the K-ETS program favors trade-intensive and/or emission-intensive subsectors, and are not horizontal in nature." *Id.*

Commerce additionally explained that, although the underlying legislation governing K-ETS itself does not identify by name the subsectors that qualify for the additional allocation, the MOE pre-selects such subsectors in defined intervals. *Id.* at 18. Specifically, the MOE determines which industrial subsectors qualify for additional permits, and this selection happens in advance of the distribution of the allocation, *i.e.*, at the outset of each phase of the program. *Id.* Thus, Commerce found that the MOE imposes the "international trade intensity" and "production cost" qualifying criteria in an explicit manner, and on a recurring basis. *Id.* Accordingly, Commerce found the program *de jure* specific. *Id.* at 18, 34.

Substantial evidence supports Commerce's determination that the criteria are not uniform across the economy or horizontal in application, and therefore are not "objective criteria or conditions" pursuant to section 1677(5A)(D)(ii). "{O}bjective criteria or conditions . . . denotes the criteria or conditions that are neutral and that do not favor one enterprise or industry over another." *Id.* at 14. That is, "objective criteria" are criteria that are economic in nature and

11

horizontal in application, such as the number of employees or the size of the enterprise." *Id*. (citing SAA at 930).

Commerce explained that, unlike neutral criteria such as the number of employees or size of the enterprise, the criteria for the additional KAU allocation inherently favors certain subsectors, such as primary steel producers (Hyundai Steel). *Id.* at 15. The favored subsectors tend to be those with heavy polluting production processes and/or those more dependent on international markets. *Id.* The criteria do not favor subsectors equally, and are thus not horizontal in application. *Id.*

Commerce compared the relatively narrow range of subsectors that qualify for the additional KAU allocation—*i.e.*, the trade and/or emission intensive subsectors—with the range of subsectors that receiving the standard allocation. *Id.* at 16. The standard allocation covers a much broader spectrum of activity, including electricity, telecommunications, computer programming, insurance, and hospital activities. *Id.* This comparison demonstrates that the criteria for qualifying for the additional KAU allocation is not equally applicable across the economy but rather limits eligibility to certain types of industries. *Id.* This, again, is consistent with the Korean government's intent to "rehabilitate and provide equal market opportunity to the participants in markets in which there are other competitors who are not subject to restrictions similar to those imposed under this program." *Id.* at 17.

Commerce's *de jure* specificity determination is also consistent with its practice. In its investigation of silicon metal from Australia, Commerce determined that, with regard to Australia's renewable energy program, the criteria were not neutral because they "favor enterprises or industries that conduct 'emission-intensive' activities and are 'trade-exposed' over industries or enterprises that do not conduct such activities and are not trade exposed which thus

12

constitutes an explicit limitation on access to the subsidy." *Silicon Metal from Australia*, 83 Fed. Reg. 9,834 (Dep't of Commerce Mar. 8, 2018), and accompanying IDM at Cmt. 3. Accordingly, Commerce determined the program to be *de jure* specific. Similarly, in an investigation of steel nails from Oman, Commerce explained that the Standard Industrial Management Regulations Law (SIMR)—a law concerning industries eligible to receive industrial licenses—expressly limited tariff exemptions to "'industrial establishments,' which are defined as enterprises that transform or convert raw materials into semi-finished goods or convert the latter into finished products, *i.e.*, manufacturing industries." *Certain Steel Nails from the Sultanate of Oman*, 80 Fed. Reg. 28,958 (Dep't of Commerce May 20, 2015), and accompanying IDM at Cmt. 1. Commerce found that SIMR favored industrial establishments that produce semi-finished or finished products. *Id.*

Indeed, as Commerce explained, its specificity determination for the European emissions program is very similar to the one here, with the programs having virtually identical eligibility criteria. Remand Results at 18-20 (citing *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1264 (Ct. Int'l Trade 2022) ("Commerce reasonably determined the ETS additional free allowances program is de jure specific because it is expressly limited to a group of companies" and "{i}t is reasonably discernible that Commerce determined the restrictions of the carbon leakage list to favor certain enterprises or industries or groups of certain industries or enterprises.")). The only real distinction—that the EU maintains a "carbon leakage list" and Korea does not—is not meaningful. *Id.* at 19.

As Commerce reasoned, "to reach different conclusions regarding two programs which use virtually identical eligibility criteria (because one program has a specifically enumerated list and one does not), creates a potential loophole whereby a foreign government could thwart

13

investigating authorities and administer programs that would evade capture through a simple rephrasing of the implementing legislation." Remand Results at 19; *see also* SAA at 929 ("the specificity test was not intended to function as a loophole through which narrowly focused {sic} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law."). The specificity test is intended to "winnow out only those foreign subsidies which truly are broadly available . . . throughout an economy"{;} it cannot have been intended to winnow out subsidies available only to discrete groups, such as the additional allowances under K-ETS. SAA at 929. Hyundai Steel's claim that Commerce did not address the Court's concerns or sufficiently explain its position is refuted by the remand results themselves. This Court should sustain Commerce's *de jure* specificity determination.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain Commerce's remand results and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

| | |
|---|---|
| OF COUNSEL: | s/Sosun Bae |
| HENDRICKS VALENZUELA | SOSUN BAE |
| Attorney | Senior Trial Counsel |
| U.S. Department of Commerce | U.S. Department of Justice |
| Office of the Chief Counsel for Trade | Civil Division |
|    Enforcement and Compliance | Commercial Litigation Branch |

1401 Constitution Avenue, NW  
Washington, D.C. 20230  
Tel: (202) 329-3648  
Email: Hendricks.Valenzuela@trade.gov

P.O. Box 480  
Ben Franklin Station  
Washington D.C. 20044  
Tel: (202) 305-7568  
Fax: (202) 305-7644  
Email: Sosun.Bae@usdoj.gov

March 6, 2024

Attorneys for Defendant

# CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant this Court's September 29, 2023 order, ECF No. 52, that this brief contains 3,894 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

s/Sosun Bae
Sosun Bae