Slip Op. 24-**55**

## UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

        Plaintiff,

      v.

UNITED STATES,

        Defendant,

    and

NUCOR CORPORATION,

        Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Court No. 22-00170

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's Remand Results regarding the 2019 administrative review of the countervailing duty order on hot-rolled steel flat products from the Republic of Korea.]

Dated: May 2, 2024

Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, Eugene Degnan, Jordan L. Fleischer, Nicholas C. Duffey, and Ryan R. Migeed, Morris, Manning & Martin, LLP, of Washington, DC, for Plaintiff Hyundai Steel Company.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was Hendricks Valenzuela, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Alan H. Price, Christopher B. Weld, Derick G. Holt, and Theodore P. Brackemyre, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") redetermination upon

remand.  Final Results of Redetermination Pursuant to Court Remand ("Remand

Results"), ECF No. 54-1.  Plaintiff, Hyundai Steel Company ("Hyundai Steel"),

commenced this action challenging Commerce's decision to countervail the

Government of the Republic of Korea's ("Government of Korea" or "GOK") emissions

trading program in the final results of the 2019 administrative review of the

countervailing duty order on hot-rolled steel flat products from the Republic of Korea

("Korea").[1]  Confid. Pl. Hyundai Steel Co.'s Mot. for J. on the Agency R., ECF No. 25;

*see also Certain Hot-Rolled Steel Flat Prods. From the Republic of Korea*, 87 Fed. Reg.

27,570 (Dep't Commerce May 9, 2022) (final results of countervailing duty admin.

review; 2019) ("*Final Results*"), ECF No. 20-4; and accompanying Issues and Decision

Mem., C-580-884 (May 3, 2022) ("I&D Mem."), ECF No. 20-5.[2]  In *Hyundai Steel Co. v.*

*United States* (*Hyundai Steel I*), 47 CIT __, 659 F. Supp. 3d 1327 (2023),[3] and as

discussed in more detail below, the court remanded Commerce's financial contribution,

---

[1] A countervailable subsidy "exists when . . . a foreign government provides a financial contribution . . . to a specific industry" that confers "a benefit" to "a recipient within the industry."  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)).

[2] The administrative record for the Remand Results is contained in a Public Remand Record ("PRR"), ECF No. 55-2.  The administrative record accompanying the *Final Results* consists of a Public Administrative Record ("PR"), ECF No. 20-1, and a Confidential Administrative Record ("CR"), ECF No. 20-2.  Hyundai Steel submitted joint appendices containing record documents cited in parties' remand comments.  Confid. Remand J.A. ("CRJA"), ECF No. 59; Public Remand J.A., ECF No. 60.  The court references the confidential record documents unless otherwise specified.

[3] *Hyundai Steel I* provides background information, familiarity with which is presumed.

benefit, and specificity findings.  On remand, Commerce reconsidered those findings

while continuing to countervail Korea's emissions trading program.  Remand Results at

6–20, 28–36.

Hyundai Steel now challenges Commerce's Remand Results.  Pl. Hyundai Steel

Co.'s Cmts. on Commerce's Final Results Pursuant to Ct. Remand ("Pl.'s Cmts."), ECF

No. 56.  Defendant United States ("the Government") and Defendant-Intervenor Nucor

Corporation ("Nucor") filed comments in support of Commerce's Remand Results.

Def.'s Cmts. in Supp. of Remand Redetermination ("Def.'s Cmts."), ECF No. 58; Def.-

Int.'s Cmts. in Supp. of the Final Results of Redetermination Pursuant to Ct. Remand

("Nucor's Cmts."), ECF No. 57.  For the following reasons, the court sustains

Commerce's financial contribution and benefit determinations and remands

Commerce's specificity determination.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[4] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

This case involves the Emissions Trading System of Korea ("K-ETS"), a program

established by the GOK to reduce greenhouse gas ("GHG") emissions.  *See Hyundai*

---

[4] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code.  All
references to the U.S. Code are to the 2018 edition unless otherwise specified.

*Steel I*, 659 F. Supp. 3d at 1330.  The rules governing the K-ETS are contained in the

Act on the Allocation and Trading of Greenhouse Gas Emissions Permits ("AAGEP")

and its accompanying Enforcement Decree.  *Id.*[5]

Relevant to the issues addressed herein, for companies subject to the K-ETS,

the GOK uses baseline emissions data from 2014 through 2016 to determine the

number of emissions permits (also referred to as Korean Allowance Units, or "KAUs") to

allocate each company for a given compliance year.  *Id.*  For 2019, the GOK provided

all subject companies with a gratuitous allocation of 97 percent of their allotted permits

("the standard allocation").  *Id.* at 1330–31.  The GOK also provided companies within

subsectors meeting certain "international trade intensity" or "production cost" criteria

with 100 percent of their permits ("the full allocation").  *Id.* at 1331.  "International trade

intensity measures exports plus imports against sales plus imports for the period of

2013 through 2015; production costs are measured as the cost of compliance

(emissions multiplied by the market price of permits) measured against the value added

during the period of 2013 through 2015."  *Id.*  Specifically, subsectors that can

demonstrate either "an international trade intensity of at least 30 percent," "production

costs of at least 30 percent," or "an international trade intensity of at least 10 percent

and production costs of at least 5 percent" are eligible for the full allocation.  *Id.* at 1331

n.10 (quoting I&D Mem. at 23).

---

[5] For the AAGEP and the Enforcement Decree, see GOK's Carbon Emissions New Subsidy Allegation Questionnaire Resp. (May 17, 2021) ("GOK's Questionnaire Resp."), Ex. CEP-1, CR 77, PR 76, CRJA Tab 2.

At the end of each annual compliance year, subject companies "must surrender permits in an amount equal to their emissions during that compliance year or incur penalties for any shortfall."  *Id.* at 1331.  To avoid a penalty, companies may

> 1) carry forward unused permits from prior years, 2) borrow permits from future years, 3) earn credits by reducing greenhouse gas emissions through external projects (carbon offset programs), 4) purchase permits from nongovernmental parties either directly or through a trading exchange, or 5) purchase permits through a government-run auction.

*Id.*

For the *Final Results*, Commerce found that the additional three percent of KAUs ("the additional allocation") provided to recipients of the full allocation, such as Hyundai Steel, constitutes a countervailable subsidy.  I&D Mem. at 17.  The court remanded Commerce's determination.  Commerce's Remand Results reflect the agency's reconsideration of those findings.  The court addresses each element of a countervailable subsidy, Commerce's findings thereto, and Hyundai Steel's challenges to those findings, in turn.

## I.  Financial Contribution

Section 1677(5) defines a financial contribution to include, *inter alia*, "(i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees," or "(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income."  19 U.S.C. § 1677(5)(D)(i)–(ii).

For the *Final Results*, Commerce concluded that the additional allocation represents a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii) in the form of

revenue forgone that would otherwise have been due.  I&D Mem. at 20.  Commerce

based its decision on the rationale that "in lieu of giving these entities the additional

KAUs for free, the GOK would have retained the ability to collect the three percent

allocation from Hyundai Steel."  *Id.* at 22.

     The court first found that the requirement for an authority to forgo or not collect

"revenue that is otherwise due" for purposes of 19 U.S.C. § 1677(5)(D)(ii) was not met

when the authority forgoes "revenue that could, but not necessarily would, have

otherwise been collected."  *Hyundai Steel I*, 659 F. Supp. 3d at 1334.  The court also

found, "as a factual matter," that the additional allocation pursuant to the K-ETS "does

not meet the plain language of the revenue forgone provision" because "the value

embodied by those permits does not represent revenue that, but for the permits being

given to Hyundai Steel gratis," would otherwise be due to the Government of Korea.  *Id.*

at 1336–37.  That is because "[c]ompanies that receive the standard allocation might

not incur any permit shortfall" and "if they do, [those companies] have various options to

remedy the shortfall besides sending payment to the GOK."  *Id.* at 1337.  As such, the

court found, companies "that receive the standard allocation do not automatically incur

any enforceable debt or financial obligation that recipients of the full allocation avoid by

reason of the additional allocation, all other things being equal."  *Id.*

     On remand, Commerce concluded that by virtue of the additional allocation, the

Government of Korea "provides a financial contribution in the form of a direct transfer of

funds, within the meaning of [19 U.S.C. § 1677(5)(D)(i)]." Remand Results at 6.[6] While

recognizing that the additional KAUs "may not be a *traditional* transfer of 'funds,'"

Commerce rested its decision on "the fungibility and marketable nature of the KAUs."

*Id.* at 9–10. Commerce explained that emissions permits are "*akin* to a stock" because

"they are tradable on private markets and can be transferred among private parties via

contract." *Id.* at 10. The agency analogized the additional allocation to its treatment of

---

[6] Commerce reconsidered the basis for its financial contribution determination "under respectful protest." Remand Results at 2 & n.4 (citing *Viraj Group Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003)). Despite this reconsidered basis for finding a financial contribution, Commerce averred that it "continues to develop its theory of financial contribution in the examination of this, and other similar, schemes," *id.* at 9, and expressed its concern with what it considers to be an "unduly restrict[ive]" interpretation of the revenue forgone provision, *id.* at 6–7. Commerce offered an interpretation of the revenue forgone provision that relies on "statutory implementation," i.e., how the provision might be "applied in agency determinations, past or future," and opined that, "as a matter of policy," interpreting the phrase "is otherwise due" should include consideration of the specific "tax or other legal regime" at issue. *Id.* at 7–8. Commerce's interpretation boils down to the assertion that in the closed universe of emissions permits, some payment "would have been otherwise due by some company, at some point" to the GOK. *Id.* at 9. Insofar as Commerce agrees with the court's holding that the plain meaning of the revenue forgone provision requires the identification of revenue that *would*, not merely *could*, have been otherwise owed to the authority, Commerce fails to substantiate the scarcity premise underlying its assertion: that "but for the full allocation, additional private purchases by companies otherwise eligible for the full allocation would *require* other[] companies to purchase permits from the GOK to avoid a penalty or that other sources of permits (including those earned through offset projects) would be exhausted." *Hyundai Steel I*, 659 F. Supp. 3d at 1337 n.24 (rejecting Nucor's similar argument as lacking record evidence). Commerce also does not address whether the statute permits the agency to consider revenue that might ultimately be sent from a third party to the authority to fulfill the revenue forgone provision given that "[i]n order to conclude that a 'person' received a subsidy, Commerce must determine that a government provided *that person* with both a 'financial contribution' . . . and a 'benefit.'" *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000) (emphasis added). However, because Commerce did not rely on this explanation, the court need not further consider these issues.

renewable energy credits ("RECs") as a direct transfer of funds.  *Id.* at 10–11

(discussing Forged Steel Fluid End Blocks From India, C-533-894 (Dec. 7, 2020)

("FEBs From India Mem.") at Cmt. 8, and Granular Polytetrafluoroethylene Resin from

India, C-533-900 (Jan. 18, 2022) ("PTFE From India Mem.") at Cmt. 7, 87 ITADOC

3765).[7]

        Hyundai Steel contends that although the statutory examples are not exhaustive,

the additional allocation is not comparable to those examples and is not a transfer of

funds.  Pl.'s Cmts. at 2–4.  The types of financial contributions listed in the statute,

however, represent "broad" and "generic categories of government practices" and the

examples that "fall[] under each of the categories are not intended to be exhaustive."

Uruguay Round Agreements Act ("URAA"), Statement of Administrative Action ("SAA"),

H.R. Doc. No. 103–316, vol. 1, at 927 (1994), reprinted in 1994 U.S.C.C.A.N. 4040,

4240.[8]  Instead, "determinations with respect to particular programs will have to be

made on a case-by-case basis."  *Id.*  Commerce found the additional allocation to be

sufficiently similar to the examples based on the fungible and marketable nature of the

permits.  Remand Results at 9.  Hyundai Steel points to no evidence to undermine that

finding.

---

[7] Many of Commerce's decision memoranda are publicly available at
https://access.trade.gov/public/FRNoticesListLayout.aspx, with separate links for pre-
and post-June 2021 memoranda.  For the PTFE From India Memorandum, the court
includes an additional citation to an online legal database since that memorandum is not
readily available at the aforementioned link.
[8] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d).

With respect to the specific examples enumerated in the statute, Hyundai Steel argues that the KAUs are not like loan guarantees or grants.  Pl.'s Cmts. at 3.  These arguments also fail.

Commerce did not base its determination on similarities between the KAUs and loan guarantees.  Instead, when addressing Hyundai Steel's argument that the transfer of funds "must necessarily relate to the transfer of money itself," Commerce noted that the statutory provision allows for the "potential direct transfer of funds or liabilities, such as loan guarantees," where guarantees "do not . . . constitute money."  Remand Results at 29.  Commerce observed that loan guarantees and KAUs are, however, similar to the extent that they each impact a company's financial bottom line.  *See id.* at 29–30.[9]

Hyundai Steel also asserts that the additional allocation is not like a grant because it is not a "gift-like transfer."  Pl.'s Cmts. at 3 (citing *Gov't of Sri Lanka v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1373, 1383 (2018) ("*GOSL*") (defining "grant")).  Commerce addressed this argument when it explained that grants "are [not] limited to 'gifts' bestowed without consideration," and, moreover, that "a subsidy need not be a 'grant' to be considered a financial contribution in the form of a direct transfer of funds."  Remand Results at 29.  Additionally, the case on which Hyundai Steel relies does not

---

[9] For loan guarantees, "a benefit exists to the extent that the total amount a firm pays for the loan with the government-provided guarantee is less than the total amount the firm would pay for a comparable commercial loan that the firm could actually obtain on the market absent the government-provided guarantee, including any difference in guarantee fees."  19 C.F.R. § 351.506(a)(1).  In addition to the loan guarantee fee, the "total amount" includes "the effective interest paid on the loan."  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,370 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*").

require a different outcome.  The *GOSL* court stated that "[g]rant" may "ordinarily" be

defined as "something granted; esp: a gift (as of land or a sum of money) usu. for a

particular purpose . . . 3a: a transfer of real or personal property by deed or writing."

308 F. Supp. 3d at 1383 (ellipsis in original) (quoting *Grant* (Noun), Webster's Third

New Int'l Dictionary (unabridged 1981)).  The *GOSL* court relied on that definition to

conclude that the "payments" at issue in that case "did not constitute a gift-like transfer"

but instead represented "the interest-free repayment of a debt."  *Id.*  Here, however,

"Hyundai Steel *was actually provided* the additional KAU allocation at no cost and

without any exchange for consideration."  Def.'s Cmts. at 5.  Hyundai Steel attempts to

obfuscate this point by asserting that "[t]he KAU allocation is not a gift-like transfer, but

instead takes the total amount of carbon emissions permitted for Korea and allocates

the permitted emission amounts to participants."  Pl.'s Cmts. at 3.  That attempt fails,

however, because the additional allocation may reasonably be characterized as part of

a system of allocating emissions permits *and* something of monetary value that Hyundai

Steel was granted for the purpose of meeting their annual compliance requirements.[10]

Hyundai Steel next contends that the permits are not "akin to a stock."  *Id.*

Commerce addressed this point as well, stating that Hyundai Steel misrepresents

Commerce's analogy.  Remand Results at 30.  Commerce stated that "KAUs constitute

---

[10] Hyundai Steel also relies on *GOSL* to support the proposition that Commerce's
determination "ignores the overall context in which [the KAUs] are provided."  Pl.'s
Cmts. at 5 (citing *GOSL*, 308 F. Supp. 3d at 1380).  The court has previously
addressed, and rejected, Hyundai Steel's reliance on *GOSL* for that proposition.  *See
Hyundai Steel I*, 659 F. Supp. 3d at 1339–40.  Hyundai Steel offers no new arguments
requiring the court to revisit that analysis.

an instrument of monetary value, *akin* to a stock; they are tradable on private markets and can be transferred among private parties via contract." *Id.* at 10.  Commerce further explained that it "used stocks as an example of a monetary instrument that represents an underlying value." *Id.* at 30.[11]  Hyundai Steel merely reprises the argument it presented to the agency without addressing the agency's reasons for dismissing that argument or pointing to evidence the agency failed to consider.[12]

Lastly, Hyundai Steel contends that subsidy programs involving RECs are distinct from the K-ETS.  Pl.'s Cmts. at 4–5.  In *FEBs From India*, Commerce found that

---

[11] Commerce refers to KAUs as "instrument[s] of monetary value," Remand Results at 10, and as "monetary instrument[s] with an underlying value," *id.* at 32.  In one subchapter, the U.S. code defines "monetary instruments" as

> (A) United States coins and currency; (B) as the Secretary may prescribe by regulation, coins and currency of a foreign country, travelers' checks, bearer negotiable instruments, bearer investment securities, bearer securities, stock on which title is passed on delivery, and similar material; (C) as the Secretary of the Treasury shall provide by regulation for purposes of sections 5316 and 5331, checks, drafts, notes, money orders, and other similar instruments which are drawn on or by a foreign financial institution and are not in bearer form; and (D) as the Secretary shall provide by regulation, value that substitutes for any monetary instrument described in subparagraph (A), (B), or (C).

31 U.S.C. § 5312(a)(3).  The court understands Commerce not to have meant that the KAUs functioned as monetary instruments within the meaning of 31 U.S.C. § 5312(a)(3), but rather that their value and transferability meant that they share similarities to monetary instruments.  *Compare* Remand Results at 10 (referring to KAUs as "market instruments"), *with id.* at 9–10 (referring to KAUs as analogous to traditional transfers of funds), *and id.* at 32 (considering KAUs "akin to money").
[12] Hyundai Steel also seeks to rely on a dictionary definition of "funds" as "an amount of money saved or made available for a particular purpose."  Pl.'s Cmts. at 4 (quoting *Funds*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/fund_1?q=funds).  Hyundai Steel fails to develop any argument that this definition is relevant to understanding the meaning of "funds" for purposes of section 1677(5A)(D)(i) in light of the broader examples listed in the statute.

the RECs "constitute[d] a financial contribution in the form of a direct transfer of funds" because "private entities [were] willing to compensate [the respondent] for RECs" such that the "RECs ha[d] monetary value."  FEBs From India Mem. at 17.  Commerce reached the same conclusion in *PTFE From India*.  *See* PTFE From India Mem. at 27.[13]

In the Remand Results, Commerce acknowledged certain distinctions in the facts underlying these determinations, explaining that, "in the Indian context, the question focused on the treatment of earned credits, rather than the value of credits provided gratuitously."  Remand Results at 10.  Nevertheless, Commerce found these determinations analogous insofar as "the respective governments were providing instruments of monetary value to respondent companies."  *Id.* at 11.  Hyundai Steel challenges this finding on the basis that "the sole purpose" of the RECs "was for sale in the market to generate funds for the recipient."  Pl.'s Cmts. at 5.  However, as Commerce found, for purposes of finding a financial contribution, the additional permits "are market instruments with prices established for the purpose of trading KAUs both through the GOK-run auction and in private trading markets."  Remand Results at 10 (citation omitted).  Commerce thus adequately explained its reliance on the REC determinations.

---

[13] While Commerce's final determination in *PTFE From India* was contested before the U.S. Court of International Trade, no party challenged Commerce's financial contribution determination.  *See Gujarat Fluorochemicals Ltd. v. United States*, 47 CIT __, 617 F. Supp. 3d 1328 (2023).

In sum, Commerce's financial contribution determination is supported by substantial evidence and is otherwise in accordance with the law.  Accordingly, it will be sustained.

## II. Benefit

"A benefit shall normally be treated as conferred where there is a benefit to the recipient."  19 U.S.C. § 1677(5)(E).  As a practical matter, the statute provides rules to guide Commerce's benefit determination in the case of an equity infusion, loan, loan guarantee, or the provision of a good or service, but these examples are not exhaustive.  *See id.* § 1677(5)(E)(i)–(iv).  Commerce's regulations also guide the agency's identification and measurement of a benefit.  *See* 19 C.F.R. §§ 351.503–351.520.  For subsidy programs not specifically covered by Commerce's regulations, Commerce "normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."  *Id.* § 351.503(b)(1).  When subsection (b)(1) does not apply, Commerce "will determine whether a benefit is conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in [19 U.S.C. § 1677(5)(E)(i)–(iv)]."  *Id.* § 351.503(b)(2).

For the *Final Results*, Commerce found a benefit pursuant to 19 C.F.R. § 351.503(b)(2) and rejected Hyundai Steel's argument that the agency should account for the burdens imposed by the K-ETS when considering this element of a subsidy.  I&D Mem. at 20.  While the court disagreed with "Hyundai Steel's primary claim that

Commerce impermissibly ignored the burdens imposed by the K-ETS program," the

court stated that Commerce may reconsider its benefit finding, as necessary, consistent

with the agency's reconsideration of its financial contribution determination.  *Hyundai*

*Steel I*, 659 F. Supp. 3d at 1338–39.

On remand, Commerce grounded its benefit determination in 19 C.F.R.

§ 351.503(b)(1) on the basis that "the GOK charged certain entities no cost for an

additional KAU allocation that has a market value."  Remand Results at 12 (footnote

omitted).  In response to Hyundai Steel's argument that the additional allocation "does

not result in Hyundai Steel . . . receiving more revenue tha[n] it otherwise would earn,"

*id.* at 32 & n.105 (ellipsis in original) (quoting Cmts. on Draft Results of Redetermination

Pursuant to Ct. Remand (Dec. 19, 2023) at 7, PRR 2, CRJA Tab 6), Commerce stated

that "Hyundai Steel receives KAUs that relieve the company from additional purchases

of necessary KAUs, they can be transferred or sold, and the company receives an

allotment in excess of that received by other participating companies, through the

preferential 100 percent allocation," *id.* at 32.[14]  Commerce calculated the benefit using

a "benchmark from the quantity and value of the private market purchases reported by

Hyundai Steel for compliance year 2019 and then multiplied the number of [the

---

[14] Commerce also noted that because the additional allocation "is analogous to a
traditional grant," Commerce's benefit determination is "potentially subject to" 19 C.F.R.
§ 351.504(a) and, thus, Commerce may "conduct a similar analysis" by "determining the
'amount of the grant.'"  Remand Results at 12–13.  Section 351.504(a) states that, "[i]n
the case of a grant, a benefit exists in the amount of the grant."

additional three percent of the] KAUs by the calculated benchmark."  *Id.* at 12 (alteration in original) (citation omitted).[15]

Hyundai Steel contends that the additional allocation "does not result in Hyundai Steel paying less for its inputs . . . or receiving more revenue than it otherwise would earn."  Pl.'s Cmts. at 6.  Insofar as 19 C.F.R. § 351.503(b)(1) posits two ways in which a benefit may be conferred, the court addresses each in turn.

With respect to Commerce's finding that Hyundai Steel paid less for its inputs by virtue of receiving the additional allocation as compared to entities that received the standard allocation, Hyundai Steel contends that "KAUs are '*emissions* permitted and allocated,'—a production output, not 'input,'" such that Commerce's treatment of KAUs as inputs "is inconsistent with the plain language of its regulations."  Pl.'s Cmts. at 6 (citation omitted).  In so arguing, Hyundai Steel conflates its actual GHG emissions with the emissions permits the GOK allocates to the company.

Hyundai Steel also seeks to rely on a narrow definition of "input" as "something that is put in."  *Id.* (quoting *Input*, Merriam-Webster, https://www.merriam-webster.com/dictionary/input).  The regulation, however, sweeps more broadly, providing "money, a good, or a service" as examples of inputs as to which a benefit may be conferred.  19 C.F.R. § 351.503(b)(1).  Commerce has explained that

> when [it] talk[s] about input costs in the context of the definition of benefit, [it is] not referring to cost of production in a strict accounting sense.  Nor [is it] referring exclusively to inputs into subject merchandise.  Instead, [the

---

[15] Commerce attributes this quotation to the Issues and Decision Memorandum.  *See* Remand Results at 12 & n.48.  However, the quoted passage does not appear in that memorandum and, thus, the citation appears to constitute a typographical error.

agency] intend[s] the term "input" to extend broadly to *any input into a firm*
that produces subject merchandise.

*CVD Preamble*, 63 Fed. Reg. at 65,360 (emphasis added).  For example, programs that

are similar to either an "equity infusion" that reduces "a firm's cost of capital" or a "freight

forwarding service" may confer benefits in the form of input cost reductions.  *Id.*

  Here, the record shows that Hyundai Steel exceeded its allocated KAUs.

Hyundai Steel's Carbon Emissions New Subsidy Allegation Questionnaire Resp. (May

17, 2021) ("NSA Resp.") at 4, CR 74–75, PR 75, CRJA Tab 1.  Hyundai Steel thus

purchased additional permits and borrowed against its 2020 allocation to meet its 2019

compliance requirements.  *Id.*[16]  The additional allocation meant, however, that Hyundai

Steel had to purchase fewer KAUs than it otherwise would have.  As such, Commerce

was within its discretion to find that KAUs with an ascertainable market value, as well as

---

[16] Hyundai Steel's argument that the court should order Commerce to instead "calculate
the benefit based on the value of the KAUs actually sold by Hyundai Steel in the review
period," of which there were none, is misplaced.  Pl.'s Cmts. at 8 (referencing 19 C.F.R.
§ 351.504(a) and the REC determinations and averring that any benefit arises when a
company "sells any excess KAUs").  Hyundai Steel did not present this argument to
Commerce, and this failure to exhaust administrative remedies generally precludes
judicial review.  *See, e.g.*, 28 U.S.C. § 2637(d); *Corus Staal BV v. United States*, 502
F.3d 1370, 1379 (Fed. Cir. 2007); *see also* Def.'s Cmts. at 8 (arguing failure to exhaust).
In any event, Hyundai Steel overlooks that Commerce permissibly based its
determination on financial relief from KAU purchases.  *See* Remand Results at 32.  That
Commerce relied on 19 C.F.R. § 351.504(a) to determine benefit in the REC
determinations, *see id.* at 13, does not undermine Commerce's decision here to rely on
19 C.F.R. § 351.503(b)(1) and the value of the KAUs purchased to calculate Hyundai
Steel's benefit.  Commerce's use of 19 C.F.R. § 351.503(b)(1) to identify and measure
the benefit instead of 19 C.F.R. § 351.504(a) simply reflects that KAUs are not *actual*
money and that 19 C.F.R. § 351.503(b)(1) represents the most direct way to capture the
value of the additional allocation in an analogous fashion.

a value to Hyundai Steel as instruments that account for its greenhouse gas emissions by virtue of the AAGEP, fall within the regulation's ambit.  Remand Results at 32.

Hyundai Steel's additional argument that KAUs are not like money, Pl.'s Cmts. at 7, is also unpersuasive.  Hyundai Steel does not rebut Commerce's finding that the emissions permits have monetary value.  Instead, Hyundai Steel argues that companies that receive the full allocation "simply have a higher cap [on emissions] than companies receiving [the standard allocation]."  *Id.*[17]  Again, Hyundai Steel misses the point that both things can be true.

As to the latter clause of the 19 C.F.R. § 351.503(b)(1), Hyundai Steel contends that "Commerce did not determine with substantial evidence that Hyundai Steel received more revenue than it would otherwise earn."  *Id.*  Commerce responded to Hyundai Steel's similar argument on remand, stating that the argument lacked clarity. *See* Remand Results at 32.  The agency also noted that "Hyundai Steel receives KAUs that relieve the company from additional purchases of necessary KAUs, they can be transferred or sold, and the company receives an allotment in excess of that received by other participating companies, through the preferential 100 percent allocation."  *Id.*

It may simply be the case that, with respect to KAUs, the additional allocation may result in either an input cost reduction or, in some circumstances, enhanced revenue.  Because substantial evidence supports Commerce's finding of a benefit

---

[17] Notwithstanding Hyundai Steel's argument, the K-ETS system does not cap Hyundai Steel's emissions as illustrated by the fact that in 2019, Hyundai Steel's emissions exceeded its full allocation, such that the company purchased additional KAUs and borrowed against its 2020 allocation.  NSA Resp. at 4.

based on the fact that the additional allocation relieved Hyundai Steel from purchasing more permits than it otherwise would have, the court need not address whether the enhanced revenue provision constitutes an additional basis for sustaining Commerce's benefit determination.[18]  Commerce's benefit determination will be sustained.

## III. Specificity

Domestic subsidies[19] may be specific as a matter of law (*de jure* specific) or as a matter of fact (*de facto* specific).  19 U.S.C. § 1677(5A)(D).  The statute provides "guidelines" for Commerce's specificity determination.  *Id.*  In particular, the statute states that a "subsidy is specific as a matter of law" when "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  *Id.* § 1677(5A)(D)(i).[20]  Pursuant to subsection (ii), a subsidy is not *de jure* specific when "the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a

---

[18] Hyundai Steel also reprises the argument that it did not receive any benefit because the K-ETS "limit[s] its production and increase[s] its costs, regardless of the relative allocation percentage."  Pl.'s Cmts. at 8.  The court previously "consider[ed]—and reject[ed]—Hyundai Steel's primary claim that Commerce impermissibly ignored the burdens imposed by the K-ETS program" when ascertaining the existence of a benefit and does so again here for the same reasons.  *Hyundai Steel I*, 659 F. Supp. 3d at 1339.

[19] In addition to domestic subsidies, the statute defines import substitution subsidies and export subsidies as *per se* specific, neither of which are relevant here.  19 U.S.C. § 1677(5A)(B),(C).

[20] For purposes of subsection (5A), "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."  *Id.* § 1677(5A).

subsidy." *Id.* § 1677(5A)(D)(ii).[21]  "[T]he term 'objective criteria or conditions' means

criteria or conditions that are neutral and that do not favor one enterprise or industry

over another."  *Id.* § 1677(5A)(D).  "Neutral in this context means 'economic in nature

and horizontal in application, such as the number of employees or the size of the

enterprise.'"  *BGH Edelstahl Siegen GmbH v. United States* (*BGH II*), 47 CIT __, __,

639 F. Supp. 3d 1237, 1243 (2023) (quoting SAA at 930, reprinted in 1994

U.S.C.C.A.N. at 4243).

> A subsidy is *de facto* specific when "one or more" statutory factors exist:
>
> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.  (II) An enterprise or industry is a predominant user of the subsidy.  (III) An enterprise or industry receives a disproportionately large amount of the subsidy.  (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).[22]  Subsections (i), (ii), and (iii) reflect Commerce's practice

at the time of enactment.  *See* SAA at 930–31, reprinted in 1994 U.S.C.C.A.N. at 4243.

For the *Final Results*, Commerce concluded that the K-ETS is *de jure* specific

because the AAGEP and the Enforcement Decree "establish criteria" that "result in an

---

[21] For a subsidy to be non-specific based on objective criteria or conditions, subsection (ii) further requires that "(I) eligibility is automatic, (II) the criteria or conditions for eligibility are strictly followed, and (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification."  *Id.* § 1677(5A)(D)(ii).  These requirements are not at issue here.
[22] Subsection (iv) states that "[w]here a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific," and is not relevant here.  *Id.* § 1677(5A)(D)(iv).

express statutory limitation on which industries qualify for the additional allocation by

setting thresholds that industries must meet." I&D Mem. at 23. Commerce further

found that the enumerated criteria are "not objective" for purposes of 19 U.S.C.

§ 1677(5A)(D)(ii). *Id.*

The court found that Commerce had "not offer[ed] a convincing explanation for

why the 'international trade intensity' or 'production cost' criteria governing the additional

allocation establish *de jure* specificity." *Hyundai Steel I*, 659 F. Supp. 3d at 1342.

Instead, the court explained, Commerce had "relied on the existence of the criteria *per

se* to establish specificity" pursuant to 19 U.S.C. § 1677(5A)(D)(i) instead of making the

findings necessary to establish "an explicit limitation *to an enterprise or industry* or

group thereof." *Id.*[23] Commerce also failed to support its determination that the AAGEP

and its implementing rules are not objective pursuant to 19 U.S.C. § 1677(5A)(D)(ii) with

analysis or citations to the record. *See id.*

On remand, Commerce provided further explanation for its determination that the

additional allocation is *de jure* specific. Remand Results at 13. Commerce first framed

the question as "whether [the] eligibility criteria are neutral and do not favor a set of

subsectors over others." *Id.* at 14. So framed, Commerce answered that question in

---

[23] The court has interpreted subsection (i) to require that "the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry." *Hyundai Steel I*, 659 F. Supp. 3d at 1342 (quoting *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 45 CIT __, __, 523 F. Supp. 3d 1393, 1403 (2021)).

the negative.  *Id.* at 14–15.  Commerce explained that the "international trade intensity"

and "production cost" criteria "are not horizontal in application" because they favor

subsectors that are GHG-intensive or "more dependent on international markets for

sales and/or sourcing."  *Id.* at 15.  According to Commerce, the criteria are

"characteristic of certain types of subsectors" and not objective in the sense that they

would "apply to subsectors across an economy."  *Id.*

Commerce also examined the subsectors that the GOK found to be eligible for

the full allocation.  Commerce found that 37 of 63 total subsectors qualified for the full

allocation, and "the vast majority are included because they satisfy the trade intensity

criteria."  *Id.* at 16.  Commerce contrasted the "internationally-oriented manufacturing

subsectors" that qualified for the full allocation with the "broader spectrum of

manufacturing groups" that qualified for the standard allocation.  *Id.* at 16; *see also id.* at

17 (referencing the "similar types" of subsectors eligible for the full allocation and

explaining that the result is consistent with the GOK's intent in ensuring that K-ETS

participants are not disadvantaged vis-à-vis competitors that are not subject to cap-and-

trade programs).  Commerce also pointed to the GOK's determination of the qualifying

subsectors as evidence of an express limitation on access to the subsidy pursuant to

section 1677(5A)(D)(i).  *Id.* at 18, 33–34.  On that basis the agency analogized the K-

ETS to the European Union Emissions Trading Scheme ("EU ETS") at issue in *BGH*

*Edelstahl Siegen GmbH v. United States* (*BGH I*), 46 CIT __, __, 600 F. Supp. 3d 1241,

1264 (2022), in which the court sustained Commerce's *de jure* specificity finding.  *See*

Remand Results at 18–19.

Hyundai Steel's first challenge to Commerce's determination presents an issue of statutory interpretation: Hyundai Steel contends that the statute required Commerce to establish *de jure* specificity pursuant to section 1677(5A)(D)(i) *before* assessing whether section 1677(5A)(D)(ii) applied.  Pl.'s Cmts. at 9–10.  In other words, according to Hyundai Steel, a subsidy that is specific pursuant to subsection (i) may ultimately be found non-specific pursuant to subsection (ii).  The Government does not directly address Commerce's application of the statutory provisions.  Nucor contends that Commerce correctly found that the full allocation is *de jure* specific pursuant to subsection (i) and, separately, that the requirements of subsection (ii) were not met. Nucor's Cmts. at 9.

It cannot be the case, as Hyundai Steel contends, that Commerce must reach an affirmative determination pursuant to subsection (i) before turning to subsection (ii).[24]  A subsidy bestowed pursuant to legislation that expressly limits access to an enterprise or industry clearly favors that enterprise or industry and, thus, cannot be rooted in objective criteria.  Analyzing the requirements of subsection (ii) would be superfluous in such instances.  *See United States v. Nordic Village Inc.*, 503 U.S. 30, 36 (1992) ("[S]tatute[s] must, if possible, be construed in such a fashion that every word has some

---

[24] Hyundai Steel relies, in part, on the court's prior holding.  Pl.'s Cmts. at 9.  The court found Commerce's prior explanation insufficient, however, insofar as Commerce appeared to find that the trade intensity and production cost criteria *per se* independently satisfied 19 U.S.C. § 1677(5)(D)(i).  *Hyundai Steel I*, 659 F. Supp. 3d at 1342.  The court remanded Commerce's determination pursuant to 19 U.S.C. § 1677(5)(D)(ii) because Commerce reached a legal conclusion without offering the requisite explanation for the court to understand the basis for those conclusions.  *Id.* at 1342–43.

operative effect."). Hyundai Steel fails to address this shortcoming in its interpretive approach. Accordingly, the court disagrees with Hyundai Steel that Commerce erred in considering the requirements of subsection (ii) without first reaching an affirmative determination pursuant to subsection (i).

The court next considers the reasons put forth by Commerce to justify its determination. Commerce found that the trade intensity and production cost criteria "are not horizontal in application" because the "favored subsectors, by their nature, have more GHG-intensive (i.e., heavy polluting) production processes" or "are more dependent on international markets for sales and/or sourcing." Remand Results at 15.[25] As such, Commerce found that the criteria "are characteristic of certain types of subsectors." *Id.* Hyundai Steel contends that Commerce disregards the possibility that "any sector could qualify if they meet the criteria." Pl.'s Cmts. at 12–13.

Commerce's rationale merely repackages the language of the criteria into a statement that certain subsectors are favored. *See* Remand Results at 15.[26] The court has rejected this reasoning: "Commerce's observation that 'some industries may benefit from the additional assistance in the form of the allocation of additional KAUs, while

---

[25] Commerce bases its determination on the conclusion that the criteria are not horizontal in application. *See, e.g.*, Remand Results at 15. Commerce makes no finding that the criteria are not economic in nature and has therefore waived any such argument.

[26] Commerce points to the GOK's explanation that the trade intensity and production cost criteria are intended to aid K-ETS participants that are "disadvantaged from market competition" by their participation in the program. *Id.* at 17 & n.64 (quoting GOK's Questionnaire Resp. at 5). Be that as it may, this statement by the GOK does not demonstrate that the recipients of the additional allocation are limited by law to certain enterprises or industries within the Korean economy.

others do not,'" *Hyundai Steel I*, 659 F. Supp. 3d at 1342 (quoting I&D Mem. at 23),

"merely reflects the truism that not all industries will 'qualif[y] under the criteria,'" *id.*

(alteration in original) (quoting *BGH II*, 639 F. Supp. 3d at 1244). Even criteria

recognized as objective (such as the size or number of employees) "could exclude

entire categories of enterprises and industries, but such criteria would not render the

subsidy *de jure* specific because it is horizontal (operating throughout the economy)."

*BGH Edelstahl Siegen GmbH v. United States* (*BGH III*), 47 CIT __, __, 663 F. Supp. 3d

1378, 1382 (2023). Converting the language of the criteria into subsector descriptors is

insufficient to demonstrate that a subsidy may not operate throughout the economy.

*See, e.g.*, Remand Results at 15 (describing the "favored subsectors" as "GHG-

intensive" or "more dependent on international markets").

　　　In addition to failing to support its finding that the K-ETS criteria are not objective,

Commerce, without explanation, considered record evidence relevant to a *de facto*

analysis. *See id.* at 15–17. As set forth above, "'objective criteria or conditions' means

criteria or conditions that are neutral and that do not favor one enterprise or industry

over another." 19 U.S.C. § 1677(5A)(D)(ii). Likewise, the SAA explains that neutrality

requires the criteria or conditions to be "horizontal in application." SAA at 930, reprinted

in 1994 U.S.C.C.A.N. at 4243. Consistent with a *de jure* analysis where the subsidy

must be limited as a matter of law, Commerce's examination of the objectivity of the

criteria should therefore be limited to the criteria used by the authority or, as in this

case, set forth in the relevant law. Such examination may support a finding that the

criteria operate vertically (rather than horizontally) to favor an enterprise or industry over

another, or put differently, "to 'expressly limit' the program's application to specifically named enterprises or industries or group of enterprises or industries." *BGH II*, 639 F. Supp. 3d at 1244.

Instead of confining its examination to the K-ETS criteria, in an effort to further support its determination, Commerce relied on "the list of subsectors" that qualified for the full allocation. Remand Results at 15. Commerce considered the number of qualifying subsectors (37 out of 63 total subsectors subject to the K-ETS); the basis for qualification (most pursuant to the trade intensity criteria); and the types of qualifying subsectors (iron and steel and various other manufacturing subsectors). *Id.* at 16. Commerce then compared the subsectors that qualified for the full allocation to the "substantive breadth of subsectors that received the [standard] allocation." *Id.* at 17; *see also id.* at 35–36. These considerations are relevant to a *de facto* specificity analysis. *See* 19 U.S.C. § 1677(5A)(D)(iii) (listing such factors as the "limited" number of recipients or whether certain enterprises or industries are "predominant user[s] of the subsidy").[27] Commerce offers no interpretation of the *de jure* provision of the statute to support the agency's consideration of the actual users of the subsidy in order to determine whether the subsidy is specific *as a matter of law*. Indeed, when explaining Commerce's implementation of subsection (i), the SAA states that when the authority "expressly limits access to a subsidy to a sufficiently small number of enterprises,

---

[27] Commerce asserts that its specificity determination is consistent with prior determinations. Remand Results at 16 n.63. The cited determinations are either factually distinct or not persuasive insofar as Commerce relied on a similar rationale with which the court, for the reasons discussed, disagrees. *See id.*

industries or groups thereof, *further inquiry into actual use of the subsidy is unnecessary*."  SAA at 930, reprinted in 1994 U.S.C.C.A.N. at 4243 (emphasis added).[28]

Lastly, Commerce's attempt to independently ground its determination in section 1677(5A)(D)(i) does not save its determination.  Remand Results at 18, 33–34.[29] Commerce notes that the GOK "pre-selects" the subsectors "in advance of the distribution of the allocation . . . at the outset of each phase of the [K-ETS] program."  *Id.* at 18.  In a strained attempt to demonstrate that the K-ETS fulfills the requirements under subsection (i) for an express limitation, Commerce states both that the GOK

---

[28] In referencing the Subsidies and Countervailing Measures Agreement underlying the specificity provisions of the URAA, the SAA explains that "a subsidy is specific not only when the subsidy is limited to certain enterprises by law (*de jure*) but also where, despite the existence of neutral and objective eligibility criteria, the subsidy is provided in fact (*de facto*) only to certain enterprises."  SAA at 913, reprinted in 1994 U.S.C.C.A.N. at 4230 (emphasis added).  The SAA thus contemplates Commerce conducting a *de facto* specificity analysis when subsidies are bestowed pursuant to objective criteria.

[29] Commerce seeks to persuade the court to follow the *BGH I* court's decision with respect to the EU ETS.  Remand Results at 18–19, 34–35.  There, the court held that "Commerce reasonably determined the ETS additional free allowances program is *de jure* specific because it is expressly limited to a group of companies . . . on the carbon leakage list."  *BGH I*, 600 F. Supp. 3d at 1264.  The record of that case and the means by which the carbon leakage list was established are not before the court and, as such, its areas of comparability and divergence may not be considered.  Of greater import is the absence of an express limitation to an enterprise or industry here.  While Commerce argues that reaching different conclusions in these cases "creates a potential loophole whereby a foreign government could . . . evade capture by the [countervailing duty] law through a simple rephrasing of the implementing legislation," Remand Results at 19, Commerce disregards its statutory authority to address the *de facto* specificity of any such program, *see supra* note 28.  Thus, if legislation establishes criteria that are not objective, yet the legislation does not expressly limit access to an enterprise or industry, the subsidy may be specific, but it does not meet the criteria for *de jure* specificity. Instead, Commerce must undertake a *de facto* specificity analysis.

"imposes" the criteria "in an explicit manner," *id.*, and that "the GOK applies explicit

criteria," *id.* at 34.  As Hyundai Steel notes, the GOK "simply applies the trade intensity

and production cost criteria to determine what sectors qualify."  Pl.'s Cmts. at 10.  Any

subsidy bestowed pursuant to eligibility criteria necessarily requires some identification

of the recipients that meet those criteria.  Commerce's rationale would appear to permit

the agency to find almost any subsidy bestowed pursuant to eligibility criteria *de jure*

specific pursuant to 19 U.S.C. § 1677(5A)(D)(i).[30]  Neither Commerce nor the

Government grapple with the consequences of Commerce's rationale.

On remand, Commerce must reconsider or reexplain its specificity finding.  In

order to find that the K-ETS program is *de jure* specific, Commerce must identify

"[w]here the authority providing the subsidy, or the legislation pursuant to which the

authority operates, *expressly limits access to the subsidy to an enterprise or industry*."

19 U.S.C. § 1677(5A)(D)(i) (emphasis added).  Alternatively, Commerce may consider

whether the record supports a finding that "there are reasons to believe that [the]

subsidy may be specific as a matter of fact," consistent with the provisions of 19 U.S.C.

§ 1677(5A)(D)(iii).  In either case, Commerce must explain the basis for its finding and

identify substantial evidence on the record in support thereof.

---

[30] According to Commerce, Hyundai Steel's arguments on this point would mean that
"so long as the initial underlying legislation did not outright name the recipient
companies or subsectors, there could be no *de jure* specificity."  Remand Results at 34.
That is not necessarily the case insofar as the statute does not require that degree of
granularity but, rather, an express limitation on access to the subsidy by "an enterprise
or industry" or groups thereof.  19 U.S.C. § 1677(5A)(D)(i).  Moreover, a *de facto*
specificity analysis is available when there is no such express limitation on access.

Court No. 22-00170 Page 28

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are sustained in part with respect to the agency's financial contribution and benefit determinations and remanded in part with respect to the agency's specificity determination; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before July 31, 2024; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 3,000 words.


/s/    Mark A. Barnett
Mark A. Barnett, Chief Judge


Dated: May 2, 2024
        New York, New York