C-580-884
Remand
Slip Op. 24-55
POR:  01/01/2019 – 12/31/2019
**Public Document**
E&C/OV:  RG, KH

***Hyundai Steel Company v. United States*,**
**Court No. 22-00170, Slip Op. 24-55 (CIT May 2, 2024)**
**Certain Hot-Rolled Steel Flat Products from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (CIT or the Court) issued on May 2, 2024.[1]  These final results of redetermination concern

Commerce's final results in the administrative review of the countervailing duty (CVD) order on

certain hot-rolled steel flat products (hot-rolled steel) from the Republic of Korea (Korea)

covering the period of review (POR) January 1, 2019, through December 31, 2019.[2]  In the

*Second Remand Order*, the Court sustained in part, and remanded in part, Commerce's

determination to countervail the Government of Korea's (GOK) provision of additional emission

allowances (KAUs) to certain companies participating in the Korean Emissions Trading System

(K-ETS), including respondent Hyundai Steel Company (Hyundai Steel).  Specifically, the Court

sustained Commerce's financial contribution and benefit determinations with respect to the

program; however, the Court remanded Commerce's specificity determination and directed that

---

[1] *See Hyundai Steel Company v. United States*, Court No. 22-00170, Slip Op. 24-55 (CIT May 2, 2024) (*Second Remand Order*).
[2] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 27570 (May 9, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

"Commerce may consider whether the record supports a finding that 'there are reasons to believe that {the} subsidy may be specific as a matter of fact,'" within the meaning of section 771(5A)(D)(iii) of the Tariff Act of 1930, as amended (the Act).[3]

On remand, Commerce, under respectful protest,[4] has revisited its specificity determination. After reopening the record to obtain additional data on program usage, to comply with the *Second Remand Order*, Commerce has revised its determination, and finds the K-ETS program *de facto* specific. This change has no effect on Commerce's subsidy rate calculation for the program.[5] Consequently, the subsidy rate for Hyundai Steel remains unchanged from the *Final Results* (*i.e.*, 0.56 percent).[6]

## II. BACKGROUND

### A. Administrative Proceeding

On December 8, 2020, Commerce initiated an administrative review of the CVD order on hot-rolled steel from Korea[7] during the POR January 1, 2019, through December 31, 2019.[8] On January 12, 2021, we selected Hyundai Steel as the mandatory respondent in the administrative review.[9] In the *Preliminary Results*, Commerce determined that Hyundai Steel received countervailable subsidies from the GOK pursuant to various programs, including through its

---

[3] *See Second Remand Order* at 27-28.
[4] *See, e.g.*, *Viraj Group Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003) (*Viraj*).
[5] *See* Memorandum, "Calculations for the Preliminary Results:  Hyundai Steel," dated October 29, 2021 (Hyundai Steel Calculation Memorandum).
[6] *See Final Results*, 87 FR at 27570.
[7] *See Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea:  Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 FR 67960 (October 3, 2016).
[8] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 78990 (December 8, 2020).
[9] *See* Memorandum, "Respondent Selection," dated January 12, 2021.

receipt of an additional allocation of KAUs as a participant in the K-ETS program.[10]  In the *Final Results*, Commerce continued to countervail the program.[11]

With respect to the K-ETS program, we found that Hyundai Steel received a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act.[12]  We explained that:

> the GOK is able to collect revenue on additional KAUs that {participating} entities may need to purchase; therefore, the GOK is providing something of value on which it could collect revenue … the three percent allocation represents a value that the GOK will no longer collect … .  Therefore, through various means, the GOK has forgone revenue otherwise due – in the form of uncollected payments/fines, or through the non-collection of additional allocation from K-ETS participants (whether from Hyundai Steel or otherwise) – by providing the additional three percent allocation to certain industries.[13]

Therefore, consistent with prior determinations regarding the program,[14] we found that the provision of additional K-ETS allocations constituted revenue forgone.

With respect to specificity, we concluded that the additional three percent KAU allocation was *de jure* specific based on the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits (AAGEP), and its implementing rules, which present the criteria for determining which industries qualify for the additional allocation.[15]  We explained:

> the criteria included in the AAGEP and implementing rules establish that some industries may benefit from the additional assistance in the form of the allocation of additional KAUs, while others do not.  More specifically, article 14 of the enforcement decree for the AAGEP states that the types of business eligible for

---

[10] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review and Rescission in Part; 2019*, 86 FR 60797 (November 4, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 17-21.

[11] *See Final Results* IDM at Comment 1.

[12] *Id.*

[13] *Id.*

[14] *See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 79 (January 3, 2022) (*CTL Plate from Korea 2019*), and accompanying IDM at Comment 1; and *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 6842 (February 7, 2022), and accompanying IDM at Comment 3.

[15] *See Final Results* IDM at Comment 1.

gratuitous allocation of all emissions permits … shall be any of the following types of businesses … (1) a business with an international trade intensity of at least 30 percent; (2) a type of business with production costs of at least 30 percent; or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent. As such, the AAGEP and implementing rules not only establish explicit limitations but also are not objective criteria or conditions, as defined by section 771(5A)(D)(ii) of the Act.[16]

Accordingly, consistent with Commerce's decision in other cases,[17] we continued to find that the additional three percent KAU allocation was *de jure* specific within the meaning of section 771(5A)(D)(i) of the Act.[18] We calculated a subsidy rate of 0.10 percent *ad valorem* for the program.[19]

**B. *First Remand Order***[20]

Hyundai Steel challenged Commerce's findings regarding the countervailability of the K-ETS program at the CIT. On September 29, 2023, the Court remanded the *Final Results* for Commerce to reconsider whether the additional three percent allocation to Hyundai Steel constituted a financial contribution, and ordered that Commerce reconsider or further explain its finding of *de jure* specificity.[21] The Court elaborated that, if a revised finding with respect to financial contribution would impact Commerce's benefit analysis, Commerce may, if necessary, also reconsider the regulatory basis for its benefit determination.[22]

With respect to Commerce's financial contribution analysis, the Court held that Commerce improperly determined that the additional three percent KAU allocation to Hyundai Steel represented revenue forgone, *i.e.*, that the additional allocation constituted revenue that was

---

[16] *Id.* (citing GOK's Letter, "GOK's Carbon Emissions New Subsidy Allegation Questionnaire Response," dated May 17, 2021 (GOK May 17, 2021 SQR), at Exhibit CEP-1 (internal quotations omitted)).

[17] *See, e.g.*, *CTL Plate from Korea 2019* IDM at Comment 1.

[18] *See Final Results* IDM at Comment 1.

[19] *Id.* at 7.

[20] *See Hyundai Steel Company v. United States*, 659 F. Supp. 3d 1327 (CIT 2023) (*First Remand Order*).

[21] *Id.*, 659 F. Supp. 3d at 1337 and 1343.

[22] *Id.*, 659 F. Supp. 3d at 1338.

otherwise due to the GOK.  The Court explained that the plain meaning of the phrase "is otherwise due" does not "encompass revenue that could, but not necessarily would, have otherwise been collected by the relevant authority."[23]  The Court found that "{t}he statutory text and legislative history are consistent with this view," and concluded that "the potential collection of revenue—either from permits or penalties" does not fulfill the statutory requirement that the revenue be "otherwise due" for a program to be examined under the revenue forgone provision of the Act.[24]  Moreover, the Court explained that, as a factual matter, the value embodied by the additional KAU allocation to Hyundai Steel does not represent revenue otherwise due because K-ETS participants that receive the standard (97 percent) allocation "do not automatically incur any enforceable debt or financial obligation that recipients of the full allocation avoid by reason of the additional allocation."[25]

With respect to Commerce's specificity analysis, the Court remanded for Commerce to reconsider or further explain its reliance on the *de jure* specificity provision of the Act.  The Court explained that "Commerce does not offer a convincing explanation for why the 'international trade intensity' or 'production cost' criteria governing the full allocation establish *de jure* specificity" and elaborated that "Commerce did not make any findings regarding the nature of the eligibility criteria that supported the *de jure* specificity finding."[26]

The Court observed that, "although a lay observer may consider it clear that the GOK makes a financial contribution to Hyundai Steel by providing additional KAUs, confers a benefit by providing those KAUs at no cost, and, by limiting the additional distribution to certain

---

[23] *Id*., 659 F. Supp. 3d at 1334.
[24] *Id*., 659 F. Supp. 3d at 1335.
[25] *Id*., 659 F. Supp. 3d at 1337.
[26] *Id*., 659 F. Supp. 3d at 1342 (internal citations omitted).

industries, does so with specificity, it is incumbent upon the agency to ground its determinations in the statute."[27]

### C. *First Remand Redetermination*[28]

On remand, Commerce reexamined its financial contribution analysis for the K-ETS program and found, consistent with the *First Remand Order* and under protest, that the program constitutes a financial contribution in the form of a direct transfer of funds (under section 771(5)(D)(i) of the Act) rather than revenue forgone (under section 771(5)(D)(ii) of the Act).[29] We also provided a revised benefit analysis to reflect this modification to our financial contribution finding.[30]  Additionally, Commerce further explained the basis of its *de jure* specificity analysis for the K-ETS program, emphasizing that (i) the GOK expressly limits access to the subsidy by identifying select subsectors for the additional KAU allocation based on trade intensity and production cost criteria, and (ii) that these criteria are neither neutral nor horizontal in application.[31]

### D. *Second Remand Order*

On May 2, 2024, the Court issued the *Second Remand Order*.  The Court sustained Commerce's revised determination that the additional allocation provided under the K-ETS program constituted a financial contribution in the form of a direct transfer of funds.[32] Moreover, the Court agreed that the additional KAUs provided a benefit because the GOK's action relieves recipients from additional purchases of necessary KAUs, they can be transferred

---

[27] *Id.*, 659 F. Supp. 3d at 1332.
[28] *See Final Results of Redetermination Pursuant to Court Remand, Hyundai Steel Company v. United States*, 659 F. Supp. 3d 1327 (CIT 2023), dated January 5, 2024 (*First Remand Redetermination*), available at https://access.trade.gov/Resources/remands/23-144.pdf.
[29] *Id.* at 6-11 and 28-32.
[30] *Id.* at 11-13 and 32-33.
[31] *Id.* at 13-20 and 33-36.
[32] *See Second Remand Order* at 6-13.

or sold, and a participating company receives an allotment in excess of that received by other participating companies through the preferential allocation.[33]

However, the Court again remanded Commerce's *de jure* specificity finding. The Court interpreted Commerce's further explanation of why the criteria for the additional allocation were not objective as an attempt to "merely repackage{} the language of the criteria into a statement that certain subsectors are favored" and held that "converting the language of the criteria into subsector descriptors is insufficient to demonstrate that a subsidy may not operate throughout the economy."[34] Thus, the Court held that Commerce failed to support its finding that the K-ETS program criteria are not objective. In addition, the Court found that "Commerce, without explanation, considered record evidence relevant to a *de facto* analysis in its *de jure* analysis,"[35] while noting that Commerce may, on remand, consider whether the program is specific as a matter of fact.[36]

## III.    ANALYSIS

Commerce has revisited its specificity analysis for the K-ETS program. To comply with the Court's order, we have revised our determination to find the program to be *de facto* specific.

A subsidy is *de facto* specific when "one or more" statutory factors exist: (I) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (II) an enterprise or industry is a predominant user of the subsidy; (III) an enterprise or industry receives a disproportionately large amount of the subsidy; (IV) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy

---

[33] *Id*. at 13-18.
[34] *Id*. at 24.
[35] *Id*.
[36] *Id*. at 27.

indicates that an enterprise or industry is favored over others.[37]  Furthermore, Commerce will examine these factors in the order in which they appear.  If a single factor warrants a finding of specificity, Commerce is not required to undertake further analysis.[38]

On remand, Commerce reopened the record and solicited data from the GOK on the number of companies receiving the additional KAU allocation (*i.e.*, those that received a 100 percent KAU allocation) under the K-ETS, rather than the standard 97 percent allocation.[39]  The GOK provided the data, which indicated that 504 companies received the 100 percent allocation.[40]  The GOK also reported that there are 787,438 companies operating in the GOK's jurisdiction during 2019.  As Commerce has previously noted, the SAA sets forth the purpose of the specificity test, which is to "function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy."[41]  We find that a program which has only 504 company recipients in an economy the size of Korea cannot be considered "widely used" throughout the economy within the spirit of the specificity test as outlined in the SAA.  As a result, we find that the program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, because the actual number of recipients of the subsidy was limited in number, *i.e.*, to just 504 recipients out of the 787,438 companies operating in the GOK's jurisdiction[42] during 2019.

---

[37] *See* section 771(5A)(D)(iii) of the Act.
[38] *See* 19 CFR 351.502(a).
[39] *See* Commerce's Letter, "Supplemental Questionnaire," dated June 6, 2024.
[40] *See* GOK's Letter, "Supplemental Questionnaire," dated June 13, 2024.
[41] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 929.
[42] *See* GOK May 17, 2021 SQR at 19.

This is consistent with our long-standing practice of applying a *de facto* specificity analysis.[43]  Recently, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) affirmed Commerce's practice of finding *de facto* specificity where the recipients of the subsidy are limited in number.  In *Gov't of Quebec*, the Federal Circuit affirmed a *de facto* specificity finding in which an even greater percentage of companies than at issue here was found to reflect a program applicable to participants that were "limited in number"; the Federal Circuit found that Commerce's use of the total number of corporate tax filers as the comparator to determine that the actual percentage of tax credit recipients was limited in number was in accordance with law.[44]  In that case, Commerce found a program providing benefits to 4,930 tax credit recipients, out of 387,949 total corporate tax filers, to be *de facto* specific given that the recipients were limited in number.  Here, Commerce finds an even more limited number, 504 out of 787,438, to be *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.  The CIT has also upheld this practice, finding specificity when observing similar proportions of beneficiaries when comparing program recipients to the number of entities throughout the entire economy.[45]

---

[43] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review, 2020*, 87 FR 66648 (November 4, 2022), and accompanying PDM at 17, unchanged in *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2020*, 88 FR 29889 (May 9, 2023) (*Hot-Rolled from Korea*) ("Further, we find this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act because the actual number of recipients of the subsidy was limited to 5,598 recipients out of 838,008 corporate taxpayers during 2020"); and *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, 2019*, 86 FR 37740 (July 16, 2021) (*CORE from Korea*), and accompanying PDM at 22, unchanged in *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 2759 (January 19, 2022) ("Because only 439 companies benefitted from this program of a total of 740,215 corporate tax returns filed in 2019, we preliminarily determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, because the actual recipients of the subsidy are limited in number.").
[44] *See Gov't of Quebec v. United States*, Slip Op. 2022-1807 (Fed. Cir. 2024) (*Gov't of Quebec*).
[45] *See Nucor Corp. v. United States*, 494 F. Supp. 3d 1377, 1383 (CIT 2021) (*Nucor*) (finding that, where only 25 companies used a program compared to all companies operating in the Korean economy, the program participants were limited in number); *Wilmar Trading PTE Ltd. v. United States*, 466 F. Supp. 3d 1334, 1358 (CIT 2020) (*Wilmar*) (finding that the 14 industries benefitting from an input provided for less than adequate remuneration (LTAR) were limited in number when compared to all industries in the economy of Indonesia); and *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1342-43 (CIT 2015) (*Borusan*)

Although on remand we have found the K-ETS program to be *de facto* specific, we express our concerns with respect to the Court's conclusions in the *Second Remand Order* on the issue of whether the K-ETS program is *de jure* specific. As illustrated in the SAA, Congress intended the specificity test to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy.[46] Regarding *de jure* specificity, the SAA instructs Commerce to apply the specificity test and conduct its analysis of *de jure* specificity on a case-by-case basis, and further notes that there is no mathematical formula for determining when a program is *de jure* specific.[47] While section 771(5)(D)(ii) of the Act allows that a subsidy may not be specific as a matter of law if the relevant legislation establishes objective criteria or conditions,[48] for the reasons stated above (and in the *Final Results* and the *First Remand Redetermination*), Commerce does not believe the record demonstrates that the K-ETS program is administered on an objective basis, in accordance with the language of the SAA.

Rather, for the reasons explained in the *First Remand Redetermination*, Commerce believes that the "international trade intensity" and "production cost" criteria expressly limit access to a sufficiently small number of enterprises, industries or groups thereof.[49] Although the Court held that Commerce "fail{ed} to support its finding that the K-ETS criteria are not

---

(finding that the eight industries that received an input for LTAR were limited in number when compared to all industries in the Turkish economy).

[46] *See* SAA at 929. The SAA goes on to state that the specificity test was not intended to function as a loophole through which narrowly focused subsidies provided to, or used by, discrete segments of an economy could escape the purview of the CVD law. *See* SAA at 930.

[47] *Id.*

[48] Section 771(5A)(D)(ii) of the Act states that the term "objective criteria or conditions" means criteria or conditions that are neutral and do not favor one enterprise or industry over another. The SAA further elucidates this concept in stating that "objective criteria or conditions" must be neutral, must not favor certain enterprises or industries over other, and must be economic or horizontal in nature. *See* SAA at 930. Under the SAA, for a subsidy program's "criteria or conditions" to be "objective," the "criteria or conditions" must meet all of the conditions set forth in the SAA.

[49] *See* SAA at 930 ("{W}here a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof …").

objective,"[50] Commerce emphasizes that the criteria for a full allocation under the K-ETS program favor enterprises that are more reliant on international markets or have higher production costs.[51]  For this reason, although Commerce has reconsidered its specificity determination and found this program to be *de facto* specific pursuant to section 771(5A)(D)(iii) of the Act in accordance with the Court's order, we are filing these final results of redetermination under respectful protest with respect to the issue of the Court's holding on *de jure* specificity.

## IV.    INTERESTED PARTY COMMENTS

On July 12, 2024, we released the Draft Results to interested parties for comment.[52]  On July 18, 2024, we received comments from Nucor Corporation (Nucor), a petitioner in the underlying proceeding, and Hyundai Steel.[53]  For the reasons explained below, we find that the GOK's provision of an additional three percent allocation of KAUs to certain recipients under the K-ETS program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.  We address interested party comments, in turn.

*Nucor's Comments*:

The following is a verbatim summary of arguments submitted by Nucor.  For further details, *see* Nucor Comments at 3-6.

{Commerce} has properly revisited its specificity determination regarding the GOK's provision of additional KAUs to certain industries and companies under the

---

[50] *See Second Remand Order* at 24.

[51] *See First Remand Redetermination* at 17 (summarizing the GOK's intent to target benefits to "participants in markets in which there are other competitors who are not subject to restrictions similar to those imposed under this program").  While the Court noted that "a *de facto* analysis is available" to Commerce, the SAA explains that "further inquiry into the actual use of the subsidy is unnecessary" when access is expressly limited.  *See Second Remand Order* at 26-27, n.28 and n.30; *see also* SAA at 930.

[52] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 22-00170, Slip Op. 24-55 (CIT May 2, 2024), dated July 10, 2024 (Draft Results).

[53] *See* Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated July 18, 2024 (Nucor Comments); and Hyundai Steel's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated July 18, 2024 (Hyundai Steel Comments).

K-ETS program, and the agency has appropriately found that the K-ETS program is *de facto* specific. Consistent with {the Court's} May 2, 2024 {*Second Remand Order*}, {Commerce}is no longer relying on a finding of *de jure* specificity – but rather one of *de facto* specificity – in determining that the K-ETS program provides countervailable subsidies.[54]  {Commerce's} *de facto* specificity analysis is supported by additional data collected from the GOK as part of this remand proceeding as well as recent court precedent affirming the agency's ability to reach a *de facto* specificity determination in similar circumstances.[55]  Thus, while Nucor believes that {Commerce} properly found this program to be *de jure* specific throughout this proceeding, at the very least, the agency should continue to find the K-ETS program to be *de facto* specific in its final remand determination.

Moreover, Nucor shares {Commerce's} concerns with the Court's opinion, which may unduly limit the ability of the agency to find complex subsidy programs, such as the K-ETS program, to be *de jure* specific in a manner consistent with the statute.[56]  Therefore, Nucor urges {Commerce} to continue to develop its *de jure* specificity practice and not to find that the {*Second Remand Opinion*} in this case limits the ability of the agency to find that similar emissions trading programs are *de jure* specific in other proceedings.

*Hyundai Steel's Comments*:

The following is a verbatim summary of arguments submitted by Hyundai Steel. For further details, *see* Hyundai Steel Comments at 2-11.

{Commerce's} comparison of the number of companies receiving the 100 percent allocation of permits with the total number of companies within the jurisdiction of the GOK is an unreasonable apples-to-oranges comparison that does not demonstrate whether the "actual recipients of the subsidy" are limited in number pursuant to section 771(5A)(D)(iii)(I) of the Act.

{Commerce's} attempts to analogize {its treatment of various} tax programs are misplaced.[57]  The comparison of tax beneficiaries with tax filers is logically consistent (*i.e.*, an apples-to apples comparison) whereas the comparison of the total number of companies in Korea to the number of companies required to participate {in K-ETS} that received the 100 percent permit allocation is logically inconsistent.

---

[54] *See* Nucor Comments at 2 (citing Draft Remand at 7-10; and *Second Remand Order* at 24-27).
[55] *Id.* (citing Draft Results at 8-9).
[56] *Id.* (citing Draft Results at 9-10).
[57] *See* Hyundai Steel Comments at 12 (citing Draft Results at 8-9; *Gov't of Quebec*, Slip Op. 2022-1807 at 12-13; *Hot-Rolled from Korea* PDM at 17; and *CORE from Korea* PDM at 22).

{Commerce's} citation to CIT cases which upheld specificity findings "in similar proportions when eligibility is available to an entire economy" is also inapposite.[58] Whether CIT cases have upheld specificity findings when eligibility is available to an entire economy is irrelevant to the relative allocations of the K-ETS program because most of the 787,438 companies within the jurisdiction of the GOK are not subject to the K-ETS.

{Commerce's} comparison does not demonstrate that the relative allocation of permits is limited in number because there is no benefit {shown} as a result of the comparison between those companies subject the K-ETS program and those that are not subject the K-ETS program. Rather, Companies who receive the 100 percent permit allocations like Hyundai Steel are disadvantaged, not benefitted, vis-à-vis the companies that are not subject to the K-ETS program given the burdens imposed upon them that are not imposed on companies who are not subject to the K-ETS program.

**Commerce's Position:** We find that the GOK's provision of a 100 percent KAU allocation under the K-ETS program to select companies is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act. For the reasons discussed below, Hyundai Steel's arguments are without merit.

As discussed above, a subsidy is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act when the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number. As the Federal Circuit recently noted,

> {t}he governing statute and the implementing regulations do not prescribe any mandatory method that Commerce must employ in assessing *de facto* specificity or analyzing the listed factors {under section 771(5A)(D)(iii) of the Act}. Rather, it is a fact-intensive and case-specific inquiry, where the factors involved and the weight accorded to them vary from case to case. In conducting this inquiry, Commerce exercises the necessary latitude afforded it in choosing the appropriate approach.[59]

Here, Commerce has compared the number of recipients of the 100 percent KAU allocation (*i.e.*, 504 companies) to the total number of companies operating in the GOK's jurisdiction during the

---

[58] *Id.* at 12 (citing Draft Results at 9; *Nucor*, 494 F. Supp. 3d at 1383; *Wilmar*, 466 F. Supp 3d at 1358; and *Borusan*, 61 F. Supp. 3d at 1342-43).
[59] *See Gov't of Quebec*, Slip Op. 2022-1807 at 26 (internal citations omitted).

POR (*i.e.*, 787,438 companies). We find that the number of recipient companies – which amounted to less than 0.1 percent of companies operating in the Korean economy – indicates that the recipients of the subsidy were limited in number and that the program was not widely used throughout the Korean economy. Accordingly, we find the program to be *de facto* specific.

As we noted, the Federal Circuit has recently determined that comparing the number of subsidy recipients to the number of corporate entities within an economy reflects an appropriate *de facto* specificity analysis and "does not conflict with the SAA's directive regarding the purpose of the specificity determination" which is to "winnow out only those foreign subsidies which are truly broad and widely used throughout an economy."[60] Such a comparison is consistent with extensive Commerce practice, and this court-affirmed approach is entirely appropriate for the intended purposes of our specificity analysis as set forth by the SAA, wherein Commerce is tasked with examining a program's usage *throughout an economy*.[61] Therefore, our analysis here is consistent with the SAA and Federal Circuit precedent. These considerations, alone, demonstrate that Commerce's approach to examining *de facto* specificity under section 771(5A)(D)(iii)(I) of the Act in this context is appropriate.

Hyundai Steel presents various arguments that Commerce must modify its specificity analysis. They are unavailing. First, Hyundai Steel cites this Court's decision in *Mosaic*.[62] In that underlying proceeding, Commerce compared the number of corporate recipients of tax penalty relief (8,761) to the total number of corporate taxpayers in Morrocco (262,165) and found the program to be *de facto* specific. The *Mosaic* court found that Commerce's specificity

---

[60] *Id*. at 27.
[61] *Id*. (citing SAA at 929) (emphasis added); *see also, e.g.*, *Hot-Rolled from Korea* PDM at 17; and *CORE from Korea* PDM at 22.
[62] *See* Hyundai Steel Comments at 5 (citing *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1315 (CIT 2023) (*Mosaic*)).

analysis was improper.[63]  As an initial point, in Commerce's final results of redetermination

pursuant to remand in that proceeding, Commerce noted that it "respectfully disagree{d} with

the CIT's holdings in the {Court's remand order} regarding Commerce's determination that the

reduction in tax fines and penalties program is *de facto* specific pursuant to section

771(5A)(D)(iii)(I) of the Act, and believes there is sufficient evidence to continue to find the

program is used by a limited number of actual recipients based on the record evidence."[64]

   Further, that case is readily distinguishable from the instant one.  First, the number of

recipients of the 100 percent KAU allocation (504) here represents a fraction of the number of

recipients in the administrative proceeding addressed in *Mosaic* (8,761).[65]  Regardless of

Hyundai Steel's arguments regarding *Mosaic* and its view of the proper comparison figure, the

key fact here is that only 504 companies used this program.  To find a program used by *only 504

companies* in the entirety of the Korea to be not specific, as Hyundai Steel contends, would strain

credulity, be antithetical to the specificity test and prior precedent, and upend the purpose of the

CVD statute to capture subsidization provided by foreign governments to discrete segments of an

economy.  Second, in *Mosaic*, the Court faulted Commerce for, in its view, not analyzing the full

universe of recipients.  As the Court noted, the fact "{t}hat 3.34% of corporate taxpayers

benefited from penalty relief, under a program that was not limited to corporate taxpayers, does

not support a conclusion that the program was not broadly available and broadly used throughout

the Moroccan economy."[66]  There, the Court indicated that the 8,761 recipient figure was an

---

[63] *See Mosaic*, 659 F. Supp. 3d at 1314.
[64] *See Final Results of Redetermination Pursuant to Court Remand*, *The Mosaic Company v. United States*, Consol. Court No. 21-00116, Slip Op. 23-134 (CIT September 14, 2023), dated January 22, 2024, available at https://access.trade.gov/Resources/remands/23-134.pdf.
[65] *See Mosaic*, 659 F. Supp. 3d at 1314.
[66] *Id*., 659 F. Supp. 3d at 1315.

incomplete representation of users of the program in that case;[67] here we have the complete number of recipients of the 100 percent allocation (which is far fewer than even that relied upon in *Mosaic*). Third, the Court found that the program in that case was "a common, ordinary tax administration program" and that the "penalty relief program at issue {was} available not only to all industries and sectors but to all types of taxpayers."[68] That too is different from the circumstances here, where the K-ETS program is limited to companies that meet a certain emission threshold and the GOK further limits its provision of the 100 percent KAU allocation to select sectors based on trade intensity and production cost criteria.[69]

Despite the differences between the cases, Hyundai Steel cites *Mosaic* in support of its argument that a comparison between "the number of companies that receive the 100 percent permit allocation with all companies within the jurisdiction of the GOK is irrelevant" because only companies that emit a certain volume of carbon equivalents are subject to the K-ETS program[70] and asserts that companies that are not subject to the K-ETS program "cannot represent the comparator for whether the recipients of the 100 percent allocations are 'limited in number.'"[71] However, not only did Commerce apply an established practice in the context of *de facto* specificity analysis by comparing the number of subsidy recipients to the number of participants in the economy in question, but this approach was also recently upheld by the Federal Circuit in *Gov't of Quebec*.

---

[67] *Id.*, 659 F. Supp. 3d at 1315 ("The term 'taxpayers' encompasses individuals as well as all types of juridical persons in addition to corporations; it is reasonable to conclude that it also might include such entities as partnerships and unincorporated associations. In deciding that the program was *de facto* specific, Commerce based its determination on 8,761 corporate *taxpayers rather than ascertain the actual number of users of the program*.") (emphasis added).

[68] *Id.*, 659 F. Supp. 3d at 1316 (internal quotations and citations omitted).

[69] *See* Draft Results at 10.

[70] *See* Hyundai Steel Comments at 3-4.

[71] *Id.* at 4 (citing section 771(5A)(D)(iii)(I) of the Act).

Hyundai Steel's attempts to distinguish *Gov't of Quebec* (and numerous additional administrative and judicial precedents that Commerce cited in the Draft Results) are unconvincing.  With respect to *Gov't of Quebec*, *Hot-Rolled from Korea*, and *CORE from Korea*, Hyundai Steel contends that, in those cases (which addressed the countervailability of tax programs), Commerce's standard *de facto* comparison was acceptable, because it was "logically consistent to compare the recipients of the tax credits, tax exemptions, and tax deductions with the total number of tax filers{, because t}ax filers are at least eligible to benefit from these tax benefits, and thus a logical comparator to actual recipients of the tax benefits."[72]  By contrast, Hyundai Steel asserts, "comparing the total number of companies in Korea, most of which are not subject to the K-ETS program and thus ineligible for additional emissions permits, to the mandatory participants in the K-ETS program who received the additional {three} percent allocation, is logically inconsistent."[73]  We disagree.  The K-ETS program, like most subsidy programs, has characteristics that limit the usage (or likelihood of usage) of the program to a subset of the economy.  Recognition of this fact does not mean that Commerce must artificially narrow its definition of "the economy" in assessing whether the program "truly {is} broadly available and widely used *throughout an economy*."[74]

In any case, none of the cited cases actually support Hyundai Steel's proposed interpretation, whereby the comparison group is restricted (*i.e.*, to compare the number of recipients to the number of "potential qualifying" entities).  For instance, regarding the tax credit program in question in *Gov't of Quebec*, "{t}o be eligible for this credit, an employer must satisfy several criteria, including, among others, engaging in a qualified business and having

---

[72] *Id.* at 9.

[73] *Id.*

[74] *See Gov't of Quebec*, Slip Op. 2022-1807 at 27 (internal citations omitted); and SAA at 929 (emphasis added).

received the required certification."[75]  Neither Commerce nor the Federal Circuit suggested that

the number of recipients must be compared to a set of only "qualified businesses" and those with

"the required certification"[76] in conducting the *de facto* specificity analysis.  Rather, the

specificity analysis was based on a comparison of recipients to the full universe of taxpayers.

The same is true of the administrative proceedings cited previously.  In *Hot-Rolled from*

*Korea*, the local acquisition tax exemption that Commerce countervailed related to instances

where "corporate properties are acquired via an originating company transferring properties to a

new company, where the shareholders are the same and the new company does not pay any value

for the acquisition of properties transferred to it."[77]  Commerce compared the number of

recipients to the total number of corporate tax filers; we did not limit the baseline of the

comparison to, for instance, a subset of companies that acquired properties during the POR.  The

is true of our analysis in *CORE from Korea* as well.  There, we countervailed a tax deduction

relating to "investments in facilities that are constructed for the purpose of preserving the

environment."[78]  We compared the number of recipients (439) to the number of total corporate

tax filers during the POR (740,215), and found the program to be specific; we again did not

artificially limit the analysis to recipients compared to the total number firms that made certain

types of investments.

This case precedent is consistent with Commerce's longstanding views of the *de facto*

specificity analysis, and Hyundai Steel's arguments run counter to such views.  Specifically, the

*CVD Preamble* reiterates a prior Commerce statement that "… {Commerce} is not required to

---

[75] *See Gov't of Quebec*, Slip Op. 2022-1807 at 11.
[76] *Id.*
[77] *See Hot-Rolled from Korea* PDM at 17.
[78] *See CORE from Korea* PDM at 21-22.

explain why the users of a subsidy may be limited in number."[79]  Rather, "the SAA clearly indicates that {Commerce} does not need to find 'targeting' or 'purposeful government action' to conclude that a domestic subsidy is specific."[80]  Hyundai Steel's proposed alternative approach—a comparison of the number of recipients to some narrow subset of the economy— seems to suggest that Commerce should consider that the eligibility criteria may naturally limit the number of potential recipients; in other words, explain *why* there are a small number of users. Such a methodology would plainly contravene the guidance set forth in the SAA and the stated purpose of Commerce's specificity analysis.  Put simply, just 504 companies in all of Korea used this program.  This is undoubtedly a limited number of users and therefore this program is specific within the meaning of section 771(5A)(D)(iii)(I).  *Why* such users may be limited in number is irrelevant to our analysis.

Hyundai Steel also asserts that the subsidy programs in question in *Nucor*, *Wilmar*, and *Borusan*—relating to loan restructuring and the provision of goods for LTAR—are distinct from the program at issue here, because, it argues, "{u}nlike the voluntary loan restructuring or the provision of palm oil or steel for LTAR {in those cases}, the K-ETS is a restrictive program and the subsidy here is alleged to be the relative difference in the emissions restrictions."  Hyundai Steel further contends that "{w}hether CIT cases have upheld specificity findings when eligibility is available to an entire economy is irrelevant" and "most of the 787,438 companies within the jurisdiction of the GOK are not subject to the K-ETS."[81]  This line of argument only serves to undermine Hyundai Steel's position while bolstering Commerce's interpretation.  With this argument, in essence, Hyundai Steel is admitting that the K-ETS program is limited to

---

[79] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65359 (November 25, 1998) (*CVD Preamble*).
[80] *Id.*
[81] *See* Hyundai Steel Comments at 10.

discrete segments of the economy.  That the program is restrictive and not available to all market participants in Korea is precisely why Commerce concluded that the program was not widely available in its initial determinations.  Nevertheless, Commerce is now concluding that this program is not widely used under a *de facto* analysis, that the recipients are limited in number, and that it is specific.[82]

Next, Hyundai Steel quotes the SAA to assert that the *de facto* specificity provision is not satisfied here because the question is whether "*the benefit of the subsidy* is spread throughout an economy" and "{c}ompanies who receive the 100 percent permit allocations like Hyundai Steel are disadvantaged, not benefitted, vis-à-vis the companies that are not subject to the K-ETS since mandatory participants are burdened with compliance costs."[83]  This argument, too, is misplaced.  The Court has—on multiple occasions now—rejected this line of argument.  In the latest instance, the *Second Remand Order* explained:

> Hyundai Steel also reprises the argument that it did not receive any benefit because the K-ETS limit{s} its production and increase{s} its costs, regardless of the relative allocation percentage.  The court previously "consider{ed}—and reject{ed}—Hyundai Steel's primary claim that Commerce impermissibly ignored the burdens imposed by the K-ETS program when ascertaining the existence of a benefit and does so again here for the same reasons.[84]

Consistent with the Court's decisions on this point, we once again reject this argument.

Finally, we note that both parties provide comments regarding Commerce's prior *de jure* specificity determination.  For the reasons explained above, we are following the directive of the

---

[82] Such characteristics, *i.e.*, the GOK's restriction on K-ETS participation to companies meeting minimum emissions levels, as well as its further restrictions on granting 100 percent KAU allocations based on trade intensity and/or production costs, are factors that are consistent with a finding of *de jure* specificity.  *See* section 771(5A)(D)(iii)(I) of the Act; and SAA at 929.

[83] *See* Hyundai Steel Comments at 7 (emphasis in original).

[84] *See Second Remand Order* at 18 (*citing First Remand Order*, 659 F. Supp. 3d at 1339).

Court to apply a *de facto* specificity analysis in these final results of redetermination. As a result, we are not addressing parties' arguments concerning a *de jure* determination.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Second Remand Order*, and under respectful protest,[85] Commerce has reexamined its specificity analysis for the GOK's provision of a 100 percent KAU allocation under the K-ETS program to find the program *de facto* specific. These changes did not change Commerce's subsidy rate calculation for this program,[86] or for Hyundai Steel's overall subsidy rate from the *Final Results* (*i.e.*, 0.56 percent).[87]

7/30/2024

X ~~Ryan Majerus~~

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[85] *See Viraj*, 343 F.3d at 1371.
[86] *See* Hyundai Steel Calculation Memorandum.
[87] *See Final Results*, 87 FR at 27570.