# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　Defendant,<br><br>　　and<br><br>NUCOR CORPORATION and GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>　　　　Defendant-Intervenors. | **NON-CONFIDENTIAL**<br>Proprietary Information Removed from Pages 3 and 5<br><br>Court No. 22-00170 |

## PLAINTIFF'S COMMENTS IN OPPOSITION TO THE REMAND RESULTS

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

August 30, 2024

**TABLE OF CONTENTS**

I. Commerce's *De Facto* Specificity Determination Is Unsupported by Substantial Evidence and Contrary to Law. ........................................................................................ 2

II. Conclusion ................................................................................................................ 11

III. Certificate of Compliance ........................................................................................ 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Borusan Mannesmann Boru Sanayi Ticaret A.S. v. United States*,
   61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ..............................................................................10

*Gov't of Quebec v. United States*,
   105 F.4th 1359 (Fed. Cir. 2024) ............................................................................................8, 9

*Mosaic Co. v. United States*,
   659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) .............................................................4, 5, 6, 7

*Nucor Corp. v. United States*,
   494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) ..........................................................................10

*Wilmar Trading PTE Ltd. v. United States*,
   466 F. Supp 3d 1334 (Ct. Int'l Trade 2020) ...........................................................................10

**Statutes**

19 U.S.C. § 1677(5A)(D)(iii)(I)........................................................................................................3, 7

**Other Authorities**

*Certain Corrosion Resistant Steel Products from the Republic of Korea:
   Preliminary Results of Countervailing Duty Administrative Review, 2019*, 86
   Fed. Reg. 37,740 (Dep't Commerce July 16, 2022) ..............................................................8, 9

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final
   Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg.
   27,570 (May 9, 2022)..............................................................................................................1, 3

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary
   Results and Partial Rescission of Countervailing Duty Administrative Review;
   2020*, 87 Fed. Reg. 66,648 (Dep't Commerce Nov. 4, 2022)..............................................7, 9

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) .................................4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION and GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Defendant-Intervenors. | Court No. 22-00170 |

**PLAINTIFF'S COMMENTS IN OPPOSITION TO THE REMAND RESULTS**

Plaintiff Hyundai Steel Company ("Hyundai Steel") hereby comments in opposition to the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Co. v. United States*, Ct. No. 22-00170 (Ct. Int'l Trade Jul. 31, 2024), ECF No. 63-1, PRR 12 ("*Remand Results*").[1] The determination at issue is *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 27,570 (May 9, 2022) ("*Final Results*"), PR 133, and accompanying Mem. (Barcode: 4238418-02) ("*Final Results IDM*"), PR 132.

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR" or "CR") or the remand administrative record number ("PRR" or "CRR").

1

### I.    Commerce's *De Facto* Specificity Determination Is Unsupported by Substantial Evidence and Contrary to Law.

In its *Remand Results*, Commerce determined that the 100 percent allocation of the carbon emission permits[2] to certain trade intensive and high production cost recipients "rather than the standard 97 percent allocation" is *de facto* specific because 504 companies received the 100 percent allocation and there are 787,438 companies operating within the jurisdiction of the Government of Korea ("GOK") during the period of review ("POR"). *Remand Results* at 8. The *Remand Results* are unsupported by substantial evidence and not in accordance with law because whether the 100 percent allocation was provided to 504 companies out of the 787,438 companies operating in Korea does not support Commerce's determination that the 100 percent allocation "rather than the standard 97 percent allocation" is *de facto* specific.

The comparison of the number of companies that receive the 100 percent permit allocation with all companies within Korea is irrelevant to whether the recipients of the additional allocations are limited in number. Only companies that, within the preceding three years, emit 125,000 tons of carbon equivalents per year, or with a place of business that has produced 25,000 tons of carbon equivalents, are subject to the KETS program. Letter from Yoon and Yang LLP, "GOK's Carbon Emissions New Subsidy Allegation Questionnaire Response" at SQA-1 p.8 & Exhibit CEP-1 Article 8 (May 17, 2021) (Barcode: 4122375), CR 77, PR 76 ("GOK NSA QR"). Entities that do not emit the threshold emissions are not subject to the KETS and are not allocated any permits. *Id.* Most of the 787,438 companies operating in Korea receive no permits because they are not subject to the KETS program and therefore cannot represent the comparator for whether the recipients of the 100 percent allocations are "limited in

---

[2] The permits are sometimes referred to as Korean Allowance Units ("KAUs").

number." *Id.* at SQA-1 p.19 (showing that **[     ]** companies received final permit allocations under the KETS program in 2019). It is meaningless to compare the number of companies that receive the 100 percent permit allocation with *all* companies in Korea; the comparison is apples to oranges.

        To be *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act, the "actual recipients of the subsidy, whether considered on an enterprise or industry basis," must be "limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I). The subsidy that Commerce alleges is the 3 percent relative differential between the entities that are allocated 100 percent of their permits and those that are allocated 97 percent of their permits. *Remand Results* at 11 ("{W}e find that the GOK's provision of an *additional* three percent allocation of KAUs to certain recipients under the K-ETS program is *de facto* specific.") (emphasis added); Mem. from Dep't Commerce, "Calculations for the Preliminary Results: Hyundai Steel" at Attachment II tab "K-ETS" (Oct. 29, 2021) (Barcode: 4178488), CR 99-100, PR 99 (determining the "3% Phase 2 'Extra' Allocation" and using it to calculate the benefit) (unchanged in *Final Results*, *Final Results IDM* at 1). As Commerce explained in the *Final Results*, it is "evaluating the additional three percent allocation" and "{w}hether the K-ETS program covers all entities within a country or not, and whether the program results in a burden that not all Korean companies must shoulder, is not the focus of {its} analysis." *Final Results IDM* at 19. Yet, in the *Remand Results*, Commerce compared the companies that receive 100 percent of the permit allocation with all 787,438 companies operating within Korea, not the number of companies who received the 97 percent permit allocation. The comparison of the companies receiving the 100 percent allocation with all companies in Korea says nothing about whether "the actual recipients of the subsidy" are limited in number pursuant to section 771(5A)(D)(iii)(I) of the Act.

3

Commerce notes that the purpose of the specificity test as expressed the Statement of Administrative Action ("SAA") is "to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy" and that the KETS "cannot be considered 'widely used' throughout the economy." *Remand Results* at 8. Commerce's reference to the purpose of the specificity test does not render its apples-to-oranges comparison reasonable or consistent with the statute. The SAA provides that "the specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because the widespread availability and use of a subsidy, the *benefit of the subsidy* is spread throughout an economy." H.R. Doc. No. 103-316 at 930 (emphasis added). Therefore, to be *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act and the purpose of the specificity test as expressed in the SAA, the "subsidy" must be "limited in number."

In *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023), "Commerce compared the number of corporate taxpaying recipients of {tax} penalty relief, 8,761, to the total number of corporate taxpayers, 262,165," and determined that the resulting percentage – 3.34% – showed that the recipients are limited in number pursuant to section 771(5A)(D)(iii)(I) of the Act. *Mosaic*, 659 F. Supp. 3d at 1314-15. The court found that the basis for Commerce's comparison and resulting low percentage was "essentially meaningless from the standpoint of determining the 'specificity' of the program because the numerator and denominator were not logically comparable." *Id.* at 1315. The court explained that the only potential recipients of this subsidy program were those that had incurred a tax penalty, not all corporate taxpayers. *Id.*

Here, as in *Mosaic*, Commerce's comparison of the number of companies that received the 100 percent allocation to all companies in Korea is "essentially meaningless… because the

4

numerator and denominator were not logically comparable." *Id.* The appropriate denominator would be companies in Korea subject to the KETS and thus who receive the 97 percent permit allocation. Without the comparison of the 100 percent companies to the 97 percent companies, there is no evidence that the "additional allocation" is specific. Here, the record shows that 504 companies received the 100 percent allocation whereas the number of companies subject to the KETS was **[     ]**. Letter from Yoon and Yang LLP, "Proprietary Designations" at 3 (July 10, 2024) (Barcode: 4592839); GOK NSA QR at SQA-1 p.19. This apples-to-apples comparison with matching numerator and denominator shows that **[     ]** percent of companies subject to the KETS program received the additional allocation. The actual recipients, for purposes of section 771(5A)(D)(iii)(I) of the Act – 504 companies – thus can scarcely be described as "limited in number."

Commerce's attempts to distinguish *Mosaic* are misguided. Commerce notes (1) that the 504 recipients of the additional allocations is less than the 8761 recipients of the tax penalty relief in *Mosaic*, (2) that the court in *Mosaic* faulted Commerce for "not analyzing the full universe of recipients" whereas here Commerce had the complete number of recipients of the 100 percent allocation, and (3) that the tax penalty in *Mosaic* was available to all types of taxpayers whereas the KETS is "limited to companies that meet a certain emission threshold and further limits the 100 percent allocation to select sectors." *Remand Results* at 15-16. None explain how the logic of *Mosaic* is inapplicable to the relative allocations within the KETS.

First, Commerce notes that the number of recipients of the 100 percent allocation "represents a fraction of the number of recipients" in *Mosaic* and emphasizes that only 504 companies received additional allocations. *Remand Results* at 15. But, whether there are less than the 8761 companies receiving tax penalty relief in *Mosaic* does not materially distinguish

5

the logic of the *Mosaic* holding.  The court reasoned in *Mosaic* that Commerce's comparison of tax penalty relief to the total number of corporate taxpayers was an illogical apples-to-oranges comparison.  *Mosaic*, 659 F. Supp. 3d at 1314-15 ("Commerce compared the number of corporate taxpaying *recipients* of penalty relief, 8761, to the total number of corporate *taxpayers*, 262,165, not the total number of corporate taxpayers who incurred penalties.") (emphasis-in-original).  That there are 504 companies here and 8761 companies in *Mosaic* does not render Commerce's faulty comparison reasonable or consistent with the statute.

Second, Commerce claims that *Mosaic* "faulted Commerce for… not analyzing the full universe of recipients" whereas here Commerce "ha{s} the complete number of recipients of the 100 percent allocation." *Remand Results* at 15-16.  However, the court faulted Commerce's apples-to-oranges comparison, as well as the fact that the tax penalty relief in *Mosaic* was not limited to corporate taxpayers.  The court stated that "because Commerce made no attempt to compare the actual recipients *to the universe or composition of the group of potential recipients*, or to ascertain whether any identifiable group of taxpayers benefited disproportionately, its 'specificity' methodology was not analytically sound." *Mosaic*, 659 F. Supp. 3d at 1315 (emphasis added).  The court in *Mosaic* reasoned that Commerce's comparison was "essentially meaningless" because "the numerator and denominator were not logically comparable." *Id.* Whether the court also noted that "the 8761 figure was an incomplete representation of users" of the penalty relief program in *Mosaic*, as Commerce points out in the *Remand Results*, does not invalidate the court's reasoning regarding Commerce's faulty apples-to-oranges comparison in that case or demonstrate that the same reasoning would not apply to the KETS here.

Third, Commerce notes that the tax penalty relief was available to all types of taxpayers but the KETS "is limited to companies that meet a certain emission threshold and the GOK

6

further limits the provision of the 100 percent KAU allocation to select sectors." *Remand Results* at 16. The problem with Commerce's analysis is that the alleged subsidy here is the three percent "additional" permits in the 100 percent allocation. Whether the KETS overall is limited to companies that meet a certain emission threshold says nothing about whether "the actual recipients" of the additional allocation, "whether considered on an enterprise or industry basis, are limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I). Commerce thus fails to demonstrate that *Mosaic* is materially distinguishable or that its logic should not apply here.

Commerce also attempts to support its *de facto* specificity determination by citing other cases where it analyzed the number of recipients of tax benefits to determine whether each program was "limited in number" for purposes of section 771(5A)(D)(iii)(I) of the Act. *Remand Results* at 8-9 (citing *Gov't of Quebec v. United States*, 105 F.4th 1359 (Fed. Cir. 2024) (sustaining Commerce's comparison of tax credit recipients with the total number of corporate taxpayers); *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 66,648 (Dep't Commerce Nov. 4, 2022) ("*Hot-Rolled*") and accompanying mem. (Barcode: 4306183-02) ("*Hot-Rolled from Korea* PDM") (discussing an exemption from local acquisition taxes); *Certain Corrosion Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, 2019*, 86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2022) ("*CORE*") and accompanying mem. (Barcode: 4142768-02) ("*CORE from Korea* PDM") (discussing tax deductions incentivizing the construction of environmentally-conscious facilities)). In each of the tax cases cited in the *Remand Results*, it is logically consistent to compare the recipients of the tax credits, tax exemptions, and tax deductions with the number of tax filers because they are eligible recipients. By contrast, Commerce's

7

comparison of the number of companies that receive the additional allocations with the total number of companies in Korea is not a comparison that would show whether the additional allocations are limited in number. The overwhelming majority of companies in Korea are not subject to the KETS program and thus not eligible for the additional permit allocation

Commerce claims that the tax credit in *Gov't of Quebec* was provided to employers engaging in a qualified business and receiving the required certification, and that the Federal Circuit allegedly sustained the specificity analysis that compared the recipients to the full universe of taxpayers. *Remand Results* at 17-18. But, the numerator and denominator used in *Gov't of Quebec* are logically consistent. In *Gov't of Quebec*, "Commerce compared 'the actual number of companies that received the tax credit in 2018 to the total number of tax filers, *inclusive of corporations and individuals in business*." *Gov't of Quebec*, 105 F.4th at 1366 (emphasis added). The Federal Circuit held that "Commerce did not err in using the total *corporate tax filers* as a comparator in assessing whether the credit recipients are limited in number," and noted that "{b}oth corporations and individuals engaging in business activities can avail themselves of this program and claim the tax credit." *Gov't of Quebec*, 105 F.4th at 1374 (emphasis added). Commerce's comparison group for the actual recipients of the tax credit in *Gov't of Quebec* was thus a logically consistent apples-to-apples comparison, unlike the comparison in the *Remand Results* which compares the recipients of the additional allocation with the 787,438 companies operating in Korea, the overwhelming majority of which are not subject to the KETS program.

Similarly, Commerce claims that *Hot-Rolled from Korea* and *CORE from Korea* support Commerce's comparison here because Commerce did not limit its comparator groups for the tax exemption and tax deduction programs in those cases. *Remand Results* at 18. As with *Gov't of*

8

*Quebec*, the comparisons of the number of recipients to the number of tax filers in both cases were logically consistent, unlike Commerce's comparison in the *Remand Results*. The tax exemption in *Hot-Rolled* provided for an exemption of acquisition taxes "{w}hen *corporate* properties are acquired via an originating company transferring properties to a new company." *Hot-Rolled from Korea* PDM at 17 (emphasis added). Commerce compared the recipients of the subsidy with the number of *corporate* taxpayers, which is a comparator group consistent with the recipients of the acquisition tax exemption. *Id.* The tax deduction that Hyundai Steel received in *CORE* allowed it a deduction from *corporate tax*, and Commerce compared the number of *companies* who benefitted from the program to the total number of *corporate* tax returns filed. *CORE from Korea* PDM at 21-22. Thus, neither *Hot-Rolled* nor *CORE* support the use of a comparison that fails to logically show whether the actual recipients of the subsidy are limited in number. Moreover, both the *Hot-Rolled* and *CORE* determinations cited by Commerce are unchallenged preliminary determinations that do not address arguments regarding whether the specificity comparisons in those cases were reasonable or logically consistent.

      Commerce misinterprets Hyundai Steel's argument as "suggesting" Commerce must explain *why* there are a small number of users. *Remand Results* at 18-19. Hyundai Steel does not argue that Commerce must explain why the KETS is allegedly limited in number. Hyundai Steel argues that Commerce's comparison of the additional allocation recipients with all companies in GOK jurisdiction is unsupported by substantial evidence and contrary to law because it does not demonstrate that the actual recipients of the subsidy are limited in number.

      Commerce also notes that the CIT has upheld Commerce's determinations finding specificity "in similar proportions of beneficiaries when comparing program recipients to the number of entities throughout the entire economy." *Remand Results* at 9 (citing *Nucor Corp. v.*

*United States*, 494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021); *Wilmar Trading PTE Ltd. v. United States*, 466 F. Supp 3d 1334 (Ct. Int'l Trade 2020); *Borusan Mannesmann Boru Sanayi Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015)). Those cases are inapposite because not all companies in Korea are subject to the KETS program. *Nucor Corp.* addresses the specificity of a *voluntary* loan restructuring program, and *Wilmar Trading* and *Borusan* discuss the specificity of programs that provide goods for less than adequate remuneration ("LTAR"). Whether the court upheld specificity findings "when comparing program recipients to the number of entities throughout the entire economy" is irrelevant to the relative allocations within the KETS program because most of the 787,438 companies in Korea are not subject to the KETS.

In the *Remand Results*, Commerce claims that Hyundai Steel's arguments admit that "the K-ETS program is limited to discrete segments of the economy" and allegedly "bolster{} Commerce's interpretation" because Hyundai Steel argued that the KETS is a "restrictive" program and that "most of the 787,438 companies within the jurisdiction of the GOK are not subject to the KETS." *Remand Results* at 19-20; Letter from Morris, Manning & Martin, LLP, "Comments on Draft Results of Redetermination Pursuant to Court Remand" at 9-10 (July 18, 2024) (Barcode: 4599079), CRR 4, PRR 6. Hyundai Steel clarifies that its statement "the KETS is a restrictive program" refers to the fact that the KETS restricts carbon emissions. Hyundai Steel does not admit that the additional allocation is limited in number. To the contrary, Commerce has failed to show with substantial evidence that the additional allocations are limited in number pursuant to section 771(5A)(D)(iii)(I) of the Act.

10

Accordingly, the *Remand Results'* determination that the 100 percent allocation of permits to the trade intensive and high production cost participants is *de facto* specific is unsupported by substantial evidence and is not in accordance with law.

**II.     Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that this Court remand Commerce's determination with instructions to reconsider the *Final Results*, and for such other relief that the Court deems just and proper.

    Respectfully submitted,

    /s/ Brady W. Mills
    Brady W. Mills
    Donald B. Cameron
    Julie C. Mendoza
    R. Will Planert
    Mary S. Hodgins
    Eugene Degnan
    Jordan L. Fleischer
    Nicholas C. Duffey
    Ryan R. Migeed

    **MORRIS, MANNING & MARTIN, LLP**
    1333 New Hampshire Ave, N.W., Suite 800
    Washington, D.C. 20036
    (202) 216-4116

    *Counsel to Plaintiff Hyundai Steel Company*

### III.    Certificate of Compliance

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 2,991 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills
